UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GAIL EUGENE PHILLIPS-WATERS, Individually and as Personal Representative of the Estate of JAMES LEON WATERS, deceased<br><br>**Plaintiff,**<br><br>v.<br><br>**MARRIOTT INTERNATIONAL, INC., et al.**<br><br>**Defendants.** | CASE NO. 1:06-CV-01310 |

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Gail Waters[1] brought this lawsuit so that others might not needlessly die, as did her husband. The Waters family mourns the loss of a beloved husband and father, who died because he stayed at defendants' hotel, rather than elsewhere. Unlike most large, upscale hotels in July 2005, defendants had decided that the Renaissance Hotel (the "Hotel") in the District of Columbia would not (a) employ individuals properly trained in first-aid techniques; (b) provide them with operating radios for use in emergencies; or (c) have automated external defibrillators ("AEDs") on the premises.[2] Defendants made those choices despite long-established law imposing special duties of care on innkeepers, and despite the fact that at the time of Mr. Waters' death, the national standard of care required hotels to have AEDs on site. As a leading national expert in emergency medicine testified:

---

[1] Ms. Waters brings this lawsuit on her own behalf and on behalf of the estate of her husband and his children and heirs.

[2] Defendants have admitted that they either now do or intend to provide AEDs in other hotels they operate. *See* Declaration of Leslie Hagin ("Hagin Decl.") at ¶ 5.

> Since 2000 the national standard for emergency first aid in places of public accommodation and assembly – such as hotels ... and the like – has required the first arriving emergency responders, with a duty to respond (in this case, members of the Hotel staff) be trained and equipped to perform CPR and to use an AED.

Second Amended Complaint ("SAC"), Ex. A (Declaration of Dr. Richard Cummins) at ¶ 12 (also submitted as Ex. A to the Declaration of Leslie Hagin ("Hagin Decl."), filed herewith).[3]

An AED is a very inexpensive first aid tool that can be used safely and successfully even by children, and undisputedly saves lives. Hagin Decl, Ex. B, at ¶¶ 17-19, 22-23, 28, 37, and exhibits thereto. Modern AEDs are safe and effective, even when used by lay-people, since they are designed to administer a shock only after analyzing the heart's rhythm and determining that an electric shock is required. *Id.* AEDs are small in size, and range in price between $1,500 and $3,000. *Id.* A study of casino security guards trained in AEDs revealed a survival rate of 74% when victims were defibrillated within the first three minutes of cardiac arrest. *Id.*

AEDs are easy to use, and cheap, but unlike other hotel operators, defendants chose not to have them at the Hotel. *See* Hagin Decl., Ex. C, at 7; Ex. D. Further, defendants did not bother to train their employees to be able to identify someone in cardiac arrest, or even provide operating radios to help emergency services people identify the location and actual condition of a victim. *See* SAC, Ex. B (submitted as Ex. A to Hagin Decl.). Defendants are, therefore, responsible for Mr. Waters' untimely death. At the very least, the jury is entitled to so find.

Defendants seek to avoid responsibility for their reckless indifference to the known health risks they imposed on their guests,[4] by relying on arguments rejected long ago, and on cases that

---

[3] Because Dr. Richard Cummins's testimony is set forth in a declaration attached to and incorporated by reference into the Second Amended Complaint, it constitutes one of the pleadings which must be taken as true for purposes of this Rule 12(b)(6) motion. Other materials appended to Ms. Hagin's declaration are matters of public record and as such, the Court may take judicial notice of them for purposes of this motion. *E.g.,* 5B Charles Allan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1357 at 376 (2004). Unless otherwise noted, all exhibits cited herein are attached to the Hagin Decl. submitted herewith.

[4] The defendants were aware of the known risks for their guests of not having on-site AEDs. The use of AEDs,

-2-

pre-date widespread use of AEDs. If that approach were valid, today we might still have Salem witch trials, a racially segregated society, public buildings without fire and smoke detectors, and cars without airbags. Asbestos and tobacco manufacturers would remain immune from lawsuits. Fortunately, the law and its attendant duties are not so static. The laws, especially tort law, evolves with technology and cultural enlightenment, and through the jury system. While 10 or 15 years ago the standard of care might, as a matter of law, not have required AEDs in hotels because the technology and medical benefits were still unproven, or the equipment was too expensive or difficult to operate, that was not the case in July 2005, when Mr. Waters died. By then, the benefits of AEDs were very well known. And the duties imposed by common law are in accord – such that by July 2005, a jury could find that the common law required hotels and other places of public accommodation to have AEDs, as part of their duty to provide protection and first aid to their guests. For these reasons, defendants' motion to dismiss this case must be denied.

Defendants' motion to dismiss this case must also be denied because they have wholly failed to even address plaintiff's non-AED negligence claims – namely, that defendants' employees were improperly trained; that defendant provided its employees with inoperable emergency response equipment such as two-way radios; and that defendant provided incomplete or inaccurate information to the District of Columbia professional emergency response team. *See* SAC at ¶¶ 9, 22 (Ex. A to Hagin Decl.).

---

and their benefits has been addressed in the media, including the hospitality industry press, for some time. And, indeed, an AED workshop was hosted in one of the defendants' other Washington, D.C. hotels. *See* Hagin Decl., Ex. B at ¶¶ 18-19, 22-23; Ex. C at 7; Exs. D-F; Exs. N-Q.

## THE ALLEGATIONS IN THE COMPLAINT AND ITS EXHIBITS, WHICH MUST BE DEEMED TRUE, ESTABLISH THE APPLICABLE DUTY OF CARE

This is, ostensibly, a Rule 12(b)(6) motion.[5] As such, all of the allegations in the SAC and its exhibits (which are incorporated by reference) must be deemed true. With respect to the AED issue, those allegations are, in pertinent part:

- On any given day or night, more than 1,500 guests or other individuals could be staying at the Renaissance Hotel and/or using its facilities. SAC at ¶ 23.

- It was reasonably foreseeable that given the large numbers of hotel guests and business invitees who stay or attend meetings at the Renaissance Hotel, that one of them, such as Mr. Waters, would likely suffer a sudden cardiac arrest while on the hotel's premises. *Id.* at ¶ 26.

- It is well known that when someone has a heart attack, every minute counts. Every minute there is a delay, the risk of increased harm or death to the victim increases. *Id.* at ¶ 29.

- Defendants knew, or should have known, that if one of their guests or business invitees, such as Mr. Waters, suffered a heart attack or cardiac arrhythmia without timely access to an AED, defendants had affirmatively created a dangerous condition and made it reasonably foreseeable that guests such as Mr. Waters, would be severely injured or die, before receiving professional medical care. SAC at ¶ 30.

- Without prompt access to an AED, the great majority of heart attack victims will die before a normal heart rhythm is restored. *Id.* at ¶ 5.

- AEDs have been demonstrated to be safe and effective, even when used by lay individuals. *Id.* at ¶ 7.

- Given the life-saving efficacy of AEDs, and the relative inexpensiveness of the device and training to use it, by the year 2000 at least, AEDs were standard in corporate and governmental offices, . . . hotels and other places where large groups of people are invited to gather, and the risk that someone among those invited will suffer a sudden cardiac arrest is quite likely. *Id.* at ¶ 6.

---

[5] In their footnote 2, defendants cited material outside the pleadings, and thus have effectively made this a summary judgment motion. Whether judged by Rule 12(b)(6) or summary judgment standards, however, defendants' motion must be denied for the reasons stated herein.

- Since at least the year 2000, the national standard for emergency first aid and protection in places of public accommodation and assembly such as hotels . . . has required that AEDs be accessible and available to the public and that staff of such facilities be adequately trained in the use of AEDs. *Id.* at ¶ 25.

- The hotel personnel did not provide Mr. Waters with a level of first aid that met the applicable standard of care on July 26, 2005 when he suffered sudden cardiac arrest. As the responsible providers of standard first aid to Mr. Waters, the hotel staff were required to have been properly trained and equipped with an AED at the time they were notified that Mr. Waters had suffered a medical emergency. SAC at ¶¶ 8, 24; *see also* SAC Ex. A at ¶¶ 11, 17.

- Mr. Waters was 58 years old when he died. Had he received a timely, properly administered AED shock by the Hotel staff, he most likely would have survived. SAC at ¶¶ 11, 21 & SAC Ex. A at ¶ 19.

These allegations (and the Complaint's supporting exhibits) establish all of the elements necessary to show the existence of a legal duty. They establish that, among other things, the Hotel was aware of the risk of injury; was aware of an inexpensive and easy way to eliminate that risk; that the national standard for first aid treatment at the time of Mr. Waters' death required the Hotel to have an AED and a staff trained to use it; and that had Hotel staff treated Mr. Waters with an AED, he more likely than not would have survived. Since these facts must be taken as true in a Rule 12(b)(6) analysis (or in a summary judgment analysis), defendant's motion must fail. As discussed below, it is undisputed that hotels owe special duties to guests and are required to administer first aid consistent with the current standard of first aid care. Based on the allegations of the Second Amended Complaint and the exhibits thereto, there can be no dispute that the Hotel did not fulfill its first aid obligations to Mr. Waters.

### DEFENDANTS' AUTHORITIES ARE INCONSISTENT WITH THE EVOLVING LEGAL TREND REGARDING AED USE

Hotels in the District of Columbia and elsewhere owe their guests a duty of reasonable care. *Hooks v. Washington Sheraton Corp.*, 578 F.2d 313 (D.C. Cir. 1978); *Frederick v. TPG*

*Hospitality, Inc.*, 56 F. Supp. 2d 76 (D.D.C. 1999). Moreover, the District's courts have repeatedly recognized the *Restatement (Second) of Torts* § 314A (1965), which concerns the special duties owed by certain entities of public accommodation such as prisons and innkeepers. *See, e.g., Toy v. District of Columbia*, 549 A.2d 1, 7 (D.C. App. 1988); *District of Columbia v. Mitchell*, 533 A.2d 629, 644 (D.C. App. 1987). Section 314A establishes the ***minimum*** standard of care for hotels and other places of public accommodation. At a minimum, § 314A requires a hotel to "protect" its guests "against unreasonable risk of physical harm, and… give them first aid after it knows or has reason to know that they are ill or injured[.]" *Restatement (Second) of Torts* § 314A (1965).

The proposed update to Section 314A recognizes that the general "duty of reasonable care" imposed on hotels and others must evolve to reflect "advancements in medical technology that may enable an actor to provide more than mere first aid." *Restatement (Third) of Torts* § 40, cmt. d (2005) (Proposed Final Draft). It is significant that, in so recognizing, the *Restatement* drafters cite a case involving whether an airline was negligent for failing to have AEDs in its airplanes. *Id.* § 40 at Reporters' Note cmt. A (citing *Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28 (D. Mass. 2002); 14 C.F.R. § 121.803 (2004)). In short, technological advances must be considered in determining the scope of a hotel's duty of care. For instance, when the Second Restatement was promulgated in 1965, virtually no one had heard of CPR, let alone AEDs. Now though, the American Red Cross incorporates AED use as part of its basic CPR/first aid training. Hagin Decl., Ex. G. By July 2005, there could be no dispute that without both CPR and AEDs, death is virtually certain from a sudden cardiac event. There is also no dispute that hoteliers, including defendants, were well aware of this.

A.    The well-reasoned, and the most recent, cases support plaintiff.

In several recent decisions, courts have recognized that the first aid standard of care applicable to public facilities evolves with technology, and have held that whether nonuse of an AED breaches that standard is a matter for the jury. In the cases described below, courts have refused to dismiss personal injury claims in circumstances reminiscent of those at issue here, even on motions for summary judgment. These courts have correctly recognized that the common law must evolve with technology, with medical research regarding the effectiveness of AEDs, and with the ever-increasing availability of AEDs. This court should do the same.

In *Thompson v. Rochester Community Schools*, 2006 WL 3040137 (Mich. App. Oct. 26, 2006), for example, the court held that the failure to use an AED could constitute gross negligence. In doing so, the court noted, among other things, that

> "[T]here's no down side" to using an AED because the AED itself will determine whether a shock is needed.
>
> * * *
>
> [T]here was admissible expert testimony in the present case that defendants' alleged gross negligence actually caused [the] death. Plaintiff's cardiology expert . . . testified that defendants "didn't act in a reasonable manner," . . . defendants should have called 911, used the AED, and then started CPR. [The expert] testified that the timely use of the AED would have restored [the victim's] normal heart rhythm. [The expert] stated that this opinion was not based on speculation, but was strongly supported by the medical literature. . . . [and] reiterated her belief that, had defendants timely used the AED and started CPR, [the victim's] normal heart rhythm would have been restored. She conclusively opined that had these measures been taken, there is a greater than 50% chance that [the victim] would have survived.

*Thompson* at * 8, 14 (attached as Ex. H to Hagin Decl.).

In *Fruh v. Welbridge Club Management, Inc., et al.*, Case No. 02-10689PBS (D. Mass., 2002), a health care facility moved for summary judgment, claiming it had no duty to have an AED on site. Hagin Decl., Ex. I. There, as here, defendants relied on cases such as *Atcovitz v. Gluph Mills Tennis Club, Inc.*, 812 A.2d 1218 (Pa. 2002), and an argument that no statute

"required" them to have an AED. The court rejected the summary judgment motion, and this argument, and the case settled for $1.8 million. *See* Ex. I, at pp. 5-6, and n.2.

Similarly, in *Eng v. 24 Hour Fitness USA, Inc.,* Cause No. RJ03120619 (Alameda Cy. Superior Court, 2005), and *Schroeder v. Golds Gym Int'l Inc.* (Cause No. 83083A, Texas Probate Ct. No. 1, 2006), the courts denied defendants' summary judgment motions regarding whether there was a legal duty to have an AED on site. *Id.* at Exs. J & K. In so doing, these courts distinguished and rejected the cases relied upon by the defendants here: *Atcovitz, supra; Rutnik v. Colonie Center Court Club, Inc.*, 249 A.D.2d 873, 627 N.Y.S.2d 451 (NY Sup. Ct., App. Div., 1998); and *Salte v. YMCA*, 351 Ill.App.3d 524, 814 N.E.2d 610 (Ill. App. Ct., 2004).

*Madison v. Ernest N. Morial Convention Center-New Orleans,* 834 So. 2d 578 (La. App., 2002), is also instructive. The *Madison* court affirmed a jury verdict against a nurse who failed to bring a defibrillator to treat a heart attack victim in a convention center. The evidence on which the jury based its verdict included testimony that:

> Health professionals who have a duty to respond to a person in cardiac arrest should have a defibrillator available either immediately or within one-two minutes.

*Madison,* 834 So.2d at 589.

> [S]tatistics show[ ] that there is a greater than 70% survival rate where someone with a proper shockable heart rhythm if defibrillated promptly.

*Id.* at 590.

> [A physician expert testified] that the decedent probably had a 70 percent chance of survival with early defibrillation . . . [and] noted that the movement in this country and elsewhere "to have defibrillators in most public places is because [the] best chance that anyone can have to survive a sudden cardiac arrest is if that person is defibrillated promptly."

*Id.* at 591.

Finally, in *Cohen v. Hilton Hotels Corp.,* Cause No. G1C 821664 (San Diego Cy. Sup. Ct., 2005), the Superior Court ruled that, pursuant to the *Restatement (Second) of Torts* § 314A, a hotel has an absolute duty to provide first aid; and thus, the key question is "whether first aid includes providing AEDs," which is a question of fact. Hagin Decl., Ex. M at 2.

In short, the best reasoned, and the most recent, cases hold that the appropriate *legal* analysis (e.g., on a Rule 12 (b)(6) motion) is whether a hotel has a duty to provide first aid. It clearly does. *See Restatement of Torts §314.* The appropriate *factual* analysis is whether the hotel breached that duty by not having an on-site AED. In an area such as this, of evolving technology and standards, this question is for the jury. In ruling otherwise, defendants' authorities misapplied the appropriate legal analysis, as subsequent decisions have recognized.

B.  Defendants' cited cases misapply legal standards, are now untimely, and were decided based on an incomplete record or analysis.

It is significant that defendants have not cited any District of Columbia case that supports their position. Instead, they rely on readily distinguishable cases from other jurisdictions. A few are illustrative.

Defendants rely, for example, on an Illinois intermediate appellate court case, *Salte v. YMCA*, which involved a health and fitness club. In that case, apparently, plaintiff failed to offer any evidence whatsoever showing the importance of having AEDs on site, how they were easy to use, how effective they were at saving lives, how industry associations and the American Heart Association recommend that AEDs be installed in public places, and how inexpensive they were. The court thus held, as a matter of law, that the club could not be found to have had a duty to have an AED on its premises. In so holding, the *Salte* court relied heavily on *Rutnick* and *Atcovitz,* two cases involving incidents that occurred in the 1990's – long before the widespread

availability, affordability, and use of AEDs. It also used a flawed duty analysis. As the dissent explained:

> Whether a duty exists is a question of law. However, the reasonableness of the care exercised by the defendant is generally a question of fact and becomes a matter of law only where reasonable people could not disagree as to the conclusions resulting from the facts.
>
> I disagree with the majority's and defendant's characterization of the issue as solely a legal question of whether defendant had a duty to provide a defibrillator. Defendant's duty, as it acknowledges, was to render reasonable first aid until professional assistance arrived. *See Restatement (Second) of Torts* § 314A, Comment f, at 120 (1965). Whether reasonable assistance encompasses the use of a defibrillator by defendant's staff paramedic is, I believe, a factual question. I further believe that a reasonable jury could find that defendant did not provide reasonable fist aid to Terry when it failed to equip its paramedic with a defibrillator to use on Terry.

*Salte*, 814 N.E.2d at 532 (case citations omitted). The dissenting analysis in *Salte* was correct. Indeed, the Illinois Supreme Court (the highest court in *Salte's* jurisdiction) has subsequently adopted the *Salte* dissent's framework of analysis for § 314A issues, effectively overruling the *Salte* majority opinion. The Illinois Supreme Court has now clarified, just as the dissent in *Salte* noted, that the concept of duty in negligence cases is involved, complex, and nebulous; whether a duty exists (*e.g.* to render first aid) is a question of law; but whether a defendant breached that duty by failing to take certain protective measures is a factual matter for the jury. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, -- N.E.2d -- (2006) (copy attached as Ex. L to Hagin Decl.).

*Rutnik v. Colonie Center Court Club,* 672 N.Y.S.2d 451 (1998), another case on which defendants rely, involved a decedent who was stricken while participating in a racquetball tournament. The incident occurred in 1991, some 14 years before the incident at issue here, and long before AED technology (and the law concerning first aid standards for places of public accommodation) had evolved to its current state. There, unlike here, defendant would not likely have known about how immediate use of an AED is essential to saving lives. Certainly no such

evidence was discussed by the Court, which dismissed the AED issue in one sentence and with no analysis. 672 N.Y.S.2d at 452. In addition, the *Rutnik* court relied on New York law, which specifically provided that voluntary participants in sporting events assume the risk of injuries associated with the sport, *id.,* a law that is inapposite here.

Defendants other "key" case, *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218 (Pn. Sup. Ct., 2002), involved a 1996 incident. Again, the incident occurred before AEDs gained widespread acceptance, became widely and inexpensively available, and came to be viewed as a routine part of ministering first aid to heart attack victims. Further, the case is distinguishable because the ruling in fact is based on a Pennsylvania statute that regulated AEDs, and arguably would have ***prohibited*** club employees from using an AED. 812 A.2d at 1221. The court in *Atcovitz* rendered a very narrow ruling, that in light of this specific Pennsylvania statute and absent a similar provision authorizing the use of AEDs in tennis clubs, the defendant did not have a duty to have an AED on the premises. *Id.*

In each of the above cases, because of the time of the injury, or the information or lack thereof that the attorneys provided to the court, there was an incomplete record or analysis. While hotels might once have had no duty to have or to use an AED, that was only the case so long as the medical literature was uncertain about the benefits of AEDs and/or the device was still unproven, the device was costly and required sophisticated training for its use, and AEDs were not yet common in public facilities. None of those factors still existed in July 2005, when Mr. Waters died. As noted elsewhere, today even a child can use the device and to install it in a hotel would, at most, cost pennies per guest. *See* Ex. N to Hagin Decl. (J. Emery, Is Your Hotel "Heart Safe"?, Vol. 12, No. 1 (Jan/Feb. 2004), The Rooms Chronicle (Cover Story), recognizing use of AEDs is "very simple and very safe;" "AEDs are literally 'easy enough for a child to

use,'"; and noting Westin Alyeska Prince Hotel and Resort, Disney Resorts and Disney Cruise Line, and Carlson Hotels had implemented AED programs in all of their facilities; further noting OSHA recommendations that all employers install AEDs); *id.* at Ex. O (AH& LA, Loss Prevention Management Bulletin, Automated External Defibrillators (AEDs) Revisited (Sept. 2002) (noting Harrah's reported in excess of 70 "saves" on the casino floor in its various locations since installing AEDs; that meeting hotels "are EXCELLENT candidates for AED deployment and most need only 1 unit"; and that a "single AED, with 12 trained operators to provide around-the-clock coverage costs less than $200 per month") (emphasis in original).[6]

In light of the well-known risks of sudden cardiac arrest, how death resulting from such incidents can be avoided by ready access to AEDs, the small cost to install AEDs, and, the D.C. statutory immunity provided to those who use AEDs to save others, there is no good reason to hold, as a matter of law, that there is no way that a jury could conclude that the standard of first aid care has evolved to require that there be AEDs in major hotels.

## DEFENDANTS' OTHER MISCELLANEOUS ARGUMENTS DO NOT SUPPORT ITS MOTION

Defendants alternatively argue that their motion should be granted because no statute required the hotel to have an AED. Defendants' reliance on the District of Columbia ordinance that immunizes users of AED devices is misplaced, as the ordinance supports, rather than refutes, plaintiff's position. The ordinance was adopted to encourage use of AEDs, and does so in part by employing the Good Samaritan rule – i.e., one will not be liable for using an AED unless he

---

[6] *See also* Hagin Decl. at Ex. P, Business Wire (Sept. 7, 2001), *re-reported in* NurseZone.com (May 2006), U.S. Disney Resorts to Install Life-Saving Cardiac Defibrillators Across Properties (reporting that all Disney golf courses, hotels and cruise line ships would be installed with AEDs by June 2002); *id.* at Ex. Q, Science Daily (Oct. 22, 1999), Automated External Defibrillators User-Friendly – Even for Children (discussing AHA research study that sixth grade school children with moderate training learned to use AEDs almost as quickly and efficiently as professional medical personnel).

or she acted negligently. If, in D.C., one can be liable for the negligent use of an AED device, by easy extension, one should be liable for the negligent failure to even have one. The ordinance, on its face, however, provides no legal protection whatsoever to someone who does not have an AED.

In an attempt to bolster their flawed analysis, the defendants misapply to the maxim of statutory interpretation *expressio unius est exclusio alterius,* "the mention of one thing implies the exclusion of another." *See Shook v. District of Columbia Fin. Responsibility and Management Assistance Authority*, 132 F.3d 775 (D.C. Cir. 1998). In *Shook*, the D.C. Circuit explained "this maxim is often misused":

> The maxim's force in particular situations depends entirely on context, whether or not the draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives. That will turn on whether, looking at the structure of the statute and perhaps its legislative history, one can be confident that a normal draftsman when he expressed "the one thing" would have likely considered the alternatives that are arguably precluded. For that reason, we think the maxim should be used as a starting point in statutory construction not as a close-out bid."

132 F.3d at 782. Likewise, as stated in *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 68-69 (D.C. Cir. 1990), the D.C. Circuit Court has noted that:

> Scholars have long savaged the *expressio* canon. Max Radin called it "one of the most fatuously simple of logical fallacies, the 'illicit major,' long the *pons asinorum* of schoolboys." *Statutory Interpretation*, 43 Harv.L.Rev. 863, 873-74 (1930) (citation omitted). See also Reed Dickerson, THE INTERPRETATION AND APPLICATION OF STATUTES 234-35 (1975); Richard A. Posner *Statutory Interpretation -- in the Classroom and in the Courtroom*, 50 U.Chi.L.Rev. 800, 813 (1983); cf. *State of Illinois, Dep't of Public Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983) ("Not every silence is pregnant"). The Supreme Court has more charitably dubbed it "a valuable servant, but a dangerous master." *Ford v. United States*, 273 U.S. 593, 612, 71 L. Ed. 793, 47 S. Ct. 531 (1927) (quoting *Colquhoun v. Brooks*, 21 Q.B.D. 52, 65). Whatever its general force, we think it an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). *See also Clinchfield Coal*,

>895 F.2d at 779 (*expressio unius* insufficient to establish unambiguous intent under *Chevron*); *TRT Telecommunications Corp. v. FCC*, 277 U.S. App. D.C. 375, 876 F.2d 134, 146 (D.C.Cir. 1989) (same). Here the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion.

*Id.*

What is clear about D.C. Code § 44-231 is that it did not in any way address the issue of requiring hotels in the District of Columbia to protect its patrons by having AEDs on its premises. That is an issue left for this Court (and jury) to decide, under common law. Defendants ignore the fact that there is nothing in the law that in any way precludes other unmentioned possibilities nor that the provisions extending immunity for AED use meant to specifically exclude requiring hotels from having AEDs.

The same analysis applies with even greater force to defendants' argument concerning the failure of the D.C. Council to enact the "Installation of Automated External Defibrillators Amendment Act of 2005", B16-0043. That bill would require D.C. hotels to have AEDs on their premises. It has been proposed but has not yet been passed by the D.C. Council. Defendants claim that because the bill did not pass they are entitled to legal immunity. However, imagine the legal chaos that would ensue if, after every legislative session of the D.C. Council, or any other legislative body for that matter, any legislation which did not pass, or in the case of B16-0043, was set aside for further study and hearings, could then be construed to provide legal immunities, rights and obligations. But, that is precisely what defendants seek.

The defendants' effort to infer specific legislative intent from the failure of the Council to pass the AED Amendment Act of 2005 is unsupported and should be disregarded. For their effort to be even credible requires proof that the legislative body considered the common law of judicial precedent on this issue, and intended that both as a matter of statutory and common law

that D.C. hotels should not be required to have AEDs. That, of course, the defendants have not even attempted to do.

Certainly, the absence of a statutory requirement does not mean that the common law does not require AED use. *See e.g., Fruh, supra,* (Ex. I to Hagin Decl.) at pp. 5-6 and n.2. Indeed, it is just as likely that the D.C. Council chose a statutory scheme that encourages (but does not require) AED usage because it does not cost tax dollars to administer (i.e., is cost-efficient) and/or because the Council favors facilitating, but not dictating, the evolution of common law.

Instead, the pervasiveness of legislative enactments across the country encouraging and/or requiring that AEDs be made available in places of public accommodation establishes that societal expectations and medical standards as to AEDs have evolved, such that the medical profession and public now believe AEDs are such an important, if not basic, part of first aid care that they should be available in such establishments – to reduce the highly foreseeable and very preventable risk of death caused by untreated cardiac arrests. If anything, these statutes buttress plaintiff's position that, with evolving medical opinion and technology, a hotel's common law duty of protection and first aid care to its guests and invitees now requires the use of AEDs.

Defendants' other suggestion, that an AED would not have made any difference because the emergency response team used one on Mr. Waters, also misses the mark. First, in this Rule 12(b)(6) motion, the Court cannot draw that inference, given the contrary statements in plaintiff's complaint and attached exhibits. Second, by the time the emergency response team arrived, it was too late for Mr. Waters, a fact established by the medical literature and plaintiff's complaint. Indeed, Section 314A of the Restatement of Torts specifically recognizes that the hotel's duty is to provide first aid to its guest until professional medical providers arrive. The

question, for the jury, is whether in July 2005 the standard for the hotel's duty to provide first aid before the Fire/EMS department arrived included use of an AED.

Finally, defendants' contention that no District of Columbia court has yet held that a hotel must have an AED is not compelling. Courts have held, as noted elsewhere, that the jury must decide if a public facility violated its duty of reasonable care by failing to provide or use an AED. It is significant that defendants do not cite to a single District case that held a hotel does not need to have an AED on site. Without any court so holding, and in light of the allegations in the Second Amended Complaint, and the sworn testimony of Dr. Cummins, there is no basis for granting defendants' Rule 12(b)(6) motion.

For the foregoing reasons, plaintiff respectfully requests that the Court deny defendants' motion to dismiss.

Respectfully submitted,

SPARKS & SILBER, LLP

Richard F. Silber, Esquire, D.C. Bar No. 395407
3221 M Street, N.W.
Washington, D.C. 20007-3616

Tel (202) 338-0687 Fax (202) 333-0858


McNAUL EBEL NAWROT & HELGREN PLLC

Leslie Hagin, Esquire, D.C. Bar No. 453450
Michael D. Helgren, Esquire*
600 University Street, Suite 2700
Seattle, Washington 98101
Tel 206/467-1816 Fax 206/624-5128

Attorneys for Plaintiff,
Gail Phillips-Waters

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2006, a true and complete copy of the foregoing *Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss* was served by the Court's ECF filing system on the following:

>David W. Goewey, Esq.
>Venable LLP
>575 - 7th Street, N.W.
>Washington, D.C. 20004-1601
>Email: DWGoewey@Venable.com
>
>Ms. Danielle Foley
>Venable LLP
>575 - 7th Street, N.W.
>Washington, DC 20004-1601
>Email: DRFoley@Venable.com
>
>Counsel for Defendants
>Marriott International, Inc. and
>Renaissance Hotel Operating Company

/s/ Leslie J. Hagin