```
*4184136*
```

1  Dale Minami, SBN (51161)
   William C. Kwong, SBN (168010)
2  Minami, Lew & Tamaki LLP
   360 Post Street, 8th Floor
3  San Francisco, CA  94108
   (415) 788-9000
4  Fax (415) 398-3887

5  Attorneys for Plaintiff Richard Eng

6

7

**F I L E D**
AL AMEDA COUNTY

JUN 2 7 2005

CLERK OF THE SUPERIOR COURT
By _____ DEPUTY

8                 SUPERIOR COURT, STATE OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10                       (Unlimited Jurisdiction)

11
   Richard Eng, an incompetent, by and )   Case No. RG03120619
12 through his Guardian ad Litem, Monica Eng )
                                           )   **DECLARATION OF KYLE McINNIS,**
13            Plaintiff,                    )   **SC.D., IN SUPPORT OF PLAINTIFF'S**
                                           )   **OPPOSITION TO DEFENDANT'S**
14               v.                         )   **MOTION FOR SUMMARY JUDGEMENT**
                                           )
15 24 Hour Fitness, USA, Inc.,             )   Date:        July 11, 2005
                                           )   Time:        9:00 a.m.
16            Defendant.                    )   Dept.:       31
                                           )   Judge:       Richman
17 _____)   Trial Date:  None set.

18         I, Kyle McInnis, Sc.D., declare as follows:

19         1.      I am 42 years-old and a resident of the State of New Hampshire, residing at 17

20 Stonehedge Road in Windham, New Hampshire, 03087.

21         2.      I currently hold the position of Professor and Chair of the Department of Exercise and

22 Health Sciences, of the College of Nursing and Health Sciences at the University of Massachusetts.

23         3.      My place of employment is located at 100 Morrissey Boulevard in Boston,

24 Massachusetts.

25         4.      I received my bachelor's degree in Biology at the University of Massachusetts-Lowell

26 in 1985 graduating Cum Laude, and an M.S. Cardiac Rehabilitation from Springfield College in

27 1987. A true and correct copy of my Curricula Vitae is attached to this Declaration as Exhibit V.

28         5.      I earned a Sc.D. (Doctorate in Science) in Applied Anatomy and Physiology from

---

Declaration of Dr. Kyle McInnis          EXHIBIT B                                    1

Boston University in 1991. This course of study involves biological systems of the body including exercise in health and disease.

6.    I have taught in the Department of Exercise Science and Physical Education at the University of Massachusetts-Boston since 1991, serving as Assistant Professor until 1997. I became a tenured Associate Professor in 1997 and became a full professor in 2003. The subject of Exercise Science and Physical Education integrates scientific research to provide educational and practical application of exercise. My specific focus and interest is in cardiovascular screening and emergency preparedness in fitness centers.

7.    In 2004, I became the Chairperson of the Department of Exercise and Physical Education.

8.    I have authored 32 chapters in numerous publications, 25 research abstracts, and two books, including the following in citation form:

a.    Tharrett, S, McInnis KJ, and Peterson J. ACSM's Health and Fitness Facilities Standards Guidelines (3rd Edition). Champaign, IL: Human Kinetics, (due 2005);

b.    McInnis KJ and Balady GJ. Exercise Guidelines for Health/Fitness Facilities. In: The Health Professionals Guide to diabetes and exercise. American Diabetes Association Clinical Education Series. Alexandria, VA. 2001.

c.    McInnis KJ, Hayakawa S., Balady GK. Cardiovascular screening and emergency procedures at health clubs and fitness centers. Am J. Cardiol 80:380-383, 1997.

d.    McInnis KJ. Safe exercise for heart disease patients. ACSM's Health and Fitness Journal September/October, 1(5):26-33, 1997.

e.    McInnis KJ and Balady GJ. Higher cardiovascular risk in health clubs. ACSM's Health and Fitness Journal Jan/Feb; 19-24, 1999.

f.    McInnis KJ and Balady G, Foster C. Exercise in health clubs. ACSM Current Comments Jan/Feb 2000.

g.    McInnis KJ, Herbert W, Herbert D, Herbert J, Ribisl P., Franklin B. Low compliance with national standards for cardiovascular emergency prepardeness at health clubs.

1    Chest 2001; 120:283-288.

2         h.    McInnis KJ, Herbert D, Herbert W.  Are health clubs unfit for cardiovascular

3    emergencies.  Cardiovascular Reviews and Reports 2001; Oct: 570-572.

4         i.    McInnis KJ.  Compliance with emergency recommendations at health clubs.

5    Am J Med Sports 2003; Jan/Feb: 100-102.

6         j.    McInnis KJ.  Advising patients on selecting a health/fitness facility and

7    qualified personal fitness trainer.  Am J Med Sports 2003; Jan/Feb: 100-102.

8    9.    I have also served in numerous professional and advisory positions , including, but

9    not limited to:

10        a.    Applied Science Advisor to WellBridge Health and Fitness/Club Sports

11   International between 1998 and 2000, providing expertise to develop policies and procedures related

12   to health/fitness facility standards and lifestyle disease management programs.

13        b.    Special Projects Coordinator for the YMCA of the USA, chairing a group and

14   serving as primary author of a technical assistance paper on automated external defibrillators for

15   distribution to all YMCA facilities across the United States.

16        c.    Since 1995, I have served as a Fellow and Program Director for the American

17   College of Sports Medicine, and since 2002 I have served on its Board of Trustees.

18        d.    Between 1993 and 1995, I was a member of the American Heart Association -

19   Massachusetts Affiliate's Committee on Cardiovascular Risk Prevention and its Task Force on

20   Cardiovascular Risk Prevention in Racial Minorities.

21   10.    I have delivered or been invited to deliver 64 lectures on various exercise science

22   related topics at regional and national health/fitness centers, hospitals, businesses, and community

23   centers, including, but not limited to the following:

24        a.    Invited speaker - "Screening for Cardiovascular Disease in Health Clubs."

25   American College of Sports Medicine's 1998 Health/Fitness Summit.  Austin, Texas.  1998.

26        b.    Invited speaker - "Cardiac Rehabilitation and Secondary Prevention in

27   Women."  American College of Sports Medicine - New England Regional Chapter Annual Meeting.

28   Providence, Rhode Island.  1998.

c.      Invited Speaker - "Emergency Preparedness of Health Clubs." American Heart Association Scientific Sessions. Chicago, Illinois. November 2002.

d.      Invited Speaker: Implementing an AED program. International Health, Racquet, and Sportsclub Association Annual Meeting. San Francisco, California. February 2003. I also was invited to speak to IHRSA in 2004 and 2005 on the subject of AEDs.

e.      Invited Speaker: AEDs and Evolving Standards in Emergency Preparation. International Health, Racquet, and Sportsclub Association Annual Meeting. Las Vegas, Nevada. February 2003.

11.     Through my professional studies and experience, I am knowledgeable in the field of exercise science and sports medicine, and in particular, the risk of sudden cardiac arrests, emergency preparedness in health clubs and the effectiveness, operation and costs of AEDs. My involvement in hospital based clinical exercise programs has also provided me with and understanding of the need for preparation and responding properly to adverse cardiovascular events during exercise.

12.     More than 1000 Americans suffer sudden cardiac arrests every day. This statistic has been widely reported by reputable organizations including the American Heart Association ("AHA"). Attached as Exhibit A is one such publication, *When Every Second Counts; Cardiac Arrest and the Need for Early Defibrillation,* AM. HEART ASS'N (1996).

13.     An extensive body of scientific publications conclusively document that while exercise is safe for most people, the incidence of experiencing an adverse cardiovascular event such as sudden cardiac arrest or myocardial infarction is considerably higher during or immediately following moderate-vigorous exertion compared to that at any other time of daily life. This is rudimentary knowledge in the field of fitness and exercise.

14.     These studies date back to the early 1970s on joggers, while even cases in early Greece and pre-modernized medicine have reported elevated cardiovascular risk with exercise.

15.     More recently, a study in the New England Journal of Medicine found the risk of cardiac death was nearly 20 times higher during or immediately following vigorous exercise. Attached as Exhibit B is a true and exact copy of, Christine M. Albert, M.D., M.P.H., et al., *Triggering of Sudden Death from Cardiac Causes by Vigorous Exertion,* 343(19) NEW ENG. J. MED.

1  1355 (2000).

2       16.    Studies and publications have reported numerous occurrences of SCAs at health
3  clubs. In 2001, I published a study demonstrating that cardiovascular events in health clubs are not
4  uncommon and that many clubs are not prepared for such emergencies, highlights of which were
5  published in a review article in Club Business Industry ("CBI"), the official Journal of the IHRSA.
6  Attached as Exhibit C is a true and accurate copy of, Kyle McInnis, *A new study reveals that clubs*
7  *need to do more than prepare for medical emergencies*, CLUB BUS. INDUS., June 2002 . CBI is
8  distributed to every health club member of IHRSA.

9       17.    I am familiar with function, operation, effectiveness and costs of AEDs through my
10  studies, review of the research and literature and through my training in hospital based
11  cardiovascular programs. AEDs and semi-automated AEDs are inexpensive, lightweight, portable
12  devices that can be used by a lay person to assist a another person whom he believes has suffered a
13  SCA. Some models are operated manually, some semi-automatic and relatively newer models are
14  completely automatic. The AED determines the victim's heart rhythm and can recognize ventricular
15  fibrillation (VF) or ventricular tachycardia, either of which are known as "SCA". In an emergency,
16  an AED can be taken to victim and pads attached to cords from the AED are applied to several
17  places on the victim's body before a "start" button is pushed. The AED then determines whether
18  SCA is present, and if so, it clears the electrical "short circuit" in the arrested heart by delivering an
19  electrical charge. The automated and semi-automated external defibrillator has been demonstrated to
20  be safe and effective, even when used by lay people, since the devices are designed not to allow a
21  user to administer a shock until after the device has analyzed a heart's rhythm and determined that an
22  electric shock is required. They are small in size, and range in price between $1,500 and $3,000.

23       18.    The role of rapid defibrillation in saving lives in the setting of cardiovascular collapse
24  is well established. Overall, it has been estimated that for every minute of delay in achieving
25  defibrillation the likelihood of survival diminishes seven to 10 percent. Also it has been estimated
26  that if AEDs were widely available, it might be possible to save as many as 30 percent of these
27  individuals who suffer from sudden cardiac death (compared to the dismal 5 percent expected
28  survival rate in the absence of AEDs). The United States Congress has incorporated these findings

1  into section 402 of H.R.2498. Attached as Exhibit D is a true and accurate printout of H.R.2498.

2      19.    I have read and reviewed, *Comparison of Naive Sixth-Grade Children with Trained*

3  *Professionals in the Use of an Automated External Defibrillator*, 100 CIRCULATION 1703 (1999).

4  This study showed that EMS responders administered and AED in 67 seconds, while the children

5  accomplished the task in 90 seconds. A true and accurate copy of this study is attached as Exhibit E.

6      20.    In 1992, the AHA publicized a standard for the emergency treatment of SCA known

7  as the **"Chain of Survival"**. The Chain of Survival is defined by four crucial links: (1) "Early

8  Access to Care," which activates the Emergency Medical System (EMS); (2) "Early

9  Cardiopulmonary Resuscitation" which can provide a few additional minutes before defibrillation;

10 (3) "Early Defibrillation," and (4); "Early Advanced Care." A true and accurate copy of this article

11 is attached as Exhibit F, *reprinted from* 268(16) J. AMER. MED. ASSOC., OCTOBER 28, 1992, 2171,

12 (1992).

13     21.    Two key and authoritative publications provided detailed recommendations for the

14 health and fitness industry on AEDs, CPR, and other staffing and facility considerations to minimize

15 cardiovascular risk in the form of a joint position statements by the American Heart Association

16 (AHA) and the American College of Sports Medicine (ACSM).

17     A.    In 2002, the AHA and ACSM issued a Joint Position Statement titled

18 *Automated External Defibrillators in Health/Fitness Facilities*, 105(9) CIRCULATION 1147-1150

19 (2002). Attached as Exhibit T is a true and accurate copy of this scientific statement. Among the

20 key points of these joint scientific statements are the following:

21     1.    To encourage AEDs in all fitness centers, and to strongly encourage

22 AEDs in large fitness facilities with membership over 2500 people and those that offer special

23 programs for clinical populations such as for older adults or those with medical conditions.

24     2.    Health/fitness facilities should be considered among the sites in which

25 public access defibrillation programs are established.

26     3.    Effective placement and use of AEDs at all health/fitness facilities is

27 encouraged, as permitted by law, to achieve the goal of minimizing the time between recognition of

28 cardiac arrest and successful defibrillation.

1      B.      In 2001, the International Health, Racquet & Sportsclub Association (IHRSA)

2  published *Defibrillators (AEDs) in Health Clubs; An IHRSA Briefing Paper*. Among other things,

3  the association: a) encouraged all health clubs to consider the advantages of installing AEDs in their

4  facilities (p. 1), b) asserted that whether a club has an AED on site does not affect its coverage or

5  rates under *most* liability insurance companies (p. 11), and 3) cited the well-known estimate that for

6  every minute of delay in achieving defibrillation the likelihood of survival diminishes seven to 10

7  percent (p. 2). Attached as Exhibit H is a true and accurate copy of this briefing paper.

8      22.     AEDs started to gain widespread public attention during the mid-1990s when the

9  mainstream media, including the New York Times, Readers Digest, Better Homes & Gardens, and

10  USA Today, published stories about the ease and effectiveness of AEDs. Attached as Exhibit I are

11  true and accurate copies of some of those articles. In 1996, the airline industry began to announce

12  their intention publically to install AEDs on all passenger aircraft 5 years before the Federal Aviation

13  Administration required them.

14      23.     In 1997, the Medical Advisory Committee of the Young Men's Christian Association

15  ("YMCA"), recommended installing AEDs at its facilities for the health and safety of its

16  constituents. Attached as Exhibit J is a true and accurate copy of that recommendation.

17      24.     Many states in our county have recognized the importance the having AEDs in health

18  clubs. Recently, Rhode Island, New York, Louisiana, and Illinois enacted laws mandating the

19  placement of AEDs in health clubs. California passed a law and 2002 that encouraged the use of

20  AEDs by immunizing lay-person rescuers using AEDs from civil liability. Attached as Exhibit K is

21  a copy of that law, CAL. A.B. 2041, Chap. 718.

22      25.     I am very family with IHRSA and, as described above, been an invited speaker at its

23  conferences in 2003, 2004 and 2005 regarding the implementation of AED programs. IRHSA

24  members, including 24 Hour Fitness USA, pledge to meet 10 published standards, including

25  "Standard #6" which provides that a club "must be able to respond in a timely manner to any

26  reasonably foreseeable emergency event that threatens the health and safety of the club users."

27  Additionally, members of IHRSA pledge to "systematically upgrade [its] professional knowledge

28  and keep abreast of new developments in [its] field" and to "design [its] facilities and programs with

Declaration of Dr. Kyle McInnis                                                                    7

1  the members' safety in mind." Attached as Exhibit L is a true and accurate copy of IHRSA's

2  Standards Facilitation Guide.

3      26.    On or about October 16, 2001, IHRSA issued a press release announcing that IHRSA

4  had entered into an agreement with Philips Medical Systems to provide AEDs at a discounted rate

5  for its heath club members. Later, stories about SCA victims saved by AEDs in health clubs were

6  published in conjunction with the discount program. Attached as Exhibit R is a true and accurate

7  printout of those stories. At its January 2002 annual convention, IHRSA even featured a Phillips

8  Medical Systems (a reputable manufacturer of AEDs) representative as a speaker. Attached as

9  Exhibit S is a true an accurate printout of the featured speakers at the 2002 IHRSA convention.

10      27.    As mentioned above, I serve on the Board of Trustees for the American College of

11  Sports Medicine ("ACSM"). The mission of the ACSM is to advance and integrate scientific

12  research to provide educational and practical applications of exercise science and sports.

13      28.    Medical literature is generally in agreement that the brain death and permanent death

14  start to occur in just four to six minutes after someone experiences cardiac arrest. The American

15  Heart Association posts this information on its website. Attached as Exhibit M is a true and accurate

16  printout of that information, *Sudden Cardiac Death; AHA Scientific Position*, AMER. HEART ASS'N,

17  *from* Http://www.americanheart.org/presenter.jhtml?identifier=4747 (last visited 1/28/2005).

18  Because Mr. Eng suffered brain damage but had not expired, he most likely suffered a cardiac arrest

19  at least four to six minutes prior to the arrival and examination of the paramedics.

20      29.    IHRSA has reported on its website that the number of health club members older than

21  55 increased by 343 percent from 1987 to 2003. Attached as Exhibit N is a true and accurate

22  printout of that information.

23      30.    SCAs in health clubs occur primarily in older adults who were new members. A

24  study conducted of British health clubs found that facilities with an AED program had a survival rate

25  of 75% as compared to a 5% survival rate in those without such a program. Attached as Exhibit O is

26  a true and accurate article; Craig Waters, *To Start A Heart; New study documents value of*

27  *defibrillators in health clubs*, CLUB BUS. INT'L, March 2004, 67.

28      31.    In 1999, IHRSA published a briefing paper, titled *Defibrillators (AEDs) in Health*

1  *Clubs*. This is an earlier version of the paper that I discuss in paragraph 21, above. Among other

2  things, the association recognized that CPR is generally ineffective for treating SCAs without

3  another link in the chain of survival, such as early defibrillation (p. 6).   Attached as Exhibit P is a

4  true and accurate copy of this briefing paper.

5       .     32.     In 1986, the American Heart Association and Journal of the American Medical

6  Association identified "health club personnel" as capable first responders and users of AEDs (p.

7  2976). Attached as Exhibit Q is a true and accurate copy of this article.

8       33.     In 1998, the AHA and ACSM issued a joint statement titled *Recommendations for*

9  *Cardiovascular Screening, Staffing, and Emergency Policies at Health/Fitness Facilities*, published

10  in the AM. HEART ASS'N, 97 CIRCULATION 2283-2293 (1998).   A true and accurate copy of the

11  statement is attached as Exhibit G. Among the key points of these joint scientific statements are the

12  following:

13                1.     All fitness staff should be certified in basic cardiac life support and/or

14                       cardiopulmonary resuscitation.

15                2.     All health/fitness facilities must have written emergency policies and

16                       procedures that are reviewed and practiced regularly.

17                3.     Emergency drills should be practiced once every 3 months.   Such drills may

18                       be needed more often in facilities with high staff turnover.

19       34.     In 1997, the American College of Sports Medicine published a textbook that is widely

20  regarded as the authoritative "standards" for operating a safe exercise facility, entitled "ACSM's

21  Standards and Guidelines for Health/Fitness Facilities," (2nd Edition).   One of the key points of this

22  authority is:

23                       a facility must be able to respond in a timely manner to any reasonably
                         foreseeable emergency event that threatens the health and safety of
24                       facility users.  Toward this end, a facility must have an appropriate
                         emergency plan that can be executed by qualified personnel in a timely
25                       manner.

26       35.     IHRSA now estimates that as high as 40 percent of clubs which responded to their

27  survey either had AEDs or were planning to obtain them. Fitness professionals are nearly universally

28  required to obtain CPR certification prior to obtaining "industry" employment.  Moreover, CPR

1 certification is considered a standard part of all credible fitness and group exercise instructor
2 certification requirements.

3     36.    In 2000, the American Heart Association recognized that a pulse check done by for
4 lay responders unreliable, and now recommends that no pulse check be done before bystanders begin
5 administering chest compressions to an unconscious person. Attached as Exhibit V is a true and
6 accurate copy of that news report, *Pulse Check no longer recommended for layperson CPR*, AM.
7 HEART ASS'N, (2000).

8     37.    I have read and reviewed *Outcomes of Rapid Defibrillation By Security Officer After*
9 *Cardiac Arrest in Casinos*, 343(17) NEW ENG. J. MED., Oct. 26, 2000, 1206. The study reported on
10 page 1206 a survival rate of 74 percent when victims were defibrillated within the first three minutes.
11 A true and accurate copy of this study is attached as Exhibit U.

12     38.    Based on my education, training, research and studies I am familiar with the concept
13 of "agonal breathing". Agonal breathing or respiration describes a condition when the heart stops
14 beating in cardiac arrest but the brain's breathing center remains alive and causes the victim to take
15 abnormal breaths. These breaths may appear like snoring, gasping, or snorting but they do not propel
16 sufficient oxygen to the brain. It is often mistaken for effective breathing and may last for several
17 minutes resulting in brain damage and death if no intervention occurs. Agonal respirations, however,
18 is a good indication that a person in cardiac arrest can be resuscitated. Based on the description of
19 Mr. Eng's breathing as "intermittent", "shuddering" "short breaths" at intervals which were
20 "unnaturally long", "rasping", "wheezing", in addition to other factors, I believe Mr. Eng was
21 experiencing agonal breathing at the time Mr. Kandaswamy was attending to him.

22     39.    Based on my review of the information available to the general public and to health
23 and exercise facilities, including 24 Hour Fitness before June 16, 2003, about sudden cardiac arrests,
24 the frequency and increased risk of sudden cardiac arrest in health facilities, the demographic
25 changes which increased the number of older persons exercising in health facilities with a
26 corresponding increased risk of suffering a cardiac arrest, the availability and effectiveness of AEDs,
27 it is my opinion that a sudden cardiac arrest was an entirely foreseeable event as of June 16, 2003. It
28 is also reasonably foreseeable that an AED would be an effective device to reverse a sudden cardiac

1  |  arrest as of June 16, 2003.

2  |      I declare under penalty of perjury under the laws of the State of California that the foregoing

3  |  is true and correct. Executed this 24 th day of June, 2005, in New Hampshire/Massachusetts.

4

5  |                         KYLE McINNIS, Sc.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Dr. Kyle McInnis                                                    11

Dale Minami, SBN (51161)
William C. Kwong, SBN (168010)
Minami, Lew & Tamaki LLP
360 Post Street, 8th Floor
San Francisco, CA  94108
(415) 788-9000
Fax (415) 398-3887

Attorneys for Plaintiff Richard Eng

SUPERIOR COURT, STATE OF CALIFORNIA

COUNTY OF ALAMEDA

(Unlimited Jurisdiction)

|  |  |
|---|---|
| Richard Eng, an incompetent, by and through his Guardian ad Litem, Monica Eng<br><br>Plaintiff,<br><br>v.<br><br>24 Hour Fitness, USA, Inc.,<br><br>Defendant. | Case No. RG03120619<br><br>**INDEX FOR THE DECLARATION OF KYLE McINNIS, SC.D. IN SUPPORT OF PLAINTIFF RICHARD ENG'S MOTION FOR SUMMARY ADJUDICATION** |

| | |
|---|---|
| Exhibit A | *When Every Second Counts; Cardiac Arrest and the Need for Early Defibrillation,* AM. HEART ASS'N (1996). |
| Exhibit B | Christine M. Albert, M.D., M.P.H., et al., *Triggering of Sudden Death from Cardiac Causes by Vigorous Exertion,* 343(19) NEW ENG. J. MED. 1355 (2000) (finding the risk of cardiac death was nearly 20 times higher during or immediately following vigorous exercise). |
| Exhibit C | Kyle McInnis, *A new study reveals that clubs need to do more than prepare for medical emergencies,* CLUB BUS. INDUS., June 2002 (demonstrating that cardiovascular events in health clubs are not uncommon and that many clubs are not prepared for such emergencies.  Original study published in CHEST, 2001). |
| Exhibit D | H.R. 2498., 106th Cong., 2nd Sess. § 402 |
| Exhibit E | John W. Gundry, et al., *Comparison of Naive Sixth-Grade Children with Trained Professionals in the Use of an Automated External Defibrillator,* 100 CIRCULATION 1703 (1999). |
| Exhibit F | *Chain of Survival,* AM. HEART ASS'N, *reprinted from* 268(16) J. AMER. MED. ASSOC., OCTOBER 28, 1992, 2171, (1992). |

| Exhibit G | Gary J. Balady, M.D., Chair, et al. *Recommendations for Cardiovascular Screening, Staffing, and Emergency Policies at Health/Fitness Facilities*, AHA/ACSM SCIENTIFIC STATEMENT, published in the AM. HEART ASS'N, 97 CIRCULATION 2283-2293 (1998). |
| --- | --- |
| Exhibit H | *Defibrillators (AEDs) in Health Clubs; An IHRSA Briefing Paper*, INT'L HEALTH, RAQUET & SPORTSCLUB ASS'N. |
| Exhibit I | Doug Levy, *Newly OK'd defibrillator could save 100,000 lives*, USA TODAY, Sept. 13, 1996, at News 1A |
| | Jane Fritsch, *Cardiologists Say Portable Defribrillators Can Save Time and Lives*, N.Y. TIMES, Apr. 16, 1997, at A1. |
| | Jane E. Brody, *A $3,000 "Fire Extinguisher" To Put Out Heart Attacks*, N.Y. TIMES. Malcolm McConnell, *This Machine Could Save Your Life*, READER'S DIG. Nov. 1997, at 69 (1997). |
| | Kathryn Trim, *A Second Chance at Life*, BETTER HOMES AND GARDENS, Nov. 1998, at 144, 146, 148 (1998). |
| | Jeffrey Leib, *United to equip its planes with advanced medical gear*, DENV. POST, Feb. 12, 1998, at 1C and 10C. |
| | Jeffrey Leib, *Airline introduces defibrillators*, DENV. POST, Nov. 28, 1999. |
| | H.R. 2843, 105th Cong., 2nd Sess. §§ 1 - 6 (1998) |
| Exhibit J | *The Use of Automated External Defibrillators in YMCAs; A Statement of the YMCA of the USA Medical Advisory Committee*, Nov. 1997, 28. (Recommended installing AEDs at its facilities for the health and safety of its constituents) |
| Exhibit K | CAL. A.B. 2041, Chap. 718 |
| Exhibit L | INT'L HEALTH, RAQUET & SPORTSCLUB ASS'N, STANDARDS FACILITATION GUIDE; HEALTH & SAFETY, LEGAL & ETHICAL STANDARDS FOR U.S. IHRSA CLUBS AS OF 1998, 2nd Ed. (1998). |
| Exhibit M | *Sudden Cardiac Death; AHA Scientific Position*, AMER. HEART ASS'N, *from* Http://www.americanheart.org/presenter.jhtml?identifier=4747 (last visited 1/28/2005). |
| Exhibit N | *U.S. Health Club Membership by Age*, INT'L HEALTH, RAQUET & SPORTSCLUB ASS'N, *from* http://cms.ihrsa.org/IHRSA/ViewPage.cfm?pageid=626 (last visited 6/22/2005). (Reporting information that the number of health club members older than 55 increased by 343 percent from 1987 to 2003.) |
| Exhibit O | Craig Waters, *To Start A Heart; New study documents value of defibrillators in health clubs*, CLUB BUS. INT'L, March 2004, 67. |
| Exhibit P | *Defibrillators (AEDs) in Health Clubs; An IHRSA Briefing Paper*, INT'L HEALTH, RAQUET & SPORTSCLUB ASS'N. (1999) (recognized that CPR is generally ineffective for treating SCAs without another link in the chain of survival, such as early defibrillation (p. 6)). |

| Exhibit Q | AM. HEART ASS'N, AND, J. AM. MED. ASS'N, STANDARDS AND GUIDELINES FOR CARDIOPULMONARY RESUSCITATION AND EMERGENCY CARDIAC CARE, at 2976 (identifying "health club personnel" as capable first responders and users of AEDs). *Reprinted from* 255(21) J. AM. MED. ASS'N, June 6. 1986. |
|---|---|
| Exhibit R | *Philips Medical Systems: Automated External Defibrillators*, INT'L HEALTH, RAQUET & SPORTSCLUB ASS'N, *from* http://cms.ihrsa.org/IHRSA/ViewPage.cfm?pageid=744 (last visited 1/27/2005). Including stories about SCA victims saved by an AED. |
| Exhibit S | *IHRSA's Top Ten "Outside the Industry" Presentation, Boston - Jan. 9, 2002*, INT'L HEALTH, RAQUET & SPORTSCLUB ASS'N, *from* http://cms.ihrsa.org/IHRSA/ViewPage.cfm?pageid=829 (last visited 1/27/2005) (Listing the featured speakers at the 2002 IHRSA convention). |
| Exhibit T | Gary J. Balady, M.D., Chair, et al., *Automated External Defibrillators in Health/Fitness Facilities*, 105(9) CIRCULATION 1147 (2002). This is a joint Scientific Statement between the AHA and ACSM. |
| Exhibit U | Terence D. Valenzuela, M.D., M.P.H., et al., *Outcomes of Rapid Defibrillation By Security Officer After Cardiac Arrest in Casinos*, 343(17) NEW ENG. J. MED., Oct. 26, 2000, 1206 (reporting on page 1206 a survival rate of 74 percent when victims were defibrillated within the first three minutes) |
| Exhibit V | *Pulse Check no longer recommended for layperson CPR*, AM. HEART ASS'N, (2000) *from* http://www.scienceblog.com/community/older/2000/A/200000488.html (last visited 6/22/2005). The American Heart Association recognized that a pulse check is unreliable, and now recommends that no pulse check be done before bystanders begin administering chest compressions to an unconscious person. |
| Exhibit W | Curriculum Vitae for Kyle McInnis |





American Heart
Association℠
*Fighting Heart Disease
and Stroke*

# when every second counts

### CARDIAC ARREST AND THE NEED FOR EARLY DEFIBRILLATION





**when every second counts**

Without warning, while enjoying a round of golf, an elderly man with no known heart disease collapses from sudden cardiac arrest.

Fire department personnel respond in less than eight minutes. But they have no automatic external defibrillator (AED). They initiate CPR. Twenty-two minutes later, paramedics arrive with a defibrillator to shock the man several times. But it's too late. He's dead.

A young man, just 34 years old, complains of shortness of breath and chest pains.

Paramedics arrive quickly, giving him oxygen. That made him feel better. But seconds later, he suffers a sudden cardiac arrest, his head slumping forward. With electrodes already attached to his chest to monitor his heart rhythm, paramedics immediately defibrillate him. He's alive today.

In most cases, it's all but impossible to predict who will have a sudden cardiac arrest, or where and when it will happen.

What we do know is that each day more than 1,000 Americans suffer from sudden cardiac arrest — usually away from a hospital. More than 95 percent of them die, in many cases because life-saving defibrillators arrive on the scene too late, if at all.

The American Heart Association estimates that 20,000 or more deaths could be prevented each year if AEDs were more widely available to first-line responders such as police officers and fire department personnel.

©1996, American Heart Association

# sudden cardiac arrest: a major cause of death

Sudden cardiac arrest, also known as sudden cardiac death, is a major cause of death in the United States. It claims an estimated 250,000 lives each year.

Abnormal heart rhythms called arrhythmias cause most sudden cardiac arrests. Ventricular fibrillation (VF) is the most common arrhythmia that causes cardiac arrest. It's a condition in which the heart's electrical impulses suddenly become chaotic, often without warning. This causes the heart to stop abruptly. Victims collapse and quickly lose consciousness. Death usually follows unless responders restore a normal heart rhythm within 5–7 minutes.

However, people who survive a sudden cardiac arrest have a good long-term outlook. About 80 percent are alive at one year and as many as 57 percent are alive at five years.

The basic cause of sudden cardiac arrest is not well understood. Many victims have no history of heart disease, or the underlying heart disease has not affected their lives. It may even happen to people in the prime of their lives — like Hank Gathers, the Loyola Marymount University basketball star who collapsed and died during a game several years ago.

Unlike other life-threatening conditions such as cancer or AIDS, there is a definitive therapy for sudden cardiac arrest: defibrillation (de-fib"rah-LA'shun). As dramatized in many television shows, paddles are placed on the unconscious person's chest and the doctor yells, "clear!" Then, an electric shock is delivered to the heart. This shock stops the abnormal rhythm and allows a coordinated rhythm and normal pumping action to resume.

2

# the chain of survival

The American Heart Association advocates using the "chain of survival," which refers to the four crucial links in the emergency treatment of sudden cardiac arrest. Starting these procedures quickly may determine whether one lives or dies.

 1. **Early Access to Care** — In most communities, dialing 911 activates the emergency medical system, which dispatches the appropriate emergency personnel to the scene.

 2. **Early Cardiopulmonary Resuscitation** (kar"de-o-PUL'mo-na-re re-sus"i-TA'shun) — If performed properly, CPR can add a few minutes to the time available for successful defibrillation. Millions of people have learned the breathing and chest compression techniques of CPR, but it does not replace defibrillation in saving lives.

 3. **Early Defibrillation** — The critical link in treating victims in VF is delivery of an electrical shock. Each minute of delay in returning the heart to its normal pattern of beating decreases the chance of survival by 10 percent. After as little as 10 minutes, very few resuscitation attempts are successful.

 4. **Early Advanced Care** — After successful defibrillation, some patients require more advanced treatments, such as airway control or intravenous drugs, on the way to the hospital.

3

# early defibrillation: key to survival

Communities around the country have invested in the chain of survival by instituting 911 systems, training personnel and buying police, fire and ambulance vehicles. Yet, many of these communities have failed to provide enough defibrillators.

The chain of survival is only as strong as its most critical link — which in most cases of cardiac arrest is early defibrillation.

For example, in New York City, where it takes an average of more than 12 minutes for emergency vehicles to arrive at the scene of a sudden cardiac arrest, the survival rate is less than 2 percent. In Seattle, the average time to defibrillation is less than seven minutes, resulting in a survival rate for VF of almost 30 percent. If a similar survival rate could be achieved nationally, it would result in nearly 250 lives saved each day.

To accomplish this life-saving goal, a defibrillator should be carried in any vehicle or be available to any person likely to arrive first at an emergency scene. Any person trained in a program using the U.S. Department of Transportation's National Highway Traffic Safety Administration First Responder National Curriculum is considered a first responder. A broad range of people can be first responders, including EMTs, police officers, fire department personnel, security personnel and flight attendants.

First responders use a limited amount of equipment to perform an initial assessment and intervention. They are trained to assist other EMS providers. First responder training and designation should be extended to all who respond to emergencies.

Currently, about 50 percent of ambulances and a smaller percentage of fire department vehicles used for emergencies have portable external defibrillators. That's way too low, considering the number of cardiac-related emergencies handled by first responders and the critical impact of early defibrillation.

As Dr. Joseph P. Ornato of the Medical College of Virginia said in a *New York Times* article: "Sending an emergency vehicle to a cardiac arrest without a defibrillator is like having policemen with guns but no bullets."

4

5



# AEDs: new technology for widespread deployment

AEDs were developed in the 1980s after advances in solid-state circuitry and micro-computers allowed defibrillators to recognize VF. These AEDs were the first to identify VF, advise the operator that a shock was indicated, and deliver the shock. Safety records for the patient and operator are excellent.

However, AEDS have not been deployed widely to many groups of emergency responders. The barriers include cost, size, maintenance needs and integration into existing EMS systems.

Recent breakthroughs in technology will mean AEDs are:

- easier to use and maintain;
- smaller, lightweight and rugged; and
- lower in cost.

The new generation of AEDs will make it more practical to train and equip a wider range of responders, including fire department personnel, police officers, lifeguards, flight attendants, security guards, and others responsible for public safety.

"Anyone who can learn CPR can learn to use AEDs," says Dr. Richard Cummins, a pioneer in the treatment of out-of-hospital sudden cardiac arrest.

Public Access Defibrillation is the ultimate goal as a result of this new technology. This will mean the general public will have access to defibrillators in highly populated areas such as office buildings, stadiums and airplanes, where survival rates from sudden cardiac arrest are less than 1 percent.

A next step will be to place AEDs in the homes of high-risk patients and to train family members to use them. Other citizens will also be trained to use AEDs to extend bystander-initiated defibrillation in rural and congested urban areas. These settings often have low survival rates because defibrillators do not reach victims in time.

We know that definitive therapy exists to treat sudden cardiac arrest. New technology is available that addresses the barriers to widespread deployment of AEDs.

## you can make a difference

So what can you do to help improve access to AEDs in your community?

Find out if the first responders (such as ambulances, police cars, and fire department vehicles) in your community are equipped with AEDs. If they are not, ask why.

Speak to members of city councils, county boards, and state legislatures. Advocate creating an early defibrillation program in your community, including equipping all first responders with AEDs.

Support allocating funds to establish an early defibrillation program and to equip all first responders with AEDs in your community.

Advocate and support regulatory changes in your state that expand the use of AEDs by a broader range of first responders.

To learn more about sudden cardiac arrest and what you can do to bring early defibrillation to your community, contact your nearest American Heart Association or call 1–800–AHA–USA–1 (1–800–242–8721) or online at http://www.amhrt.org

*Special thanks to the following who have made this brochure possible through their generous educational grants:*

*Gannett Foundation*
*Heartstream*
*Hewlett-Packard Company*
*Laerdal Foundation*
*Laerdal Medical Corporation*
*Marquette Electronics, Inc.*
*Physio-Control*
*SurVivaLink*
*Zoll Medical Corporation*



# TRIGGERING OF SUDDEN DEATH FROM CARDIAC CAUSES BY VIGOROUS EXERTION

Christine M. Albert, M.D., M.P.H., Murray A. Mittleman, M.D., Dr.P.H., Claudia U. Chae, M.D., M.P.H,
I.-Min Lee, M.B., B.S., Sc.D., Charles H. Hennekens, M.D., Dr.P.H., and JoAnn E. Manson, M.D., Dr.P.H.

## ABSTRACT

*Background*  Retrospective and cross-sectional data suggest that vigorous exertion can trigger cardiac arrest or sudden death and that habitual exercise may diminish this risk. However, the role of physical activity in precipitating or preventing sudden death from cardiac causes has not been assessed prospectively in a large number of subjects.

*Methods*  We used a prospective, nested case–crossover design within the Physicians' Health Study to compare the risk of sudden death during and up to 30 minutes after an episode of vigorous exertion with that during periods of lighter exertion or none. We then evaluated whether habitual vigorous exercise modified the risk of sudden death that was associated with vigorous exertion. In addition, the relation of vigorous exercise to the overall risk of sudden death and nonsudden death from coronary heart disease was assessed.

*Results*  During 12 years of follow-up, 122 sudden deaths were confirmed among the 21,481 male physicians who were initially free of self-reported cardiovascular disease and who provided information on their habitual level of exercise at base line. The relative risk of sudden death during and up to 30 minutes after vigorous exertion was 16.9 (95 percent confidence interval, 10.5 to 27.0; $P<0.001$). However, the absolute risk of sudden death during any particular episode of vigorous exertion was extremely low (1 sudden death per 1.51 million episodes of exertion). Habitual vigorous exercise attenuated the relative risk of sudden death that was associated with an episode of vigorous exertion (P value for trend = 0.006). The base-line level of exercise was not associated with the overall risk of subsequent sudden death.

*Conclusions*  These prospective data from a study of U.S. male physicians suggest that habitual vigorous exercise diminishes the risk of sudden death during vigorous exertion. (N Engl J Med 2000;343:1355-61.)
©2000, Massachusetts Medical Society.

Physical activity clearly benefits cardiovascular health.[1-3] In prospective epidemiologic studies, both vigorous physical activity and moderate activity are consistently associated with a reduced risk of coronary heart disease.[4-7] However, it is also recognized that sudden death from cardiac causes seems to occur with an unusually high frequency during or shortly after vigorous exertion.[7] Approximately 6 to 17 percent of all sudden deaths occur in association with exertion,[8-11] and there is evidence to suggest that vigorous exertion simultaneously triggers and protects against sudden death.[11] However, the role of vigorous exertion in precipitating or preventing sudden death has not been assessed prospectively in a large number of subjects. The prospective data compiled in the Physicians' Health Study presented a unique opportunity to determine whether vigorous exertion triggers sudden death and whether habitual vigorous exercise diminishes the risk.

## METHODS

### Study Population

The methods of the Physicians' Health Study have been described in detail elsewhere.[12] Briefly, 22,071 male physicians who were from 40 to 84 years of age in 1982 and had no history of myocardial infarction, stroke, transient ischemic attacks, or cancer were assigned to receive aspirin, beta carotene, or both, according to a randomized, placebo-controlled, two-by-two factorial design. At base line, the physicians completed questionnaires on their cardiovascular risk factors, intake of selected foods, and frequency of vigorous exercise. In this investigation, we excluded 590 men who reported having angina or having undergone coronary revascularization, or for whom data on physical activity were missing, at base line, leaving 21,481 participants as the base population for the analysis.

### Study Design

We used a nested case–crossover design to quantify the relative risk of sudden death from cardiac causes during or up to 30 minutes after an episode of vigorous exertion as compared with the risk during periods of lighter exertion or none (Fig. 1). The case–crossover study design permits the assessment of change in the risk of an event during a brief "hazard period" during and after exposure to a transient risk factor.[13] For each subject who had an event (i.e., who died), the prospectively determined habitual frequency of exertion for that subject served as the control information, and each such subject therefore served as his own control in this "self-matched" analysis.

### Frequency and Timing of Vigorous Exertion

#### Frequency of Vigorous Exertion at Base Line

At base line, the subjects were asked, "How often do you exercise vigorously enough to work up a sweat?" The possible responses were rarely or never, one to three times a month, once a week, two to four times a week, five or six times a week, or daily. This measure of physical activity correlates with maximal oxygen

From the Division of Preventive Medicine, Department of Medicine, Brigham and Women's Hospital, Boston (C.M.A., C.U.C., I.-M.L., J.E.M.); the Cardiology Division, Department of Medicine, Massachusetts General Hospital, Boston (C.M.A., C.U.C.); the Cardiology Division, Beth Israel Deaconess Medical Center, Boston (M.A.M.); the Department of Epidemiology, Harvard School of Public Health, Boston (I.-M.L., M.A.M., I.E.M.); and the Department of Medicine, Epidemiology and Public Health, University of Miami School of Medicine, Miami (C.H.H.). Address reprint requests to Dr. Albert at the Division of Preventive Medicine, Brigham and Women's Hospital, 900 Commonwealth Ave. E., Boston, MA 02215-1204, or at calbert@partners.org.

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

The New England Journal of Medicine



**Figure 1. Design of Nested Case–Crossover Analysis.**
The hatched portion of the time line represents the 60-minute hazard period (30 minutes during and 30 minutes after vigorous exertion). If a sudden death occurred during this period, there was considered to have been exposure to vigorous exertion. If a sudden death occurred during the shaded portion of the time line, there was considered to have been no exposure to vigorous exertion.

uptake,[14] time on the treadmill during exercise testing,[15] and the high-density lipoprotein cholesterol level.[16] The midpoint value was assigned to each response category and multiplied by 52 to estimate the usual annual frequency. Subjects were not asked about the average duration of exertion at base line, but the question was asked of those who reported engaging in a regular program of exercise in a questionnaire administered at 36 months (59 percent of the total cohort). The median duration reported (30 minutes) was used as an estimate of the usual duration of vigorous exercise at base line. In our primary analysis we assessed the risk of sudden death during and 30 minutes after exertion (Fig. 1). We therefore assumed that each episode of exertion was associated with 60 minutes of exposure time. To calculate the unexposed person-time, the person-time of exposure (in hours) was subtracted from the number of hours in a year.

### Activity at the Time of Death

The specific activity in which the subject was engaged at the time of sudden death and for one hour before death was ascertained from the medical record or from the next of kin. The degree of physical exertion was quantified on a scale of 1 to 8 metabolic equivalents (MET).[17] The subject was considered to have been exposed to vigorous exertion if the activity was estimated as 6 MET or more. If the activity was unknown or was at a level of less than 6 MET, there was considered to have been no exposure.

### Definitions

An end-points committee of physicians confirmed all events by review of medical records. Deaths for which there was evidence of coronary heart disease at or before death and no evidence of a noncoronary cause were classified as due to cardiac causes. To identify sudden deaths, medical records and reports from the next of kin for all subjects who had died from cardiac causes were reviewed again by two cardiologists, and agreement was reached on whether the death was sudden.

Sudden death was defined as death within one hour after the onset of symptoms or death after a witnessed cardiac arrest or abrupt collapse that was not preceded by symptoms lasting more than one hour. Information from the death certificate was not used to determine the timing of death. To increase the specificity of our method for identifying death from arrhythmia, we excluded anyone who had evidence of circulatory collapse (hypotension, exacerbation of congestive heart failure, or altered mental status) before the disappearance of the pulse.[18]

### Absolute Risk during Vigorous Exertion

Each physician's reported frequency of vigorous exertion at base line (episodes per week) was multiplied by the follow-up time in weeks to generate an estimate of the total number of episodes of vigorous exertion in the population, and the absolute risk of sudden death associated with an episode of vigorous exertion was calculated. This risk was then compared with the incidence of sudden death during lighter physical activity, and the difference in absolute risk was estimated.

### Case–Crossover Analysis

The analysis of case–crossover data is similar to that of a crossover experiment in which the risk to each subject is assessed during periods of exposure and nonexposure. The ratio of the observed frequency of exposure in the 60-minute hazard period (Fig. 1) to the frequency of exposure expected on the basis of the usual frequency of exercise reported at base line was used to calculate an odds ratio as a measure of relative risk.[18,19] The data were then stratified for each subject and analyzed by methods for cohort studies with sparse data in each stratum.[20] Modification of the relative risk by habitual vigorous exertion was assessed by comparison of the relative risks for three categories of habitual vigorous exertion (less than once, one to four times, and five or more times per week), and a test for linear trend[21] was performed. The effect of the time of day on the relative risk of sudden death was assessed by stratification of the analysis according to the time of death, followed by comparison of the relative risks by means of a test for homogeneity.[22] All reported P values are two-sided.

### Sensitivity Analyses

Three sensitivity analyses were performed. First, to examine the sensitivity of the results to the hazard period chosen, we considered only the period during vigorous exertion (the labeled portion in Fig. 1) as the period of exposure and reexamined the relative risk of sudden death during this 30-minute hazard period. Second, we examined the sensitivity of the results to changes in our estimate of the usual duration of vigorous exertion. Third, we examined the sensitivity of the results to our definition of sudden death, which, although specific for death from arrhythmia, excluded most unwitnessed deaths and deaths during sleep. Some of these deaths could have been sudden, and their systematic exclusion could have biased our results toward a positive association between death and vigorous exercise. Therefore, in this analysis, we included unwitnessed deaths with an autopsy result consistent with an arrhythmic cause and those that occurred during sleep without preceding symptoms as sudden deaths.

### Overall Risk of Sudden and Nonsudden Death from Cardiac Causes

The base-line information on the usual frequency of vigorous exertion was modeled in four categories (less than once, one to four times, and five or more times per week), and the relative risks of sudden death and nonsudden death from coronary heart disease for the base population of 21,481 men were computed with use of Cox proportional-hazards models[23] with simultaneous control for potential confounders.

## RESULTS

During 12 years of follow-up, 122 sudden deaths from cardiac causes occurred among the 21,481 participants. The age-adjusted risk factors at base line and the usual frequency of vigorous exertion for those who died suddenly and for the other participants are shown in Table 1. The majority of participants reported exercising vigorously two to four times per week, and the distribution of the categories for usual fre-

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

TRIGGERING OF SUDDEN DEATH FROM CARDIAC CAUSES BY VIGOROUS EXERTION

TABLE 1. CHARACTERISTICS OF THE SUBJECTS WHO DIED SUDDENLY
AND THOSE WHO DID NOT.*

| CHARACTERISTIC | NO SUDDEN DEATH (N=21,359) | SUDDEN DEATH (N=122) | P VALUE |
|---|---|---|---|
| | means ±SD | | |
| Age (yr) | 53.0±9.42 | 60.5±9.6 | <0.001 |
| Body-mass index† | 24.9±3.0 | 25.2±2.9 | 0.32 |
| | no. (%) | | |
| Frequency of vigorous exercise | | | 0.41 |
| <1 time/wk | 5,890 (27.6) | 32 (22.5) | |
| 1 time/wk | 3,941 (18.4) | 27 (20.1) | |
| 2–4 times/wk | 8,063 (37.7) | 40 (38.8) | |
| 5 or 6 times/wk | 2,328 (10.9) | 9 (9.9) | |
| Daily | 1,137 (5.3) | 14 (8.6) | |
| Smoking status | | | 0.05 |
| Current smoker | 2,366 (11.1) | 20 (19.8) | |
| Past smoker | 8,367 (39.3) | 53 (40.3) | |
| Never smoked | 10,592 (49.6) | 48 (40.0) | |
| Medical conditions | | | |
| Diabetes | 477 (2.2) | 13 (10.7) | 0.001 |
| High cholesterol level‡ | 1,264 (6.7) | 10 (8.2) | 0.73 |
| Hypertension§ | 2,852 (13.5) | 40 (32.5) | 0.001 |
| Parental myocardial infarction before 60 years of age | 2,761 (13.0) | 17 (17.1) | 0.18 |
| Alcohol intake | | | 0.05 |
| <Weekly | 5,476 (25.8) | 48 (37.8) | |
| Weekly | 10,475 (49.3) | 36 (37.5) | |
| Daily | 5,277 (24.9) | 37 (24.7) | |
| Fish consumption (<1 serving/wk)¶ | 1,902 (9.2) | 17 (15.0) | 0.03 |
| Treatment group | | | |
| Aspirin | 10,661 (49.9) | 59 (54.9) | 0.75 |
| Beta carotene | 10,678 (50.0) | 61 (50.2) | 0.98 |

*Characteristics have been standardized according to age in the entire cohort. Not all questions were answered by all subjects.

†The body-mass index is the weight in kilograms divided by the square of the height in meters.

‡This diagnosis was based on a self-reported high cholesterol level, a cholesterol level ≥260 mg per deciliter (6.7 mmol per liter), or the use of cholesterol-lowering medications.

§This diagnosis was based on a self-reported systolic blood pressure ≥160 mm Hg, a diastolic blood pressure ≥90 mm Hg, or the use of antihypertensive medications.

¶Information was ascertained on the 12-month questionnaire.

quency of vigorous exertion did not differ significantly between those who died and those who did not. Complete information on physical activity during the hour before death was available for 80 percent of the sudden deaths. Seventeen such deaths (13.9 percent) occurred during vigorous exertion, and six (4.9 percent) occurred within 30 minutes after vigorous exertion. The majority of the participants were engaged in dynamic exercise, such as jogging or racquet sports (68 percent). The rest were involved in other sports (25 percent) or heavy yardwork or home repairs (7 percent).

Among the 21,481 men, the incidence of sudden death per person-hour was 1 death per 19 million hours. The risk of sudden death associated with an episode of vigorous exertion was 1 per 1.42 million episodes or person-hours at risk. Alternatively, the risk of sudden death during periods of lighter exertion or none was 1 death per 23 million person-hours. From these data, the unadjusted difference in risk associated with exposure to vigorous exertion can be estimated at 1 excess sudden death per 1.51 million episodes of vigorous exertion. On the basis of the case–crossover method, the relative risk of sudden death during the one-hour period associated with vigorous exertion (Fig. 1), as compared with other time points, was significantly elevated at 16.9 (95 percent confidence interval, 10.5 to 27.0; P<0.001).

### Effect of the Frequency of Vigorous Exercise

The results after stratification according to the usual frequency of vigorous exercise at base line are presented in Table 2. The relative risk of sudden death associated with an episode of vigorous exertion was lower among those who exercised more frequently

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

The New England Journal of Medicine

**TABLE 2. EFFECT OF HABITUAL VIGOROUS EXERCISE ON THE RISK OF SUDDEN DEATH DURING VIGOROUS EXERTION.**

| FREQUENCY OF HABITUAL VIGOROUS EXERCISE | SUDDEN DEATHS | | RELATIVE RISK (95% CI)* |
|---|---|---|---|
| | TOTAL | RELATED TO VIGOROUS EXERTION | |
| | | no. | |
| <1 time/wk | 32 | 3 | 74.1 (22.0–249) |
| 1–4 times/wk | 67 | 13 | 18.9 (10.2–35.1) |
| ≥5 times/wk | 23 | 7 | 10.9 (4.5–26.2) |

*The relative risk is the risk of sudden death during and 30 minutes after an episode of vigorous exertion, as compared with the risk during periods of lighter exertion or none. CI denotes confidence interval.

**TABLE 3. RELATIVE RISK OF SUDDEN DEATH ASSOCIATED WITH AN EPISODE OF VIGOROUS EXERTION, ACCORDING TO THE TIME OF DEATH.**

| TIME OF DEATH | SUDDEN DEATHS | | RELATIVE RISK (95% CI)* |
|---|---|---|---|
| | TOTAL | RELATED TO VIGOROUS EXERTION | |
| | | no. | |
| All times | 122 | 23 | 16.9 (10.5–27.0) |
| 6 a.m.–noon | 33 | 7 | 18.5 (7.3–46.6) |
| Noon–6 p.m. | 23 | 5 | 19.0 (6.9–52.2) |
| 6 p.m.–midnight | 36 | 6 | 16.6 (7.0–39.8) |
| Midnight–6 a.m. | 17 | 1 | 4.58 (0.55–37.9) |

*The relative risk is the risk of sudden death during and 30 minutes after an episode of vigorous exertion, as compared with the risk during periods of lighter exertion or none. CI denotes confidence interval. Subjects were excluded if exact times of death were not known.

(P for trend=0.006). Men who rarely engaged in vigorous exercise (less than once a week) had a relative risk of sudden death of 74.1 in the period during and 30 minutes after exertion. In comparison, men who exercised at least five times per week had a much lower risk (relative risk, 10.9); however, this risk was still significantly higher than that during periods of lighter exertion or none.

**Effect of Time of Death**

It is well known that the incidence of sudden death varies according to the time of day. If the subjects tended to exercise during the circadian peak in the incidence of sudden death (from 6 a.m. to noon),[24] this fact could account for part of the increased risk associated with exertion. To address this issue, we reexamined the relative risks according to the time of death (Table 3). The relative risk associated with an acute episode of vigorous exertion was not significantly modified by the time of death. In addition, the relative risk associated with vigorous exertion remained significantly elevated at times other than the circadian peak in sudden death, except for the period from midnight to 6 a.m., when exposure to exertion was low.

**Sensitivity Analyses**

Seventeen of the 23 sudden deaths that were associated with vigorous exertion occurred during the exertion. Using the case–crossover method, we found the estimated relative risk of sudden death during exertion (a 30-minute hazard period) to be higher (relative risk, 44.9; 95 percent confidence interval, 26.7 to 75.4) than that during the 60-minute hazard period, but it was still modified by habitual vigorous ex-

ercise (P for trend=0.003). When the usual duration of vigorous exercise was estimated to be 20 minutes, the relative risk of sudden death in the 60-minute hazard period was 20.4 (95 percent confidence interval, 12.7 to 32.7); it was 14.6 (95 percent confidence interval, 9.10 to 23.4) when the duration was estimated to be 40 minutes. Again, modification by usual vigorous exercise remained significant (P≤0.005). Finally, if deaths that occurred during sleep or were unwitnessed were included as sudden deaths, the relative risk of sudden death in the 60-minute hazard period remained elevated (relative risk, 13.8; 95 percent confidence interval, 8.9 to 21.2), and this excess risk was still modified by the frequency of vigorous exercise (P for trend=0.003) (Table 4).

**Overall Risk Associated with Vigorous Exercise at Base Line**

The base-line level of vigorous exercise was not significantly associated with the risk of subsequent sudden death, either before or after potential confounders had been controlled for. In contrast, the risk of nonsudden death from coronary heart disease was lower among the men who participated in vigorous exercise than among those who did not. However, no further reduction in risk was observed for a frequency of exercise of more than once a week (Table 5).

**DISCUSSION**

In this prospective, nested case–crossover study of apparently healthy male physicians, the risk of sudden death was transiently elevated in association with an episode of vigorous exertion by a factor of 14 to 45, as compared with the risk during periods of lighter or no exertion. Despite the high relative risk, the

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

●                                   ●

TRIGGERING OF SUDDEN DEATH FROM CARDIAC CAUSES BY VIGOROUS EXERTION

TABLE 4. RESULTS OF THE INCLUSION OF
UNWITNESSED DEATHS AND DEATHS
DURING SLEEP AS SUDDEN DEATHS.

| FREQUENCY OF HABITUAL VIGOROUS EXERCISE | SUDDEN DEATHS | | RELATIVE RISK (95% CI)* |
| --- | --- | --- | --- |
| | TOTAL | RELATED TO VIGOROUS EXERTION | |
| | | no. | |
| <1 time/wk | 54 | 3 | 47.6 (14.6–156) |
| 1–4 times/wk | 96 | 15 | 14.1 (8.1–24.6) |
| ≥5 times/wk | 27 | 8 | 10.5 (4.6–23.7) |

*The relative risk is the risk of sudden death during and immediately after an episode of vigorous exertion, as compared with the risk during periods of lighter exertion or none. CI denotes confidence interval.

TABLE 5. MULTIVARIATE RELATIVE RISK OF
SUDDEN DEATH AND NONSUDDEN DEATH FROM
CORONARY HEART DISEASE ACCORDING TO THE
FREQUENCY OF VIGOROUS EXERCISE AT BASE LINE.

| FREQUENCY OF VIGOROUS EXERCISE | SUDDEN DEATH (N=109) | NONSUDDEN DEATH (N=146) |
| --- | --- | --- |
| | relative risk (95% CI) | |
| <1 time/wk | 1.0 | 1.0 |
| 1 time/wk | 1.68 (0.98–2.87) | 0.61 (0.37–1.02) |
| 2–4 times/wk | 1.13 (0.69–1.88) | 0.59 (0.40–0.88) |
| ≥5 times/wk | 1.36 (0.76–2.43) | 0.61 (0.37–1.02) |
| P for trend | 0.63 | 0.03 |

*The multivariate model includes age (as a continuous variable); assignment to aspirin and beta carotene treatment; body-mass index (in quartiles); smoking status (current smoker, <20 cigarettes/day or ≥20 cigarettes/day; past smoker; never smoked); history of diabetes, hypertension, or hypercholesterolemia; consumption of alcohol (pseudocontinuous, linear, and quadratic term), use of vitamin E, vitamin C, and multivitamins at base line; and frequency of consumption of fish at 12 months (<1 time/month, 1–3 times/month, weekly, 2–4 times/week, ≥5 times/week). Only subjects for whom data were available are included. CI denotes confidence interval.

absolute excess risk of sudden death during any particular episode of vigorous exertion was extremely low (1 death per 1.51 million episodes of vigorous exertion), similar to that reported in other populations.[7,9,11]

As expected, the base-line level of habitual exercise significantly attenuated the increase in the risk of sudden death that was associated with an episode of vigorous exertion in both the primary analysis and

the three sensitivity analyses. Habitually active men had a much lower risk of sudden death in association with an episode of vigorous exertion than men who exercised less than once a week; however, the most active men's risk remained significantly elevated during and after vigorous exertion in all analyses. These results are similar to those reported for nonfatal myocardial infarction[17,25] and corroborate those previously reported in a population-based, retrospective case–control study of victims of cardiac arrest.[11]

The effect of vigorous exertion on the sympathetic nervous system, plaque vulnerability, or both, could account for the findings. Acute bouts of exercise activate the sympathetic nervous system and decrease vagal activity, leading to an acute increase in susceptibility to ventricular fibrillation.[26] However, habitual vigorous exertion increases basal vagal tone, resulting in increased cardiac electrical stability and in protection against ventricular fibrillation.[27] In addition, sympathetic surges associated with acute exertion may promote plaque rupture,[10,28] and habitual vigorous exercise could modify this risk through favorable effects on lipids or by decreasing the hemodynamic stress at a given workload.

Our finding that there was no relation between the frequency of vigorous exercise as reported by the men at base line and the overall risk of sudden death appears to be at odds with the findings of numerous studies in which regular exercise was associated with reductions in the long-term risk of cardiac events.[4,6,29-32] However, few studies have examined sudden death specifically and rigorously, and the results of prospective studies have been conflicting. The Framingham Study found no relation between physical activity and sudden death during 20 years of follow-up.[33,34] In contrast, the British Regional Heart Study[35] and the Multiple Risk Factor Intervention Trial[6] found significant reductions in the risk of sudden death associated with both moderate and vigorous exercise.

Several factors may explain why we found no association between habitual exercise and the subsequent risk of sudden death. First, we had no information about moderate levels of activity, in which the men in our sedentary category could have been participating regularly. Moderate physical activity is associated with a markedly reduced risk of coronary events[32,36] and cardiac arrest,[37] and therefore it might also protect against sudden death. Second, activity levels may have changed over the course of the study, and misclassification of the exposure could have contributed to the null result. Finally, the effect of vigorous exercise on the risk of sudden death may actually be different from its effect on other cardiovascular end points, such as nonsudden death (Table 5).

Our study has several limitations. First, the measure of physical activity that we used is limited in comparison with more objective measures of physical fit-

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

ness, which have been shown to correlate with rates of cardiac events.[38] Second, the base-line data on the frequency of vigorous exertion were not updated during the study. Since levels of physical activity tend to vary over time,[39] there is likely to have been misclassification in our assessment of each person's level of habitual exercise; if such errors were random, this factor would tend to bias our results toward a null finding. However, if participation in vigorous exercise either increased or decreased over time, then our estimates of the relative risk during exertion might have been biased toward a positive or negative association, respectively. In addition, we lacked information on the duration of vigorous exertion. For both of these reasons, the magnitude of the relative risk associated with an acute episode of vigorous exertion should be viewed as an estimate.

Third, the rarity of exertion-related sudden death limits the statistical power of the study and tends to produce unstable estimates of risk. However, although the number is still quite small, the 23 sudden deaths that were associated with vigorous exertion in this study make up one of the largest series to date. Finally, our study and the earlier retrospective study[11] included only men, and therefore these data may not apply to women.

In summary, prospective data on U.S. male physicians suggest that bouts of vigorous exertion are associated with a transient increase in the risk of sudden death and that habitual vigorous exercise diminishes this risk. The absolute magnitude of the increase in risk associated with vigorous exertion is extremely small, and the overall risk of sudden death was not increased in association with increasing frequency of vigorous exertion. Therefore, these data should not discourage participation in an exercise program. The benefits of a physically active lifestyle in terms of multiple health outcomes, including the frequency of all cardiovascular events, clearly outweigh the small risks described above. However, further research directed at the mechanisms underlying sudden death during vigorous exertion may lead to innovative strategies to prevent this rare but devastating event.

Supported by grants (CA-40360 and HL-34595) from the National Institutes of Health. Dr. Albert is the recipient of a Mentored Clinical Scientist Development Award (1-K08-HL-03783) from the National Heart, Lung, and Blood Institute.

## REFERENCES

1. Paffenbarger RS Jr, Hyde RT, Wing AL, Lee I-M, Jung DL, Kampert JB. The association of changes in physical-activity level and other lifestyle characteristics with mortality among men. N Engl J Med 1993;328:538-45.
2. Sandvik L, Erikssen J, Thaulow E, Erikssen G, Mundal R, Rodahl K. Physical fitness as a predictor of mortality among healthy, middle-aged Norwegian men. N Engl J Med 1993;328:533-7.
3. Kushi LH, Fee RM, Folsom AR, Mink PJ, Anderson KE, Sellers TA. Physical activity and mortality in postmenopausal women. JAMA 1997; 277:1287-92.
4. Paffenbarger RS Jr, Hale WE. Work activity and coronary heart mortality. N Engl J Med 1975;292:545-50.

5. Morris JN, Everitt MG, Pollard R, Chave SPW, Semmence AW. Vigorous exercise in leisure-time: protection against coronary heart disease. Lancet 1980;2:1207-10.
6. Leon AS, Connett J, Jacobs DR Jr, Rauramaa R. Leisure-time physical activity levels and risk of coronary heart disease and death: the Multiple Risk Factor Intervention Trial. JAMA 1987;258:2388-95.
7. Kohl HW III, Powell KE, Gordon NF, Blair SN, Paffenbarger RS Jr. Physical activity, physical fitness, and sudden cardiac death. Epidemiol Rev 1992;14:37-58.
8. Cobb LA, Weaver WD. Exercise: a risk for sudden death in patients with coronary heart disease. J Am Coll Cardiol 1986;7:215-9.
9. Thompson PD, Funk EJ, Carleton RA, Sturner WQ. Incidence of death during jogging in Rhode Island from 1975 through 1980. JAMA 1982; 247:2535-8.
10. Burke AP, Farb A, Malcom GT, Liang Y, Smialek JE, Virmani R. Plaque rupture and sudden death related to exertion in men with coronary artery disease. JAMA 1999;281:921-6.
11. Siscovick DS, Weiss NS, Fletcher RH, Lasky T. The incidence of primary cardiac arrest during vigorous exercise. N Engl J Med 1984;311:874-7.
12. Steering Committee of the Physicians' Health Study Research Group. Final report on the aspirin component of the ongoing Physicians' Health Study. N Engl J Med 1989;321:129-35.
13. Maclure M. The case-crossover design: a method for studying transient effects on the risk of acute events. Am J Epidemiol 1991;133:144-53.
14. Siconolfi SF, Lasater TM, Snow RCK, Carleton RA. Self-reported physical activity compared with maximal oxygen uptake. Am J Epidemiol 1985;122:101-5.
15. Kohl HW, Blair SN, Paffenbarger RS Jr, Macera CA, Kronenfeld JJ. A mail survey of physical activity habits as related to measured physical fitness. Am J Epidemiol 1988;127:1228-39.
16. Washburn RA, Goldfield SRW, Smith KW, McKinlay JB. The validity of self-reported exercise-induced sweating as a measure of physical activity. Am J Epidemiol 1990;132:107-13.
17. Mittleman MA, Maclure M, Tofler GH, Sherwood JB, Goldberg RJ, Muller JE. Triggering of acute myocardial infarction by heavy physical exertion: protection against triggering by regular exertion. N Engl J Med 1993;329:1677-83.
18. Hinkle LE Jr, Thaler HT. Clinical classification of cardiac deaths. Circulation 1982;65:457-64.
19. Mittleman MA, Maclure M, Robins JM. Control sampling strategies for case-crossover studies: an assessment of relative efficiency. Am J Epidemiol 1995;142:91-8.
20. Greenland S, Robins JM. Estimation of a common effect parameter from sparse follow-up data. Biometrics 1985;41:55-68.
21. Berlin JA, Longnecker MP, Greenland S. Meta-analysis of epidemiologic dose-response data. Epidemiology 1993;4:218-28.
22. Rothman KJ, Greenland S. Modern epidemiology. 2nd ed. Philadelphia: Lippincott–Raven, 1998:253-79.
23. Cox DR. Regression models and life-tables. J R Stat Soc [B] 1972;34: 187-220.
24. Muller JE, Ludmer PL, Willich SN, et al. Circadian variation in the frequency of sudden cardiac death. Circulation 1987;75:131-8.
25. Willich SN, Lewis M, Löwel H, Arntz H-R, Schubert F, Schröder R. Physical exertion as a trigger of acute myocardial infarction. N Engl J Med 1993;329:1684-90.
26. Penenner F, Cleroux J, Perrault H, Cousineau D, de Champlain J, Nadeau R. Plasma norepinephrine response to exercise before and after training in humans. J Appl Physiol 1981;51:812-5.
27. Holl SS Jr, Vianoli E, Adamson PB, Verrier RL, Foreman RD, Schwartz PJ. Exercise training confers anticipatory protection from sudden death during acute myocardial ischemia. Circulation 1994;89:548-52.
28. Willich SN, Maclure M, Mittleman M, Arntz H-R, Muller JE. Sudden cardiac death: support for a role of triggering in causation. Circulation 1993;87:1442-50.
29. Berlin JA, Colditz GA. A meta-analysis of physical activity in the prevention of coronary heart disease. Am J Epidemiol 1990;132:612-28.
30. Chae CU, Albert CM, Lee I-M, Manson JE, Hennekens CH. Relative importance of frequency vs duration of physical activity in CHD risk reduction in the Physicians' Health Study. Circulation 1997;96:Suppl I:I-503. abstract.
31. Lee I-M, Hennekens CH, Berger K, Buring JE, Manson JE. Exercise and risk of stroke in male physicians. Stroke 1999;30:1-6.
32. Manson JE, Hu FB, Rich-Edwards JW, et al. A prospective study of walking as compared with vigorous exercise in the prevention of coronary heart disease in women. N Engl J Med 1999;341:650-8.
33. Kannel WB, Thomas HE Jr. Sudden coronary death: the Framingham Study. Ann N Y Acad Sci 1982;382:3-21.

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.

TRIGGERING OF SUDDEN DEATH FROM CARDIAC CAUSES BY VIGOROUS EXERTION

34. Kannel WB. Exercise and sudden death. JAMA 1982;248:3143-4.
35. Wannamethee G, Shaper AG, Macfarlane PW, Walker M. Risk factors for sudden cardiac death in middle-aged British men. Circulation 1995;91: 1749-56.
36. Pate RR, Pratt M, Blair SN, et al. Physical activity and public health: a recommendation from the Centers for Disease Control and Prevention and the American College of Sports Medicine. JAMA 1995;273:402-7.
37. Lemaitre RN, Siscovick DS, Raghunathan TE, Weinmann S, Arbogast

P, Lin DY. Leisure-time physical activity and the risk of primary cardiac arrest. Arch Intern Med 1999;159:686-90.
38. Blair SN, Kampert JB, Kohl HW III, et al. Influences of cardiorespiratory fitness and other precursors on cardiovascular disease and all-cause mortality in men and women. JAMA 1996;276:205-10.
39. Lee I-M, Paffenbarger RS JR, Hsieh C-C. Time trends in physical activity among college alumni, 1962-1988. Am J Epidemiol 1992;135:915-25.

Downloaded from www.nejm.org at UC SHARED JOURNAL COLLECTION on June 21, 2005 .
Copyright © 2000 Massachusetts Medical Society. All rights reserved.





Illustration credit: images.com

# A new study reveals that clubs need to do more to prepare for medical emergencies

**By Kyle McInnis, Sc.D.**

*a*s the owner, operator, or general manager of a health club, you're well aware of the benefits of regular exercise. You're committed to providing a stimulating environment that attracts members of all ages and fitness levels. You embrace national health recommendations that are designed to get people exercising safely and regularly.

All well and good. But... would you really be ready if a medical emergency occurred at your club?

## ALARMING RESULTS

A new study of commercial health and fitness facilities reveals, unfortunately, that most clubs aren't very aware of, and rarely adhere to, the national standards that have been established for cardiovascular screening and emergency procedures. The study underscores both the medical and legal importance of complying with existing recommendations.

The purpose of the study, which surveyed 122 randomly selected health clubs in Ohio, was to evaluate compliance with safety measures promulgated in 1998 by the American Heart Association (AHA) and the American College of Sports Medicine (ACSM), and subsequently supported by IHRSA. Among the key recommendations are that clubs: require a cardiovascular screening of all new members and/or prospective users; and have written emergency policies and procedures that are reviewed and practiced regularly.

The results of the study, published last year in an issue of *CHEST,* indicate that 52% of the clubs surveyed had no written emergency response plan, and that 82% didn't conduct emergency response drills in accordance with national standards . ▶

# AED *ALERT!* continued

Moreover, 25% of the facilities admitted that they didn't utilize a pre-entry screening of even the most rudimentary form (e.g., a basic health-history questionnaire to identify individuals with signs, symptoms, or a history of cardiovascular disease).

You're likely to find such statistics alarming, particularly if—like nearly 20% of the surveyed clubs—you've had a serious cardiac event (i.e., a fatal or nonfatal heart attack) take place on site. An earlier study, which involved 110 clubs in Massachusetts, showed that, over a five-year period, fully 70% had experienced a medical emergency serious enough to require that an ambulance be called.

These findings, sobering enough in themselves, take on added significance when one considers the fact that one of the fastest growing membership categories now consists of people 55 or older—the age when serious heart disease is most prevalent. Overall, 60.8 million Americans, or approximately 20% of the population, have some form of cardiovascular disease, and, this year alone, an estimated 1.1 million will suffer a new or recurrent heart attack.

## IS YOUR CLUB PREPARED?

The proper screening of club clients, and a well-rehearsed emergency response plan, are both essential to a safe exercise environment. So, too, is the availability of, and ability to use, appropriate medical equipment—principal among which is the automatic external defibrillator (AED). These units—portable, easy-to-employ devices that deliver an electric shock during sudden cardiac arrest (SCA) to restore the heart's normal rhythm—are becoming commonplace in more and more public places. They've recently been mandated for federal buildings nationwide, are being phased in on all U.S. commercial airline flights, and are being adopted by a growing number of IHRSA clubs, including all of the facilities operated by The Sports Club Company, the Tennis Corporation of America (TCA), the

Wellbridge Health and Fitness Centers, and, in the U.K., Cannons Health and Fitness, Ltd.

Although most people are very unlikely to experience a cardiovascular emergency, such as SCA, while working out, accumulating scientific evidence suggests that the risk of a cardiac event is as much as 15-20 times higher during, or immediately following, vigorous exercise. Those in the greatest danger are individuals with occult or known coronary heart disease, but, regrettably, potential victims are difficult to identify since most of the victims of SCA have had no previous warning signs.

each year, about 225,000 Americans die of SCA outside of a hospital, and it's been estimated that, if AEDs were widely available, as many as 50% of those stricken might survive; currently, 95% of them die. Cardiopulmonary resuscitation (CPR) is critical to maintaining the supply of oxygen to vital organs during an attack, but only a defibrillating heart shock can save someone who's succumb to SCA.

## WOULD YOUR STAFF ACT IN TIME?

When considering how best to respond to a cardiac emergency in your club, the most important thing to remember is that time is of the essence. According to the AHA, the chances of surviving SCA decrease by 7%-10% each minute following the moment of collapse. After just 10 minutes, the odds of survival become virtually nonexistent; and irreversible brain injury occurs even more rapidly.

Even if your staff recognizes a cardiac event and summons the local emergency medical services (EMS) team immediately, it will take, on average, 10-12 minutes for them to arrive and deliver an AED shock. What that means is that, while dialing 911 is an important part of any emergency response plan, it's hardly the entire plan. What's required is a trained staff who can identify a cardiac event, summon EMS

## EMERGENCY RESPONSE

Percent of fitness centers with a written emergency response plan (n=65) as recommended by the AHA/ACSM and IHRSA



Number of times per year, if any, that emergency response procedures are reviewed or practiced at health clubs (n=175). Recommendation from AHA/ACSM is at least quarterly drills.



## SELF ASSESMENT QUIZ

Study results and a self-assessment questionnaire on compliance with AHA/ACSM cardiac emergency procedures.

| | Study Results N (%) | Self-Assessment Quiz* |
|---|---|---|
| All fitness and aerobics staff certified in basic cardiac life support | 44 (68%) | |
| Have a written emergency response plan | 34 (52%) | |
| Emergency telephone numbers *posted* throughout the facility | 28 (43%) | |
| Emergency response plan *posted* at the facility | 23 (35%) | |
| Outside medical care personnel involved in *developing or evaluating* the plan | 20 (31%) | |
| *Records* kept at facility that shows results of emergency rehearsals | 10 (15%) | |
| *Practice* emergency drills at least quarterly | 6 (9%) | |

* *Answer "yes" or "no" to check your compliance with existing standards. A "no" to any question should be remedied.*

quickly, initiate CPR, and, if necessary, using an AED, deliver a shock to the heart until trained medical personnel arrive on the scene.

David L. Herbert—a lawyer in Canton, Ohio, the coeditor of *The Exercise Standards and Malpractice Reporter*, and one of the authors of the *CHEST* study—suggests that AEDs may well be required by law for clubs in the years ahead. "While the jury verdicts and case law results to date have not determined that health clubs must have AEDs in their facilities to meet the so-called standard of care, I believe that this will probably change in the future," says Herbert. However, it's

important to point out that, after significant research, IHRSA also concluded that there isn't a legal standard of care that requires that AEDs be in all fitness centers; however, the association encourages operators to consider the advantages of installing AEDs in their facilities.

The findings contained in the *CHEST* report suggest that the on-site emergency response procedures at many facilities are in need of evaluation and upgrading. (To find out how your own club is doing with respect to the AHA/ACSM standards, and how it compares to the survey respondents, make use of the accompanying self-assessment quiz.

## FOUR STEPS YOU SHOULD TAKE

Clubs that aren't currently in compliance should take one or more of the following steps: (1) train all fitness staff in CPR; (2) acquire an AED and provide AED training, integrating it into most CPR certifications; (3) require a basic, preparticipation cardiovascular screening procedure of all prospective users; and (4) create a written emergency response plan, and rehearse and review it regularly.

By initiating these simple measures, concerned and conscientious owners can make their clubs safer for every guest and member, including those at increased risk of exercise-related cardiovascular complications; assure themselves that medical emergencies will be dealt with promptly and professionally; and, in the event of a problem, may reduce their legal liability if a claim or lawsuit is filed… Which should let *everyone* rest more easily. ■

### ASSOCIATE MEMBER RESOURCES

For more information on related products and services, please see the advertisements in this issue for:

- xxxxxxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. xx
- xxxxxxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. xx
- xxxxxxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. xx
- xxxxxxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. xx
- xxxxxxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. xx
- xxxxxxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg. xx

## IHRSA'S HEALTHY HEART PROGRAM

HRSA has entered into an agreement with Philips Medical Systems (formerly Agilent Technologies), of Andover, Massachusetts, to provide its member clubs with AED units, training, and support services. IHRSA's Healthy Heart program offers participating facilities a 20%-30% discount on the standard Philips "ship set," which includes an AED, case, extra battery, etc., that

normally sells for $3,000-$3,500. Philips presented a workshop and seminar on AED use during IHRSA's recent 21st Annual International Convention and Trade Show in Phoenix, and reports that hundreds of clubs have already enrolled in the Healthy Heart program. For more information about this important new IHRSA benefit, call 800-453-6860, Ext. 1648.

DR. MCINNIS *is an associate professor in the department of exercise science and physical education at the University of Massachusetts, in Boston, and the director of research for the Rippe Lifestyle Institute, in Shrewsbury, Massachusetts, and can be contacted at 617-287-7495 or kmcginnis1@aol.com.*

# RUNOVER AED

## AD PAGE 36



| THIS SEARCH | THIS DOCUMENT | GO TO |
|---|---|---|
| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

# H.R.2498

**Public Health Improvement Act (Enrolled as Agreed to or Passed by Both House and Senate)**

### TITLE IV--CARDIAC ARREST SURVIVAL

#### Subtitle A--Recommendations for Federal Buildings

## SEC. 401. SHORT TITLE.

This subtitle may be cited as the `Cardiac Arrest Survival Act of 2000'.

## SEC. 402. FINDINGS.

Congress makes the following findings:

(1) Over 700 lives are lost every day to sudden cardiac arrest in the United States alone.

(2) Two out of every three sudden cardiac deaths occur before a victim can reach a hospital.

(3) More than 95 percent of these cardiac arrest victims will die, many because of lack of readily available life saving medical equipment.

(4) With current medical technology, up to 30 percent of cardiac arrest victims could be saved if victims had access to immediate medical response, including defibrillation and cardiopulmonary resuscitation.

(5) Once a victim has suffered a cardiac arrest, every minute that passes before returning the heart to a normal rhythm decreases the chance of survival by 10 percent.

(6) Most cardiac arrests are caused by abnormal heart rhythms called ventricular fibrillation. Ventricular fibrillation occurs when the heart's electrical system malfunctions, causing a chaotic rhythm that prevents the heart from pumping oxygen to the victim's brain and body.

(7) Communities that have implemented programs ensuring widespread public access to defibrillators, combined with appropriate training, maintenance, and coordination with local emergency medical systems, have dramatically improved the survival rates from cardiac arrest.

(8) Automated external defibrillator devices have been demonstrated to be safe and effective, even when used by lay people, since the devices are designed not to allow a user to administer a shock until after the device has analyzed a victim's heart rhythm and determined that an electric shock is required.

(9) Increasing public awareness regarding automated external defibrillator devices and encouraging their use in Federal buildings will greatly facilitate their adoption.

(10) Limiting the liability of Good Samaritans and acquirers of automated external defibrillator devices in emergency situations may encourage the use of automated external defibrillator devices, and result in saved lives.

## SEC. 403. RECOMMENDATIONS AND GUIDELINES OF SECRETARY OF HEALTH AND HUMAN SERVICES REGARDING AUTOMATED EXTERNAL DEFIBRILLATORS FOR FEDERAL BUILDINGS.

Part B of title II of the Public Health Service Act (42 U.S.C. 238 et seq.) is amended by adding at the end the following:

# `RECOMMENDATIONS AND GUIDELINES REGARDING AUTOMATED EXTERNAL DEFIBRILLATORS FOR FEDERAL BUILDINGS

`SEC. 247. (a) GUIDELINES ON PLACEMENT- The Secretary shall establish guidelines with respect to placing automated external defibrillator devices in Federal buildings. Such guidelines shall take into account the extent to which such devices may be used by lay persons, the typical number of employees and visitors in the buildings, the extent of the need for security measures regarding the buildings, buildings or portions of buildings in which there are special circumstances such as high electrical voltage or extreme heat or cold, and such other factors as the Secretary determines to be appropriate.

`(b) RELATED RECOMMENDATIONS- The Secretary shall publish in the Federal Register the recommendations of the Secretary on the appropriate implementation of the placement of automated external defibrillator devices under subsection (a), including procedures for the following:

`(1) Implementing appropriate training courses in the use of such devices, including the role of cardiopulmonary resuscitation.

`(2) Proper maintenance and testing of the devices.

`(3) Ensuring coordination with appropriate licensed professionals in the oversight of training of the devices.

`(4) Ensuring coordination with local emergency medical systems regarding the placement and incidents of use of the devices.

`(c) CONSULTATIONS; CONSIDERATION OF CERTAIN RECOMMENDATIONS- In

carrying out this section, the Secretary shall--

`(1) consult with appropriate public and private entities;

`(2) consider the recommendations of national and local public-health organizations for improving the survival rates of individuals who experience cardiac arrest in nonhospital settings by minimizing the time elapsing between the onset of cardiac arrest and the initial medical response, including defibrillation as necessary; and

`(3) consult with and counsel other Federal agencies where such devices are to be used.

`(d) DATE CERTAIN FOR ESTABLISHING GUIDELINES AND RECOMMENDATIONS- The Secretary shall comply with this section not later than 180 days after the date of the enactment of the Cardiac Arrest Survival Act of 2000.

`(e) DEFINITIONS- For purposes of this section:

`(1) The term `automated external defibrillator device' has the meaning given such term in section 248.

`(2) The term `Federal building' includes a building or portion of a building leased or rented by a Federal agency, and includes buildings on military installations of the United States.'.

## SEC. 404. GOOD SAMARITAN PROTECTIONS REGARDING EMERGENCY USE OF AUTOMATED EXTERNAL DEFIBRILLATORS.

Part B of title II of the Public Health Service Act, as amended by section 403, is amended by adding at the end the following:

# `LIABILITY REGARDING EMERGENCY USE OF AUTOMATED EXTERNAL DEFIBRILLATORS

`SEC. 248. (a) GOOD SAMARITAN PROTECTIONS REGARDING AEDS- Except as provided in subsection (b), any person who uses or attempts to use an automated external defibrillator device on a victim of a perceived medical emergency is immune from civil liability for any harm resulting from the use or attempted use of such device; and in addition, any person who acquired the device is immune from such liability, if the harm was not due to the failure of such acquirer of the device--

`(1) to notify local emergency response personnel or other appropriate entities of the most recent placement of the device within a reasonable period of time after the device was placed;

`(2) to properly maintain and test the device; or

`(3) to provide appropriate training in the use of the device to an employee or agent of the acquirer when the employee or agent was the person who used the device on the victim, except that such requirement of training does not apply if--

`(A) the employee or agent was not an employee or agent who would have been reasonably expected to use the device; or

`(B) the period of time elapsing between the engagement of the person as an employee or agent and the occurrence of the harm (or between the acquisition of the device and the occurrence of the harm, in any case in which the device was acquired after such engagement of the person) was not a reasonably sufficient period in which to provide the training.

`(b) INAPPLICABILITY OF IMMUNITY- Immunity under subsection (a) does not apply to a person if--

`(1) the harm involved was caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the victim who was harmed;

`(2) the person is a licensed or certified health professional who used the automated external defibrillator device while acting within the scope of the license or certification of the professional and within the scope of the employment or agency of the professional;

`(3) the person is a hospital, clinic, or other entity whose purpose is providing health care directly to patients, and the harm was caused by an employee or agent of the entity who used the device while acting within the scope of the employment or agency of the employee or agent; or

`(4) the person is an acquirer of the device who leased the device to a health care entity (or who otherwise provided the device to such entity for compensation without selling the device to the entity), and the harm was caused by an employee or agent of the entity who used the device while acting within the scope of the employment or agency of the employee or agent.

`(c) RULES OF CONSTRUCTION-

`(1) IN GENERAL- The following applies with respect to this section:

`(A) This section does not establish any cause of action, or require that an automated external defibrillator device be placed at any building or other location.

`(B) With respect to a class of persons for which this section provides immunity from civil liability, this section supersedes the law of a State only to the extent that the State has no statute or regulations that provide persons in such class with immunity for civil liability arising from the use by such persons of automated external defibrillator devices in emergency situations (within the meaning of the State law or regulation involved).

`(C) This section does not waive any protection from liability for Federal officers or employees under--

`(i) section 224; or

`(ii) sections 1346(b), 2672, and 2679 of title 28, United States Code, or under alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of title 28.

`(2) CIVIL ACTIONS UNDER FEDERAL LAW-

`(A) IN GENERAL- The applicability of subsections (a) and (b) includes applicability to any action for civil liability described in subsection (a) that arises under Federal law.

`(B) FEDERAL AREAS ADOPTING STATE LAW- If a geographic area is under Federal jurisdiction and is located within a State but out of the jurisdiction of the State, and if, pursuant to Federal law, the law of the State applies in such area regarding matters for which there is no applicable Federal law, then an action for civil liability described in subsection (a) that in such area arises under the law of the State is subject to subsections (a) through (c) in lieu of any related State law that would apply in such area in the absence of this subparagraph.

`(d) FEDERAL JURISDICTION- In any civil action arising under State law, the courts of the State involved have jurisdiction to apply the provisions of this section exclusive of the jurisdiction of the courts of the United States.

`(e) DEFINITIONS-

`(1) PERCEIVED MEDICAL EMERGENCY- For purposes of this section, the term `perceived medical emergency' means circumstances in which the behavior of an individual leads a reasonable person to believe that the individual is experiencing a life-threatening medical condition that requires an immediate medical response regarding the heart or other cardiopulmonary functioning of the individual.

`(2) OTHER DEFINITIONS- For purposes of this section:

`(A) The term `automated external defibrillator device' means a defibrillator device that--

`(i) is commercially distributed in accordance with the Federal Food, Drug, and Cosmetic Act;

`(ii) is capable of recognizing the presence or absence of ventricular fibrillation, and is capable of determining without intervention by the user of the device whether defibrillation should be performed;

`(iii) upon determining that defibrillation should be performed, is able to deliver an electrical shock to an individual; and

`(iv) in the case of a defibrillator device that may be operated in either an automated or a manual mode, is set to operate in the automated mode.

`(B)(i) The term `harm' includes physical, nonphysical, economic, and noneconomic losses.

`(ii) The term `economic loss' means any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities) to the extent recovery for such loss is allowed under applicable State law.

`(iii) The term `noneconomic losses' means losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium (other than loss of domestic service), hedonic damages, injury to reputation and all other nonpecuniary losses of any kind or nature.'.

**Subtitle B—Rural Access to Emergency Devices**

## SEC. 411. SHORT TITLE.

This subtitle may be cited as the `Rural Access to Emergency Devices Act' or the `Rural AED Act'.

## SEC. 412. FINDINGS.

Congress makes the following findings:

(1) Heart disease is the leading cause of death in the United States.

(2) The American Heart Association estimates that 250,000 Americans die from sudden cardiac arrest each year.

(3) A cardiac arrest victim's chance of survival drops 10 percent for every minute that passes before his or her heart is returned to normal rhythm.

(4) Because most cardiac arrest victims are initially in ventricular fibrillation, and the only treatment for ventricular fibrillation is defibrillation, prompt access to defibrillation to return the heart to normal rhythm is essential.

(5) Lifesaving technology, the automated external defibrillator, has been developed to allow trained lay rescuers to respond to cardiac arrest by using this simple device to shock the heart into normal rhythm.

(6) Those people who are likely to be first on the scene of a cardiac arrest situation in many communities, particularly smaller and rural communities, lack sufficient numbers of automated external defibrillators to respond to cardiac arrest in a timely manner.

(7) The American Heart Association estimates that more than 50,000 deaths could be prevented each year if defibrillators were more widely available to designated responders.

(8) Legislation should be enacted to encourage greater public access to automated external defibrillators in communities across the United States.

## SEC. 413. GRANTS.

(a) IN GENERAL- The Secretary of Health and Human Services, acting through the Rural Health Outreach Office of the Health Resources and Services Administration, shall award grants to community partnerships that meet the requirements of subsection (b) to enable such partnerships to purchase equipment and provide training as provided for in subsection (c).

(b) COMMUNITY PARTNERSHIPS- A community partnership meets the requirements of this subsection if such partnership--

   (1) is composed of local emergency response entities such as community training facilities, local emergency responders, fire and rescue departments, police, community hospitals, and local non-profit entities and for-profit entities concerned about cardiac arrest survival rates;

   (2) evaluates the local community emergency response times to assess whether they meet the standards established by national public health organizations such as the American Heart Association and the American Red Cross; and

   (3) submits to the Secretary of Health and Human Services an application at such time, in such manner, and containing such information as the Secretary may require.

(c) USE OF FUNDS- Amounts provided under a grant under this section shall be used--

   (1) to purchase automated external defibrillators that have been approved, or cleared for marketing, by the Food and Drug Administration; and

   (2) to provide defibrillator and basic life support training in automated external defibrillator usage through the American Heart Association, the American Red Cross, or other nationally recognized training courses.

(d) REPORT- Not later than 4 years after the date of the enactment of this Act, the Secretary of Health and Human Services shall prepare and submit to the appropriate committees of Congress a report containing data relating to whether the increased availability of defibrillators has affected survival rates in the communities in which grantees under this section operated. The procedures under which the Secretary obtains data and prepares the report under this subsection shall not impose an undue burden on program participants under this section.

(e) AUTHORIZATION OF APPROPRIATIONS- There is authorized to be appropriated $25,000,000 for fiscal years 2001 through 2003 to carry out this section.

## TITLE V--LUPUS RESEARCH AND CARE

## SEC. 501. SHORT TITLE.

This title may be cited as the `Lupus Research and Care Amendments of 2000'.

## SEC. 502. FINDINGS.

The Congress finds that--

## SEC. 413. GRANTS.

(a) IN GENERAL- The Secretary of Health and Human Services, acting through the Rural Health Outreach Office of the Health Resources and Services Administration, shall award grants to community partnerships that meet the requirements of subsection (b) to enable such partnerships to purchase equipment and provide training as provided for in subsection (c).

(b) COMMUNITY PARTNERSHIPS- A community partnership meets the requirements of this subsection if such partnership--

(1) is composed of local emergency response entities such as community training facilities, local emergency responders, fire and rescue departments, police, community hospitals, and local non-profit entities and for-profit entities concerned about cardiac arrest survival rates;

(2) evaluates the local community emergency response times to assess whether they meet the standards established by national public health organizations such as the American Heart Association and the American Red Cross; and

(3) submits to the Secretary of Health and Human Services an application at such time, in such manner, and containing such information as the Secretary may require.

(c) USE OF FUNDS- Amounts provided under a grant under this section shall be used--

(1) to purchase automated external defibrillators that have been approved, or cleared for marketing, by the Food and Drug Administration; and

(2) to provide defibrillator and basic life support training in automated external defibrillator usage through the American Heart Association, the American Red Cross, or other nationally recognized training courses.

(d) REPORT- Not later than 4 years after the date of the enactment of this Act, the Secretary of Health and Human Services shall prepare and submit to the appropriate committees of Congress a report containing data relating to whether the increased availability of defibrillators has affected survival rates in the communities in which grantees under this section operated. The procedures under which the Secretary obtains data and prepares the report under this subsection shall not impose an undue burden on program participants under this section.

(e) AUTHORIZATION OF APPROPRIATIONS- There is authorized to be appropriated $25,000,000 for fiscal years 2001 through 2003 to carry out this section.

### TITLE V--LUPUS RESEARCH AND CARE

## SEC. 501. SHORT TITLE.

This title may be cited as the `Lupus Research and Care Amendments of 2000'.

## SEC. 502. FINDINGS.

The Congress finds that--

(1) lupus is a serious, complex, inflammatory, autoimmune disease of particular concern to women;

(2) lupus affects women nine times more often than men;

(3) there are three main types of lupus: systemic lupus, a serious form of the disease that affects many parts of the body; discoid lupus, a form of the disease that affects mainly the skin; and drug-induced lupus caused by certain medications;

(4) lupus can be fatal if not detected and treated early;

(5) the disease can simultaneously affect various areas of the body, such as the skin, joints, kidneys, and brain, and can be difficult to diagnose because the symptoms of lupus are similar to those of many other diseases;

(6) lupus disproportionately affects African-American women, as the prevalence of the disease among such women is three times the prevalence among white women, and an estimated 1 in 250 African-American women between the ages of 15 and 65 develops the disease;

(7) it has been estimated that between 1,400,000 and 2,000,000 Americans have been diagnosed with the disease, and that many more have undiagnosed cases;

(8) current treatments for the disease can be effective, but may lead to damaging side effects;

(9) many victims of the disease suffer debilitating pain and fatigue, making it difficult to maintain employment and lead normal lives; and

(10) in fiscal year 1996, the amount allocated by the National Institutes of Health for research on lupus was $33,000,000, which is less than one-half of 1 percent of the budget for such Institutes.

### Subtitle A--Research on Lupus

---

| THIS SEARCH | THIS DOCUMENT | GO TO |
| --- | --- | --- |
| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

---

# The New England Journal of Medicine

©Copyright, 2000, by the Massachusetts Medical Society

VOLUME 343     OCTOBER 26, 2000     NUMBER 17



## OUTCOMES OF RAPID DEFIBRILLATION BY SECURITY OFFICERS AFTER CARDIAC ARREST IN CASINOS

TERENCE D. VALENZUELA, M.D., M.P.H., DENISE J. ROE, DR.P.H., GRAHAM NICHOL, M.D., M.P.H., LANI L. CLARK, B.S., DANIEL W. SPAITE, M.D., AND RICHARD G. HARDMAN, B.S.

### ABSTRACT

*Background* The use of automated external defibrillators by persons other than paramedics and emergency medical technicians is advocated by the American Heart Association and other organizations. However, there are few data on the outcomes when the devices are used by nonmedical personnel for out-of-hospital cardiac arrest.

*Methods* We studied a prospective series of cases of sudden cardiac arrest in casinos. Casino security officers were instructed in the use of automated external defibrillators. The locations where the defibrillators were stored in the casinos were chosen to make possible a target interval of three minutes or less from collapse to the first defibrillation. Our protocol called for a defibrillation first (if feasible), followed by manual cardiopulmonary resuscitation. The primary outcome was survival to discharge from the hospital.

*Results* Automated external defibrillators were used in 105 patients whose initial cardiac rhythm was ventricular fibrillation. Fifty-six of the patients (53 percent) survived to discharge from the hospital. Among the 90 patients whose collapse was witnessed (86 percent), the clinically relevant time intervals were a mean (±SD) of 3.5±2.9 minutes from collapse to attachment of the defibrillator, 4.4±2.9 minutes from collapse to the delivery of the first defibrillation shock, and 9.8±4.3 minutes from collapse to the arrival of the paramedics. The survival rate was 74 percent for those who received their first defibrillation no later than three minutes after a witnessed collapse and 49 percent for those who received their first defibrillation after more than three minutes.

*Conclusions* Rapid defibrillation by nonmedical personnel using an automated external defibrillator can improve survival after out-of-hospital cardiac arrest due to ventricular fibrillation. Intervals of no more than three minutes from collapse to defibrillation are necessary to achieve the highest survival rates. (N Engl J Med 2000;343:1206-9.)

©2000, Massachusetts Medical Society.

O UT-OF-HOSPITAL cardiac arrest is a major cause of death in the United States.[1,2] Studies of cardiac arrest in the nation's largest cities have shown dismal rates of survival to hospital discharge (less than 5 percent for cases of ventricular fibrillation in which the collapse is witnessed).[3,4] By contrast, some mid-sized urban areas with excellent emergency medical systems have achieved survival rates of 15 to 35 percent.[5,6] The majority of cases of out-of-hospital cardiac arrest arise from ventricular fibrillation.[7,8] Survival after out-of-hospital cardiac arrest due to ventricular fibrillation is determined primarily by the length of time from the onset of ventricular fibrillation to electrical defibrillation.[9] Therefore, early in the 1990s, the American Heart Association initiated a program to ensure public access to defibrillation and reduce the delay between collapse and electrical defibrillation.[10] The keys to reducing the interval from collapse to defibrillation are increasing the availability of automated external defibrillators and increasing the number of people trained to use them. We conducted a prospective, observational study of cardiac arrest in casinos to determine whether training casino security officers in electrical defibrillation and manual cardiopulmonary resuscitation would increase the rate of survival to discharge from the hospital after cardiac arrest.

## METHODS

### Subjects

We identified persons who had had cardiac arrest in casinos in Clark County, Nevada (in which Las Vegas, Henderson, and Laughlin are located); Lake Tahoe, Nevada; Philadelphia, Mississippi; and

From the Department of Emergency Medicine, College of Medicine (T.D.V., L.L.C., D.W.S.), and the Division of Epidemiology and Biostatistics, College of Public Health (D.J.R.), University of Arizona, Tucson; the Clinical Epidemiology Unit, Ottawa Civic Hospital, University of Ontario, Ottawa, Ont., Canada (G.N.); and the Clark County Fire Department, Las Vegas (R.G.H.). Address reprint requests to Dr. Valenzuela at the Department of Emergency Medicine, 1501 N. Campbell Ave., P.O.B. 245057, Tucson, AZ 85724-5057, or at terry.scmrc.arizona.edu.

Tunica, Mississippi. The subjects had cardiac arrest within the property of the casinos, including the common areas where gambling occurred and the hotel rooms. Subjects who met the inclusion criteria had been unconscious and unresponsive, had no palpable carotid pulse, and had no spontaneous respiration. Subjects less than nine years of age or weighing 36 kg or less were excluded, according to the specifications of the defibrillator manufacturers. Age and weight were estimated visually by security officers. Data on cases of cardiac arrest were collected consecutively from participating casinos.

### Training and Equipment of Responders

The security officers were required to have current American Heart Association basic-cardiopulmonary-resuscitation certification before training. Training was conducted by two of the investigators and lasted five to six hours. The curriculum consisted of the following: introduction to cardiac arrest and objectives of defibrillation training, basic anatomy and physiology of cardiac arrest, assessment of the patient, orientation to the automated external defibrillator, protocol for automated external defibrillation, small-group practice with the defibrillator, skills testing, written examination, and review. Two to three hours of the course consisted of hands-on practice and scenarios. The passing score for the written test was set at 75 percent.

An initial group of approximately 1350 security officers from 10 casinos was trained and equipped by March 1, 1997. Thereafter, security officers at casinos that requested participation in the program were trained as the time of the investigators allowed. All officers received the same course and testing. A prospectively set threshold for data analysis (100 cases of ventricular fibrillation) was reached on October 12, 1999. Data were collected from a total of 32 casinos over approximately 32 months.

The casinos were encouraged to place a sufficient number of defibrillators on their premises to meet a goal of no more than three minutes of elapsed time from collapse to defibrillation. Implementation of these recommendations was left to the management of the individual casinos. Casino security officers staged mock cardiac arrests at various locations to determine the length of time required to bring defibrillators to those locations from their storage places. The casinos were free to purchase any current-generation automated external defibrillator; several brands were in use by the end of the study.

### Protocol

Security officers remain in designated areas of the casinos at all times. An officer is always visible from any point in the public area of the casino. In addition, security cameras mounted in the ceiling randomly scan the public areas, and security personnel can focus on unusual events. In our study, when the officers were notified by radio of the presence of a "sick person," the nearest officer proceeded to the patient and assessed him or her for responsiveness, spontaneous respiration, and palpable carotid pulse. This officer initiated manual cardiopulmonary resuscitation if indicated. A second officer, who had also been informed by radio of the patient's location and who had prior knowledge of where the defibrillators were stored, brought the nearest defibrillator to the patient. The defibrillator was immediately attached and activated, and audible prompts (by a recorded voice) from the various devices were followed. Resuscitative efforts by the security officers continued until the patient regained pulse and spontaneous respiration or until the paramedics arrived.

### Collection of Data

Data from the participating casinos were provided to the study investigators by the Clark County Fire Department. The casinos outside Nevada are owned by corporations with headquarters in Las Vegas and also reported through the Clark County Fire Department. The following data were collected: the subject's name, address, Social Security number (for collection of follow-up data from survivors), and date of birth; the location of the arrest in the casino; whether the subject was receiving cardiopulmonary

resuscitation from either the first-responding security officer or from a bystander when the security officer equipped with a defibrillator arrived; and the presence or absence of a pulse, the subject's respiratory effort, and any change in level of consciousness at the time the subject left the casino with the paramedics. In addition, the security officers completed a one-page data form and an incident report specific to the casino.

The time of collapse and the time of initiation of manual cardiopulmonary resuscitation for witnessed arrests were obtained from security videos if the subject collapsed in a common area. If the cardiac arrest was witnessed in a hotel room, the security officer asked the witness or witnesses about the interval between the collapse and the call for help. The time of the call for help was documented on the officer's incident report.

The defibrillation times were recorded automatically by the defibrillator devices. Two types of devices were used. In the case of one type, each device's internal clock is synchronized when contact with the main computer is made to transmit data after an event or each month if the automated electrical defibrillator is not used. The computer's clock is synchronized daily with an atomic clock in Boulder, Colorado. For the other type of device, whose internal clock could not be synchronized remotely, the machine was reset every day to match the casino's security-center clock.

The defibrillators recorded a detailed sequence of events during resuscitation that provided tracings of the cardiac wave form with real clock times and, if the device had audio recording, an audio recording of the resuscitation effort. The time of arrival of the paramedics at the arrest scene was obtained from audio recordings, dispatch records, reports from the emergency medical service, and security videotapes. Data on the subjects' outcomes and their hospital course were obtained by the paramedics of the Clark County Fire Department from the hospitals to which the subjects were transported. Study data forms and electronic data from the defibrillators were collected from all participating casinos by the Clark County Fire Department and forwarded to investigators at the University of Arizona for review and analysis.

### Outcome Variables

The time of collapse, time of initiation of manual cardiopulmonary resuscitation, and time of first electrical defibrillation were used to calculate the predictor intervals from collapse to cardiopulmonary resuscitation and from collapse to defibrillation. The primary outcome variable was survival to discharge from the hospital. Consent for review of hospital records was obtained from surviving subjects and from family members of those who did not survive. The study was approved by the institutional review board of the University of Arizona.

### Statistical Analysis

Descriptive statistics such as proportions, means, and standard deviations were used to summarize the results. A sample size of 100 subjects with cardiac arrest due to ventricular fibrillation was prospectively established to ensure that the accuracy of the model of survival after cardiac arrest could be estimated with a standard error of no more than 5 percent. The rate of survival among subjects undergoing defibrillation no more than three minutes after collapse was compared with that among subjects undergoing defibrillation more than three minutes after collapse by a chi-square test, and the 95 percent confidence interval was computed for the difference between the rates of survival. Differences between the results for the subjects in our study and previously reported results for patients in Tucson, Arizona, and King County, Washington,[4] were examined with use of chi-square tests for categorical variables and Kruskal-Wallis tests for continuous variables. All P values are two-sided.

## RESULTS

The demographic characteristics of the subjects and the intervals from collapse to various interventions are shown in Table 1. The sample contained 148 subjects

The New England Journal of Medicine

TABLE 1. CHARACTERISTICS OF SUBJECTS
WITH CARDIAC ARREST IN CASINOS.*

| CHARACTERISTIC | ALL CARDIAC ARRESTS (N=148) | WITNESSED ARRESTS WITH AN INITIAL RHYTHM OF VENTRICULAR FIBRILLATION (N=90) |
|---|---|---|
| Age — yr | 64±12 | 65±11 |
| Male sex — % | 80 | 84 |
| CPR administered before arrival of defibrillator — no. (%) | 63 (43) | 49 (54) |
| Interval from collapse to CPR — min | —† | 2.9±2.8 |
| Initial rhythm of ventricular fibrillation — no. (%) | 105 (71) | 90 (100) |
| Interval from collapse to attachment of defibrillator — min | —† | 3.5±2.9 |
| Interval from collapse to first defibrillation — min | —† | 4.4±2.9 |
| Interval from collapse to arrival of paramedics — min | —† | 9.8±4.3 |
| Survival to discharge from hospital — no. (%) | 56 (38) | 53 (59) |

*Plus–minus values are means ±SD. CPR denotes cardiopulmonary resuscitation.

†Intervals from collapse to intervention could not be calculated for unwitnessed arrests.

with confirmed cardiac arrest. None of them were children, and therefore no cases were excluded because of the age and weight criteria. One hundred five subjects had an initial cardiac rhythm of ventricular fibrillation, 17 had pulseless electrical activity, and 26 had asystole. No subjects whose initial cardiac rhythm was not ventricular fibrillation survived to discharge from the hospital. Of the 148 subjects in the total group, 17 (11 percent) were pronounced dead at the scene, 60 (41 percent) were pronounced dead in the hospital emergency department, 15 (10 percent) were admitted to the hospital and died before discharge, and 56 (38 percent) survived to discharge from the hospital.

Ventricular fibrillation accounted for 105 of the 148 cases (71 percent). Fifteen subjects who had ventricular fibrillation collapsed unobserved; three of them survived to hospital discharge (20 percent). Of the 105 patients with ventricular fibrillation, 4 (4 percent) were pronounced dead at the scene, 35 (33 percent) were pronounced dead in the hospital emergency department, 10 (10 percent) were admitted to the hospital and died before discharge, and 56 (53 percent) survived to discharge from the hospital.

We performed subgroup analysis on data from the 90 subjects with witnessed cardiac arrest due to ventricular fibrillation. They were predominantly male (84 percent), with a mean (±SD) age of 65±11 years. The demographic characteristics of this subgroup did not differ significantly from those of the entire group of subjects. Fifty-four percent of the subjects with wit-

nessed arrests received cardiopulmonary resuscitation before the arrival of the guard with the defibrillator: 61 percent of them from security officers, 16 percent from strangers, 14 percent from family members, and 8 percent from friends or coworkers. The mean intervals from collapse to various interventions were 2.9±2.8 minutes for cardiopulmonary resuscitation, 3.5±2.9 minutes for attachment of the defibrillator, 4.4±2.9 minutes for the first defibrillation shock, and 9.8±4.3 minutes for arrival of the paramedics. Fifty-three of those with witnessed cardiac arrest due to ventricular fibrillation (59 percent) survived to discharge from the hospital; those who did not survive died at the casino (2 percent), in the emergency department of the hospital (29 percent), or after hospital admission (10 percent). Among subjects whose collapse was witnessed, the survival rate was 74 percent (26 of 35) for those who received their first defibrillation no later than three minutes after collapse and 49 percent (27 of 55) for those who received their first defibrillation more than three minutes after collapse. This difference (25 percentage points) was statistically significant (P=0.02), with a 95 percent confidence interval of 5.6 to 44.8 percentage points.

## DISCUSSION

The work of White and others demonstrated that people without other medical training could successfully resuscitate victims of out-of-hospital cardiac arrest due to ventricular fibrillation.[11,12] Investigators subsequently advocated strategies to shorten the delay from collapse to electrical defibrillation by training and equipping for defibrillation new classes of responders with a variety of backgrounds.[13] Device manufacturers responded to the American Heart Association's public-access defibrillation initiative by producing automated external defibrillators that are simpler and less expensive and that require less maintenance than previous portable defibrillators.

The challenge for the future is to decide where defibrillators should be available, place them there, and train appropriate groups of people to use them. Some airlines have already placed defibrillators on their aircraft and trained their attendants to use them.[14-16]

On the basis of their experience with cardiac arrests in casinos, officers of the Clark County Fire Department reasoned that casino security officers, whose job involves rapid response to emergencies but who have not previously received medical training other than basic cardiopulmonary resuscitation, would be ideal candidates for training in a rapid-defibrillation program. Our objective was to determine whether these officers could successfully resuscitate victims of cardiac arrest due to ventricular fibrillation through the use of automated external defibrillators. The survival rates achieved in this project were very high for persons with out-of-hospital cardiac arrest due to ventricular fibrillation.

What accounts for the apparent success of this project, and what are the implications for so-called public-access defibrillation? First, the majority of all arrests in this study occurred in the public areas of the casinos, not in the guests' rooms, and therefore were visible to security officers and video cameras. Studies of traditional emergency-medical-services systems indicate that less than 20 percent of cardiac arrests occur in public places.[17] The arrests in the casinos were therefore more frequently witnessed and recognized than those in other studies, and treatment was initiated sooner. Cardiac arrests are not likely to be detected as quickly in sites such as apartment buildings or gated communities, where residents do not spend extended periods in public areas. Second, the response intervals in the casinos were shorter than those reported with traditional emergency-response systems. The intervals from collapse to cardiopulmonary resuscitation were significantly shorter for the arrests that occurred in casinos (2.9 minutes) than for those that occurred in Tucson, Arizona (4.7 minutes), and King County, Washington (3.4 minutes), as were the intervals from collapse to defibrillation (4.4 minutes in the casinos, 5.1 minutes in King County, and 9.5 minutes in Tucson).[9]

These results have implications for the Public Access Defibrillation Study funded by the National Heart, Lung, and Blood Institute, a prospective, randomized study of rapid defibrillation by nonmedical providers. Survival rates in study sites where collapse-to-defibrillation intervals are not consistently in the range of three to four minutes may not be much higher than those with the best traditional emergency-medical-services systems; still, the results from these sites may be an improvement over those of emergency-medical-services systems with prolonged response times. Casinos also have an unusually high density of cardiac arrests in their public areas, in comparison with other types of public places.[18]

The limitations of this study include the lack of access to data on cardiac arrests that occurred in casinos other than the participating casinos during the study period. At the time the study was undertaken, uncertainty about potential legal liability limited the group of casinos willing to risk participation. A rolling implementation strategy, such as we used, was the only feasible option. In addition, there was no formal neurologic testing in survivors. However, the disposition of the subjects sheds light on their neurologic function at discharge. At the end of the study, no survivor was dependent on others for daily support. Therefore, it is unlikely that any survivor could be classified in cerebral-performance categories higher than 1 (good cerebral performance) or 2 (moderate cerebral disability) on the widely used Cerebral Performance scale.[19]

Our study has shown that rapid defibrillation by casino security officers is both feasible and effective; it also demonstrates that, to increase the survival rates over those obtained with standard emergency-services systems, the interval between collapse and the first defibrillation must be short.

*We are indebted to the Clark County Fire Department, whose officers conceived the project; to the participating casinos, which had the courage to implement this program when their potential liability was unclear; to the medical directors of the casinos who, without financial compensation, provided the local medical oversight necessary for the project; and to Medtronic-PhysioControl for supplying the study computers.*

## REFERENCES

1. Engelstein ED, Zipes DP. Sudden cardiac death. In: Alexander RW, Schlant RC, Fuster V, eds. Hurst's the heart, arteries and veins. 9th ed. Vol. 1. New York: McGraw-Hill, 1998:1081-112.

2. Myerburg RJ, Castellanos A. Cardiac arrest and sudden cardiac death. In: Braunwald E, ed. Heart disease: a textbook of cardiovascular medicine. 5th ed. Philadelphia: W.B. Saunders, 1997:742-79.

3. Becker LB, Ostrander MP, Barrett J, Kondos GT. Outcome of CPR in a large metropolitan area — where are the survivors? Ann Emerg Med 1991;20:355-61.

4. Gallagher EJ, Lombardi G, Gennis P. Effectiveness of bystander cardiopulmonary resuscitation and survival following out-of-hospital cardiac arrest. JAMA 1995;274:1922-5.

5. Eisenberg MS, Horwood BT, Cummins RO, Reynolds-Haertle R, Hearne TR. Cardiac arrest and resuscitation: a tale of 29 cities. Ann Emerg Med 1990;19:179-86.

6. Valenzuela TD, Spaite DW, Meislin HW, Clark LL, Wright AL, Ewy GA. Case and survival definitions in out-of-hospital cardiac arrest: effect on survival rate calculation. JAMA 1992;267:272-4.

7. Eisenberg MS. The problem of sudden cardiac death. In: Eisenberg MS, Bergner L, Hallstrom AP, eds. Sudden cardiac death in the community. New York: Praeger, 1995:1-16.

8. Becker LB. The epidemiology of sudden death. In: Paradis NA, Halperin HR, Nowak RM, eds. Cardiac arrest: the science and practice of resuscitation medicine. Baltimore: Williams & Wilkins, 1996:28-47.

9. Valenzuela TD, Roe DJ, Cretin S, Spaite DW, Larsen MP. Estimating effectiveness of cardiac arrest interventions: a logistic regression survival model. Circulation 1997;96:3308-13.

10. Weisfeldt ML, Kerber RE, McGoldrick RP, et al. American Heart Association report on the Public Access Defibrillation Conference December 8-10, 1994. Circulation 1995;92:2740-7.

11. White RD, Hankins DG, Bugliosi TF. Seven years' experience with early defibrillation by police and paramedics in an emergency medical services system. Resuscitation 1998;39:145-51.

12. Mosesso VN Jr, Davis EA, Auble TE, Paris PM, Yealy DM. Use of automated external defibrillators by police officers for treatment of out-of-hospital cardiac arrest. Ann Emerg Med 1998;32:200-7.

13. Nichol G, Hallstrom AP, Kerber R, et al. American Heart Association report on the Second Public Access Defibrillation Conference, April 17-19, 1997. Circulation 1998;97:1309-14.

14. O'Rourke MF, Donaldson E, Geddes JS. An airline cardiac arrest program. Circulation 1997;96:2849-53.

15. Page RL, Hamdan MH, McKenas DK. Defibrillation aboard a commercial aircraft. Circulation 1998;97:1429-30.

16. Page RL, Joglar JA, Kowal RC, et al. Use of automated external defibrillators by a U.S. airline. N Engl J Med 2000;343:1210-6.

17. Becker L, Eisenberg M, Fahrenbruch C, Cobb L. Public locations of cardiac arrest: implications for public access defibrillation. Circulation 1998;97:2106-9.

18. Gratton M, Lindholm DJ, Campbell JP. Public-access defibrillation: where do we place the AEDs? Prehosp Emerg Care 1999;3:303-5.

19. Safar P, Bircher NG. Cardiopulmonary cerebral resuscitation: basic and advanced cardiac and trauma life support: an introduction to resuscitation medicine. 3rd ed. London: W.B. Saunders, 1988.





# Circulation

(*Circulation*. 1999;100:1703-1707.)
© 1999 American Heart Association, Inc.

**Clinical Investigation and Reports**

## Comparison of Naive Sixth-Grade Children With Trained Professionals in the Use of an Automated External Defibrillator

John W. Gundry, MD; Keith A. Comess, MD;
Frances A. DeRook, MD; Dawn Jorgenson, PhD;
Gust H. Bardy, MD

From the Division of Cardiology, Department of Medicine, University of Washington, Seattle, Wash.

Correspondence to Gust H. Bardy, MD, Box 356422, University of Washington Medical Center, Seattle, WA 98195-6422. E-mail gbardy@u.washington.edu

▶  ## Abstract

*Background*—Survival after out-of-hospital cardiac arrest (OHCA) is strongly influenced by time to defibrillation. Wider availability of automated external defibrillators (AEDs) may decrease response times but only with increased lay

▸ Abstract of this Article (ғʀᴇᴇ)
▸ **Reprint (PDF) Version of this Article**
▸ Email this article to a friend
▸ Similar articles found in:
   Circulation Online
   PubMed
▸ PubMed Citation
▸ This Article has been cited by:
   other online articles
▸ Search Medline for articles by:
   Gundry, J. W. ‖ Bardy, G. H.
▸ Alert me when:
   new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
   **Health policy and outcome research**
   **Arrhythmias, clinical electrophysiology, drugs**
   **CPR and emergency cardiac care**

▲ **Top**
• **Abstract**
▼ **Introduction**
▼ **Methods**