use. Consequently, this study endeavored to improve our understanding of AED use in naive users by measuring times to shock and appropriateness of pad location. We chose sixth-grade students to simulate an extreme circumstance of unfamiliarity with the problem of OHCA and defibrillation. The children's AED use was then compared with that of professionals.

▼ **Results**
▼ **Discussion**
▼ **References**

*Methods and Results*—With the use of a mock cardiac arrest scenario, AED use by 15 children was compared with that of 22 emergency medical technicians (EMTs) or paramedics. The primary end point was time from entry onto the cardiac arrest scene to delivery of the shock into simulated ventricular fibrillation. The secondary end point was appropriateness of pad placement. All subject performances were videotaped to assess safety of use and compliance with AED prompts to remain clear of the mannequin during shock delivery. Mean time to defibrillation was $90\pm14$ seconds (range, 69 to 111 seconds) for the children and $67\pm10$ seconds (range, 50 to 87 seconds) for the EMTs/paramedics ($P<0.0001$). Electrode pad placement was appropriate for all subjects. All remained clear of the "patient" during shock delivery.

*Conclusions*—During mock cardiac arrest, the speed of AED use by untrained children is only modestly slower than that of professionals. The difference between the groups is surprisingly small, considering the naïveté of the children as untutored first-time users. These findings suggest that widespread use of AEDs will require only modest training.

**Key Words:** defibrillation • fibrillation • death, sudden • cardiopulmonary resuscitation

# ▶  Introduction

▲ **Top**
▲ **Abstract**
• **Introduction**
▼ **Methods**
▼ **Results**
▼ **Discussion**
▼ **References**

Sudden cardiac death (SCD) is the leading cause of death in the United States, accounting for >350 000 cases annually.[1] The vast majority of SCD cases are due to ventricular fibrillation (VF).[2] Survival to hospital discharge after out-of-hospital cardiac arrest (OHCA) remains poor, generally only in the 5% to 20% range, from the best of emergency response centers.[3] The most effective intervention for VF is rapid defibrillation. This intervention is significantly more important to survival than cardiopulmonary resuscitation[4] and is the reason that American Heart Association guidelines were rewritten to support the use of defibrillatory shocks before basic life support in a cardiac arrest.[5] In certain environments, survival rates can approach 80% to 100% when defibrillation is achieved within the first few minutes of a cardiac arrest.[6][7] Despite efforts to bolster emergency medical care by broadening training in defibrillation to include, in addition to paramedics, emergency medical technicians, response times for OHCA remain unacceptably long.

The development of automated external defibrillators (AEDs) in the early 1980s made possible the use of defibrillation by individuals other than paramedics and hospital personnel.[8] Further

technological developments in the 1990s have made these devices more portable and simpler to use. With these improvements and the recognition of time to defibrillation as 1 of the most critical, if not the most important, factors in clinical outcome, AED use by laypersons has developed widespread support.[2] More widespread use of AEDs may significantly affect response times for OHCA and therefore survival. In large measure, wider availability of AEDs means that lay users will increase in number. Consequently, this study endeavored to improve our understanding of how well lay users will use AEDs by measuring use times and appropriateness of pad location in a controlled fashion. Naive users, sixth-grade students, were chosen to simulate an extreme circumstance for purposes of comparison with trained professional users.

## ▶  Methods

### Subject Recruitment and Selection

The study was approved by the University of Washington Human Subjects Review Committee. Informed consent was obtained from each subject before the test was conducted (parental permission was obtained for the schoolchildren). Subjects were recruited by obtaining permission first from their respective training supervisors/teacher. They were required to have at least a sixth-grade reading level and no physical limitations (eg, visual or hearing handicaps or relative immobility) that would preclude the efficient use of an AED.

▲ Top
▲ Abstract
▲ Introduction
• Methods
▼ Results
▼ Discussion
▼ References

The 15 sixth-grade schoolchildren were selected from a single class at St Joseph Catholic School (Seattle, Wash). The entire class was recruited, but only 15 children received parental consent to participate. None of them had prior basic life support training or experience with an AED. None of the children was prompted or prepared in any way by the investigators before the study. The 22 emergency medical technicians (EMTs) or paramedics were chosen from the Kitsap County Fire Department (Bremerton, Wash). Each EMT or paramedic had extensive clinical training and experience managing a wide array of medical emergencies, including cardiac arrest. Every 6 months, each EMT or paramedic had been given a 2 1/2-hour formal workshop on AED use and its application to clinical scenarios.

### Equipment
#### AED

The AED (Hewlett-Packard Heartstream ForeRunner AED) delivers 150-J biphasic truncated exponential waveform shocks that adjust waveform shape according to chest impedance. The device measures 6x22x20 cm and weighs 2 kg. Disposable, self-adhesive defibrillation pads with integrated cable and connector are supplied with the device. Diagrams on the pads illustrate placement in an anterior-anterior (lead II) position (Figure 1 ⊞). Optional PC cards include the training card TC1, which places the AED in a scenario-based training mode and disables the energy delivery system. Each subject was assured of this safety feature before beginning the test. After the device was turned on and the pads were properly positioned and connected to the device, an internal protocol evaluated the patient's ECG and signal quality to determine whether a

shock was appropriate. Connection impedance for proper defibrillation pad contact was also evaluated. Voice prompts guided the user through the necessary steps (Figure 2⯐), and abbreviated text prompts were displayed on the screen.



**Figure 1.** AED with electrode pads and connector.

**View larger version (76K):**
[in this window]
[in a new window]



**Figure 2.** Sequence of AED voice prompts during mock cardiac arrest.

**View larger version (25K):**
[in this window]
[in a new window]

**Mannequin**

The mannequin (Laerdal ResusciAnne) is widely used by the AHA for instructional purposes during advanced cardiac life support (ACLS) courses. The mannequin was fully dressed to better portray a cardiac arrest situation and to provide a natural barrier to the placement of electrode pads. Copper stripping was arranged in a grid on this mannequin to allow the AED to calculate patient impedance when electrode pads were placed during a training scenario. Voice prompts then told the subject if pads were making appropriate skin contact.

**Video and Photography Materials**

A Sony portable video recorder and videotape of sufficient quantity to record 5 minutes documented each subject's performance. A Polaroid instant camera photographed electrode pad

applications and position.

**Protocol**

The subjects were informed that their performance would be evaluated in a mock cardiac arrest resuscitation on a mannequin. As part of this evaluation, the subjects were told they would be videotaped. Each subject was tested individually and could not view another's performance. The importance of speed was emphasized to each subject before the test. The only instruction given to the schoolchildren was verbal directions as to the identity of the electrode pads and the necessity of peeling them from their packaging and placing them on the mannequin's chest. (In earlier tests, lay users proved unfamiliar with the word "pads" and how to peel the cover off.) The EMTs/paramedics were not given any such instruction about the electrode pads.

The test began when the subject was handed the AED with instructions that in an adjoining room a mannequin was lying on the floor, representing an unresponsive, pulseless person. The AED was packaged in a soft case with the zipper shut. The device was kept in its usual standby mode at the beginning of the test, ie, battery inserted. Present in the testing room was a physician certified in ACLS and AED use. The physician's role was to observe the performance of the subject and give feedback after the resuscitation test was completed. A fully dressed mannequin lay supine on the floor. A video camera and operator stood at 1 corner of the room. The steps observed in performing resuscitation to first shock included (1) opening the soft case, (2) turning on the AED with a press of a single button, (3) attaching the electrode pad connector to AED, (4) applying the electrode pads to the patient, (5) safely staying clear of the mannequin while charging, and (6) administering the shock (press of a single button) when instructed by the AED.

The subjects were not permitted to ask questions during the test, and no guidance or clues were provided by the researchers. After each subject's completion of the test, the physician-observer took a photograph of the electrode pad positioning. This physician then reviewed the videotape material to determine the time from beginning the test to delivering a shock. (The AED is designed to give an audible sound when the shock is delivered during the cardiac arrest scenario.) A separate physician, also certified in ACLS and AED use, independently reviewed the videotape of each mock resuscitation. This physician was not present during the training or testing process. Proper completion of each step was verified and recorded by the reviewer.

Performance of the step involving the application of pads to the patient received particular attention. Evaluation of this step was based primarily on the application of pads that would achieve an effective current vector through the left ventricle.[10][11][12][13] For practical purposes, this involves placement in an anterior-apical position (right infraclavicular–left lateral chest wall) as diagrammed on the electrode pads provided in the AED package and shown in Figure 1⊞. An accepted range for pad positioning was diagrammed on a custom-made plastic sheet designed to consistently fit the mannequin chest wall. Subject pad application (as determined from the photograph) was compared with this range as part of the performance evaluation. The relation between subject pad positioning and the accepted range was recorded by the physician-observer (see the Data Analysis section). The accepted range for the right infraclavicular pad involves the

following: cephalad border, 3 cm above the clavicle; lateral border, midaxillary line; medial border, 3 cm left of the midsternum; and caudal border, costal margin. The accepted range for the apical pad involves the following: cephalad border, top of the axilla; lateral border, midaxillary line; medial border, 2 cm right of the midsternum; and caudal border, 4 cm below the costal margin. Admittedly, these border designations are somewhat arbitrary. They are created, however, in accordance with the idea of achieving an effective current vector. Subjects were graded in a pass/fail format for this step. Criteria for passing were for all the following to be met: (1) clothing separated from mannequin chest wall before pad placement, (2) each pad placed within the accepted range (as defined above), (3) pads separated by $\geq 2$ cm from each other, and (4) each pad interfaced by $\geq 50\%$ with the mannequin chest wall.

### Data Analysis
#### Primary End Point

The primary end point in this study, time to first shock from entry into the room of the mock cardiac arrest scenario, was chosen to represent the most crucial factor in determining survival in a cardiac arrest victim. Previous studies have suggested that a large benefit in survival from OHCA is achieved with a reduction in time to defibrillation rates of >3 minutes. A much smaller survival benefit is seen when response times differ by just 1 minute.[14] Differences in time to defibrillation rates of $\leq 15$ seconds have not been proven to result in significant differences in survival. By use of a $t$ test and 95% CIs, the mean response time of the children was compared with that achieved by the EMT/paramedic group. The sample size was selected to show a 15-second difference in AED use times ($P=0.05$, power=0.80), assuming that the AED use time for the EMT/paramedic group would be $80 \pm 15$ seconds (from preliminary tests). This design required $\geq 15$ subjects for each group.

#### Secondary End Points

Secondary end points were chosen to assess the effectiveness of the resuscitation effort. Proper pad positioning (as outlined above) was determined in a pass/fail format and compared in a proportional manner between groups. Procedure safety was assessed by observing whether the subject stayed clear of the mannequin when instructed, ie, during device charging and shock delivery.

## ▶    Results

### Time to Defibrillation

Time from beginning the scenario to delivering the AED shock is summarized in the Table⊞. Mean time to defibrillation was $90 \pm 14$ seconds (range, 69 to 111 seconds) for the sixth-grade schoolchildren and $67 \pm 10$ seconds (range, 50 to 87 seconds) for the EMT/paramedics ($P<0.0001$). The difference in mean values between the children and EMT/paramedics was 23 seconds, with a 95% CI of the difference from 15 to 31 seconds.

▲ Top
▲ Abstract
▲ Introduction
▲ Methods
• Results
▼ Discussion
▼ References

**View this table:**    **Table 1.** Time From Start of Resuscitation Scenario to AED Shock
[in this window]
[in a new window]

**Electrode Pad Positioning and Safety**
Electrode pad positioning was determined to be adequate for all schoolchildren and all
EMT/paramedics. All subjects in each group stayed effectively clear of the mannequin during the
process of device charging and shock delivery.

# ▶    Discussion

**Technological Developments in AEDs**

| ▲ Top |
|---|
| ▲ Abstract |
| ▲ Introduction |
| ▲ Methods |
| ▲ Results |
| • Discussion |
| ▼ References |

AEDs were first developed in the late 1970s[8] and became available for clinical
use in the early 1980s.[15] The AED identifies VF in cardiac arrest victims and
provides the means to deliver defibrillation shocks. The operator is neither
required to make judgments regarding the cardiac rhythm nor required to
acknowledge the need for defibrillatory shocks. Recent advances have enhanced the ease of use
of AEDs, including instructional verbal prompts, simplified displays, and icons to help in proper
pad placement. An emphasis on human-factors design has simplified the steps that the user must
perform. In addition, application of more effective low-energy biphasic waveforms to these
devices as a means of energy delivery has significantly reduced their size and enhanced their
portable nature. The clinical utility of biphasic waveform use in victims of OHCA has been well
demonstrated.[16] [17] [18] More efficient use of energy by biphasic waveform AEDs leads to smaller
capacitors and batteries. This contributes to the significantly smaller overall size of the newest
AEDs.

The impetus for support of the broader use of AEDs derives from observations that the single
most important factor determining outcome from cardiac arrest is time to defibrillation. Providing
defibrillation to a cardiac arrest victim improves survival by ≈10%/min during the first 10
minutes of the arrest.[14] Use of AEDs by trained EMTs has shown to improve survival from
OHCA.[9] Likewise, use of AEDs in OHCA by police officers has significantly improved response
times and yielded survival rates as high as 58%.[4] The successful use of AEDs by persons with
minimal training or by nonprofessionals has now been applied also to the casino and airline
industries.[7] [16] [17] [19]

Undoubtedly, many public arenas exist in which response times by trained medical personnel
may be unacceptably long. The AHA estimates that broader use of AEDs by first-line responders
could avert 20 000 to 100 000 deaths per year.[20] Economic analysis has suggested that the cost
per life saved from OHCA by emergency medical systems that provide EMTs with defibrillation
training may be less than $5000, a value well below that addressing other major causes of
death.[21]

**Previous Studies Examining AED Use With Trained Laypersons**

Unfortunately, few studies have addressed the training needs or requirements surrounding the use of these devices by lay individuals or non-EMT/paramedic personnel. One study examined the use of AEDs on mannequins by family members of cardiac arrest survivors.[22] All but 2 of 34 individuals were trained to deliver the first defibrillatory shock within 2 minutes in a mock cardiac arrest situation. Significant worsening of speed and quality of performance was observed on retesting after 6 weeks. The variable most highly correlated with skill decline was age. Decreases in performance may have related to the protocol used in the study, which preceded current guidelines for cardiopulmonary resuscitation (CPR); subjects were required to perform CPR before the first defibrillatory shock and between each successive shock. Furthermore, the device used for the study (Heart Aid, model 80, Cardiac Resuscitator Corp) was significantly larger than the most recent AEDs and lacks verbal prompts and simplified visual displays. In another study, volunteers were trained in a 2-hour class to operate an AED and perform CPR.[23] Retesting at 1 year showed that the volunteers were satisfactorily able to remember how to operate the device although the time required to deliver a shock was greater.

More recently, use of AEDs by student nurses trained in CPR was studied.[24] With a simplified and updated protocol (instructions initially for 3 successive defibrillatory shocks) and use of a somewhat newer-generation AED (Laerdal Heartstart 3000), these individuals were trained to deliver a first shock within 60 seconds. Subtle loss of speed and skill was seen after 1 week and 1 month, but training reinforcement led to a retention of the initial recorded speed and skill after 3 and 6 months. However, this AED did not include the more instructive verbal prompts and visual displays that many modern AEDs use. In another study, lay users were successfully trained to deliver shocks from an AED during an AHA HeartSaver course.[25] Time to first shock increased from 70 to 83 seconds when retention was tested 2 to 4 months later.

**Study Implications**

The studies referenced above involved laypersons who were given comprehensive instruction and training before AED use. From a public-access defibrillation standpoint, perhaps a more pertinent issue is whether individuals with minimal or no training can safely and effectively use these devices. No prior study has examined this question, nor has any prior study compared AED use by laypersons to a reference standard, in this case, EMTs and paramedics. This study demonstrated that the speed of AED use by essentially untrained sixth-grade schoolchildren was very good and only modestly slower than that of individuals whose job it is to resuscitate victims from cardiac arrest. Performance quality, specifically electrode pad application, was similar in both groups. All test subjects stayed effectively clear of the mannequin during device charging and shock delivery. In general, these findings suggest that training requirements will not significantly limit more widespread use of AEDs.

The principal obstacle to actual use of the AED appeared to be identifying and understanding the term "pads." Questionnaires distributed after the tests suggest that many laypersons do not have an initial intuitive understanding of electrode pad identity or function. Some children expected paddles as portrayed in movies or on television to be inside the case. This information may be

helpful in the design of future equipment in which the identity of the electrode pads is clearly marked and the need to peel them from their packaging is clearly stated.

Despite some of these difficulties, most subjects responding to the posttest questionnaire found the AED to be relatively straightforward to use. Having completed the drill, all children but 1 agreed that they could teach use of this AED to someone else, and all believed that they would use the AED on a family member if the situation arose. For the EMTs/paramedics, 96% found AED use in this drill to be easier than performing CPR.

Finally, despite the very limited instruction, there were no safety concerns. None of the users touched the pads or the mannequin during mock shock delivery. Thus, given appropriate AED commands, modern AEDs can be used safely.

### Study Limitations

The subjects chosen for this study were not selected at random. Therefore, this selection process may introduce some bias. Despite this limitation, they represent an extreme of the uninitiated lay user. Another limitation is subject motivation. It is difficult to imagine the anxiety induced by a real cardiac arrest. A mock cardiac arrest scenario cannot simulate OHCA in all its variations. Nevertheless, the importance of speed was emphasized to each subject before the test. Considering the general premise of this study, it seems intuitive that the group performance would likely remain similar albeit somewhat longer for the children.

### Conclusions

In conclusion, AEDs have developed concurrently with our understanding of time to defibrillation as a crucial factor determining outcome from cardiac arrest. Historically, the complexity and size of AEDs dictated that they could be used only by trained medical professionals. Recent technological developments and emphasis on human-factors design have made these devices much more portable and straightforward to use. These factors have supported the notion of a broader use of AEDs, including laypersons. In this study, statistically significant reductions in defibrillation times were seen with EMTs/paramedics versus untrained lay subjects. The absolute differences between groups, however, were small and may be of little clinical relevance. Furthermore, lay subjects demonstrated proficient electrode placement and safety precautions with the AED system used. These findings suggest that use of this AED by untrained laypersons may be feasible and that complex and time-consuming training programs may not be necessary. The utility of a simplified training program may be in helping a user perform under the pressure and anxiety of an actual emergency rather than learning a complex operational task. One might suggest that even a child can do it.

## ▶ Acknowledgments

We thank the children and their parents of the sixth-grade class from St Joseph Catholic School, Seattle, Wash, for participating in this trial. We also thank the EMTs and paramedics from the

Kitsap County Fire Department, Bremerton, Wash, for taking the time from their busy schedules to help advance our understanding of AED use. Finally, we thank Hewlett Packard, Inc, for loaning the resuscitation mannequin, AED, and electrode pads to the investigators of this study.

Received April 1, 1999; revision received June 27, 1999; accepted July 2, 1999.

# ▶ References

▲ Top
▲ Abstract
▲ Introduction
▲ Methods
▲ Results
▲ Discussion
• References

1.  Gillum RF. Sudden coronary death in the United States. *Circulation.* 1989;79:756–765.[Abstract]
2.  Weaver DW. Considerations for improving survival from out-of-hospital cardiac arrest. *Ann Emerg Med.* 1986;15:1181–1186.[Medline]
3.  Moss AJ. Sudden cardiac death and national health. *Pacing Clin Electrophysiol.* 1993;16:2190–2191.[Medline]
4.  White RD, Asplin BR, Bugliosi TF, Hankins DG. High discharge survival rate after out-of-hospital ventricular fibrillation with rapid defibrillation by police and paramedics. *Ann Emerg Med.* 1996;28:480–485.[Medline]
5.  Guidelines for cardiopulmonary resuscitation and emergency cardiac care. *JAMA.* 1992;268:2171–2298.[Medline]
6.  Hossack KF, Harwig R. Cardiac arrest associated with supervised cardiac rehabilitation. *J Cardiac Rehab.* 1982;2:402–408.
7.  Valenzula TD, Bjerke HS, Clark LL, Hardman R, Spait DW, Nichol G. Rapid defibrillation by nontraditional responders: the casino project. *Soc Acad Emerg Med.* 1998;127:414. Abstract.
8.  Diack AW, Welborn S, Rullman RG, Walter CW, Wayne MA. An automatic cardiac resuscitator for emergency treatment of cardiac arrest. *Med Instrument.* 1979;13:78–83.
9.  Cummins RO, Thies W. Encouraging early defibrillation: the American Heart Association and automatic external defibrillators. *Ann Emerg Med.* 1990;19:1245–1248.[Medline]
10. Ewy GA. Influence of paddle-electrode location and size on success of cardioversion. *N Engl J Med.* 1982;306:174–175.[Medline]
11. Jorgenson DB, Haynor DR, Bardy GH, Kim Y. Computational studies of transthoracic and transvenous defibrillation in a detailed 3-D human thorax model. *IEEE Trans Biomed Eng.* 1995;42:172–184.[Medline]
12. Jorgenson DB, Schimpf PH, Shen I, Johnson G, Bardy GH, Haynor DR, Kim Y. Predicting cardiothoracic voltages during high energy shocks: methodology and comparison of experimental to finite element model data. *IEEE Trans Biomed Eng.* 1995;42:359–371.
13. Murai T, Kagawa Y. Electrical impedance computed tomography based on a finite element model. *IEEE Trans Biomed Eng.* 1985;32:177–184.[Medline]
14. Eisenberg MS, Horwood BT, Cummins RO, Reynolds-Haertle R, Hearne TR. Cardiac arrest and resuscitation: a tale of 29 cities. *Ann Emerg Med.* 1990;19:179–186.[Medline]
15. Weaver DW, Copass MK, Hill DL, Fahrenbruch C, Hallstrom AP, Cobb LA. Cardiac arrest treated with a new automatic external defibrillator by out-of-hospital first responders. *Am J Cardiol.* 1986;57:1017–1021.[Medline]
16. Poole JE, White RD, Kanz KG, Hengstenberg F, Jarrard GT, Robinson JC, Santana V, McKenas DK, Rich N, Rosas S, Merritt S, Magnotto L, Gallagher J, Gliner BE, Jorgensen DB, Morgan CB, Dillon SM, Kronmal RA, Bardy GH, for the LIFE Investigators. Low-energy impedance-compensating biphasic waveforms terminate ventricular fibrillation at high rates in victims of out-of-hospital cardiac arrest. *J Cardiovasc Electrophysiol.*

1997;8:1373–1385.[Medline]

17. Gliner BE, Jorgensen DB, Poole JE, White RD, Kanz KG, Lyster TD, Leyde KW, Powers DJ, Morgan CB, Kronmal RA, Bardy GH, for the LIFE Investigators. Treatment of out-of-hospital cardiac arrest with a low-energy impedance-compensating biphasic waveform automatic external defibrillator. *Biomed Instrum Technol.* 1998;32:631–644.[Medline]

18. Cummins RO, Hazinski MF, Kerber RE, Kudenchuk PJ, Becker L, Nichol G, Malanga B, Aufderheide TP, Stapleton EM, Kern K, Ornato JP, Sanders A, Valenzuela T, Eisenberg M. Low-energy biphasic waveform defibrillation: evidence-based review applied to emergency cardiovascular care guidelines. *Circulation.* 1998;97:1654–1667. [Free Full Text]

19. Page RL, Hamden MH, McKenas DK. Defibrillation aboard a commercial aircraft. *Circulation.* 1998;97:1429–1430.[Free Full Text]

20. *Expanded Access to Defibrillation: Legislative Advocacy Guide.* Dallas, Tex: American Heart Association; 1996.

21. Ornato JP, Craren EJ, Gonzalez ER, Garnett AR, McClung BK, Newman MM. Cost-effectiveness of defibrillation by emergency medical technicians. *Am J Emerg Med.* 1988;6:108–112.[Medline]

22. Moore JE, Eisenberg MS, Cummins RO, Hallstrom A, Litwin P, Carter W. Layperson use of automatic external defibrillation. *Ann Emerg Med.* 1987;16:669–672.[Medline]

23. Cummins RO, Schubach JA, Litwin PE, Hearne TR. Training laypersons to use automatic external defibrillators: success of initial training and one-year retention of skills. *Am J Emerg Med.* 1989;7:143–149.[Medline]

24. McKee DR, Wynne G, Evans TR. Student nurses can defibrillate within 90 seconds: an evaluation of a training program for third year student nurses in the use of an automatic external defibrillator. *Resuscitation.* 1994;27:35–37.[Medline]

25. Cummins RO, Doherty A, Hein K, Damon S, Doherty D, Jerin J, Stiehr D. Teaching citizens to use an AED during the AHA HeartSaver course: active vs passive learning and long-term retention of skills. *Circulation.* 1997;96(suppl I):I-365. Abstract.

## This article has been cited by other articles:



**The New England Journal of Medicine**                                    ▸ HOME

S. L. Caffrey, P. J. Willoughby, P. E. Pepe, and L. B. Becker
**Public Use of Automated External Defibrillators**
N. Engl. J. Med., October 17, 2002; 347(16): 1242 - 1247.
[Abstract] [Full Text] [PDF]



**CMAJ**                                                                    ▸ HOME

M. Shuster and W. Clark
**Implementing public-access programs for automated external defibrillation**
Can. Med. Assoc. J., June 1, 2000; 162(13): 1804 - 1805.
[Full Text]

**JOURNAL WATCH** [GENERAL]                                                ▸ HOME

**Automated External Defibrillators Are Easy to Use**
Journal Watch (General), October 29, 1999; 1999(1029): 1 - 1.

 [Full Text]

 JOURNAL WATCH EMERGENCY MEDICINE                    ▸HOME

**Sixth-Graders Can Operate a Defibrillator Without Any Training**
Journal Watch Emergency Medicine, December 1, 1999; 1999(1201): 24 - 24.
[Full Text]

 The New England Journal of Medicine                  ▸HOME

R. M. Robertson
**Sudden Death from Cardiac Arrest -- Improving the Odds**
N. Engl. J. Med., October 26, 2000; 343(17): 1259 - 1260.
[Full Text]

 Circulation                                        ▸HOME

H. Domanovits, G. Meron, and F. Sterz
**Comparison of Naive Sixth-Grade Children With Trained Professionals in the Use of an Automated External Defibrillator**
Circulation, November 14, 2000; 102(20): e166 - 166.
[Full Text] [PDF]

---

▸ Abstract of this Article (FREE)
▸ Reprint (PDF) Version of this Article
▸ Email this article to a friend
▸ Similar articles found in:
   · Circulation Online
     PubMed
▸ PubMed Citation
▸ This Article has been cited by:
▸ Search Medline for articles by:
     Gundry, J. W. | Bardy, G. H.
▸ Alert me when:
     new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
     **Health policy and outcome research**
     **Arrhythmias, clinical electrophysiology, drugs**
     **CPR and emergency cardiac care**

2/11/2003



# Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiac Care

Recommendations of the 1992 National Conference

 American Heart Association

 The Journal of the American Medical Association



**Chain of Survival**

EARLY
ACCESS

EARLY
CPR

EARLY
DEFIBRILLATION

EARLY
ADVANCED CARE

Reprinted from *The Journal of the American Medical Association*, October 28, 1992, Volume 268, Number 16, Pages 2171-2302. © 1992, American Medical Association

# Part III

# Adult Advanced Cardiac Life Support

ADVANCED cardiac life support (ACLS) includes the knowledge and skills necessary to provide the appropriate early treatment for cardiopulmonary arrest. Additional important areas of impact are the proper management of situations likely to lead to cardiac arrest and the stabilization of the patient in the early period following a successful resuscitation. ACLS includes (1) basic life support (BLS); (2) the use of adjunctive equipment and special techniques for establishing and maintaining effective ventilation and circulation; (3) electrocardiographic (ECG) monitoring and arrhythmia recognition; (4) establishment and maintenance of intravenous (IV) access; (5) therapies for emergency treatment of patients with cardiac or respiratory arrests (including stabilization in the postarrest phase); and (6) treatment of patients with suspected acute myocardial infarction (MI). ACLS includes the ability to perform these skills and the knowledge, training, and judgment about when and how to use them.

As many communities as possible should provide complete ACLS. Every community should continually strive to provide as many ACLS functions as possible, in particular early defibrillation and noninvasive airway support.

BLS and ACLS should be integrated into a community as part of an emergency care system. This system should have enough laypersons trained in BLS to ensure immediate ventilatory and circulatory assistance to any arrest victim and immediate entry of that victim into the emergency medical services (EMS) system. In turn, the emergency care system, under medical supervision, should provide rescue personnel adequately trained in BLS and ACLS to respond promptly when summoned.[1] ACLS must be continued either until the patient has been admitted to a medical facility capable of continuing care or until life support efforts have been terminated by the responsible physician's order or by a properly executed advance directive.

The same level of training, commitment, and medical supervision should be applied to in-hospital ACLS.

## BLS AND EARLY DEFIBRILLATION

Community and in-hospital ACLS must be supported by a well-established BLS program that provides immediate emergency cardiopulmonary resuscitation (CPR) capability. The 1992 national conference strongly endorsed the principle of early defibrillation, which states that all personnel whose jobs require that they perform basic CPR be trained to operate and permitted to use defibrillators, particularly automated external defibrillators (AEDs).

In respiratory arrest, airway adjuncts and ventilation devices should be readily available. In cardiac arrest, the need for early defibrillation is clear and should have the highest priority. Today with the availability of automated external defibrillators, defibrillation can be considered part of BLS. Except for defibrillation, adjunctive equipment should not divert attention or effort from basic resuscitative measures. Rescue personnel should know the indications for and techniques of using adjunctive equipment. Such equipment should

be tested periodically according to prescribed regulations, and adequate records of such tests maintained.

## ADJUNCTS FOR OXYGENATION, VENTILATION, AND AIRWAY CONTROL

### Oxygenation Devices

Supplemental oxygen should be used during cardiopulmonary emergencies as soon as it is available. Rescue breathing (ventilation using exhaled air) will deliver about 16% to 17% oxygen to the patient, ideally producing an alveolar oxygen tension of 80 mm Hg. Hypoxemia occurs because of underlying respiratory disease or low cardiac output (and resultant wide arteriovenous oxygen difference) and the presence of intrapulmonary shunting and ventilation-perfusion abnormalities. In turn, hypoxemia leads to anaerobic metabolism and metabolic acidosis, which can frequently blunt the beneficial effects of chemical and electric therapy. Thus, it is recommended that 100% inspired oxygen ($FIO_2$=1.0) be used during BLS and ACLS.

Supplemental oxygen reduces both the magnitude and the extent of ST-segment changes on the ECG in patients with acute MI.[3] For patients with chronic obstructive lung disease and carbon dioxide retention, lower inspired oxygen flow rates may be necessary (eg, 1 to 2 L/min). However, oxygen should not be withheld for fear of suppressing respiration if hypoxemia is suspected or if significant respiratory distress is present. The rescuer should be prepared to provide assisted ventilation if necessary.

### Ventilatory Devices

Some ventilatory devices are difficult to classify within the effectiveness classification scheme (see p 2174) because clinical research has not yet produced sufficient information.

Masks.—A well-fitting mask can be an effective, simple adjunct for use in artificial ventilation by appropriately trained rescuers.[5] Masks should be made of transparent material to allow detection of regurgitation; capable of a tight fit on the face, with an oxygen (insufflation) inlet of a standard 15-mm/22-mm coupling size; and available in one average size for adults with additional sizes for infants and children. Masks equipped with a one-way valve that diverts the victim's exhaled gas are recommended for mouth-to-mask ventilation. Mouth-to-mask has been shown to be superior to bag-valve-mask devices in delivering adequate tidal volumes on manikins.[4,5] Unfortunately studies in humans are lacking. These devices are not to be confused with face shield devices, which do not have an exhalation port. The efficacy of face shields has not been compared with that of other devices, and at this time face shields should be considered Class IIb (acceptable, possibly helpful). Such devices are for BLS only.

An adequate seal is best achieved with a mouth-to-mask device when the rescuer is positioned at the top of the patient's head. The rescuer ventilates the victim by sealing his or her lips around the coupling adapter of the mask. Both



# AHA/ACSM Scientific Statement

# Recommendations for Cardiovascular Screening, Staffing, and Emergency Policies at Health/Fitness Facilities

Writing Group

Gary J. Balady, MD, Chair; Bernard Chaitman, MD; David Driscoll, MD; Carl Foster, PhD; Erika Froelicher, PhD; Neil Gordon, MD; Russell Pate, PhD; James Rippe, MD; Terry Bazzarre, PhD

The message from the nation's scientists is clear, unequivocal, and unified: physical inactivity is a risk factor for cardiovascular disease,[1,2] and its prevalence is an important public health issue. New scientific knowledge based on epidemiological observational studies, cohort studies, controlled trials, and basic research has led to an unprecedented focus on physical activity and exercise. The promotion of physical activity is at the top of our national public health agenda, as seen in the publication of the 1996 report of the US Surgeon General on physical activity and health.[3]

The attention now being given to physical activity supports the goals of Healthy People 2000[4] and should lead to increased levels of regular physical activity throughout the US population, including the nearly one fourth of adult Americans who have some form of cardiovascular disease.[5] Although regular exercise reduces subsequent cardiovascular morbidity and mortality,[1,2,6] the incidence of a cardiovascular event during exercise in patients with cardiac disease is estimated to be 10 times that of otherwise healthy persons.[7] Adequate screening and evaluation are important to identify and counsel persons with underlying cardiovascular disease before they begin exercising at moderate to vigorous levels.

Moderate (or higher) levels of physical activity and exercise are achieved in a number of settings, including >15 000 health/fitness facilities across the country. A recent survey of 110 health/fitness facilities in Massachusetts found that efforts to screen new members at enrollment were limited and inconsistent.[8] Nearly 40% of responding facilities stated that they do not routinely use a screening interview or questionnaire to evaluate new members for symptoms or history of cardiovascular disease, and 10% stated that they conducted no initial cardiovascular health history screening at all.

This statement provides recommendations for *cardiovascular screening* of all persons (children, adolescents, and

"Recommendations for Cardiovascular Screening, Staffing, and Emergency Policies at Health/Fitness Facilities" was approved by the American Heart Association Science Advisory and Coordinating Committee in March 1998.

This statement is being published simultaneously in *Medicine and Science in Sports and Exercise.*

A single reprint is available by calling 800-242-8721 (US only) or writing the American Heart Association, Public Information, 7272 Greenville Avenue, Dallas, TX 75231-4596. Ask for reprint No. 71-0140. To purchase additional reprints: up to 999 copies, call 800-611-6083 (US only) or fax 413-665-2671; 1000 or more copies, call 214-706-1466, fax 214-691-6342, or E-mail pubauth@smhrt.org. To make photocopies for personal or educational use, call the Copyright Clearance Center, 508-750-8400.

(*Circulation.* 1998;97:2283-2293.)

© 1998 American Heart Association, Inc and American College of Sports Medicine.

adults) before enrollment or participation in activities at health/fitness facilities. Staff qualifications and emergency policies related to cardiovascular safety are also discussed. Health/fitness facilities are defined here as organizations that offer health and fitness programs as their primary or secondary service or that promote high-intensity recreational physical activity (eg, basketball, tennis, racquetball, and swim clubs). Ideally such facilities have a professional staff, but those that provide space and equipment only (eg, unsupervised hotel exercise rooms) are also included. A health/fitness facility user is defined as a dues-paying member or a guest paying a regular daily fee to use the facility specifically to exercise. These recommendations are intended to assist health/fitness facility staff, healthcare providers, and consumers in the promotion and performance of safe and effective physical activity/exercise.

The writing group based these recommendations on a review of the literature and the consensus of the group. Earlier statements from the American Heart Association (AHA) and the American College of Sports Medicine (ACSM) are highlighted and supplemented. These recommendations were peer reviewed by selected authorities in the field representing the AHA, the ACSM, the American College of Cardiology, the International Health Racquet and Sports Clubs Association (IHRSA), and the Young Men's Christian Association. The recommendations are not mandatory or all-encompassing, nor do they limit provision of individualized care by practitioners exercising independent judgment. With this statement the AHA and the ACSM assume no responsibility toward any individual for whom this statement may be applied in the provision of individualized care. Specific details about exercise testing and training of persons with and without cardiovascular disease and those with other health problems are provided elsewhere.[7,9-11] The ACSM has published comprehensive guidelines for operating health/fitness facilities.[12] Although issues in competitive sports are beyond the scope of this statement, the 26th Bethesda Conference[13] on sudden cardiac death in competitive athletes and the AHA[14] provide specific recommendations for the screening and evaluation of athletes for congenital heart disease, systemic hypertension, and other cardiovascular diseases before participation in competitive sports.

## Cardiovascular Screening

### Rationale

Regular exercise results in increased exercise capacity and physical fitness, which can lead to many health benefits. Persons who are physically active appear to have lower rates of all-cause mortality, probably because of a decrease in

occurrence of chronic illnesses, including coronary heart disease. This benefit may be the result of an improvement in cardiovascular risk factors in addition to enhanced fibrinolysis, improved endothelial function, decreased sympathetic tone, and other as yet undetermined factors.[1] Regular endurance exercise leads to favorable alterations in the cardiovascular, musculoskeletal, and neurohumoral systems. The result is a training effect, which allows an individual to do increasing amounts of work while lowering the heart rate and blood pressure response to submaximal exercise. Such an effect is particularly desirable in patients with coronary artery disease because it allows increased activity with less ischemia.[1]

The Centers for Disease Control and Prevention,[2] the ACSM,[2] and the AHA[11] recommend that every American participate in at least moderate-intensity physical activity for ≥30 minutes on most, if not all, days of the week. Unfortunately, many Americans are sedentary or perform too little physical activity; only 22% of adult Americans engage in regular exercise ≥5 times a week.[3] The prevalence of physical inactivity is higher among culturally diverse segments of the US population, low-income groups, the elderly, and women.[3] It is important for healthcare providers to educate the public about the benefits of physical activity and to encourage more leisure-time exercise, particularly for those who are underactive. Consumers should seek information about safe and effective ways to increase physical activity and initiate and maintain a regular program of exercise.

Efforts to promote physical activity will result in an increasing number of persons with and without heart disease joining the >20 million persons who already exercise at health/fitness facilities.[15] Current market research indicates that 50% of health/fitness facility members are older than 35 years, and the fastest-growing segments of users are those older than 55 and those aged 35 to 54.[15] With increased physical activity, more people with symptoms of or known cardiovascular disease will face the cardiovascular stress of physical activity and possible risk of a cardiac event. More than one fourth of all Americans have some form of cardiovascular disease.[3] The prevalence of coronary heart disease for American adults aged 20 years and older is 7.2% in the general population, 7.5% for non-Hispanic whites, 6.9% for non-Hispanic blacks, and 5.6% for Mexican Americans.[3] The prevalence of myocardial infarction in older Americans aged 65 to 69 is 18.0% and 9.7% for men and women, respectively.[3]

Moderately strenuous physical exertion may trigger ischemic cardiac events, particularly among persons not accustomed to regular physical activity and exercise. Siscovick et al[16] examined the incidence of primary cardiac arrest in men aged 25 to 75 years after excluding those with a history of clinically recognized heart disease. Although the risk was significantly increased during high-intensity exercise, the likelihood for primary cardiac arrest during such activity in a clinically healthy population was estimated at 0.55 events/10 000 men per year. Maron et al[17] studied causes of sudden death in competitive athletes. In persons younger than 35 years, 48% of deaths were due to hypertrophic cardiomyopathy. Coronary artery anomalies, idiopathic left ventricular

hypertrophy, and coronary heart disease each accounted for 10% to 20% of deaths. In those over 35, coronary artery disease accounted for approximately 80% of all deaths. *Overall, the absolute incidence of death during exercise in the general population is low.*[18-20] *Each year approximately 0.75 and 0.13/100 000 young male and female athletes*[20] *and 6/100 000 middle-aged men die during exertion.*[17] No estimates are available for middle-aged women or the elderly.

Cardiovascular events other than death during exercise have also been studied. Data from the Framingham Heart Study indicate that the baseline risk of myocardial infarction in a 50-year-old man who is a nonsmoker and does not have diabetes is approximately 1% per year, or approximately 1 chance per million per hour.[21] Heavy exertion (≥6 METs [metabolic equivalents]) within 1 hour of symptomatic onset of acute myocardial infarction has been reported in 4.4% to 7.1% of patients.[22,23] The adjusted relative risk is significantly greater in persons who do not participate in regular physical activity, with an approximate 3-fold increase in risk during the morning hours. The relation of physical activity to acute myocardial infarction in the thrombolytic era was examined among 3339 patients in the TIMI II trial,[24] where moderate or marked physical activity preceded myocardial infarction in 18.7% of patients.

Van Camp et al[25] reported the incidence of major cardiovascular complications in 167 randomly selected cardiac rehabilitation programs that provided supervised exercise training to 51 000 patients with known cardiovascular disease. The incidence of myocardial infarction was 1/294 000 person-hours; the incidence of death was 1/784 000 person-hours.

## Screening Prospective Members/Users

*All facilities offering exercise equipment or services should conduct cardiovascular screening of all new members and/or prospective users.* The primary purpose of preparticipation screening is to identify both those not known to be at risk and those known to be at risk for a cardiovascular event during exercise. Recent evidence suggests that screening by health/fitness facilities is done only sporadically.[8] In Canada, evidence from the Canadian Home Fitness Test and its screening instrument, the Physical Activity Readiness Questionnaire (PAR-Q), suggests that even simple screening questionnaires can effectively identify many persons at high risk and increase the safety of nonsupervised exercise.[26] Current knowledge of the relation between identifiable risk factors, the incidence of cardiovascular disease, and the triggering factors for acute myocardial infarction suggests that screening is both reasonable and prudent.

The cost-effectiveness of preparticipation screening is an important consideration. Exercise testing is comparatively expensive. The incidence of false-positive findings when testing asymptomatic persons[27] and the need to follow up abnormal results can lead to subsequent and more costly procedures. A thorough and mandatory screening process that might prove optimally sensitive in detecting occult cardiovascular disease might be so prohibitive to participation that fewer persons would engage in a fitness program. Such a result would be counterproductive to the goal of maximizing

Balady et al    June 9, 1998    *2285*

**TABLE 1.  Revised Physical Activity Readiness Questionnaire (PAR-Q)**

| Yes | No | |
|-----|-----|---|
| ___ | ___ | 1. Has a doctor ever said that you have a heart condition and recommended only medically supervised activity? |
| ___ | ___ | 2. Do you have chest pain brought on by physical activity? |
| ___ | ___ | 3. Have you developed chest pain in the past month? |
| ___ | ___ | 4. Have you on 1 or more occasions lost consciousness or fallen over as a result of dizziness? |
| ___ | ___ | 5. Do you have a bone or joint problem that could be aggravated by the proposed physical activity? |
| ___ | ___ | 6. Has a doctor ever recommended medication for your blood pressure or a heart condition? |
| ___ | ___ | 7. Are you aware, through your own experience or a doctor's advice, of any other physical reason that would prohibit you from exercising without medical supervision? |

If you answered "yes" to any of these questions, call your personal physician or healthcare provider before increasing your physical activity.
Adapted from Shephard et al[26] and Thomas et al.[28]

physical activity. Because most of the health benefits of exercise accrue at moderate levels of intensity,[2] where the risks are probably low, recommendations that would inhibit large numbers of persons from participating in exercise programs are not justified. Preparticipation screening should identify persons at high risk and should be simple and easy to perform. Public health efforts should focus on increasing the use of preparticipation screening.

Two practical tools for preparticipation screening are likely to have an effect on identifying high-risk individuals without inhibiting their participation in exercise programs. The PAR-Q[28] (Table 1) is a self-administered questionnaire that focuses primarily on symptoms that might suggest angina pectoris. Participants are directed to contact their personal physician if they answer "yes" to 1 or more questions. The PAR-Q also identifies musculoskeletal problems that should be evaluated before participation since these might involve modification of the exercise program. The questionnaire is designed to be completed when the participant registers at a health/fitness facility. In unsupervised fitness facilities (eg, hotel fitness centers), the PAR-Q can be self-administered by means of signs prominently displayed at the main entry into the facility. Although less satisfactory than documenting the results of screening, use of signs and similar visual methods are a minimal recommendation for encouraging prospective users to assess their health risks while exercising at any facility.

Another simple, self-administered device that aims to identify high-risk individuals without negatively impacting participation is a questionnaire patterned after one developed by the Wisconsin Affiliate of the American Heart Association[29] (Table 2). The 1-page form is slightly more complex than the PAR-Q and uses history, symptoms, and risk factors (including age) to direct prospective members to either

participate in an exercise program or contact their physician (or appropriate healthcare provider) before participation. Persons at higher risk are directed to seek facilities providing appropriate levels of staff supervision. The questionnaire can be administered within a few minutes on the same form participants use to join or register at the facility. It identifies potentially high-risk participants, documents the results of screening, educates the consumer, and encourages and fosters appropriate use of the healthcare system. In addition, it can guide staff qualifications and requirements. This instrument is also simple enough to be adapted for use as self-screening signs posted in nonstaffed facilities.

Health appraisal questionnaires should preferably be interpreted by qualified staff (see next section for criteria) who can limit the number of unnecessary referrals for preparticipation medical evaluation, avoiding undue expense and barriers to participation.

In view of the potential legal risk assumed by operators of health/fitness facilities, it is recommended that all facilities providing staff supervision document the results of screening. Screening, particularly for participants for whom a medical evaluation is recommended, requires time, personnel, and financial resources. Individual facilities can determine the most cost-effective way to conduct and document preparticipation screening.

Every effort should be made to educate all prospective new members about the importance of obtaining a health appraisal and—*if indicated*—medical evaluation/recommendation before beginning exercise testing/training. The potential risks inherent in not obtaining an appraisal should also be emphasized. Without an appraisal, it is impossible to determine whether a person may be at significant risk of severe bodily harm or death by participating in an exercise program. The same is true of persons who undergo a health appraisal, are identified as having symptoms of or known cardiovascular disease, and refuse or neglect to obtain the recommended medical evaluation yet seek admission to a health/fitness facility program. *Because of safety concerns, persons with known cardiovascular disease who do not obtain recommended medical evaluations and those who fail to complete the health appraisal questionnaire upon request may be excluded from participation in a health/fitness facility exercise program to the extent permitted by law.*

Persons without symptoms or a known history of cardiovascular disease who do not obtain the recommended medical evaluation after completing a health appraisal should be required to sign an assumption of risk or release/waiver. Both of these forms may be legally recognized in the jurisdiction where the facility is located. When appropriate guidelines are followed, it is likely that the potential benefits of physical activity will outweigh the risks. *Persons without symptoms or a known history of cardiovascular disease who do not obtain recommended medical evaluations or sign a release/waiver upon request may be excluded from participation in a health/fitness facility exercise program to the extent permitted by law. Persons who do not obtain an evaluation but who sign a release/waiver may be permitted to participate.* However, they should be encouraged to participate in only moderate-

**TABLE 2.  AHA/ACSM Health/Fitness Facility Preparticipation Screening Questionnaire**

Assess your health needs by marking all *true* statements.

**History**

You have had:

_____ a heart attack
_____ heart surgery
_____ cardiac catheterization
_____ coronary angioplasty (PTCA)
_____ pacemaker/implantable cardiac
         defibrillator/rhytm disturbance
_____ heart valve disease
_____ heart failure
_____ heart transplantation
_____ congenital heart disease

*If you marked any of the statements in this section, consult your healthcare provider before engaging in exercise. You may need to use a facility with a medically qualified staff.*

**Symptoms**

_____ You experience chest discomfort with exertion.

_____ You experience unreasonable breathlessness.

_____ You experience dizziness, fainting, blackouts.

_____ You take heart medications.

**Other health issues:**

_____ You have musculoskeletal problems.

_____ You have concerns about the safety of exercise.

_____ You take prescription medication(s).

_____ You are pregnant.

**Cardiovascular risk factors**

_____ You are a man older than 45 years.

_____ You are a woman older than 55 years or you have had a hysterectomy or you are postmenopausal.

_____ You smoke.

_____ Your blood pressure is >140/90.

_____ You don't know your blood pressure.

_____ You take blood pressure medication.

_____ Your blood cholesterol level is >240 mg/dL.

_____ You don't know your cholesterol level.

_____ You have a close blood relative who had a heart attack before age 55 (father or brother) or age 65 (mother or sister).

_____ You are diabetic or take medicine to control your blood sugar.

_____ You are physically inactive (ie, you get <30 minutes of physical activity on at least 3 days per week).

_____ You are >20 pounds overweight.

*If you marked 2 or more of the statements in this section, consult your healthcare provider before engaging in exercise. You might benefit by using a facility with a professionally qualified exercise staff to guide your exercise program.*

_____ None of the above is true.

*You should be able to exercise safely without consulting your healthcare provider in almost any facility that meets your exercise program needs.*

AHA/ACSM indicates American Heart Association/American College of Sports Medicine.

or lower-intensity physical activities and counseled about warning symptoms and signs of an impending cardiovascular event.

The major objectives of preparticipation cardiovascular screening are to identify persons with known cardiovascular disease, symptoms of cardiovascular disease, and/or risk factors for disease development who should receive a medical evaluation/recommendation before starting an exercise program or undergoing exercise testing. Screening also identifies persons with known cardiovascular disease who should not participate in an exercise program or who should participate at least initially in a medically supervised program, as well as persons with other special needs.[7,12]

Screening also serves another purpose. One of the trends in cardiac rehabilitation is to "mainstream" low-risk, clinically stable patients to community facilities rather than specialized, often costly cardiac programs. Facility directors should expect that an increasing percentage of their participants will have health histories that warrant supervision of exercise programs by professional staff.

When a medical evaluation/recommendation is advised or required, written and active communication with the individual's personal physician (or healthcare provider) is strongly recommended. The sample letter and medical release form in Tables 3A and 3B can be used or modified for such purposes.

Balady et al    June 9, 1998    *2287*

**TABLE 3A.  Sample Physician Referral Form***

Dear Dr. _____:

Your patient (name of patient) would like to begin a program of exercise and/or sports activity at (name of health/fitness facility). After reviewing his/her responses to our cardiovascular screening questionnaire, we would appreciate your medical opinion and recommendations concerning his/her participation in exercise/sports activity. Please provide the following information and return this form to (name, address, telephone, fax of health/fitness facility contact):

1. Are there specific concerns or conditions our staff should be aware of before this individual engages in exercise/sports activity at our facility?    Yes/No
   If yes, please specify: _____

2. If this individual has completed an exercise test, please provide the following:
   a. Date of test _____
   b. A copy of the final exercise test report and interpretation
   c. Your specific recommendations for exercise training, including heart rate limits during exercise: _____

3. Please provide the following information so that we may contact you if we have any further questions:
   _____ I AGREE to the participation of this individual in exercise/sports activity at your health/fitness facility.
   _____ I DO NOT AGREE that this individual is a candidate to exercise at your health/fitness facility because _____

Physician's signature _____

Physician's name _____

Address _____

Telephone _____    Fax _____

Thank you for your help.

*Must be accompanied by a medical release form.

## Characteristics of Participants

Intensity of physical activity is measured through endurance- or strength-type exercise as defined in Table 4. Health appraisal questionnaires should be used before exercise test-ing and/or training to initially classify participants by risk for triage and preliminary decision making (Table 5), namely, apparently healthy persons (Class A-1); persons at increased risk (Classes A-2 and A-3); and persons with known cardio-

**TABLE 3B.  Sample Authorization for Release of Medical Information**

1. I hereby authorize _____ to release the following information from the medical record of _____

Patient's name _____

Address _____

Telephone _____

Date of birth _____

2. Information to be released:

(If specific treatment dates are not indicated, information from the most recent visit will be released.)

_____ Exercise test                     _____ Most recent history and physical exam
_____ Most recent clinic visit          _____ Consultations
_____ Laboratory results (specify) _____
_____ Other (specify) _____

3. Information to be released to:

Name of person/organization _____

Address _____

Telephone _____

4. Purpose of disclosure information _____

5. I do not give permission for disclosure or redisclosure of this information other than that specified above.

6. I request that this consent become invalid 90 days from the date I sign it or _____ .
   I understand that this consent can be revoked at any time except to the extent that disclosure made in good faith has already occurred in reliance of this consent.

7. Patient's signature _____

   Date _____

   Witness _____

   (Please print)

   Signature _____

TABLE 4.    Classification of Physical Activity Intensity[3]

| | Endurance-Type Activity | | | | | | | | Strength-Type Exercise |
|---|---|---|---|---|---|---|---|---|---|
| | Relative Intensity | | | Absolute Intensity (METs) in Healthy Adults (age in years) | | | | | Relative Intensity* |
| Intensity | VO₂ max (%) Heart Rate Reserve (%) | Maximum Heart Rate (%) | RPE† | Young (20–39) | Middle-aged (40–64) | Old (65–79) | Very old (80+) | RPE | Maximum Voluntary Contraction (%) |
| Very light | <25 | <30 | <9 | <3.0 | <2.5 | <2.0 | ≤1.25 | <10 | <30 |
| Light | 25–44 | 30–49 | 9–10 | 3.0–4.7 | 2.5–4.4 | 2.0–3.5 | 1.26–2.2 | 10–11 | 30–49 |
| Moderate | 45–59 | 50–69 | 11–12 | 4.8–7.1 | 4.5–5.9 | 3.6–4.7 | 2.3–2.95 | 12–13 | 50–69 |
| Hard | 60–84 | 70–89 | 13–16 | 7.2–10.1 | 6.0–8.4 | 4.8–6.7 | 3.0–4.25 | 14–16 | 70–84 |
| Very hard | ≥85 | ≥90 | >16 | ≥10.2 | ≥8.5 | ≥6.8 | ≥4.25 | 17–19 | >85 |
| Maximum‡ | 100 | 100 | 20 | 12.0 | 10.0 | 8.0 | 5.0 | 20 | 100 |

*Based on 8–12 repetitions for persons <50 and 10–15 repetitions for persons ≥50.

†Borg rating of Relative Perceived Exertion (RPE), 6–20 scale.[30]

‡Maximum values are mean values achieved during maximum exercise by healthy adults.

Absolute intensity (metabolic equivalents [METs]) values are approximate mean values for men. Mean values for women are approximately 1–2 METs lower than those for men.

vascular disease (Classes B, C, and D). Apparently healthy persons of all ages and asymptomatic persons at increased risk (Classes A-1 through A-3) may participate in *moderate-intensity* exercise without first undergoing a medical examination or a medically supervised, symptom-limited exercise test. Apparently healthy younger persons (Class A-1) may also participate in *vigorous* exercise without first undergoing a medical examination and a medically supervised exercise test. It is suggested that persons classified as Class A-2 and particularly Class A-3 undergo a medical examination and possibly a maximal exercise test before engaging in vigorous exercise. All other persons (Classes B and C) should undergo a medical examination and perform a maximal exercise test before participation in moderate or vigorous exercise unless exercise is contraindicated (ie, Class D). Data from a medical evaluation performed within 1 year are acceptable unless clinical status has changed. Medically supervised exercise tests should be conducted in accordance with previously published guidelines.[7]

**Using Screening Results for Risk Stratification**

With completion of the initial health appraisal and, if indicated, medical consultation and supervised exercise test, participants can be further classified for exercise training on the basis of individual characteristics detailed below. The following classifications have been modified using existing AHA[7] and ACSM[10] guidelines and are recommended (Table 5):

*Class A: Apparently healthy.* There is no evidence of increased cardiovascular risk for exercise. This classification includes (1) "apparently healthy" younger persons (Class A-1) and (2) irrespective of age, persons who are "apparently healthy" or at "increased risk" (Classes A-2 and A-3) and who have a normal diagnostic maximal exercise test. Submaximal exercise tests are sometimes performed at health/fitness facilities where permitted by law for nondiagnostic purposes, including physical fitness assessment, exercise

prescription, and monitoring of progress.[10] Such testing is also useful for educating participants about exercise and for motivating them. Nondiagnostic exercise testing should be conducted only for persons in Class A and only by appropriately qualified, well-trained personnel (see section on staffing below) who are knowledgeable about indications and contraindications for exercise testing, indications for test termination, and test interpretation. All health/fitness facilities, including those where exercise testing is performed, should have an emergency plan (see section on emergency policies and procedures below) to ensure that emergencies are handled safely, efficiently, and effectively. No restrictions other than provision of basic guidelines are required for exercise training. No special supervision is required during exercise training.

*Class B: Presence of known, stable cardiovascular disease with low risk for vigorous exercise but slightly greater than for apparently healthy persons.* This classification includes clinically stable persons with (1) coronary artery disease (myocardial infarction, coronary artery bypass surgery, percutaneous transluminal coronary angioplasty, angina pectoris, abnormal exercise test, or abnormal coronary angiogram), (2) valvular heart disease; (3) congenital heart disease (risk stratification for patients with congenital heart disease should be guided by the 26th Bethesda Conference recommendations[13]); (4) cardiomyopathy (includes stable patients with heart failure with characteristics as outlined below but not recent myocarditis or hypertrophic cardiomyopathy); and (5) exercise test abnormalities that do not meet the criteria outlined in Class C below. The clinical characteristics of such persons are (1) New York Heart Association (NYHA) Class I or II (Table 6); (2) exercise capacity >6 METs; (3) no evidence of heart failure; (4) free of ischemia or angina at rest or on the exercise test ≤6 METs; (5) appropriate rise in systolic blood pressure during exercise; (6) absence of nonsustained or sustained ventricular tachycardia; and (7) ability to satisfactorily self-monitor intensity of activity. For these

TABLE 5. Participant/Health-Fitness Facility Selection Chart

| Participant Characteristics | Risk Class A-1 | Risk Class A-2 | Risk Class A-3 | Risk Class B | Risk Class C | Risk Class D |
|---|---|---|---|---|---|---|
| Age/gender | Children | Men >45 y | Men >45 y | Children* | Children* | Children* |
| | Adolescents | Women >55 y | Women >55 y | Adolescents* | Adolescents* | Adolescents* |
| | Men ≤45 y | | | Men | Men | Men |
| | Women ≤55 y | | | Women | Women | Women |
| Cardiovascular risk factors | None | None | ≥2 | May be present | May be present | May be present |
| Known CVD | None | None | None | Yes | Yes | Yes |
| CVD features (see text for details) | Class A apparently healthy | Class A apparently healthy | Class A apparently healthy | Class B known CVD; low risk | Class C known CVD; moderate risk | Class D known CVD; high risk |
| Low intensity | Facility 1–4 | Facility 1–4 | Facility 1–4 | Facility 1–5 | Facility 4–5 | Not recommended |
| Moderate intensity | Facility 1–4 | Facility 1–4 | Facility 1–4 | Facility 4–5 | Facility 5 | Not recommended |
| Vigorous intensity | Facility 1–4 | Facility 1–4 | Facility 1–4 | Facility 4–5 | Facility 5 | Not recommended |

| Facility Characteristics | | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| Type of facility | Unsupervised exercise room | Single exercise leader | Fitness center for healthy clients | Fitness center serving clinical populations | Medically supervised clinical exercise program |
| Personnel | None | Exercise leader Recommended: medical liaison | General manager Health/fitness instructor Exercise leader Recommended: medical liaison | General manager Exercise specialist Health/fitness instructor Medical liaison | General manager Exercise specialist Health/fitness instructor Medical liaison |
| Emergency plan | Present | Present | Present | Present | Present |
| Emergency equipment | Telephone in room Signs | Telephone Signs Recommended: blood pressure kit Stethoscope | Telephone Signs Recommended: blood pressure kit Stethoscope | Telephone Signs Blood pressure kit Stethoscope | Telephone Signs Blood pressure kit Stethoscope Oxygen Crash cart Defibrillator |

*Risk stratification for patients with congenital heart disease should be guided by recommendations of the 26th Bethesda Conference.[13]
CVD indicates cardiovascular disease.

persons, activity should be individualized with exercise prescription by qualified personnel. Medical supervision is recommended during prescription sessions and nonmedical supervision by appropriately qualified staff for other exercise sessions until the participant understands how to monitor his or her own activity. Subsequent exercise training may be performed without special supervision.

*Class C: Those at moderate to high risk for cardiac complications during exercise and/or who are unable to self-regulate activity or understand the recommended activity level.* This classification includes persons with (1) coronary artery disease with the clinical characteristics outlined below; (2) acquired valvular heart disease; (3) congenital heart disease (risk stratification for patients with congenital heart disease should be guided by the 26th Bethesda Conference recommendations[13]); (4) cardiomy-

TABLE 6. New York Heart Association Classification[7]

| Class I | Heart disease without symptoms |
|---|---|
| Class II | Heart disease with symptoms during ordinary activity |
| Class III | Heart disease with symptoms during less than ordinary activity |
| Class IV | Heart disease with symptoms at rest |

opathy (includes stable patients with heart failure with characteristics as outlined below but not recent myocarditis or hypertrophic cardiomyopathy); (5) exercise test abnormalities not directly related to ischemia; (6) a previous episode of ventricular fibrillation or cardiac arrest that did not occur in the presence of an acute ischemic event or cardiac procedure; (7) complex ventricular arrhythmias that are uncontrolled at mild to moderate work intensity with medication; (8) 3-vessel or left main coronary artery disease; and (9) ejection fraction <30%. One or more of the following clinical characteristics are also present: (1) ≥2 previous myocardial infarctions; (2) NYHA Class III or greater; (3) exercise capacity <6 METs; (4) ischemic horizontal or down-sloping ST depression ≥1 mm or angina at a workload ≤6 METs; (5) a fall in systolic blood pressure with exercise; (6) a medical problem that the physician believes may be potentially life-threatening; (7) a previous episode of primary cardiac arrest; and (8) ventricular tachycardia at a workload <6 METs. Physical activity should be individualized, and exercise should be prescribed by appropriately qualified medical personnel. Medical supervision, monitoring for adverse signs and symptoms, electrocardiographic monitoring of heart rate

and rhythm, and blood pressure monitoring are recommended during exercise sessions until safety is established. Subsequent exercise training should be supervised by appropriately qualified personnel.

*Class D: Unstable conditions with activity restriction.* This classification includes those with (1) unstable ischemia; (2) heart failure that is not compensated; (3) uncontrolled arrhythmias; (4) severe and symptomatic aortic stenosis; (5) hypertrophic cardiomyopathy or cardiomyopathy from recent myocarditis; (6) severe pulmonary hypertension; or (7) other conditions that could be aggravated by exercise (for example, resting systolic blood pressure >200 mm Hg or resting diastolic blood pressure >110 mm Hg; active or suspected myocarditis or pericarditis; suspected or known dissecting aneurysm; thrombophlebitis and recent systemic or pulmonary embolus). In this population no physical activity is recommended for conditioning purposes. Risk stratification for patients with congenital heart disease should be guided by the 26th Bethesda Conference recommendations.[13]

These classifications are presented as a means of beginning exercise with the lowest possible risk. They do not consider accompanying morbidities (for example, insulin-dependent diabetes mellitus, morbid obesity, severe pulmonary disease, complicated pregnancy, or debilitating neurological or orthopedic conditions) that may constitute a contraindication to exercise or necessitate closer supervision during exercise training.

## Using Screening Results for Exercise Prescription

For individuals considered to be in Class A, exercise training intensity (Table 4) may be prescribed using the rating of perceived exertion alone and/or specific target heart rates. A suggested rating of perceived exertion for such persons is 12 to 16 (moderate to hard) on the Borg scale of 6 to 20 and/or an intensity level that corresponds to 50% to 90% of maximum heart rate or 45% to 85% of maximum oxygen uptake or heart rate reserve. Heart rate reserve is defined as maximum heart rate minus resting heart rate. For persons taking medications that affect heart rate (eg, β-adrenergic blockers), these heart rate methods do not apply unless guided by an exercise tolerance test.

In the absence of atrial fibrillation, frequent atrial or ventricular ectopy, a fixed-rate pacemaker, or similar conditions, exercise intensity should be prescribed for persons with cardiovascular disease (Class B or C) using target heart rates and perceived exertion ratings in accordance with previously published guidelines.[7,10] For these persons, target heart rates should be prescribed using data obtained during exercise testing performed while the participant is taking his or her usual cardioactive medications. In the absence of myocardial ischemia or other significant exercise test abnormalities, a target range of 50% to 90% of peak heart rate or 45% to 85% of peak measured oxygen uptake or heart rate reserve is recommended. This intensity level corresponds to 12 to 16 (moderate to hard) on the Borg scale. In the presence of myocardial ischemia (ie, ischemic ST-segment depression >1 mm, chest discomfort believed to be angina pectoris, or

other symptoms believed to be an anginal equivalent), significant arrhythmia, or other significant exercise test abnormalities (eg, a fall in systolic blood pressure from baseline, systolic blood pressure >240 mm Hg, or diastolic blood pressure >110 mm Hg), the target training intensity is derived from the heart rate associated with the abnormality. If this occurs at a high level of exercise, the above target heart rate recommendations are applicable, provided that the upper limit of the range is ≥10 beats per minute (bpm) below the level at which the abnormality appears. Otherwise, the recommended upper limit of training heart rate is 10 bpm less than that associated with the abnormality.

## Staffing

Health/fitness facility personnel involved in management or delivery of exercise programs must meet academic and professional standards and have the required experience as established by the ACSM.[10,12] Such personnel include the general manager/executive director, medical liaison, fitness director, and exercise leader. In general, health/fitness facility personnel should have the formal training and experience needed to ensure that clients are provided with safe, effective programs and services. The levels of education and experience needed to ensure effectiveness and safety vary with the health status of the client population. The kinds of personnel who should be employed at health/fitness facilities serving various types of clients are summarized in Table 5.

The general manager/executive director is responsible for the overall management of the facility and should have competencies in business as well as design and delivery of exercise programs.

The medical liaison reviews medical emergency plans, witnesses and critiques medical emergency drills, and reviews medical incident reports. In Level 2 and 3 facilities (Table 5), the medical liaison may be a licensed physician, a registered nurse trained in advanced cardiac life support, or an emergency medical technician. In Level 4 and 5 facilities (Table 5), the medical liaison must be a licensed physician.

The fitness director manages the facility's exercise and activity programs and is responsible for program design and the training and supervision of staff. He or she must have a degree in exercise science, another health-related field, or equivalent experience, and knowledge of exercise physiology, exercise programming, and operation of exercise facilities. The fitness director must hold professional certification at an advanced level by a nationally recognized health/fitness organization. In Level 3 facilities this certification should be comparable to ACSM health fitness instructor certification. In Level 4 and 5 facilities the fitness director should be certified at a level that correlates with ACSM exercise specialist certification. The exercise specialist typically holds a master's degree in exercise science or a related field and has extensive experience in exercise testing and leadership in clinical populations. He or she must be trained in cardiopulmonary resuscitation (CPR) and should have ≥1 year of supervisory experience in the fitness industry.

The exercise leader works directly with program participants and provides instruction and leadership in specific modes of exercise. He or she also helps program participants master the behavioral skills needed to adhere to exercise programs. In Level 1, 2, and 3 facilities the exercise leader as a minimum must have a high school diploma or equivalent and entry-level or higher professional certification from a nationally recognized health/fitness organization (comparable to ACSM exercise leader certification). In Level 4 facilities the exercise leader should have education and experience corresponding to that required by ACSM health fitness instructor certification. In Level 5 facilities the exercise leader should be either an exercise specialist or a health fitness instructor directly supervised by an exercise specialist. *In all cases the exercise leader must be trained in CPR and should have prior supervised internship or work experience in the health/fitness industry.*

Some health/fitness facilities provide services in allied health fields such as nutrition, stress management, and physical therapy. Personnel providing such services should meet current accepted professional standards in those fields and should be certified as recommended by relevant professional organizations and licensed by or registered with the state as required by law.

### Emergency Policies and Procedures

*All health/fitness facilities must have written emergency policies and procedures that are reviewed and practiced regularly.* Such plans will correspond to the type of facility and risk level of its membership outlined in Table 5. All fitness center staff who directly supervise program participants should be trained in basic life support. Health/fitness facilities must develop appropriate emergency response plans and must train their staff in appropriate procedures to provide during a life-threatening emergency. When an incident occurs, each staff member must perform the necessary emergency support steps in accordance with established procedures. It is important for everyone to know the emergency plan. Emergency drills should be practiced once every 3 months or more often with changes in staff; retraining and rehearsal are especially important. When new staff are hired, new team arrangements may be necessary. Because life-threatening cardiovascular emergencies are rare, constant vigilance by staff and familiarity with the plan and how to follow it are important.

It is essential to acknowledge that emergency equipment alone does not save lives. Equipment alone may offer a false sense of security if it is not backed up with appropriate staffing. The training and preparedness of an astute professional staff who can readily handle emergencies is paramount. This issue is particularly important if persons with certain medical conditions are recruited and encouraged to exercise in a specific health/fitness facility. Such a facility has the responsibility to offer appropriate coverage by personnel as outlined above and in Table 5. Acquisition of equipment for evaluation and resuscitation will depend on the risk level of participants, personnel, and medical coverage. All facilities must have a telephone that is readily accessible and available when emergency assistance is needed. It would be useful for all supervised facilities to have a sphygmomanometer and stethoscope readily available. Level 4 and 5 facilities that recruit members with known cardiovascular disease must have such equipment available, and Level 5 facilities (supervised cardiac rehabilitation) should be fully equipped according to the recommendations of the AHA[9] and the American Association of Cardiovascular and Pulmonary Rehabilitation.[31] Such equipment includes a defibrillator, oxygen, and fully stocked crash cart. Delineation of specific equipment standards in such facilities is beyond the scope of these guidelines; such information is detailed in the documents above.[9,31] Appropriately trained staff who are medically and legally empowered must be available to operate such devices during a facility's operational hours.

The emergency plan must address transportation of victims to a hospital emergency room and must include telephone access to 911 or the local emergency unit access system. Health/fitness facility personnel should be familiar with emergency transport teams in the area so that access and location of the center are clearly identified. Staff should greet the emergency response team at the entrance of the facility so that they can be promptly guided to the site of the emergency. A staff member should remain with the victim at all times. Prompt emergency transport is optimized by free and ready access to the victim within the health/fitness facility and assistance by designated staff.

### General Considerations in Selecting a Health/Fitness Facility

In selecting a health/fitness facility, an individual should first consider his or her health status. Persons with a history of cardiovascular disease should seek facilities that provide or require a thorough medical evaluation of prospective members/users. Personnel should include nurses, exercise specialists, health/fitness instructors, and/or exercise leaders licensed or certified by the appropriate agencies, organizations, or authorities. They should be trained to recommend and supervise exercise in patients with cardiovascular and other chronic diseases. Persons at high risk for development of cardiovascular disease should seek facilities that require appropriate medical evaluation of clients and employ exercise leaders who are certified as competent to design and deliver exercise programs for high-risk persons. Table 5 summarizes personnel and safety recommendations for health/fitness facilities (Levels 1 through 5) serving clients in various health categories (Classes A through C).

Persons seeking health/fitness facilities should select one that meets professional and industry standards. Facilities should be clean, well-maintained, and spacious enough to ensure the comfort and safety of program participants. Indoor facilities should be climate controlled, and changing rooms and showers should be provided. Flooring in areas where exercise is to be carried out should be designed to minimize risk of injury. Exercise equipment should be well-maintained. The variety, amount, and availability of exercise equipment should match individual needs and preferences, including time of day and preferred

mode of exercise. For example, if aerobic dance is the preferred mode of exercise, individuals should seek a fitness center that offers this program at a convenient time and that provides an exercise leader who is competent in this activity and able to teach men and women of various age and fitness levels.

The programs and services of a health/fitness center should optimize participation. The location of the center should minimize time spent traveling to it. The social environment should be attractive and the staff competent in helping members/users master the behavioral skills needed to adopt and maintain a physically active lifestyle.

## Summary of Key Points

- Physical inactivity is a risk factor for cardiovascular disease; it is very prevalent and an important health issue.
- Regular exercise reduces subsequent cardiovascular morbidity and mortality.[1,2,6]
- Efforts to promote physical activity will impact everyone, including persons with cardiovascular disease.
- The incidence of a cardiovascular event during exercise among patients with cardiac disease is greater than that among otherwise healthy persons.[7]
- Overall, in the general population the absolute incidence of death during exercise is relatively low.[7]
- *All facilities offering exercise equipment or services should conduct a cardiovascular screening of all new members and/or prospective users.* Preparticipation screening should identify persons at high risk, and public health efforts should focus on increasing the use of screening. In view of the potential legal risk assumed by operators of fitness facilities, it is recommended that those facilities providing staff supervision document the results of screening.
- When a medical evaluation/recommendation is advised or required, written and active communication by facility staff with the individual's personal physician (or healthcare provider) is strongly recommended.
- Health appraisal questionnaires should be used before exercise testing and/or training to initially classify participants by risk for triage and preliminary decision making. Following the initial health appraisal and, if indicated, medical consultation and supervised exercise test, participants can be further classified for exercise training on the basis of individual characteristics.
- Every effort should be made to educate participants about the importance of obtaining a preparticipation health appraisal and, if indicated, a medical evaluation/recommendation. The potential risks incurred without obtaining an appraisal and/or evaluation should also be emphasized.
- *The AHA, the IHRSA, and the ACSM recommend that all health/fitness facilities have written emergency policies and procedures that are reviewed and practiced regularly.*[12,13] It is essential to acknowledge that emergency equipment alone does not save lives: training and preparedness by astute professional staff who can readily handle emergencies is paramount.
- Whatever their health status, persons seeking a health/fitness facility should choose one that provides equipment, programs, staff, services, and membership contracts appropriate for their needs and that meets accepted professional and industry standards.

## References

1. Fletcher GF, Balady GJ, Blair SN, Blumenthal J, Casperson C, Chaitman B, Epstein S, Froelicher ES, Froelicher V, Pina I, Pollock M. Statement on exercise: benefits and recommendations for physical activity programs for all Americans. *Circulation.* 1996;94:857–862.
2. Pate RR, Pratt M, Blair SN, Haskell WL, Macera CA, Bouchard C, Buchner D, Ettinger W, Heath GW, King AC, Kriska A, Leon AS, Marcus BH, Morris J, Paffenbarger RS, Patrick K, Pollock ML, Rippe JM, Sallis J, Wilmore JH. Physical activity and public health: a recommendation from the Centers for Disease Control and Prevention and the American College of Sports Medicine. *JAMA.* 1995;273:402–407.
3. *Physical Activity and Health: A Report of the Surgeon General.* Atlanta, Ga: US Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion; 1996.
4. *Healthy People 2000: National Health Promotion and Disease Prevention Objectives.* US Dept of Health and Human Services/Public Health Service. Publication no. (PHS) 91–50213.
5. American Heart Association. *Heart and Stroke Facts: 1997 Statistical Supplement.* Dallas, Tex; 1996.
6. Paffenbarger RS, Hyde RT, Wing AL, Hsieh CC. Physical activity, all-cause mortality, and longevity of college alumni. *N Engl J Med.* 1986;314:605–613.
7. Fletcher GF, Balady G, Froelicher VF, Hartley LH, Haskell WL, Pollock ML. Exercise standards: a statement from the American Heart Association. *Circulation.* 1995;91:580–615.
8. McInnis KJ, Hayakawa S, Balady GJ. Cardiovascular screening and emergency procedures at health clubs and fitness centers. *Am J Cardiol.* 1997;80:380–383.
9. Pina IL, Balady GJ, Hanson P, Labovitz AJ, Madonna DW, Myers J. Guidelines for clinical exercise testing laboratories: a statement for healthcare professionals from the American Heart Association. *Circulation.* 1995;91:912–921.
10. American College of Sports Medicine. Kenney WL, ed. *Guidelines for Exercise Testing and Prescription.* 5th ed. Baltimore, Md: Williams & Wilkins; 1995:269–287.
11. Fletcher G. How to implement physical activity in primary and secondary prevention: a statement for healthcare professionals from the American Heart Association. *Circulation.* 1997;96:355–357.
12. Peterson JA, Tharrett SJ, eds. *American College of Sports Medicine Health/Fitness Facility Standards and Guidelines.* 2nd ed. Champaign, Ill: Human Kinetics Publishers; 1997.
13. 26th Bethesda Conference. Recommendations for determining eligibility for competition in athletes with cardiovascular abnormalities. *J Am Coll Cardiol.* 1994;24:845–899.
14. Maron BJ, Thompson PD, Puffer JC, McGrew CA, Strong WB, Douglas PS, Clark LT, Mitten MJ, Crawford MH, Atkins DL, Driscoll DJ, Epstein AE. Cardiovascular preparticipation screening of competitive athletes: a statement for health professionals from the American Heart Association. *Circulation.* 1996;94:850–856.
15. *1997 IHRSA/American Sports Data Health Club Trend Report.* Hartsdale, NY: American Sports Data; 1997.
16. Siscovick DS, Weiss NS, Fletcher RH, Lasky T. The incidence of primary cardiac arrest during vigorous exercise. *N Engl J Med.* 1984;311:874–877.
17. Maron BJ, Shirani J, Poliac LC, Mathenge R, Roberts WC, Mueller FO. Sudden death in young competitive athletes: clinical, demographic, and pathological profiles. *JAMA.* 1996;276:199–204.
18. Thompson PD, Funk EJ, Carleton RA, Sturner WQ. Incidence of death during jogging in Rhode Island from 1975 through 1980. *JAMA.* 1982; 247:2535–2538.
19. Thompson PD. The cardiovascular complications of vigorous physical activity. *Arch Intern Med.* 1996;156:2297–2302.
20. Van Camp SP, Bloor CM, Mueller FO, Cantu RC, Olson HG. Nontraumatic sports death in high school and college athletes. *Med Sci Sports Exerc.* 1995;27:641–647.
21. Anderson KM, Wilson PW, Odell PM, Kannel WB. An updated coronary risk profile: a statement for health professionals. *Circulation.* 1991;83: 356–362.

Balady et al    June 9, 1998    2293

22. Mittleman MA, Maclure M, Tofler GH, Sherwood JB, Goldberg RJ, Muller JE. Triggering of acute myocardial infarction by heavy physical exertion: protection against triggering by regular exertion. N Engl J Med. 1993;329:1677–1683.

23. Willich SN, Lewis M, Lowel H, Arntz HR, Schubert F, Schroder R. Physical exertion as a trigger of acute myocardial infarction. N Engl J Med. 1993;329:1684–1690.

24. Tofler GH, Muller JE, Stone PH, Forman S, Solomon RE, Knatterud GL, Braunwald E. Modifiers of timing and possible triggers of acute myocardial infarction in the Thrombolysis in Myocardial Infarction Phase II (TIMI II) study group. J Am Coll Cardiol. 1992;20:1049–1055.

25. Van Camp SP, Peterson RA. Cardiovascular complications of outpatient cardiac rehabilitation programs. JAMA. 1986;256:1160–1163.

26. Shephard RJ, Thomas S, Weller I. The Canadian home fitness test: 1991 update. Sports Med. 1991;11:358–366.

27. Gibbons RJ, Balady GJ, Beasley JW, Bricker JT, Duvernoy WF, Froelicher VF, Mark DB, Marwick TH, McCallister BD, Thompson PD Jr, Winters WL, Yanowitz FG, Ritchie JL, Cheitlin MD, Eagle KA, Gardner TJ, Garson A Jr, Lewis RP, O'Rourke RA, Ryan TJ. ACC/AHA guidelines for exercise testing: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol. 1997;30:260–311.

28. Thomas S, Reading J, Shephard RJ. Revision of the Physical Activity Readiness Questionnaire (PAR-Q). Can J Sports Sci. 1992;17:338–345.

29. How to Choose a Health Club. Milwaukee, Wisc: Wisconsin Affiliate, American Heart Association; 1989.

30. Borg GA. Psychophysical basis of perceived exertion. Med Sci Sports Exerc. 1982;14:377–381.

31. American Association of Cardiovascular and Pulmonary Rehabilitation. Guidelines for Cardiac Rehabilitation Programs. 2nd ed. Champaign, Ill: Human Kinetics Publishers; 1995.

KEY WORDS: AHA Medical/Scientific Statements ■ exercise ■ risk factors ■ prevention

H

06/13/2005 MON 17:02  FAX 413 582 6881 Weinberg & Garber                    ☒003/022

# DEFIBRILLATORS (AEDs) IN HEALTH CLUBS
## An IHRSA Briefing Paper

❖ **IHRSA's Position**

After significant research, IHRSA has concluded that there is not a legal standard of care that requires that automated external defibrillators (AEDs) be in all fitness centers. However, the association encourages health club operators to consider the advantages of installing AEDs in their facilities.

❖ **What is an AED?**

An AED is a battery-driven device used to administer an electric shock through the chest wall to the heart of a person who has gone into cardiac arrest. An AED analyzes the heart's rhythm through adhesive electrodes and, if necessary, tells the user to deliver a shock to the victim. The shock, called defibrillation, may help the heart to reestablish an effective rhythm of its own. An AED is about the size of a laptop computer and weighs 4 to 7 pounds. The devices currently sell for $3,000 - $4,000 each, but prices are going down as demand increases and technology improves.

Two IHRSA associate members supply AEDs: Agilent Technologies and Medtronic Physio-Control (see "Additional Resources" for contact information).

❖ **What is cardiac arrest and how prevalent is it?**

One of the leading causes of death among American adults, sudden cardiac arrest (SCA) strikes more than 700 people in the U.S. every day and kills over 95% of them. The risk increases with age. The average age of a victim is 65, but SCA is unpredictable and can happen to anyone, anywhere. Although pre-existing heart disease is a common cause of cardiac arrest, some victims have had no previous heart problems.

The most common cause of SCA is ventricular fibrillation — an ineffective quivering of the heart muscle that makes it unable to pump blood through the body. Once the blood stops circulating, a person quickly loses consciousness and the ability to breathe, and, without prompt, effective treatment, will die.

*The International Health, Racquet & Sportsclub Association (IHRSA)*                    1
*263 Summer Street • Boston, MA 02210 • (800) 228-4772 • fax (617) 951-0056 • http://www.ihrsa.org*

W/M C0058

SCA is *not* the same thing as a heart attack, although a person suffering a heart attack is more likely to develop abnormal heart rhythms and SCA. A heart attack is caused by blocked blood flow to the heart muscle so the muscle begins to die. SCA is caused by an abnormal heart rhythm. A heart attack is often preceded by chest, arm, upper abdomen, or jaw pain, nausea and sweating. There is rarely a warning before SCA. Heart attack patients usually remain conscious, but SCA victims always lose consciousness.

Nearly three-quarters of cardiac arrests occur at home. About 10% occur in hospitals. That leaves 15% -- or approximately 105 cardiac arrests per day -- that occur in places other than the home or hospital.

❖    **How effective are AEDs at treating cardiac arrest?**

"Survival can be as high as 90 percent if defibrillation is provided during the first minute following collapse," according to Mary Fran Hazinski. R.N., M.S.N., chairperson of the American Heart Association's Emergency Cardiovascular Care Programs. For every minute that defibrillation is delayed, survival falls about 7 - 10%.

People who survive SCA have a good long-term outlook. About 80% are alive after one year and approximately 57% are alive at five years.

❖    **Are AEDs safe to use?**

According to the American Heart Association, an AED is safe to use by anyone who has been trained to operate it, and using one is easier than administering CPR. Studies have shown the devices to be 90% sensitive (able 90% of the time to detect a rhythm that should be defibrillated) and 99% specific (able 99% of the time to recommend not shocking when defibrillation is not indicated). Because of the wide variety of situations in which it will typically be used, the AED is designed with multiple safeguards and warnings before an electric shock is released. The AED is programmed to deliver a shock only when it has detected ventricular fibrillation.

W/M 00059

06/13/2005 MON 17:02  FAX 413 582 6881 Weinberg & Garber                    ⓐ005/022

❖    **If AEDs are easy to use, why is formal training needed to use them?**

Emergency equipment alone doesn't save lives. Its presence in a club can give a false sense of security if staff is not trained and prepared to use it.

Still, AEDs are considered so user-friendly that even untrained rescuers can generally succeed in attaching the pads, pressing "analyze" (if required), and delivering shocks. In one study, sixth graders with no AED experience were put up against paramedics. The children performed a successful rescue in about 90 seconds — only 20 seconds behind the professionals. However, untrained rescuers may not know how to recognize the signs of SCA, and they may not use an AED promptly and safely, posing some danger of electric shock to themselves and others. Also, untrained rescuers probably would not know how to respond to the victim if the AED prompts "no shock advised."

An AED operator must also know when to activate the EMS system and how to perform CPR, since after delivering a series of three shocks, the typical AED will prompt the operator to continue CPR while the device continues to analyze the patient. The ventilation and compression skills learned in a CPR class help to circulate oxygen-rich blood to the brain. Early CPR is an integral part of providing lifesaving aid to people suffering from SCA.

❖    **How much training is required to use an AED?**

AED training requirements vary by state. Many states' AED laws list the American Red Cross and American Heart Association as providers of courses that satisfy the states' training requirements.

The American Red Cross offers a variety of AED courses including a 4-hour course designed for individuals with a job-related duty to act in an emergency. The American Heart Association offers a 3.5 – 4 hour BLS (Basic Life Support) Heartsaver AED Course. AED certification must be renewed after two years.

Some club operators offer more frequent "refresher" courses than is required by law. This can help make staff more comfortable with the idea of using an AED in an emergency. For example, managers at Little Rock Athletic Club in Arkansas undergo one-hour training and practice sessions every three months. The club's health director has even been trained to teach new staff members on the AED.

W/M 00060

IHRSA members who have AEDs report having trained varying segments of their staff. Some have trained "all staff", others "just full-time staff", others "just managers." Other trained groups include lifeguards, tennis pros, front desk staff, personal trainers and fitness instructors.

If a club has an AED, it is *essential* that at least one person who is trained in its use be on duty at all times. If a cardiac arrest occurs at a club that has an AED but no one is on duty who is trained to use it, the club could be found liable for negligence. The argument could be made that members had a false sense of security due to the presence of an AED, when in fact no one on duty at that time was qualified to use it.

❖   **Why is a "prescription" needed to purchase an AED?**

Because the FDA has determined that their labeling alone is not sufficient to provide all the information and training for proper use of AEDs, FDA regulations permit the sale of AEDs only with the authorization or order of a licensed physician. This does not mean that the physician must be consulted before each use, but a physician will not typically authorize the purchase unless he or she is satisfied that the purchaser has the necessary training program and other preparations in place.

Some clubs have members who are also physicians, who are willing to provide this service (sometimes in exchange for a discounted membership). Also, some AED suppliers offer programs that match clubs with physicians in their state who will, for a fee, act as that club's medical authority.

❖   **Will obtaining an AED increase our responsibility and therefore our liability risk?**

According to IHRSA's survey of its members, concerns about potential liability have held back many clubs from looking into obtaining an AED.

However, according to Richard A. Lazar, an attorney and AED industry consultant, "In most settings the medical benefits of AEDs far outweigh any legal risks. As these devices become more widely used, there will potentially be greater liability risk for not adopting AED programs."

*The International Health, Racquet & Sportsclub Association (IHRSA)*
*263 Summer Street • Boston, MA. 02210 • (800) 228-4772 • fax (617) 951-0056 - http://www.ihrsa.org*

4

W/M 00061

At the federal level, the "Cardiac Arrest Survival Act" became law in November of 2000. It establishes protections from civil liability for personal injury or wrongful death resulting from the emergency use of AEDs. Not only does it protect the AED user from liability, but it also protects a person who maintained the device, provided training in the device, tested the device, or acquired the device (in most cases) as well as the physician who provided medical oversight regarding the AED. (Read the full text of the Act at http://www.ihrsa.org/publicpolicy/industryissues/defibrillators.html.)

At least 45 states have amended their "Good Samaritan" laws to cover the use of an AED. These laws eliminate or at least limit the liability of the lay rescuer and some or all of the key enablers of a public access defibrillation program. Key enablers include the physician who provides medical authorization for AED use; the trainers and course directors who teach lay rescuers the skills of AED use; and the deploying organizations, premise owners, or other entities who have enabled placement of AEDs.

Agilent Technologies offers an indemnification policy for users of its Heartstream ForeRunner® or FR2® AED. It protects users from claims or actions arising from "the mechanical or electrical failure or malfunction of the FR2." There are exceptions in cases of negligence, gross negligence, or improper acts, and in cases of AEDs that are not properly maintained or operated.

Medtronic Physio-Control Corporation offers an indemnity program to users of its LIFEPAK® 500 AED. The only exceptions are if the user is grossly negligent or intentionally misuses the device. Participants must agree to periodic inspection of the devices and ensure that the operator has received training from an American Heart Association Basic Life Support level trainer (or equivalent). For an additional charge, club operators can purchase a policy protecting themselves and AED users from liability for improper actions or even failure to act.

❖    **Will having an AED mean that my club is getting into the medical field?**

That's a legitimate concern, according to Attorney Thomas P. Gmelich, head of the Sports & Recreation Litigation Team at the law firm of Bradley & Gmelich. "The use of a defibrillator, coupled with other available medical services at a health club, may result in a higher duty of care owed by the club to its member," he wrote in ACSM's Health & Fitness Journal. "As more and more health clubs are offering increased services that are medical, and not necessarily recreational, in nature (e.g., cardiac screening, body fat testing, dietary

W/M 00062

06/13/2005 MON 17:03  FAX 413 582 6881 Weinberg & Garber                    @008/022

counseling, chiropractic services), an argument can be made that the health club is more similar to a medical facility than a recreational facility. As such, a higher duty of care would be owed by the club to members and guests. The use of a defibrillator (an obvious medical service) at the facility would also bolster the argument that a higher duty of care was required."

Gmelich also explained that liability waivers may not be effective when an AED is involved. "Because the use of a defibrillator at a health and fitness club may be considered to be a 'medical service,' an alleged negligent misuse of or failure to maintain the equipment might not be negated by an otherwise enforceable waiver and release contained in a membership agreement. For example, many states enforce waivers and releases for injuries involving the negligence of health club employees, particularly relating to personal training, because such training is considered to be a recreational activity. However, California courts will not enforce waivers and releases for medical negligence, primarily because such conduct affects the public interest. As such, if a health club employee is alleged to have used a defibrillator negligently, causing injury to a club member, and the use of the defibrillator is deemed to be a medical service, the courts may be reluctant to enforce an otherwise valid waiver and release on the grounds that enforcing the release would be against public policy. (The enforceability of a waiver or release depends on the specific state in which it was executed)," he wrote.

❖   **If I decide to install an AED, is one per facility enough?**

That depends on the size of the facility and how long it would take a responder to reach it in the event of an emergency. The statistic to keep in mind is that every minute that passes before returning the heart to a normal rhythm after SCA reduces the chance of survival by 7 – 10%.

Officials at Chicago's Midway and O'Hare Airports recently installed 70 AEDs into their corridor walls. The devices are no more than 2 minutes apart at walking speed. According to Agilent Technologies, between June 1999 and July 2000, 13 people were treated with AEDs at these two airports. While four had underlying conditions that could not be treated by an AED, nine survived to be discharged from the hospital.

W/M 00063

04/27/2005 WED 15:25  FAX 413 582 6881 Weinberg & Garber

06/13/2005 MON 17:04  FAX 413 582 6881 Weinberg & Garber                    ☒009/022

❖    **Why are health clubs often mentioned as possible locations for AEDs?**

According to Dr. Christine Albert, who has researched the relationship between exercise and sudden death, "The chances of dying suddenly while exercising (are) very low. About 1 death per 1 million episodes of vigorous exercise." However, physical stress, such as that caused by intense exercise, can cause the heart rhythm in some people to become chaotic, which can lead to ventricular fibrillation.

Nearly one in four adult Americans has some form of cardiovascular disease. During exercise, people with heart disease are at a 10 times higher risk of having a cardiac event than people who are disease free.

The fastest-growing segment of health club members is people over age 34, an age when the risk of heart disease begins to rise, says Gary J. Balady, M.D., the previously mentioned cardiologist and professor of medicine at Boston University School of Medicine. "Many Americans are surviving their heart attacks and are being told by their doctors to exercise more. So there may be more individuals showing up at health clubs who have heart disease."

The American Heart Association recently published its International Cardiopulmonary Resuscitation (CPR) and Emergency Cardiovascular Care (ECC) 2000 Guidelines. These guidelines recommend "as a goal delivery of electric shock by a defibrillator within five minutes for an out-of-hospital sudden cardiac victim." They also recommend that "AEDs be placed where there is a reasonable probability of one sudden cardiac arrest occurring every five years."

Today approximately 80% of ambulances and 50% of fire department vehicles that have basic and advanced lifesaving support capabilities have defibrillators, but these vehicles may not arrive within five minutes. Since a person's chance of survival from SCA is reduced by 10% for every minute that passes, a response time of less than five minutes is crucial.

❖    **How many health clubs have AEDs?**

IHRSA surveyed health club operators about AEDs in the spring of 2001. Of the 162 respondents, 25% have at least one AED on site.

W/M 00064

Several club chains, including Fitcorp, The Sports Club Company, and Wellbridge Health and Fitness Centers have at least one AED in each of their facilities.

**Common reasons cited by IHRSA clubs for having AEDs include:**

- High number of older and/or deconditioned members;
- Belief that an AED is as essential as CPR training;
- Response time for local rescue squad is too long;
- Review of response to previous medical emergency at club;
- Prices have gone down in recent years;
- Media coverage of lives saved;
- Marketing/PR value;
- State's "Good Samaritan" law now protects facility from liability;
- Requests of members, including those in medical fields;
- Club offers cardiac rehabilitation programs;
- Concern that it is becoming an industry standard.

**Common reasons cited by IHRSA clubs for *not* having AEDs include:**

- Cost;
- Liability concerns if AED is used improperly, ineffectively or not at all;
- Hospital/fire station/ambulance service located close to club;
- High staff turnover causes training problems;
- Difficulty in ensuring that someone who is trained is always on duty;
- Certification is too involved, time-consuming, or costly;
- Desire to keep club out of medical field;
- Concerns about insurance coverage.

❖   **Have any lives been saved in clubs with AEDs?**

Yes, according to news stories, AED suppliers, and surveys of IHRSA members. Here are a few examples:

- In July 2001, a 45-year-old member fell unconscious while running on the treadmill at the Liberty Sports Complex in Ann Arbor, Michigan. A fitness trainer revived him with the club's AED. In the time between shocks, two nurses stepped up to give CPR. The fitness director and club member also helped until paramedics arrived.

*The International Health, Racquet & Sportsclub Association (IHRSA)*                    8
263 Summer Street • Boston, MA 02210 • (800) 228-4772 • fax (617) 951-0056 • https://www.ihrsa.org

W/M 00065

- In February 2001, a man who had been using a stationary bike fell to the floor at Omni 41 Health and Fitness Connection in Shererville, Indiana, a victim of SCA. The club had installed an AED just four weeks prior. One shock from the AED revived the member immediately. The man is now in a cardiac rehab program and the club expects him to return as a member very soon.

- In January 1998, an elderly woman collapsed while attending a physical therapy class at Health First Pro-Health and Fitness Center, a hospital-based health club in Florida. A club employee was able to revive the SCA victim with one shock, paving the way for full recovery from what might have otherwise been a fatal event.

- In March 1998, a 49-year-old man who went into cardiac arrest while playing basketball at Little Rock Athletic Club in Arkansas was saved with an AED which had been installed just three months earlier. Weeks after the incident, the man was back playing basketball at the club.

- Several clubs report that members have been successfully defibrillated with AEDs brought in by ambulances and other first-response services.

❖   **Has anyone died at a club that might have been saved by an AED?**

Yes. News stories as well as surveys of IHRSA clubs indicated that there have been some recent fatal cardiac arrests at fitness centers. Here are a few examples:

- An Army colonel was exercising in a Washington, DC club early one morning in 1998 when he experienced a sudden cardiac arrest. Paramedics were called and bystanders performed CPR. Medics arrived more than 20 minutes after his collapse and defibrillated him. They started his heart, but by that time he had suffered irreversible brain damage. He died two weeks later.

- A Miami, Florida club didn't have an AED on site in the fall of 1997 when a 35-year-old man collapsed and died from SCA after a basketball game.

- EMTs couldn't save the life of the 55-year-old man whose heart stopped while he worked out in a New York City gym in 1996 since it took their ambulance 16 minutes to wind its way through the traffic-clogged streets. Theoretically, his odds of

W/M 00066

survival were high, since a doctor who was exercising nearby and a club employee who was a trained paramedic began working on him immediately, and the hospital was only 10 blocks away.

This is not an uncommon scenario. In New York City it takes an average of 11.4 minutes for an ambulance to arrive at the scene of a cardiac arrest and another minute before emergency personnel can administer the needed shock. Coupled with the average two-minute delay in calling 911 after a person collapses, it's no wonder that fewer than 1% of New York City SCA victims survive.

❖ **Have any facilities been sued for not having an AED?**

Yes, including some health clubs Most recently, in 2000, a Florida jury returned a verdict in favor of Q The Sports Club, which was sued for negligence for not having an AED or oxygen present when a member suffered a medical emergency, which resulted in brain damage. The jury agreed with the Q's defense that no regulation or health club industry standard required defibrillators at the time of the incident, which occurred in 1998.

In 1991, a racquetball player was playing in a tournament at a New York health club when he collapsed. CPR was performed by a bystander and a doctor who was in the tournament. An ambulance took him to a hospital, but attempts to revive him were unsuccessful. The cause of death was SCA, a consequence of atherosclerotic heart disease. His estate sued the club for wrongful death, claiming among other things that it failed to have proper procedures, personnel and equipment (*i.e.* an AED) ready to respond to medical emergencies. The New York Supreme Court of Appeals upheld a lower court's ruling that the participant assumed the risk of playing in the tournament. The court noted that the entire staff of the club was trained in CPR, 911 was called shortly after his collapse, and a rescue squad arrived within five minutes. The court wrote, "Plaintiff's contention that defendants were negligent in failing to have a defibrillator present during the tournament for immediate use lacks merit."

A Philadelphia tennis club was recently sued by a man who went into cardiac arrest at the facility and incurred brain damage because he was in ventricular fibrillation and too much time passed before he was resuscitated. The court found that the club did not have an obligation to have an AED with a person trained to use it on the premises. (The case will likely be appealed.) Helping the case was the fact that in Pennsylvania, at the time of the

*The International Health, Racquet & Sportsclub Association (IHRSA)*
*263 Summer Street • Boston, MA 02210 • (800) 228-4772 • fax (617) 951-0056 • http://www.ihrsa.org*

10

W/M 00067

06/13/2005 MON 17:05  FAX 413 582 6881 Weinberg & Garber    @013/022

incident in question. tennis personnel were not permitted to use an AED without having certain certifications from the Department of Health.

Not all facilities fared so well in court. In June 1996. a Florida jury found Busch Gardens negligent for not properly training its employees to provide emergency care — and for failing to have essential medical equipment. including an AED, on the premises. The plaintiff was awarded $500.000 in damages for the death of her teenage daughter.

In another recent case. a federal judge found Lufthansa Airlines negligent for failing to provide timely treatment to a passenger who suffered a cardiac emergency. The damage award in that case was $2.7 million.

❖  **Will having an AED affect my liability insurance coverage?**

IHRSA surveyed several liability insurance providers on this topic. Whether a club has an AED on site does not affect its coverage or rates under mass liability insurance companies. However. this may change in the near future. If you are considering obtaining an AED. contact your insurance agent to determine if there are any potential coverage issues specific to your insurance policy.

**DISCLAIMER: The information in this paper is intended for the education of IHRSA members and should not be considered legal advice. Individuals needing legal advice should consult an attorney who is competent in this area.**

*Last updated 8/10/01*

*The International Health, Racquet & Sportsclub Association (IHRSA)*
263 Summer Street • Boston, MA 02210 • (800) 228-4772 • fax (617) 951-0056 • http://www.ihrsa.org    11

WM 00068

@012/023    04/27/2005 WED 15:27  FAX 413 582 6881 Weinberg & Garber
RECEIVED TIMEJUN. 13.  1:52PM    PRINT TIMEJUN. 13.  2:06PM

## ADDITIONAL RESOURCES

**Agilent Technologies**
(800) 453-6860
http://www.agilent.com/healthcare/heart

**American Heart Association**
(800) AHA-USA1
http://www.americanheart.org

**American Red Cross**
(703) 248-4222
http://www.redcross.org

**Medtronic Physio-Control Corporation**
(800) 442-1142
attn: Doug Hakala, Business Development Manager for Commercial Accounts
http://www.aedhelp.com

**Public Access Defibrillation League (PADL)**
http://www.padl.org

W/M 00069



Copyright 1996 Gannett Company, Inc.

USA TODAY

September 13, 1996, Friday,  FINAL EDITION

SECTION: NEWS;  Pg. 1A

LENGTH: 258 words

HEADLINE: Newly OK'd defibrillator could save 100,000 lives

BYLINE: Doug Levy

BODY:
   A lightweight, less expensive and easier-to-use device to start the heart beating again has been approved by the Food and Drug Administration.

   Seattle-based Heartstream announced the approval Thursday, saying its ForeRunner automatic defibrillator now can be available to the people most likely to reach a cardiac arrest victim first, such as police or office security guards.

   Fewer than 25% of emergency vehicles carry defibrillators, but using one within four minutes of a cardiac arrest increases survival rates to 30%, from less than 5%.

   Defibrillators, which shock a heart into normal rhythm, long have been carried by paramedics.

   But their use has been limited by the cost, size and need for maintenance. Even automated versions, in use by some fire and police departments, cost $ 5,000 or more.

   ForeRunner "has some very definite advantages," says Dr. Roger White of the Mayo Clinic, who urged defibrillators be put in police cars in the clinic's hometown of Rochester, Minn.

   It now has the USA's highest cardiac arrest survival rate.

   The American Heart Association estimates 100,000 lives could be saved if defibrillators were more widely used.

   `Heartstream plans to sell ForeRunner for $ 3,000 to $ 4,000. A recording

provides instructions, and there are only two buttons to use.
Powered by a long-life battery, the four-pound device is about
the size of a large paperback.

   ForeRunner was not approved for use on airplanes because its ability
to function at high altitude is unstudied.

GRAPHIC: PHOTO, Color, Robert Sorbo, AP; New model: Smallest, cheapest


LANGUAGE: ENGLISH
LOAD-DATE: September 13, 1996

P 0136

# Cardiologists Say Portable Defibrillators Can Save Time and Lives

### By JANE FRITSCH

When Tony Cox's heart stopped beating, he was working out on a treadmill at the Reebok Club on the Upper West Side.

Theoretically, his odds of survival were as high as 60 percent or 70 percent. A doctor was exercising nearby and a club employee was a trainee paramedic; they began working on him immediately. Others called 911. And the club was only 10 blocks from St. Luke's-Roosevelt Hospital, whose ambulances respond to 911 calls.

But Winston Hill (Tony) Cox, a 55-year-old father of four and the former chairman of Showtime, died that Saturday afternoon last September.

He might have had a chance, doctors said, if emergency medical workers had arrived sooner with a defibrillator, a machine that delivers

### RACING THE AMBULANCE
*A special report.*

an electric shock to restart the heart. But it took 16 excruciating minutes for the ambulance to arrive that day, far more than the 5- or 6-minute window of hope.

In New York City, in fact, the likelihood of being revived after cardiac arrest is only about one percent. The congested traffic in New York and in most American cities — and the vast distances ambulances must travel in rural areas mean that emergency workers simply cannot reach most cardiac arrest victims in time.

Cardiologists estimate that a half or more of the 350,000 people who die of cardiac arrest in the United States each year could have been saved.

Cardiologists now argue that it is time to give up on emergency medi-

cal squads as the chief means of reviving heart patients. In the last year, the American Heart Association has begun to push for much wider availability of defibrillators. The devices should be placed just about everywhere, the association contends — in factories, health clubs, apartment buildings, and even in private homes, and available for use by a variety of nonmedical people, like security guards and doormen. Within a decade, the association hopes, the devices should become as common as fire extinguishers.

While the heart association's proposal may seem simple, state laws and Federal regulations are in the way.

The Food and Drug Administration, which regulates the machines, has not considered whether they are safe and effective for use by the general public.

State emergency medical directors have joined together to oppose the widespread use of defibrillators, saying that the matter needs more study.

Still, the heart specialists plan to



The Lifepak 500 is made by Physio-Control, one of four companies vying in the defibrillator market.

Librado Romero/The New York Times

Continued on Page A22, Column 1

10 BEST LIVES OF OUR YEARS MEET "THE First Lady of Comics." Meet the ROCKAFORD of Jackie O. Tonight only on A&E 8 PM ET/9 PM PT —ADVT.

CAMPAIGN FOR TOBACCO-FREE KIDS HITS THE Tobacco Industry Hard. See Today's Op-Ed page—Advt.

THE NEW YORK TIMES is available for home or office delivery in most major U.S. cities. Call toll-free 1-800-NYTIMES. Ask about Times-media TimesCard.

*Continued From Page A1*

fight aggressively for their plan, kicking it off at a meeting this week near Washington.

Not too long ago, defibrillators were so complicated that the operators had to be specially trained to read the screens and interpret the heart waves. But the heart association says a new generation of automatic, easy-to-use machines has been developed that can be operated by almost anyone. The new lightweight machines analyze heart rhythms, decide whether a shock is needed, and give simple voice instructions. The machines will not shock a person who does not need it, the manufacturers say.

What has made the machines practical, the association says, are five-year lithium batteries that eliminate the need for regular maintenance. The Food and Drug Administration approved several of the new, lightweight models last fall, but only for prescription use.

The average cost is about $3,000, but the price is expected to drop significantly if the market is opened to all who want to buy them.

The collection of data on deaths from cardiac arrest is haphazard, making the rates difficult to compare. But experts generally agree that dismal survival rates apply to all but a few American cities and most suburban and rural areas.

"This is an area that has been hidebound by rules and laws and regulations," said Dr. Myron L. Weisfeldt, the chairman of the Department of Medicine at Columbia-Presbyterian Medical Center and the head of the heart association's task force on defibrillators.

"If the defibrillators aren't there, and the survival rate is less than 5 percent, then you'd better find a way to get them there," Dr. Weisfeldt said.

### The Condition

## The Heart And Its Problems

Like Mr. Cox, about half of all those who die of heart disease die suddenly and unexpectedly, without ever having shown any symptoms, the heart association says. Many are unaware that they have clogged arteries or other types of heart disease.

In Mr. Cox's case, an autopsy showed that three coronary arteries were blocked, but there was no sign of the muscle damage that would have been present if he had had a heart attack.

If Mr. Cox's heart had not be started, he might have been a candidate for cardiac bypass surgery, Dr. Nicholas J. Fortuin, a professor of medicine at Johns Hopkins, said. That procedure restores blood flow to the heart and can add decades to a life. But Mr. Cox might have died even with early defibrillation, Dr. Fortuin said.

Cardiac arrest does not necessarily mean a heart attack occurred. Arterial blockages alone can cause the heart's electrical impulses to become disorganized and incapable of coordinating the contractions that keep the heart beating normally.

The disorganized electrical activity, called ventricular fibrillation, can last for about five minutes. During that time, a shock from a defibrillator can reorganize the electrical impulses so that the heart resumes normal beating.

But with each passing minute, the likelihood of successful defibrillation drops significantly. Expertly done

electrical impulses to be reorganized by a shock from a defibrillator.

Dr. John La Pook, a Manhattan internist and friend of Mr. Cox, was so disturbed by his friend's unexpected death that he has since purchased a defibrillator and keeps it at his apartment on Central Park West. Sometimes, he even takes his defibrillator to his regular basketball game in Brooklyn, where he plays with an friends with ages ranging from the 30's into the 50's. At first they laughed at him, Dr. La Pook said; but they seem to have come to appreciate having the thing around.

### The Device

## The Newest Models Come on the Market

Use of defibrillators by the public is generally not covered by state "good samaritan" laws, which protect amateur rescuers from liability. But cardiologists are afraid that at some point, health clubs, office buildings and other public buildings as well as airlines could be found negligent if they did not have defibrillators.

American Airlines recently became the first airline in this country to order defibrillators for its planes, and other domestic airlines are considering it because it is still not impossible to land a plane and get a defibrillator to a victim in time. Metro North has ordered defibrillators to be placed on its cart of emergency medical supplies in Grand Central Station, and a few casinos in Las Vegas have also bought defibrillators.

Dr. La Pook can legally have his own defibrillator because he is a physician. Under current Federal regulations and the law in most states, including New York, only doctors or people authorized by doctors may buy and operate defibrillators, even the simplest models.

Last fall, the National Association of State Emergency Services Directors became so concerned with the push for public access to defibrillators that it passed a resolution calling on the heart association to postpone its defibrillator campaign until data show that use by the public is effective and safe.

"They are potentially wonderful devices," said Dr. Robert R. Bass, the executive director of the Maryland Institute for Emergency Medical Services. "But we don't see any evidence that the devices are going to be effective in the hands of the public. Before we call for a national movement to place these devices everywhere, we need to know how safe they are and what's the cost benefit."

Manufacturers of the devices say they are completely safe, and the heart association says they are all but foolproof. And, they add, if the choice is between defibrillation by an amateur and no defibrillation at all, the answer is clear.

But Food and Drug Administration officials say some safety and ethical considerations have yet to be addressed.

"There's a question of whether you can do as much harm as you can do good," said Thomas J. Callahan, the Food and Drug Administration official who oversees the evaluation of such devices. "In the hands of a lay person, are there going to be more disasters than there are benefits?"

He said he was not certain that in all cases the new machines could distinguish heart rhythms that should be shocked from those that should not. To evaluate fine distinctions, he said, trained technicians are



Tony Cox died after his heart stopped as he exercised. A defibrillator might have helped his odds.

"The reality is that none of us are that good at it," said Dr. Alexander Kuehl, the chairman of the New York City medical advisory committee for emergency services and the former head of the city's emergency services agency.

"There's always a danger that you're going to shock a heart back into a living rhythm, but that the brain is going to be dead," he said. "But if we can get the heart back, very few of us play God in terms of who lives and who dies. We bring back the one thing that we can bring back, which is the heart, and hope that the brain is intact."

And those who are brain dead need not linger on life supports, he said, adding, "Two days later you unplug the respirator."

### Present Practice

## A Few New Models But Most Are Old

For the near future, at least, New Yorkers must depend on the Fire Department's emergency services for help with cardiac arrests. The department has worked aggressively for the last three years to improve response time, and there are indications that the efforts are working. But no statistics have been compiled to show whether the survival rate has improved. The study that showed a one percent survival rate in New York City was published in the Journal of the American Medical Association and was based on 1991 data.

Since then, the department has gradually equipped all fire engines in Brooklyn, Queens, the Bronx and Staten Island with defibrillators, on the theory that firetrucks are more likely to reach victims in time than are ambulances. Similar plans are under way in Manhattan.

The latest statistics show that the average response time for fire engines on cardiac arrest calls is only 'five' minutes, according to Deputy Commissioner Edward M. Dolan. It takes another 'five minutes for an ambulance to arrive, he said.

The firefighters are using virtually the same models that the heart association is advocating for public use.

The Suffolk County Police Department has ordered the models for its police cars because the county is almost entirely served by volunteer ambulance squads, which have great difficulty reaching victims in time.

Four companies are now manufacturing the machines, and are in

consultation with the heart association to be as simple as possible for amateurs to use. The recent advances that makes them practical, according to cardiologists, is the inclusion of a lithium battery with a five-year life. The batteries eliminate the need for constant maintenance or recharging, and computer chips perform complete tests of the operating systems each day.

When the machine is turned on, it gives a series of simple voice instructions, so that panicky users do not need to stop to read complex directions. The rescuer is told to attach two plastic leads to the victim's chest and then stand back.

The machine analyzes the heart rhythm and determines whether the victim's heart is in fibrillation. If so, it charges up, instructs the rescuer to stand clear, and then to push a red button that delivers a shock. The machine may call for a second or third shock if necessary, then a period of cardio-pulmonary resuscitation, followed by another cycle of shocks.

4 -13-99

## 'Fire Extinguisher' Out Heart Attacks





Portable defibrillators are making a major difference in cardiac survival rates in places like Rochester, Minn.

### How Defibrillators Help

### In the Right Places

### Assessing Lifesaving Value

Source: United States Departments of Agriculture and Health and Human Services; National Dairy Council

The New York Times

# Reader's Digest

November 1997 $2.25

*The world's largest-circulation magazine*
*over 27 million copies in 19 languages bought monthly*

## THIS MACHINE COULD SAVE YOUR LIFE
PAGE 69

## COMING SOON: WILD WEATHER
PAGE 92

### A BROTHER'S HELPING HANDS PAGE 112

NOVEMBER '97

The Education of Frank McCourt . . . . . . . . . . Barbara Sande Dimmitt 62

This Machine Could Save Your Life  Malcolm McConnell 69
A Heroine in Hell . . . . . . . . . . . . . . . Lawrence Elliott 74
The King of Dumb . . . . . . . . . . . . . . . The New Republic 83
Are You Getting the Wrong Prescription? . . Money 85
Get Ready for Some Wild Weather . . . . . . . . 92

Disabled by a Paper Cut . . . . . . . . . . Per Ola & Emily d'Aulaire 92
A Brother's Helping Hands . . . . . . . . . . . . Dale Van Atta 99
Because of Hanna's Poem . . . . . . . Diana in Wall Life 112
Journey to the Bottom of the World . . . . . . . . . . . 121
Secrets from "The Millionaire Next Door" . . . . . . . . 126
Encounter on a Kentucky Road . . . . Peter Michelmore 133
That's Outrageous! . . . . . . . . . . . . . . . . . . . 148
I Like Them Hot, Hot, Hot . . . . . . . . . . Outside 153
The Stadium Shell Game . . . . . . . . . . Jim Keown 160
Go Ahead—Smell! . . . . . . . . . Chicago Tribune Magazine 168
Radical Islam's Bloody Battlefield  Fergus M. Bordewich 168
Why Our Kids Can't Do Math  The Wall Street Journal 181
Sex After 35: It Can Be Better . . . . . . . . . . . . . . 181

American Health for Women 187

BOOK SECTION | Tears of Rage . . . . . . From the book 104

The Promise, 9 • New Help for PMS, 19
Squirrel That Slept in a Shoe, 29 • My Kid's College
Fund Blues, 45 • Heroes for Today, 49 • First Steps, 55
Tales Out of School, 25 • Humor in Uniform, 41
Quotable Quotes, 61 • Life in These United States, 81
Personal Glimpses, 90 • Laughter, 97 • Day's Work, 119
News of Medicine, 136 • Word Power, 157
Picturesque Speech, 179 • Points to Ponder, 193

"BACK ELL, MONHEGAN LIGHT—OIL ON PANEL BY AMERICAN ARTIST PETER POSKAS, 1994. COURTESY SCHMIDT BINGHAM GALLERY, NEW YORK CITY

© 1997 ConAgra Brands, Inc.

# Two new ways to a great meal:

## Follow the recipe. Or the aroma.





### Introducing Healthy Choice® Garlic Lovers. Cheese.

**Garlic Lovers Frittata**

¼ cup frozen diced potato, peppers and onions, thawed
Vegetable oil spray
¼ cup salt
⅛ cup pepper
2 tbsp egg black (also about optional)

- ¼ cup (from zucchini slices, quartered)
- 1½ cups (6 oz.) Healthy Choice Garlic Lovers Shredded Cheese
- 1 cup chopped tomatoes
- 2 cups (16 oz.) Egg Beaters®

Microwave potatoes 3 to 5 minutes on high, or until hot; drain. Spray 10" non-stick, oven-safe skillet (or pie pan) with vegetable oil spray. Layer potatoes, salt, pepper, zucchini, 1 cup cheese, and tomatoes in skillet. Shake cup of mixture; pour over vegetables in skillet. Bake 25 minutes at 350°. Top with remaining cheese; cover with foil. Continue baking 5 minutes or until center is set. Cool slightly before serving.

Yields 6 servings. Nutrition information per serving: 108 calories, 0 mg cholesterol, 477mg sodium, 0.5 g fat.

**EAT what you LIKE®**
**HEALTHY CHOICE®**
http://www.healthychoice.com

---

## *Among our*
# November Contributors

**McConnell**



CONTRIBUTING EDITOR Malcolm McConnell went to Rochester, Minn., to witness how a small high-tech device is saving lives there—and could save hundreds of thousands nationwide. *Page 69.*

**Stein**



"DESPITE WHAT people may think," visiting the South Pole is not like a stay in a meat locker," reports Mary Roach. "There's no animal life, but there are some very interesting humans." *Page 126.*

WHEN HE SAW THE OBITUARY of a one-time U.S. Senator, journalist and author Harry Stein recalled all that he had once written about the man—and realized for the first time what his reporting had missed. *Page 83*

**Roach**



"I'VE BEEN WRITING STORIES about my life as a physician for some time," says Spencer Nadler, a surgical pathologist, "and medical facts—the building blocks of my career—permeate the page. My story in Reader's Digest shows how a remarkable woman inspired me with her humanity and courage." *Page 121.*

**Nadler**



**Keown**

"I WENT FROM REPORTING about fields of dreams to fields of schemes," says San Francisco Chronicle sports columnist Tim Keown of his first assignment for The Digest. "Taxpayers today are picking up the tab on a billion-dollar welfare system for wealthy team owners—and most don't even know it." *Page 153.*



## This Machine Could Save Your Life

So why isn't it widely available?

BY MALCOLM McCONNELL

Commercial artist David Dutton, 56, sat on a commuter train, returning from New York City to his Long Island home on the evening of March 20, 1997. Dutton had no known health problems, but as the train clattered through Queens, he suddenly gasped, his face turned a mottled red, and

he slumped unconscious in his seat. It was 7:30 p.m. He had gone into cardiac arrest.

While the train crew called ahead for medical aid, a passenger performed CPR, alternately doing chest compressions and mouth-to-mouth breathing. But Dutton's heart was seized by the chaotic rhythm called

PHOTO: © DOROTHY HEARTMANN / INC.

---

heard the steadying tones of Frank McCourt, teacher: *Of course you do. Dig deeper. Find your own voice and dance your own dance.*

He scribbled a few lines. "I'm in a playground on Classon Avenue in Brooklyn with my brother Malachy. He's two, I'm three. We're on the seesaw." In the innocent voice of an unprotected child who could neither comprehend nor control the world around him, Frank McCourt told his tale of poverty and abandonment.

In September 1996 *Angela's Ashes* hit bookstores. Within weeks McCourt received an excited call from his agent: his book was getting warm reviews and selling at an unbelievable rate. The most surprising call came on April 7, 1997, when McCourt learned that *Angela's Ashes* had received America's most coveted literary award: the Pulitzer Prize.

McCourt laid his hands on the lectern, finishing his commencement address at Lincoln Center. "Early in my teaching days, the kids asked me the meaning of a poem," he said.

"I replied, 'I don't know any more than you do. I have ideas. What are your ideas?' I realized then that we're all in the same boat. What does anybody know?'

"So when you go forth tonight, fellow students—for I'm still one of you—remember that you know nothing! Be excited that your whole life is before you for learning."

As he gave them a crooked smile, the students leapt to their feet, waving and whistling. *This is too much*, he thought, startled by the intensity of their response. During months of speeches and book signings, he had received many accolades. But this—this left him fighting back tears. *It's the culmination of everything, coming from them.*

Their standing ovation continued long after Frank McCourt, the teacher who had learned his own lessons slowly but well, returned to his seat.

*Come to www.readersdigest.com to ask Frank McCourt about writing, teaching and life.*

### Long Arm of the Law

A California attorney wasn't aware that his valuable golf clubs had been stolen out of the trunk of his parked car until San Francisco police called to say they had the clubs and the thief. It seems that plainclothes officer Bob Bohannan noticed a rough-looking young man trying to hawk golf clubs one at a time on the street.

"You a golfer?" Bohannan asked. When the young man nodded, Bohannan pointed to a club and said, "I've always wondered about that one. Is it a driver or a passenger?"

"Uh," the punk hesitated, "passenger."

—Herb Caen in *San Francisco Chronicle*

68

READER'S DIGEST • NOVEMBER 1997

ventricular fibrillation (VF), and CPR alone could not jump-start it.

Dutton's only hope was the process called defibrillation: a brief electrical shock that overpowers the irregular VF rhythm so the heart can resume its natural contractions.

But by the time a rescue team carrying a defibrillator reached the train, it had been more than six minutes since Dutton's collapse, and his heart did not respond to attempts to restart it.

The great majority of cardiac-arrest victims die before help can reach them. But these deaths are not inevitable. "Many of the thousand cardiac-arrest incidents each day are clearly survivable," says Dr. Myron Weisfeldt, chairman of the American Heart Association's (AHA) task force on automatic external defibrillation. Time is critical: many cardiac arrests become fatal four to seven minutes after VF begins, so early defibrillation is the single most crucial factor. Every minute that passes before returning the heart to its normal rhythm decreases the chance of survival by ten percent; after just four minutes without defibrillation, only about 60 percent of victims survive. After ten minutes, few survive.

But in congested cities, emergency medical technicians (EMTs) equipped with defibrillators usually arrive too late. For years the cardiac-arrest survival rate in New York City, for example, was just over one percent. Nationwide it averages less than ten percent.

But a safe and effective technology exists that could improve these odds dramatically. It is the automatic external defibrillator (AED), a small computerized, battery-operated device, which can be as small as a book and weigh as little as four pounds. AEDs are nearly foolproof to operate. And their cost keeps going down: some devices now sell for around $3000.

In Rochester, Minn., automatic defibrillators have transformed emergency care of cardiac-arrest patients. In 1990 the Mayo Clinic's Dr. Roger D. White, medical director of the city's ambulance service, noted that police cars often reached cardiac-arrest victims two to three minutes before EMTs did. As trained "first responders," police officers gave CPR, but had no way of defibrillating victims, who often died. "What if we equip cars with defibrillators and train patrol officers to use them?" White suggested to the police.

Seven years later Rochester boasts what may be the highest cardiac-arrest survival rate in the world—45 percent. In the program's first five years, police defibrillated 31 cardiac-arrest patients, 18 of whom survived. Their lifesaving efficiency was tested last January 3.

Software designer Peter Czok, 50, had complained to co-worker Doreen Marks that his chest felt congested. "Maybe I'm catching pneumonia," he said. Then after lunch his head dropped, and Marks heard a weird gurgling from his throat. "Peter, don't fool around," she chided.

Czok toppled limply from his swivel chair. His face was a muddy red, his mouth agape, his sightless eyes open and blank. Terrified, Marks called 911 at 2:27 p.m.

Officer Eldon Morrison and his partner, rookie Steve Thompson, arrived at 2:30 p.m. By then Czok's face was a ghastly purple. Probing for a pulse, Thompson announced, "He's in cardiac arrest!"

As Morrison cut open Czok's shirt, Thompson pressed defibrillation pads firmly onto his chest. The computer's voice announced, "Analyzing heart rhythm. Do not touch the patient."

Within seconds the recorded voice intoned, "Shock advised. Stay clear of patient." The orange shock button flashed. "Deliver shock now."

Thompson stabbed the button. "Shock delivered," the computer announced. It was 2:31 p.m. Less than five minutes had elapsed since the 911 call.

Peter Czok was released from the hospital a week later. "I was dying when the officers arrived," he says. "If they hadn't used a defibrillator, I never would have survived."

Rochester's experience has demonstrated that nonmedical professionals equipped with AEDs and proper training can save many cardiac-arrest victims. Following this city's lead, other police agencies nationwide have embraced the use of AEDs.

"The Rochester experience has shown that the police can consistently reach cardiac-arrest patients before EMTs do," stresses Leonard

## THIS MACHINE COULD SAVE YOUR LIFE

### To Make Sure This Device Is in Your Life:

1. Ask your community police and fire departments if their "first response" vehicles contain AEDs. If not, send a letter or fax requesting them, and suggest they call Leonard Matarese, who heads the International Association of Chiefs of Police defibrillation effort, at 305-865-7586 for more information.

2. Call the nurse or medical department at your workplace to find out if your employer provides AEDs and has trained operators. If not, send a copy of this article. As Dr. Weisfeldt notes, "Thousands of people needlessly die of cardiac arrest each year in our offices and factories."

3. If your state limits access to AEDs (to find out, call the AHA at the number below), write your state senator or legislator, telling them you support changes in the law permitting trained responders to use AEDs, and that sample legislation is available from the AHA.

To learn more about sudden cardiac arrest and what you can do to bring early defibrillation to your community, contact the American Heart Association at 1-800-AHA-USA-1 or on-line at http://www.amhrt.org.

READER'S DIGEST • NOVEMBER 1997

Matarese, chief of public safety in Florida's Indian Creek Village. Last year he equipped all of his squad cars and patrol boats with AEDs. And Matarese is helping forge an alliance between the nation's fire and police chiefs that he hopes will soon put an AED in every emergency vehicle in America.

Last winter police in Cincinnati started testing AEDs in patrol cars. Similar programs have begun in Camden County, Georgia, and Greenwich, Conn. Within two weeks of training, Greenwich police saved two lives with the defibrillators.

Last July 2 firebrigade members at New York City's Grand Central Terminal were trained to operate a newly purchased AED. The next day they used it to save the life of 42-year-old attorney Bob Adams, who went into cardiac arrest while trying to catch a train.

There are still legal and bureaucratic hurdles to wider AED access.



Steve Parinisi (here with wife, Karen) owes his life to the defibrillator. "I was within minutes of death," he says.

In many states defibrillation is considered a medical procedure limited to doctors and EMTs. Chafing against such hidebound regulations, Dr. Weisfeldt stresses that the new AEDs are fail-safe in the hands of trained adults. He predicts that 100,000 people could be saved each year if AED use were expanded to include firefighters, police officers, security guards and family members of heart-disease patients. "We should press ahead to provide defibrillators and training to thousands of people, such as apartment-house custodians, bus drivers and train conductors," Weisfeldt urges.

But the strongest advocates for this innovative technology are those whose lives it has saved.

On the afternoon of Monday, December 30, 1996, Steve Parinisi, 30, and his wife Karen, 31, sat in Boston's Logan Airport. The newlyweds were returning to their Pennsylvania home after a weekend trip. Suddenly Karen saw Steve go pale and his lips turn blue. *Oh, no,* she thought. On their honeymoon in Italy two months earlier, Steve had

## THIS MACHINE COULD SAVE YOUR LIFE

suffered symptoms of heart trouble, but had seemed in good health since.

But now a massive coronary-artery blockage had triggered ventricular fibrillation. Bystanders administered CPR until medics arrived. They had to shock Steve twice with an AED before his heart had resumed spontaneous contractions.

"I was within minutes of death," Parinisi says. "But that defibrillator gave me back my life."

Reflecting on such rescues, David Dutton's widow, Sandra, notes sadly that her husband could also be alive today if AEDs had been available that March night on the commuter train. "David's needless death should be a lesson to all of us," she says. The equipment to save thousands of lives exists. Now we must demand that it be made available everywhere.

*Reprints of this article are available. See page 218*

### Cartoon Quips®

Wife to husband, about teen-age daughter: "Good news! She only wants to pierce her ears."
— Honu in *Punch*

Goldilocks, accompanied by man in suit, to three bears: "You guys are in big trouble. This is my lawyer—I burned my mouth on your porridge."
— Schwadron in *The Wall Street Journal*

Annoyed wife to husband: "No, I don't think our marriage would benefit from a mission statement."
— Mankoff in *The New Yorker*

Analyst to patient's wife: "Don't worry, ma'am. We'll do everything for him that psychobabble can do."
— Blive in *The Wall Street Journal*

Executive behind desk to prospective employee: "It's always cozy in here. We're insulated by layers of bureaucracy"
— Cotham in *The New Yorker*