

Better Homes and Gardens

www.bhglive.com
NOVEMBER 1998 $2.49

# 1998 Home of the Year

Loaded with features for comfortable living p.209

## Big, chewy cookies

They're easy to make and oh-so-good p.234

Better Homes and Gardens
Television Show
Sunday
WFSB
8 A.M.

## FLOWERS

The 7 best indoor blooms

## DECORATING

How to pick the right colors for your home p.189



health

# A Second Chance at Life

Cardiac defibrillators are saving people's lives, but not everyone has quick access to them.

Julie Lycksell and her daughters, Lisa and Laurie, are thankful their local police equipped squad cars with defibrillators.

by Kathryn Trim

When Julie Lycksell walked into a restaurant on February 6, 1998, to celebrate her forty-eighth birthday, she never dreamed she'd end up grateful just to be alive.

Julie, who lives on Long Island, New York, was about to order dessert when she slumped over onto her husband's shoulder.

All color drained from her face. Her heart stopped beating. Her husband and a doctor from a nearby table frantically started CPR and someone called an ambulance.

Without any warning, Julie—who had never experienced any heart problems—was in sudden cardiac arrest, her chance of survival dwindling with every passing minute.

Less than 60 seconds after the 911 call, Suffolk County police officer James Brierton rushed through the door carrying a machine about the size of a laptop computer. He attached two electrodes to Julie's chest, and with the press of a button, an electric shock restarted her heart—giving her the best birthday present ever.

"In twenty-six years as an operating room nurse, I've used a defibrillator on hundreds of patients," Julie says. "I just never thought someone would need to use one on me."

**The little machine that could.** Every year in the United States, more than 350,000 people collapse from sudden cardiac arrest. Few are as lucky as Julie. Ninety-five percent die before help can reach them. But now, more and more people are surviving, thanks to a lifesaving shock from a machine called an automated external defibrillator.

In sudden cardiac arrest, a chaotic rhythm—or fibrillation—overtakes the heart, causing it to stop beating.

*continued on page 146*

# A Second Chance

*continued from page 144*

There are generally no warning signs, and people often have no prior history of heart disease. The person collapses immediately and then loses consciousness. A defibrillator machine uses an electric shock to jolt the heart, allowing the normal rhythm to regain control.

The new battery-operated defibrillators cost about $3,000 and are easy and safe to use, even for someone with little or no medical knowledge. There are several different models available, but most of them monitor heart rate and pulse and, if required, direct the rescuer to push a single button that sends an electrical shock to the victim's heart.

"The machine does all the decision making. All you have to do is hook it up and follow the directions," says Dr. Terry Valenzuela, an emergency medicine professor at the University of Arizona in Tucson.

A defibrillator won't advise to shock unless the victim is in a shockable rhythm, and there's no way to override the computer and shock someone if it's not required.

While CPR buys valuable time, defibrillation is key to saving a cardiac arrest victim. For each minute the heart doesn't beat, the chance for survival goes down by 10 percent. Within four to six minutes, brain tissue begins to die. After only 10 minutes, 99 percent of sudden cardiac arrest victims are dead.

**Another rescue tool.** It's estimated that at least 100,000 cardiac arrest victims could be saved each year if first responders, such as police officers, firefighters, security staff, and flight attendants, were trained and equipped with defibrillators. Anyone planning to use a defibrillator is required to take a three-hour training course and CPR training.

In Rochester, Minnesota, a study found that police arrived at medical emergencies before an ambulance 44 percent of the time. The city's ambulances already had the defibrillators, but by installing defibrillators in Rochester police cars, the survival rate for cardiac arrest jumped from 30 percent to almost 45 percent—one of the highest rates in the country.

Just seven months before Julie's sudden cardiac arrest, the Suffolk County Police Department equipped all its squad cars with defibrillators.

But not all first responders have them. In fact, half the nation's ambulances aren't equipped with the machines, according to a 1997 survey by the American Heart Association (AHA), which is leading the charge for all emergency responders to have defibrillators. But there are several obstacles to overcome, such as cost and legal restrictions, before the machines are widespread.

American Airlines and Qantas Airlines have installed defibrillators on all or most planes. Delta Airlines is scheduled to have its entire fleet outfitted with the machines by the year 2000, and United Airlines says it will begin installing them on all their domestic and international flights starting this month. Flight attendants

## COMMUNITY COLLABORATIONS

If your city doesn't have a defibrillator, don't despair. Across the country, people are taking charge to raise money to buy the machines, which cost about $3,000.

Betty Berry of Lexington, Missouri, raised more than $5,200 to help city leaders buy one. She, along with her church, hosted a charity concert featuring her daughter's handbell choir.

In Makefield Township, Pennsylvania, high school senior Aarti Sheth worked with the local police to organize a community day, which included a 5K run, to help raise money. The event inspired an area high school to donate money from its annual fund-raiser to buy defibrillators for the city. To date, $6,000 has been raised.

"Get out there and do it," says Aarti. "Don't go in with the preconceived notion that people won't be receptive, because they'll surprise you."

Mary Newman, author of *Challenging Sudden Death: A Community Guide to Help Save Lives*, says first responders should be able to be on the scene, defibrillator in hand, within seven minutes.

If you want to make sure your local emergency medical services have defibrillators, you'll need to make a few phone calls. What you do next is optional, but Newman and the American Heart Association (AHA) have a few suggestions. Consider the following:

- Check with your local police and fire departments to see if emergency vehicles are equipped with defibrillators. If not, find out why. If funding isn't available, solicit donations from local corporations, civic groups, and private foundations, or host your own fund-raiser.
- To find out whether your state allows trained nonmedical personnel to use defibrillators, call the AHA (800/242-8721) or your local emergency medical agency. Either group should be able to tell you if your community is already equipped with defibrillators.
- Form a community task force to start a public awareness campaign.
- For more information on defibrillators, call your local AHA office.

*continued on page 148*

# A Second Chance

*continued from page 146*

This defibrillator, made by SurVivaLink Corp., weighs just under 7 pounds and turns on when you open the lid. A computerized voice walks a first responder through the rescue step-by-step. The electrodes are already connected under the lid, saving precious time. The machine analyzes the heart rhythm and determines whether a shock is needed. If so, it instructs the rescuer to push a button, which sends an electrical current to the heart.

will be trained on how to use the machines.

Putting defibrillators on every airplane would save an estimated seven lives a year, according to a 1997 study by Dr. James Atkins, a cardiologist at the University of Texas Southwestern Medical Center.

**Lifesaving for the layman.** In addition to equipping traditional first responders, proponents of defibrillators want to put them wherever the people are. In May 1997, Boyd Gaming Corp. installed defibrillators at seven of its Las Vegas casinos.

"Casinos are about the size of a small town," says Stan Smith, director of risk management for Boyd. "The paramedics do a great job, but once they get through the door they have to get through all the people."

In the past year, Boyd has trained about 700 employees, mostly security officers and office workers, to use defibrillators, which has reduced the medical response time to about one to two minutes.

The Meadowlands sports complex in East Rutherford, New Jersey, which seats up to 110,000 fans, updated its emergency medical team with several portable defibrillators in 1992. The sports complex already had a hospital-like defibrillator, but most cardiac arrests at the Meadowlands happen in the top two rows of the stadium, says Fran Guthrie, the Meadowlands emergency medical team manager. It's hard to get the bulky equipment up there fast enough. With the lighter, more portable defibrillators, the cardiac survival rate at the stadium has reached about 80 percent.

**Jumping through hoops.** With the current situation of who does and who doesn't have defibrillators, it's truly a stroke of luck being in the right place at the right time. Or, it could just be a matter of living in the right state.

Only half of the United States have laws that allow nonmedical people to use a portable defibrillator. Many older laws refer to the era when earlier versions of the machines required the person operating it to make a medical judgment.

There are also legal concerns about liability. There is a push to include defibrillators in states' versions of the Good Samaritan law. This would ensure that the responder could not be sued if he or she tried in good faith to save the victim's life and something went wrong.

The fears are unfounded, says Pat Stieg, Minnesota director of public advocacy for the AHA. "These machines are virtually foolproof, but there is always someone who says 'what if' and won't use them until they're covered by law out of fear of being sued," he says.

The AHA and community activists are working to ensure that all state laws are friendly toward the use of defibrillators. These groups expect that all states will update their laws concerning defibrillator use within the next year.

Cost also can be an issue, especially for smaller communities. Although the $3,000 price tag is quite an improvement over the original $10,000 price a few years ago, many communities simply haven't budgeted for such an investment. However, the value of having defibrillators nearby is becoming well-known, and many communities are taking it into their own hands to raise the needed money.

The biggest advocates for buying defibrillators are cardiac arrest survivors. Julie Lycksell is back working full-time at the hospital and spends much of her spare time spreading the word about the little machine that saved her life.

"They're worth the money, even if they save just one life," she says. "One of those lives was mine."

...servation architect for Denver... ...low said he can't estimate the increase... Saslow and his partners say they... costs. ...sure they can afford the project. It's not the first time development on the ...And they are convinced homebuyers site has been stumped. ...ll pay the extra costs to preserve 70 per... ...t of the exterior of the building, which

## Initial approval in 1993

...s built around 1900. The original Elephant Corral buildings have since been torn down and have been replaced by other buildings that include an office complex of the same name.

Saslow and partners initially received approval for a smaller scale development in 1993, but were stopped by several factors, including a legal dispute over right of access on the property. Additionally, the 10-story Palace Lofts development was built on the opposite corner of the block, which Saslow has said completely changed its character.

## Saslow's plan

Under Saslow's plan, the Cherry Creek ...de of 1408 Wazee would be preserved largely because of its historic signs on the building advertising M&O Cigar and Hartmann-Bruderlin Printing Co. That side would be part of the entrance to the housing units and visible on Wazee Street.

As a result, Saslow proposed a larger building on his land but faced restrictions because of the LoDo historic district.

"There's a reason for those preservation

Please see ELEPHANT on 10C

Denver will be able to send students and faculty members to Centura hospitals and clinics around the state, bring Centura professionals to classrooms to teach and learn and get help from Centura in shaping the health administration curriculum.

"We are partnering with an organization that has the same purpose we do — serving the people of Colorado," said Gary Susnara, chief executive officer of Centura, which operates 17 hospitals statewide.

"They will come in and study us and give us ideas on how we can be better. And we'll help them build a program that will train future leaders of health care," he said.

...oup ...rship

...a comeback. ...the organization ...argest show — ...people saw more ...bits in the Colora... ...on Center — but ...membership has ...ne.

...rough his compa... Colorado Inc., is ...ission for recruit... ...mbers, but he has ...ing the show out of ...et for the past 18 ...said. The show ...$30,000 a year in ...s.

..., he said, because ...en involved in the ... some years ago ...ome convinced of ...for growth.

"...a tremendous ...otential for ABC if ...

...se see ABC on 10C

# United to equip its planes with advanced medical gear

By Jeffrey Leib
Denver Post Business Writer

United Airlines said it will begin placing advanced medical equipment, including cardiac defibrillators, on all its planes this summer "to allow employees and volunteer medical personnel to assist customers who experience medical emergencies in flight."

Defibrillators give the heart an electric shock and can restore a normal heart rhythm in many cases of cardiac arrest, Gary Kohn, United's corporate medical director, said in a message to company employees on Wednesday.

## Following American's lead

In putting the equipment on its planes, United will follow the lead taken by American Airlines in installing defibrillators and other medical gear on planes. About a year ago, American placed the equipment on its aircraft that fly

international routes over water. Later this year, American plans to add the equipment to planes in domestic service.

Delta Air Lines announced recently that it too will install the life-saving cardiac devices and "expanded emergency medical kits" on all of its planes, beginning in July.

United said it will provide advanced training on defibrillators for flight attendants. It said an "enhanced medical kit" it will install on planes contains drugs to treat cardiac arrest and other medical conditions such as diabetes, seizures, asthma and allergic reactions.

The kits will be available for use by "volunteer physicians" who may be on board during an emergency, the company said.

A computer inside the defibrillator "assesses a customer's heart rhythm and that determines whether a shock is needed," United said.

## Airline sued

Recently, the widow of a passenger who died of a heart attack on board a United flight sued the airline, claiming that his life might have been saved if the plane had been equipped with a defibrillator and drugs to treat a cardiac arrest.

United spokesman Joe Hopkins said the company's decision to add defibrillators and the advanced medical kit to its planes was unrelated to the lawsuit.

"We've been looking at this is...

Please see UNITED on 10C

*Denver Post*, Denver, Colorado
Thurs day 12 Month Feb Yr 1998
Page # 1C Column 2,3,4

# [illegible] holds 11th annual expo

ABC from Page 1C

things are done right," he said. "Colorado has a certain aura to it that's a marketable item."

"One of the problems we've had with ABC was the lack of getting anything done," he said. "There's been some momentum building; we've been growing ever since people realized there was a live body around, and that's generating new interest with the program."

The roster of members — who pay $295 a year if they have sales less than $5 million, and $500 with higher sales — is about 120, said Webber. That means almost a third [illegible] membership has been added in the past few months.

The organization has a Web site, www.marketcolorado.com, and is setting up an Internet mall for sales of Colorado-made products.

"One of our biggest challenges," Webber said, "is most small companies that get involved in ABC don't have distribution systems for the products."

Admission to the expo is $3 for adults, with a $1 discount if you show a King Soopers Sooper Card, a Wal-Mart Supercenter sales receipt, or a ticket stub from the Colorado Garden and Home Show, being held at the Convention Center next door.

Free parking is available at Elitch's, from which shuttle buses will operate continuously Saturday and Sunday for $1 per round trip.

# United to outfit planes with medical equipment

UNITED from Page 1C

[illegible] for more than two years with the Federal Aviation Administration and Air Transport Association," said Hopkins. The ATA is a trade group that represents most major U.S. airlines.

United also involved its unions in planning to add the emergency medical equipment to planes. Hopkins added. United has about 21,[illegible]00 unionized flight attendants and 9,500 pilots who are members of the Air Line Pilots Association.

United said a team of employees from its medical department, flight operations and onboard services — which includes flight attendants — have been working for more than a year to streamline in-flight medical emergency procedures, design crew training for handling emergencies and develop a database on ground medical facilities. United accounted for about two-thirds of Denver International Airport's passenger traffic last year; it flew 23 million passengers in and out of DIA in 1997.

*Denver Post*, Denver, Colorado
Thursday 12 Month Feb Yr 1998
Page # 10C Column 1,2

PRICED RIGHT!
Everyday at Computer All[iance]
Acer AOpen
PENTIUM® II 233MMX
• 32MB RAM
• 4.3GB HD
Complete Multimedia System with 24X CD ROM
only $1299.95
Monitor Sold Separately
32x CD ROM $99.95
External Mac
SounTastic
MEMORY
4MB 72 Pin Non Parity $19.95
8MB 72 Pin Non Parity $29.95
16MB 72 Pin Non Parity $39.95
32MB 72 Pin Non Parity $79.95
With coupon only • Exp. 2/14/98
Intel
P166MMX
P200MMX
P233MMX
Installation
With coupon only
Computer Alliance
SERVICE
UPGRADES
NETWORKS
1244 Sant
832-
1401 S.
727-

There's a Lot to Love About Our New Calling Plans

ERICSSON DH
DUAL MOD
DIGITAL PC
$49.99
OFFER EXP: 2 1

Sunday, November 28, 1999 THE DENVER POST

# LIFEATTENDANTS

Special to The Denver Post / Steve Kagan

United Airlines flight attendant Loretta Sommers learns to use a defibrillator while Cathy Dikoes looks on.

## Airline introduces defibrillators

By Jeffrey Leib
Denver Post Business Writer

CHICAGO — A United Airlines flight attendant lies unconscious in the rear galley of the Boeing 727. If it's a heart attack, she'll be dead in 10 minutes unless fellow crew member Charlie Pender can save her.

Pender reaches into the plane's "grab-and-go" bag and takes out a device that will analyze the problem and, if needed, zap the heart back to life. He presses the defibrillator's green "on" button.

The machine's mechanical voice calls out instructions: "Apply pads to the patient's bare chest. Plug in pads' connector next to flashing light."

■ AIRLINES: Life savers being installed. /7K

The device analyzes the heart rhythm.

"Shock advised," it says. "Stay clear of patient."

Pender presses the orange "shock" button.

The machine considers the results. They're good. "It is safe to touch the patient. Check airway, check breathing, check pulse. If needed, begin CPR."

Pender and two colleagues, Gayle Rhea and Jerry Nabors, have made the "save."

But the rescue occurred not on a plane but in a hotel room near O'Hare Airport, and the crew member actually was a mannequin named Annie.

They and another dozen United flight attendants are learning how to use defibrillators as part of United's emergency medical training program. The airline has

Please see HELP on 7K

### Portable defibrillator easy to use

United Airlines has started to put automated external defibrillators on its planes to treat victims of sudden cardiac arrest. All 592 planes in United's fleet will be equipped with the device by February 2001 and flight attendant training has begun.

Turn on the machine and a built-in speaker gives clear, step-by-step spoken instructions.
Weight: 4 pounds
Cost: $3,000-$4,000
1
2
3
Speaker
Shock button is pressed once the machine determines if a shock is needed.
Screen shows the status of the defibrillator and electrical rhythm of the patient's heart.

Source: Agilent Technologies

The Denver Post/Peter Pauley

"This will save lives. I have no doubt about that."

Thomas Frohlich
chief of cardiology at Evanston Hospital, near Chicago

| THIS SEARCH | THIS DOCUMENT | GO TO |
|---|---|---|
| Next Hit | Forward | New Bills Search |
| Prev Hit | Back | HomePage |
| Hit List | Best Sections | Help |
| | Contents Display | |

Bill 5 of 5
Final version (Enrolled Bill) as passed by both Houses. There are 4 other versions of this bill.

| GPO's PDF Display | Congressional Record References | Link to House Committee Report 456 | Bill Summary & Status | Printer Friendly Display - 7,953 bytes. [Help] |
|---|---|---|---|---|

**Aviation Medical Assistance Act of 1998 (Enrolled as Agreed to or Passed by Both House and Senate)**

--H.R.2843--

H.R.2843

*One Hundred Fifth Congress*

*of the*

*United States of America*

*AT THE SECOND SESSION*

Begun and held at the City of Washington on Tuesday,

the twenty-seventh day of January, one thousand nine hundred and ninety-eight

An Act

To direct the Administrator of the Federal Aviation Administration to reevaluate the equipment in medical kits carried on, and to make a decision regarding requiring automatic external defibrillators to be carried on, aircraft operated by air carriers, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the `Aviation Medical Assistance Act of 1998'.

## SEC. 2. MEDICAL KIT EQUIPMENT AND TRAINING.

Not later than 1 year after the date of the enactment of this Act, the Administrator of the Federal

Aviation Administration shall reevaluate regulations regarding: (1) the equipment required to be carried in medical kits of aircraft operated by air carriers; and (2) the training required of flight attendants in the use of such equipment, and, if the Administrator determines that such regulations should be modified as a result of such reevaluation, shall issue a notice of proposed rulemaking to modify such regulations.

## SEC. 3. REPORTS REGARDING DEATHS ON AIRCRAFT.

(a) IN GENERAL- During the 1-year period beginning on the 90th day following the date of the enactment of this Act, a major air carrier shall make a good faith effort to obtain, and shall submit quarterly reports to the Administrator of the Federal Aviation Administration on, the following:

(1) The number of persons who died on aircraft of the air carrier, including any person who was declared dead after being removed from such an aircraft as a result of a medical incident that occurred on such aircraft.

(2) The age of each such person.

(3) Any information concerning cause of death that is available at the time such person died on the aircraft or is removed from the aircraft or that subsequently becomes known to the air carrier.

(4) Whether or not the aircraft was diverted as a result of the death or incident.

(5) Such other information as the Administrator may request as necessary to aid in a decision as to whether or not to require automatic external defibrillators in airports or on aircraft operated by air carriers, or both.

(b) FORMAT- The Administrator may specify a format for reports to be submitted under this section.

## SEC. 4. DECISION ON AUTOMATIC EXTERNAL DEFIBRILLATORS.

(a) IN GENERAL- Not later than 120 days after the last day of the 1-year period described in section 3, the Administrator of the Federal Aviation Administration shall make a decision on whether or not to require automatic external defibrillators on passenger aircraft operated by air carriers and whether or not to require automatic external defibrillators at airports.

(b) FORM OF DECISION- A decision under this section shall be in the form of a notice of proposed rulemaking requiring automatic external defibrillators in airports or on passenger aircraft operated by air carriers, or both, or a recommendation to Congress for legislation requiring such defibrillators or a notice in the Federal Register that such defibrillators should not be required in airports or on such aircraft. If a decision under this section is in the form of a notice of proposed rulemaking, the Administrator shall make a final decision not later than the 120th day following the date on which comments are due on the notice of proposed rulemaking.

(c) CONTENTS- If the Administrator decides that automatic external defibrillators should be required--

(1) on passenger aircraft operated by air carriers, the proposed rulemaking or

recommendation shall include--

(A) the size of the aircraft on which such defibrillators should be required;

(B) the class flights (whether interstate, overseas, or foreign air transportation or any combination thereof) on which such defibrillators should be required;

(C) the training that should be required for air carrier personnel in the use of such defibrillators; and

(D) the associated equipment and medication that should be required to be carried in the aircraft medical kit; and

(2) at airports, the proposed rulemaking or recommendation shall include--

(A) the size of the airport at which such defibrillators should be required;

(B) the training that should be required for airport personnel in the use of such defibrillators; and

(C) the associated equipment and medication that should be required at the airport.

(d) LIMITATION- The Administrator may not require automatic external defibrillators on helicopters and on aircraft with a maximum payload capacity (as defined in section 119.3 of title 14, Code of Federal Regulations) of 7,500 pounds or less.

(e) SPECIAL RULE- If the Administrator decides that automatic external defibrillators should be required at airports, the proposed rulemaking or recommendation shall provide that the airports are responsible for providing the defibrillators.

## SEC. 5. LIMITATIONS ON LIABILITY.

(a) LIABILITY OF AIR CARRIERS- An air carrier shall not be liable for damages in any action brought in a Federal or State court arising out of the performance of the air carrier in obtaining or attempting to obtain the assistance of a passenger in an in-flight medical emergency, or out of the acts or omissions of the passenger rendering the assistance, if the passenger is not an employee or agent of the carrier and the carrier in good faith believes that the passenger is a medically qualified individual.

(b) LIABILITY OF INDIVIDUALS- An individual shall not be liable for damages in any action brought in a Federal or State court arising out of the acts or omissions of the individual in providing or attempting to provide assistance in the case of an in-flight medical emergency unless the individual, while rendering such assistance, is guilty of gross negligence or willful misconduct.

## SEC. 6. DEFINITIONS.

In this Act--

(1) the terms `air carrier', `aircraft', `airport', `interstate air transportation', `overseas air

transportation', and `foreign air transportation' have the meanings such terms have under section 40102 of title 49, United States Code;

(2) the term `major air carrier' means an air carrier certificated under section 41102 of title 49, United States Code, that accounted for at least 1 percent of domestic scheduled-passenger revenues in the 12 months ending March 31 of the most recent year preceding the date of the enactment of this Act, as reported to the Department of Transportation pursuant to part 241 of title 14 of the Code of Federal Regulations; and

(3) the term `medically qualified individual' includes any person who is licensed, certified, or otherwise qualified to provide medical care in a State, including a physician, nurse, physician assistant, paramedic, and emergency medical technician.

Speaker of the House of Representatives.

Vice President of the United States and

President of the Senate.

---

*THIS SEARCH*
Next Hit
Prev Hit
Hit List

*THIS DOCUMENT*
Forward
Back
Best Sections
Contents Display

*GO TO*
New Bills Search
HomePage
Help

---



## Appendix A – YMCA of the USA Medical Advisory Committee Recommendation

The Use of Automated External Defibrillators in YMCAs

A Statement of the YMCA of the USA Medical Advisory Committee:

Sudden cardiac arrest is a major cause of death in the United States. It claims an estimated 225,000 lives each year. Early use of cardiopulmonary resuscitation (CPR) and rapid defibrillation are the two major contributors to the survival of adult victims of sudden cardiac arrest. As an organization dedicated to the health and safety of its constituents, many of whom participate in activities requiring physical exertion, YMCAs have long required staff to be certified in CPR in the event of a cardiac emergency in a YMCA activity. With the development of automated external defibrillators (AEDs), YMCAs and other community organizations have access to a new tool, which can significantly increase the survival rate of adult cardiac arrest victims.

AEDs that accurately analyze cardiac rhythms and, if appropriate, deliver an electric counter shock were introduced in 1979. AEDs are widely used by trained emergency personnel and first-responders, and have proven accurate and effective. A logical extension of the AED concept is "public access defibrillation", the widespread use of AEDs by nonmedical, minimally trained personnel.

Recent technological breakthroughs have made AEDs easier to use and maintain, smaller and more lightweight, and lower in cost. The new generation of AEDs make it more practical to train and equip a wide range of emergency first-responders in the community, including selected YMCA staff members. Safety is ensured by the built-in computers, which allow the unit to recognize ventricular fibrillation (an arrhythmia that causes cardiac arrest), advise the operator that a shock is indicated, and deliver the shock as a safe level.

The American Heart Association has published a statement[1] endorsing the use of AEDs in public places, stating that "Automatic external defibrillation is one of the most promising methods for achieving rapid defibrillation. In public access defibrillation, the technology of defibrillation and training in its use are accessible to the community". It should be noted that the AHA recommends the use of AEDs only with persons over the age of eight.

The Medical Advisory Committee of the YMCA of the USA endorses the American Heart Association's position on the use of automated external defibrillators, and suggests that YMCAs may want to consider having them available in their facilities and programs. Following are guidelines regarding the use of AEDs in the YMCA:

---

[1] "Public Access Defibrillation", American Heart Association, June 1995



1. The AED equipment should be purchased from a manufacturer who has met FDA standards.

2. YMCA staff should be trained in the procedures and use of the AED. Supplying a training program in the use of the equipment is one of the benchmarks of a reputable vendor. As a minimum, on-going staff training on a yearly basis is recommended, either from the equipment manufacturer or from a nationally recognized organization such as the American Heart Association, the American Red Cross, or the National Safety Council. YMCAs should check their state law regarding training requirements and guidelines.

3. In conjunction with their Medical Advisory Committee, YMCAs should establish and follow specific procedures for using the AED.

4. YMCAs should establish a regular maintenance and testing schedule for the AED equipment.

The American Heart Association recommends the following manufacturers who have met FDA standards for automated external defibrillators:

Philips Medical Systems/Heartstream, 800-934-7372
Laerdal Medical Corporation, 800-431-1055
Physio-Control Corporation, 800-426-8047
SurVivalink, 800-991-5465

November 1997



**Assembly Bill No. 2041**

CHAPTER 718

An act to amend Section 1714.21 of the Civil Code, to amend Section 1797.190 of, and to amend, repeal, and add Section 1797.196 of, the Health and Safety Code, relating to liability.

[Approved by Governor September 20, 2002. Filed
with Secretary of State September 20, 2002.]

LEGISLATIVE COUNSEL'S DIGEST

AB 2041, Vargas.   Liability: emergency care.

Existing law provides immunity from civil liability to any person who completes a basic cardiopulmonary resuscitation (CPR) or automatic external defibrillator (AED) course that complies with regulations adopted by the Emergency Medical Services (EMS) Authority and the standards of the American Heart Association or the American Red Cross, and who, in good faith, renders emergency care by the use of an AED at the scene of an emergency, without the expectation of receiving compensation for providing the emergency care.

This bill would revise those provisions by deleting the requirement that a person complete a basic CPR or AED course. The bill would further provide immunity from civil liability to a person or entity that acquires an AED for emergency use and renders emergency care, if that person or entity is in compliance with specified requirements.

Existing law authorizes the EMS Authority to establish minimum standards for AED use and training by unlicensed or uncertified individuals. Existing law requires specified persons to meet those standards.

This bill would expand the authorization to establish standards and would delete the requirement that specified persons meet those standards.

This bill would also require that the supplier of an AED notify the local EMS authority of the existence, location, and type of AED acquired, and provide to the acquirer specified information governing the use and maintenance of the AED. The bill would additionally require certain persons or entities that have acquired an AED to ensure employee training in CPR and AED use, as specified, and to follow particular emergency safety procedures. The bill would specify that the above requirements shall remain effective until January 1, 2008.

*The people of the State of California do enact as follows:*

SECTION 1. Section 1714.21 of the Civil Code is amended to read:

1714.21. (a) For purposes of this section, the following definitions shall apply:

(1) "AED" or "defibrillator" means an automated or automatic external defibrillator.

(2) "CPR" means cardiopulmonary resuscitation.

(b) Any person who, in good faith and not for compensation, renders emergency care or treatment by the use of an AED at the scene of an emergency is not liable for any civil damages resulting from any acts or omissions in rendering the emergency care.

(c) A person or entity who provides CPR and AED training to a person who renders emergency care pursuant to subdivision (b) is not liable for any civil damages resulting from any acts or omissions of the person rendering the emergency care.

(d) A person or entity that acquires an AED for emergency use pursuant to this section is not liable for any civil damages resulting from any acts or omissions in the rendering of the emergency care by use of an AED, if that person or entity has complied with subdivision (b) of Section 1797.196 of the Health and Safety Code.

(e) A physician who is involved with the placement of an AED and any person or entity responsible for the site where an AED is located is not liable for any civil damages resulting from any acts or omissions of a person who renders emergency care pursuant to subdivision (b), if that physician, person, or entity has complied with all of the requirements of Section 1797.196 of the Health and Safety Code that apply to that physician, person, or entity.

(f) The protections specified in this section do not apply in the case of personal injury or wrongful death that results from the gross negligence or willful or wanton misconduct of the person who renders emergency care or treatment by the use of an AED.

(g) Nothing in this section shall relieve a manufacturer, designer, developer, distributor, installer, or supplier of an AED or defibrillator of any liability under any applicable statute or rule of law.

SEC. 2. Section 1797.190 of the Health and Safety Code is amended to read:

1797.190. The authority may establish minimum standards for the training and use of automatic external defibrillators.

SEC. 3. Section 1797.196 of the Health and Safety Code is amended to read:

1797.196. (a) For purposes of this section, "AED" or "defibrillator" means an automated or automatic external defibrillator.

(b) In order to ensure public safety, any person or entity that acquires an AED is not be liable for any civil damages resulting from any acts or omissions in the rendering of the emergency care under subdivision (b) of Section 1714.21 of the Civil Code, if that person or entity does all of the following:

(1) Complies with all regulations governing the placement of an AED.

(2) Ensures all of the following:

(A) That the AED is maintained and regularly tested according to the operation and maintenance guidelines set forth by the manufacturer, the American Heart Association, and the American Red Cross, and according to any applicable rules and regulations set forth by the governmental authority under the federal Food and Drug Administration and any other applicable state and federal authority.

(B) That the AED is checked for readiness after each use and at least once every 30 days if the AED has not been used in the preceding 30 days. Records of these checks shall be maintained.

(C) That any person who renders emergency care or treatment on a person in cardiac arrest by using an AED activates the emergency medical services system as soon as possible, and reports any use of the AED to the licensed physician and to the local EMS agency.

(D) For every AED unit acquired up to five units, no less than one employee per AED unit shall complete a training course in cardiopulmonary resuscitation and AED use that complies with the regulations adopted by the Emergency Medical Service Authority and the standards of the American Heart Association or the American Red Cross. After the first five AED units are acquired, for each additional five AED units acquired, one employee shall be trained beginning with the first AED unit acquired. Acquirers of AED units shall have trained employees who should be available to respond to an emergency that may involve the use of an AED unit during normal operating hours.

(E) That there is a written plan that describes the procedures to be followed in the event of an emergency that may involve the use of an AED, to ensure compliance with the requirements of this section. The written plan shall include, but not be limited to, immediate notification of 911 and trained office personnel at the start of AED procedures.

(3) Building owners ensure that tenants annually receive a brochure, approved as to content and style by the American Heart Association or American Red Cross, which describes the proper use of an AED, and also ensure that similar information is posted next to any installed AED.

(4) No less than once a year, building owners will notify their tenants as to the location of AED units in the building.

(c) Any person or entity that supplies an AED shall do all of the following:

(1) Notify an agent of the local EMS agency of the existence, location, and type of AED acquired.

(2) Provide to the acquirer of the AED all information governing the use, installation, operation, training, and maintenance of the AED.

(d) A violation of this provision is not subject to penalties pursuant to Section 1798.206.

(e) The protections specified in this section do not apply in the case of personal injury or wrongful death that results from the gross negligence or willful or wanton misconduct of the person who renders emergency care or treatment by the use of an AED.

(f) Nothing in this section or Section 1714.21 shall be construed to require a building owner or a building manager to acquire and have installed an AED in any building.

(g) This section shall remain in effect only until January 1, 2008, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2008, deletes or extends that date.

SEC. 4. Section 1797.196 is added to the Health and Safety Code, to read:

1797.196. (a) For purposes of this section, "AED" or "defibrillator" means an automated or automatic external defibrillator.

(b) In order to ensure public safety, any person who acquires an AED shall do all of the following:

(1) Comply with all regulations governing the training, use, and placement of an AED.

(2) Notify an agent of the local EMS agency of the existence, location, and type of AED acquired.

(3) Ensure all of the following:

(A) That expected AED users complete a training course in cardiopulmonary resuscitation and AED use that complies with regulations adopted by the Emergency Medical Services (EMS) Authority and the standards of the American Heart Association or the American Red Cross.

(B) That the defibrillator is maintained and regularly tested according to the operation and maintenance guidelines set forth by the manufacturer, the American Heart Association, and the American Red Cross, and according to any applicable rules and regulations set forth by the governmental authority under the federal Food and Drug Administration and any other applicable state and federal authority.

(C) That the AED is checked for readiness after each use and at least once every 30 days if the AED has not been used in the preceding 30 days. Records of these periodic checks shall be maintained.

(D) That any person who renders emergency care or treatment on a person in cardiac arrest by using an AED activates the emergency medical services system as soon as possible, and reports any use of the AED to the licensed physician and to the local EMS agency.

(E) That there is involvement of a licensed physician in developing a program to ensure compliance with regulations and requirements for training, notification, and maintenance.

(c) A violation of this provision is not subject to penalties pursuant to Section 1798.206.

(d) This section shall become operative on January 1, 2008.

O



2nd Edition

Health & Safety, Legal & Ethical Standards for U.S. IHRSA clubs as of 1998

# STANDARDS FACILITATION GUIDE

IHRSA

International Health, Racquet & Sportsclub Association

# ACKNOWLEDGEMENTS

*IHRSA gratefully acknowledges the generous contributions of time, insight, and support of the Membership/Standards Review Committee and of the following individuals, without whose efforts this Facilitation Guide would not have been possible.*

- ***Peg Calvario, Owner,*** Pottstown Health Club, Pottstown, Pennsylvania
- ***Bob Chaiken, Regional Manager,*** Club Sports International (CSI), Denver, Colorado
- ***Nestor L. Fernandez II, Regional Manager,*** Western Athletic Club, San Francisco, California
- ***Rob Goldman, Vice President,*** The Columbia Association, Columbia, Maryland
- ***Gary Klencheski, President,*** Fitcorp, Boston, Massachusetts
- ***Mike McPhee,*** Club Team, Toronto, Ontario, Canada
- ***Frank Napolitano, President,*** Highpoint Athletic Club, Chalfont, Pennsylvania
- ***Stephen J. Tharrett, Vice President,*** Athletics and Tennis, Club Corporation of America (CCA), Dallas, Texas

© Copyright 1998, IHRSA, The International Health, Racquet & Sportsclub Association, 263 Summer Street, Boston, MA 02210 800-228-4772 (U.S. and Canada), 617-951-0055 (Massachusetts and International), 617-951-0056 (Fax), 888-658-8611 (Fax on Demand), info@ihrsa.org (E-mail), http://www.ihrsa.org (Web site)

*Cover illustration by Jean Tuttle*

# TABLE OF CONTENTS

| | |
|---|---|
| 2 | Code of Conduct |
| 3 | Preface |
| 3 | Membership Pledge |
| 4 | Standards Conversion Chart |
| 5 | IHRSA Membership Eligibility Standards |
| 6 | Introduction |
| 7 | IHRSA Membership Review/Disciplinary Process |
| 9 | IHRSA Membership Review Complaint Form |
| 10 | Associate Member Code of Conduct |
| 11 | Associate Member Review Process |
| 12 | Ethical Standards |
| 14 | IHRSA's Summary of Health Club Consumer Protection Laws |
| 15 | Health and Safety Standards |
| 17 | In Case Of An Emergency |
| 19 | Physical Activity Readiness Questionnaire (PAR-Q) |
| 20 | Health History Questionnaire |
| 22 | Physician's Statement and Clearance Form |
| 23 | SUBJECT: Code-One-Life Threatening Emergency |
| 25 | Partial List of Club Professional Certifying Organizations |
| 29 | The Pottstown Health Club's Childcare Policy Statement |
| 31 | References to other, relevant IHRSA publications and resources |

# PREFACE

*By Stephen J. Tharrett, MS*

IHRSA quality means: insuring that each prospective member is treated with honesty and integrity; that your club allows that person the freedom to select his or her membership without coercion; that your club provides a facility, equipment, and activities that are safe; and, finally, that your club provides a qualified staff that can fully meet the needs of both prospects and members.

Since 1992, IHRSA has embraced this belief by requiring that its member clubs adhere to a set of membership eligibility standards. These standards, relating to health and safety, and ethics, are the very foundation of the association.

In 1995, the American College of Sports Medicine (ACSM) embarked on the process of drafting a second version of its standards for health and fitness facilities. The first version, numbering more than 300 and detailed in the now-famous "yellow book" published in 1992, weren't well-received by IHRSA. Recognizing the importance of having a single set of guidelines for the industry, the ACSM appointed a committee, which I headed, to evaluate the existing standards, and then produce a set of industry-acceptable ones. This committee included IHRSA members: Jennifer Harding, of the East Side Athletic Club in Milwaukie, Oregon; Gary Klencheski, M.Ed, President, Fitcorp, Boston; and Frank Napolitano, JD, President, Highpoint Athletic Club, Chalfont, Pennsylvania.

As part of the review and development process, the committee utilized a peer-review group consisting of over 90 organizations, including the YMCA, JCC, IDEA, AFAA, and the President's Council on Physical Fitness and Sports (PCPFS). This group also involved numerous IHRSA members.

Over a one-year period, the committee and peer-review group generated five or six drafts, finally reaching agreement on six health and safety standards and over 300 guidelines. With the addition of a standard for the care of children in clubs, the six ACSM standards articulate the original vision of the IHRSA standards in a way which allows each facility more latitude to determine the exact criteria for its own compliance.

Hence, in April of 1997, IHRSA's board of directors and membership overwhelmingly supported a plan to substitute the six ACSM standards for IHRSA's original seven standards on health and safety, thus creating one set to serve as the cornerstone of quality in the industry beginning in 1998.



# INTRODUCTION

*By Gary Klencheski*

On January 1, 1994, IHRSA adopted Membership Eligibility Standards for all members of the association. These standards represented baseline performance criteria that clubs needed to comply with in order to provide users with a relatively safe environment in which every physical activity, or program, is conducted in an appropriate manner.

To assist its members in complying with the Membership Eligibility Standards, IHRSA developed a *Standards Facilitation Guide* in 1993.

This past year, the association revised its Membership Eligibility Standards. Consequently, we have revised the Standards Facilitation Guide, and have provided you with the following information:

- An interpretation of each standard;

- Answers to common questions about each standard;

- Examples of various forms used by clubs that believe themselves to be in compliance with the revised standards.

Several of the standards are followed by recommendations that clubs may want to consider. However, these recommendations do not imply a higher standard of industry practice at this time, and clubs are not currently required to comply with them.

Members may find that exceeding some of these standards is desirable or necessary. This document is not intended to create new laws, and is not a substitute for local, state, and federal law, which will always take precedence. IHRSA's Government Relations Department produces legal briefing papers to assist members (see page 31), but clubs may still need to check local and state law, or consult with an attorney, about any legal questions they may have.

Each IHRSA member has the responsibility to abide by the association's Membership Pledge, Membership Eligibility Standards, Code of Conduct, and By-Laws. Membership compliance is based on the honor system. In order for these standards to be credible to consumers, the media, regulatory agencies, and ourselves, a club owner or an authorized representative of each club is asked to verify, annually, that their club(s) conforms to the Membership Eligibility Standards. Furthermore, IHRSA has developed a Membership Review Committee, composed of three members of the board of directors and two non-board members appointed by the chairperson, to review reports of member noncompliance, and to take appropriate disciplinary action. Any IHRSA member has the right to initiate the membership review process by submitting, in writing, to IHRSA's executive director, evidence of such noncompliance on any part of any member. The Membership Review Committee and, then, the board of directors, after satisfying each party's due-process rights, will then determine the appropriate action to be taken.

# Code of Conduct

*As a member of IHRSA, we consider it our mission to enhance the quality of life through physical fitness and sports. To this end, we endeavor to provide quality facilities, programs, and instruction. We further strive to instill in those we serve an understanding of the value of physical fitness and sports to their lives.*

**In order to fulfill our mission, we pledge the following:**

- That we open our membership to persons of all races, creeds, and places of national origin;
- That we treat each member as though the success of our club depends on that individual alone;
- That we systematically upgrade our professional knowledge and keep abreast of new developments in our field;
- That we design our facilities and programs with the members' safety in mind;
- That we continue to increase the value and benefits of our services and programs;
- That we provide public-service programs to expand awareness of the benefits of regular exercise and sports;
- That we deliver what we promise; and
- That we agree to conduct our business in a manner which commands the respect of the public for our industry and for the goals toward which we strive.

IHRSA is a nonprofit trade association serving the private health, racquet, and sportsclub industry worldwide.

# Membership Pledge

*As a member of IHRSA, I agree to operate my club(s) in the best interest of the consumer and the industry by:*

- Abiding by all local, state, or federal consumer-protection legislation and all other applicable laws;
- Placing all presell membership fees in escrow in a segregated account;
- Refusing to sell prepaid lifetime memberships;
- Not guaranteeing membership or renewal fees beyond a three-year period or the period permitted by applicable law;
- Refusing to engage in deceptive, high-pressure sales tactics;
- Opening membership to persons of all races, creeds, and places of national origin;
- Operating my club(s) in accordance with the principles outlined in the IHRSA Code of Conduct.

# STANDARDS CONVERSION CHART

### Original IHRSA Membership Eligibility Standards

*Health and Safety*

Standard 1: At all times, the club has at least one fully stocked first aid kit in a place where staff can easily access it.

Standard 2: The club has at least one staff member scheduled to be on site at all times who has current CPR certification.

Standard 3: The club has an emergency plan in plain view of front-desk personnel and posts the telephone numbers for police, fire and emergency medical assistance in the front-desk area so that, if need be, such assistance can be summoned immediately.

Standard 4: The club offers a standardized health history questionnaire, such as the Physical Activity Readiness Questionnaire (PAR-Q), to all new club members before they begin using any of the club's athletic or fitness facilities.

Standard 5: In the event that the club identifies health problems that would put a member at risk upon beginning a program of regular exercise, the club recommends that those individuals who are found to have such risk factors obtain medical clearance (physician's approval) before beginning their regular exercise program.

Standard 6: The person who has supervisory responsibility for the aerobics program at the club has at least a bachelor's degree in exercise science or physical education OR a current certification from a nationally or internationally recognized certifying agency.

Standard 7: The person who has supervisory responsibility for the fitness program at the club has at least a bachelor's degree in exercise science or physical education OR a current certification from a nationally or internationally recognized certifying agency.

Standard 8: The club conforms to local and state codes relating to signage alerting members to the potential risks involved in each of the following areas: swimming pools, whirlpools, saunas, steam rooms, cold plunge, suntan equipment, racquetball/squash courts and exercise areas.

*Ethical*

Standard 9: The club will open its membership to persons of all races, creeds, and places of national origin.

Standard 10: The club responds to and endeavors to resolve within 60 days any consumer complaints made to the Better Business Bureau or to state or local Consumer Protection Agencies (or other such agencies).

Standard 11: The club will place all presell membership fees in a segregated escrow account.

Standard 12: The club will not sell prepaid, lifetime memberships.

Standard 13: The club meets state and/or local statutes pertaining to providing new members with written information regarding their right to cancel their membership and/or to refunds for members who (a) relocate or (b) have documentable medical reasons why they can no longer engage in club fitness or athletic activities.

## PLUS

### The ACSM's Six Standards

1. A facility must be able to respond in a timely manner to any reasonably foreseeable emergency event that threatens the health and safety of facility users. Toward this end, a facility must have an appropriate emergency plan that can be executed by qualified personnel in a timely manner.

2. A facility must offer each user a preactivity screening that is appropriate to the physical activities to be performed by the user.

3. Each person who has supervisory responsibility for a physical activity program or area at a facility must have demonstrable professional competence in that physical activity program or area.

4. A facility must post appropriate signage alerting users to the risks involved in their use of those areas of a facility that present potential increased risk(s).

5. A facility that offers youth services or programs must provide appropriate supervision.

6. A facility must conform to all relevant laws, regulations, and published standards.

## EQUALS

## IHRSA's New Membership Eligibility Standards

(see next page)

2 Hell Joy 8

# IHRSA Membership Eligibility Standards

*Each member ("Member") has the responsibility to abide by the Association's Membership Pledge, Membership Eligibility Standards, Code of Conduct, and By-Laws. None of these, however, are intended to create new law or substitute for local, state, or federal law, which will always take precedence. IHRSA will assist clubs as much as possible in interpreting these standards, but clubs need to check local and state law, or check with an attorney about any legal questions they may have.*

**Standard 1.**

The club will open its membership to persons of all races, creeds, and places of national origin.

**Standard 2.**

The club responds to and endeavors to resolve, within 60 days, any consumer complaints made to the Better Business Bureau or to state or local Consumer Protection Agencies (or other such agencies).

**Standard 3.**

The club will place all presell membership fees in a segregated escrow account.

**Standard 4.**

The club will not sell prepaid, lifetime memberships.

**Standard 5.**

The club must conform to all relevant laws, regulations, and published standards.

**Standard 6.**

The club must be able to respond in a timely manner to any reasonably foreseeable emergency event that threatens the health and safety of the club users. Toward this end, a club must have an appropriate emergency plan that can be executed by qualified personnel in a timely manner.

**Standard 7.**

The club must offer each adult member a preactivity screening appropriate to the physical activities to be performed by the member.

**Standard 8.**

Each person who has supervisory responsibility for a physical activity program or area at the club must have demonstrable professional competence in that physical activity program or area.

**Standard 9.**

The club must post appropriate signage alerting users to risks involved in their use of those areas of the club that present potential increased risk(s).

**Standard 10.**

A club that offers youth services or programs must provide appropriate supervision.



# IHRSA Membership Review/Disciplinary Process

*IHRSA's Membership Review Committee (the "Committee") is a standing committee to review reports of member noncompliance, and to take appropriate disciplinary action. The Committee's purpose is to ensure compliance with the association's By-Laws and/or Membership Eligibility Standards. The Committee shall consist of five members. The president of the association shall annually appoint three board members for this Committee. There shall be one from each class. The senior member will serve as chairperson. The chairperson will then select two additional non-board members to serve three-year terms, in advisory roles. Their terms shall be staggered (initially one member would be selected for a three-year term and the other for a two-year term). Any IHRSA member has the right to initiate the membership review process by submitting, in writing, to IHRSA's executive director, evidence of such noncompliance on any part of any other member. The Committee and, then, the board of directors, after satisfying each party's due-process rights, will determine the appropriate action to be taken.*

**The Committee shall be empowered to oversee due process as follows:**

1. If any member believes that a party has violated the By-Laws and/or Membership Eligibility Standards, that Member shall be entitled to report the same, in writing, to the executive director and, in the absence of the executive director, to the director of operations. The executive director and/or the director of operations will review the evidence (the "Evidence"), request additional information as required, solicit documentation and information from the Member being charged, conduct telephone inquiries as necessary, and otherwise assemble all of the Evidence.

2. In the event that the executive director is unable to resolve the Complaint, the director shall refer the complaint to the Committee. The Committee shall notify all of the parties. The Complaint and the Evidence shall be referred to the Committee for adjudication.

3. Upon receipt of the Evidence from the executive director, the chairperson of the Committee shall confer with the members of the Committee, as well as the parties to the Complaint. The Complaint may be investigated and handled by teleconferencing. A preliminary determination by the Committee is issued to both parties. All notices will be delivered by certified mail and return receipt requested, or by dated telecopier transmission. Within thirty (30) days following the Committee's decision, either party shall have the right to appeal the decision to the full Committee for a hearing.

4. Subsequent to the establishment of the time, place, and date(s) of the hearing, the Committee shall notify the parties of the conduct of the hearing; and as follows: (a) The charging party shall present the Evidence and, subject to the Committee's discretion, such witnesses as he determines to be relevant. The charged party shall have the right to confront all witnesses and present evidence; (b) Following the presentation of the Complaint, the charged party shall present such evidence and witnesses as are relevant, and make opening and closing statements. The witnesses shall be subject to cross-examination. The conduct of the administrative hearing shall be governed by administrative procedures, rules, and principles of equity rather than the strict rules of



## IHRSA Membership Review/Disciplinary Process ... *continued*

evidence. The Committee shall be governed by standards of fairness and due process in reviewing and evaluating the testimony and materials, and in reaching its decision.

5. Within thirty (30) days following the Committee's close of the hearing, the Committee shall make its decision as follows: (a) That the charge be dismissed; (b) That the charge has been proven and that the Member be suspended; or (c) That the charge has been proven and that the Member be expelled from IHRSA. The Committee shall mail a copy of its decision to the charging party and the charged party by certified mail and return receipt requested, or by dated telecopier transmission, setting forth their decision and their right to appeal the Committee's decision to the board of directors.

6. Within thirty (30) days following the Committee's decision, either party shall have the right to appeal the decision to the board of directors and to appear before the board at a time and date established by the board of directors; the board shall thereafter conduct an appeal of the Committee's decision hearing following the same procedures and rules set out herein.

7. The board of directors shall, within thirty (30) days following the conclusion of the Appeal Hearing, issue a decision either adopting the recommendation of the Committee or alternatively selecting another remedy. The decision of the board of directors shall be final and binding on all parties.