Not Reported in N.W.2d                                                                 **Page  1**
Not Reported in N.W.2d, 2006 WL 3040137 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

Thompson    v.    Rochester    Community
SchoolsMich.App.,2006.Only the Westlaw citation
is currently available.
UNPUBLISHED    OPINION.    CHECK    COURT
RULES BEFORE CITING.
Court of Appeals of Michigan.
James THOMPSON, Personal Representative of the
Estate of Mary Elizabeth Elkins, Plaintiff-
Appellant,
v.
ROCHESTER COMMUNITY SCHOOLS,
Elizabeth Bentley, Pamela Semann, Mark Merlo,
Penelope Burke, Robert Clark, Ilene Ingram,
Charles May, Don May, and Linda Crowell,
Defendants-Appellees.
Docket No. 269738.

Oct. 26, 2006.

Oakland Circuit Court; LC No.2003-054985-NI.

Before:  BORRELLO,  P.J.,  and  JANSEN  and
COOPER, JJ.
PER CURIAM.
**\*1** In this wrongful death action, plaintiff appeals as
of right the trial court's grant of summary
disposition in favor of defendants on the basis of
governmental immunity. We affirm in part, reverse
in part, and remand for further proceedings.

This action arises out of the death of 15-year-old
Mary Elizabeth ("Cady") Elkins, which occurred on
February 6, 2002. The individual defendants FN1
were employees of defendant Rochester Community
Schools, and plaintiff's decedent, Cady Elkins, was
a student at Rochester High School. On February 6,
2002, at approximately 12:40 p.m., Cady was
waiting in line in the high school cafeteria when she
suddenly collapsed and fell to the floor. While Cady
lay on the floor, she was unresponsive and
unconscious. Defendants at no time administered
CPR to Cady or used the high school's **Automated
External Defibrillator** ("**AED**"). Cady's mother
was called by school staff, and arrived at the high
school before paramedics or other emergency
personnel. School staff eventually called 911. When
paramedics ultimately arrived on the scene, they
performed CPR, administered drugs, and took other
life-support measures. Nonetheless, Cady never
regained consciousness and died.

FN1. Defendant Don May was employed as the high
school principal. Defendants Robert Clark, Ilene
Ingram, Linda Crowell, and Charles May were
employed as assistant principals. Defendants Pamela
Semann and Penelope Burke were employed as hall
monitors. Defendant Mark Merlo was employed as a
teacher and coach. Defendant Elizabeth Bentley was
employed as a paraprofessional.

Plaintiff filed this action alleging that defendants
had been grossly negligent in their response to
Cady's condition. Plaintiff alleged that each of
defendants owed Cady a duty of care. Plaintiff
asserted that defendants had breached their duty by
failing to administer aid and CPR, failing to use the
high school's **AED**, and failing to call 911 in a
timely manner. With respect to defendant Don May,
plaintiff alleged that because he was the principal,
he had breached additional duties, including the duty
to implement proper safety rules and the duty to
properly train and advise school staff members.

I. Basic Facts

Cady Elkins was present in the high school cafeteria
at about 12:39 or 12:40 p.m. on February 6, 2002.
Paraprofessional Elizabeth Bentley and three
cafeteria workers noticed Cady step out of the lunch
line. According to the cafeteria workers, Cady was
"[j]ust standing there," had a "dazed" look on her
face, and was "a little white." One of the workers
asked Cady if she was alright. Cady was
unresponsive as she continued to stand nearby. As
one of the cafeteria workers approached Cady, she
began to fall. The cafeteria worker attempted to
break Cady's fall and helped Cady to the floor.

Two of the cafeteria workers rolled Cady onto her
side, began to clear the spilled food from around
Cady, and attempted to "loosen up a purse that was
around her." The other cafeteria worker went to
look for help. She could not find any of the assistant
principals, so she went to the kitchen and called the
main office. She testified that she told the office
staff, "[W]e have a student down in A line. We need
staff assistance. We need EMS." She also told the
office staff that she believed Cady was having a
seizure. Hall monitor Pamela Semann arrived on the
scene and attempted to call for help on her walkie
talkie. However, she was not sure if anyone heard
her because of the high noise level in the cafeteria.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT H

Not Reported in N.W.2d
(Cite as: Not Reported in N.W.2d)

**\*2** Bentley testified that there was a "rush of color" to Cady's face and that Cady's facial expressions were changing. Although Bentley had worked with an epileptic student in the past, she admitted that she was not an expert on epilepsy. Nonetheless, she assumed that Cady was experiencing an epileptic seizure. The cafeteria workers also assumed that Cady was experiencing a seizure. Bentley testified that she began to time the "seizure." Someone then checked to see whether Cady was breathing. Bentley testified, "We just let the seizure ride out."

Coach Mark Merlo and assistant principals Ilene Ingram, Chuck May, and Robert Clark later arrived on the scene. The cafeteria workers were concerned that not enough was being done for Cady. However, according to one of the cafeteria workers, Ingram sternly stated, "[W]e're handling it." According to another cafeteria worker, Ingram stated, "[W]e have it under control."

Merlo glanced at Cady while talking to Ingram and Clark. According to one bystander, Merlo looked toward Cady and said "it looks like a seizure, you've got to let her ride it out." After hastily diagnosing Cady's condition as a seizure, Merlo left the cafeteria. One of the cafeteria workers suggested that she did not believe Merlo cared about Cady's welfare, and characterized Merlo's attitude toward the situation as "flippant." Although Merlo was a football coach who was trained in first aid and CPR, he never rendered aid to Cady.

Merlo testified that he believed Cady had been experiencing a seizure and that he had told one of the cafeteria workers that calling 911 was not necessary. Merlo noted that Cady's coloration had become "blotchy," but that he had not been concerned because he believed that such coloration was normal during a seizure. After Merlo left the cafeteria, he went to the main office and told office staff that everything in the cafeteria was "going fine."

Bentley testified that after four or five minutes, when it appeared that the "seizure" had stopped, she told everyone present "that [Cady] would probably be in a deep sleep." Bentley testified that Cady was completely unresponsive and could not be roused. Bentley testified that by the time she left the cafeteria, the coloration of Cady's face had turned to ashen gray. Bentley also testified that she had

previously been trained in CPR. However, she confirmed that she never took Cady's pulse, checked Cady's breathing, or performed CPR.

Hall monitor Penelope Burke testified that everyone "thought that [Cady] was sleeping." Semann testified that Clark was taking Cady's pulse and that Ingram was calling Cady's name and "trying to wake [Cady] up." Semann testified that Cady's face had initially been "bright scarlet red," and that Cady had been sweating heavily. However, Semann testified that Cady's face had subsequently become gray and much paler in color.

Semann admitted that at some point, an unidentified female student had approached her and offered the use of her cellular phone to call 911. However, Semann told the girl that the phone was not needed because it was not necessary to call 911. Semann also admitted that one of the cafeteria workers had later offered to call 911. However, Semann similarly told the worker that it was not necessary to call 911.

**\*3** By this time, Cady's face was turning blue or purple in color. One of the cafeteria workers stated aloud that she did not think Cady was breathing. Another cafeteria worker testified, "I assumed that with her lips turning blue, she wasn't getting oxygen...." A third cafeteria worker testified that she asked aloud whether paramedics had been contacted, and that she was worried that Cady "was going to die" when she began to turn blue and purple. It is undisputed that no one at any time attempted CPR or mouth-to-mouth breathing, and that no one retrieved or used the high school's **AED**.

Ingram testified that she at no time checked Cady's pulse or breathing. However, Ingram testified that she had attempted to rouse Cady by talking to her and holding her hand. Ingram never saw Cady move, and indicated that Cady was unconscious and unresponsive at all times. Ingram stated, "I think I said [to] call 911," but she was not certain. Ingram testified, "I thought [Cady] was resting. I thought she was sleeping."

Clark testified that as of the time he first arrived in the cafeteria, 911 had not yet been called. Clark believed that 911 was called "approximately five minutes" after he and Ingram had arrived in the cafeteria. Clark testified that there was no written

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
(Cite as: Not Reported in N.W.2d)

policy regarding situations such as this, but that it was "common sense" that any member of the high school staff was authorized to call 911. Nonetheless, Clark never called 911 himself, and never told anyone else to call 911. Clark noted that there was an **AED** in the school and that several staff members had been trained regarding its operation. Nonetheless, the **AED** was never used. Neither Clark nor anyone else ever attempted to perform CPR.

Clark testified that he had not performed CPR or used the **AED** because he believed that Cady still had a pulse, albeit a weak one, throughout the entire time that he was present. However, Clark admitted that he may have used his thumb to check Cady's pulse. Clark testified that each time he checked Cady's pulse, "it gradually declined."

Secretary Grace Preston was in the main office with secretary Barb Springer and assistant principal Linda Crowell during the incident. The office staff's first notice that Cady had collapsed was a walkie talkie call stating that "a student was down." Crowell testified that the main office was initially informed only that "someone was having a seizure in the cafeteria." According to Crowell, assistant principal Charles May then came into the office and reported that "Cady Elkins, one of [the] students, is having a seizure." Preston testified that someone then retrieved Cady's emergency card and brought it to her and Crowell. Preston testified that "[t]here was nothing on [Cady's] card to indicate that there was a seizure plan on file." The card did not indicate that Cady had a seizure disorder, asthma, or any other medical condition. Preston and Crowell then began making telephone calls in an attempt to reach Cady's mother, but did not immediately call 911.

**\*4** Preston reached Cady's mother on the telephone and handed the phone to Crowell. Crowell testified that she told Cady's mother, "We believe that [Cady has] had a seizure, can you come to the school." According to Crowell, Cady's mother responded by stating, "[M]y daughter doesn't have seizures."

Preston then decided to call 911.FN2 Preston testified that she had decided it was necessary to call 911 when she overheard via the walkie talkie that "the student was not responding." The 911 call was placed at 12:54 p.m. Preston repeated aloud the 911

operator's instructions, and Crowell relayed the instructions to the personnel in the cafeteria via her walkie talkie.

FN2. It is unclear whether Crowell contributed to this decision to call 911. It appears from the record that the 911 call would have been even further delayed had Preston not taken action when she did.

Crowell testified that she did not remember having any difficulty with this arrangement. However, the 911 transcript tells a slightly different story. The 911 transcript reveals significant delays in responding to the operator's questions and instructions. These delays were apparently caused by the fact that all questions and instructions were being relayed to the scene through a third party, and by the fact that Crowell was trying to carry on two conversations-one with Preston and the other via the walkie talkie-at the same time. The 911 transcript also reveals the absence of professionalism and a sense of urgency on the part of school staff. At several points, the transcript indicates that one or more people in the school office were laughing instead of listening to the 911 operator's instructions.

The 911 operator asked at least four times whether Cady was breathing before anyone answered. After being repeatedly asked whether Cady was breathing, Preston told the operator, "They don't know the difference." The 911 operator then stated, "It's very important because she might not be breathing." Preston finally told the operator that she believed Cady was breathing. The 911 operator then asked twice whether Cady was unconscious. No one answered. The operator also asked whether Cady's breathing was shallow. Preston simply stated that Cady was unresponsive. The 911 operator then gave Preston several instructions. Preston relayed the instructions to Crowell, and Crowell relayed the instructions via walkie talkie. Although the operator repeatedly asked whether anyone had looked into Cady's mouth to determine whether there were any obstructions, Preston told the operator several times that no one had yet done so. Someone then stated, "I know (LAUGHTER) [i]t shouldn't take this long to look in her mouth," and, "They can't get her mouth open." Preston reiterated that Cady was not moving and was unresponsive. At that time, the 911 call ended.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sometime just prior to the 911 call, principal Don May had arrived in the cafeteria. Don May testified that he checked to see whether Cady was breathing, and that "her chest was moving." Don May did not check Cady's pulse because he surmised that she was still breathing. He described Cady's coloration at that time as pale and splotchy.

*5 Ingram informed Don May that Cady had experienced a seizure and was now "resting comfortably." As Crowell relayed instructions from the 911 operator, Don May took charge of the situation. Don May asked the cafeteria workers for gloves and a turkey baster. Don May then put on a glove and tried to open Cady's mouth. By this time, Cady was "very bluish." Don May testified that Cady's jaw was clenched shut and difficult to open; nonetheless, he stated that he was able to get one finger into her mouth and did not feel any obstructions. At no time did Don May administer resuscitative breathing or CPR to Cady. Nor did Don May instruct anyone else to do so. He testified, "[W]e did not feel it was necessary." He also testified that no one ever used the school's **AED**. He stated that because the **AED** was relatively new, it was "an unknown device to us," and no one thought to use it. He did admit, however, that certain members of the school's staff had been trained on how to use the **AED**.

Cady's mother arrived at the school. By this time, Cady's coloration had changed significantly, and Don May had become "very concerned about Cady's breathing." Clark testified that Cady's coloration was "very quick[ly]" becoming blue. Ingram went outside to meet Cady's mother. Ingram and Cady's mother went into the cafeteria. Cady's mother was only in the cafeteria for a short time before she and Ingram left the area.

Paramedics then arrived. Clark claimed that although Cady was blue by this time, she still had a pulse until the final minute before the paramedics arrived.

Don May testified that there was a building procedure or guideline that required an immediate 911 call in the case of apparent cardiac or circulatory problems. However, the high school staff believed that Cady was experiencing a seizure, and he testified that there was no policy concerning whether 911 should be called in cases of seizure.

Don May testified that if the same type of incident occurred today, he would call 911 immediately.

Secretary Barb Springer testified that on past occasions, when two other students had experienced epileptic seizures in the school, 911 had been called promptly. Moreover, Ingram testified that in the previous school year she had called 911 for a student at the school who "had a nosebleed." Ingram stated that she had called 911 only one minute after the student first began experiencing the nosebleed.

Paramedic Robert Harmer and his partner, paramedic Ronda Pavlicek, responded to the 911 call. Harmer and Pavlicek were in their ambulance when they received the call at 1:00 p.m. They were near the high school at the time, and were informed by the dispatcher that there was a "seizure" victim at the school. Harmer and Pavlicek arrived at the high school at 1:03 p.m.

Pavlicek was greeted at the school door by an unidentified male assistant principal, and she began asking him questions. Pavlicek testified that she asked the assistant principal whether Cady was breathing. However, the assistant principal did not know. Pavlicek testified that she then asked him about Cady's coloration. He responded, "[O]h, ma'am, she's blue." When Pavlicek arrived in the cafeteria she discovered that Cady was not breathing. Pavlicek "grabbed [Cady's] jaw and did a jaw thrust" in order to open Cady's mouth. Pavlicek then gave Cady "two breaths." Pavlicek testified that Cady had no pulse. Pavlicek began CPR.

*6 Harmer came into the cafeteria with the medical equipment and began working on Cady as well. Members of the local fire department also arrived. Harmer testified that Cady was blue. As Pavlicek was doing chest compressions, Harmer used the bag valve mask (BVM) in an attempt to restart Cady's breathing. Harmer inserted an endotracheal ("ET") tube into Cady's throat, and began to use the portable EKG machine. Harmer removed some food from Cady's mouth. Defibrillation was performed, but it was apparently unsuccessful. Pavlicek and Harmer then administered medication through the ET tube.

Because of Cady's blue coloration when the paramedics arrived, Pavlicek concluded that Cady "had been down greater than ten minutes." Due to

this blue coloration, Pavlicek opined that Cady had not been breathing and had not had a pulse for between six and ten minutes before the paramedics arrived.

Harmer testified that when he and Pavlicek arrived on the scene, Cady was already in full cardiac arrest. Harmer testified that whereas a normal patient is pink, warm, and dry when the paramedics arrive on the scene, Cady had been pale, cool, and dry. At 1:06, Cady's EKG was "flat line," meaning "no electrical rhythm or activity." At all relevant times after the paramedics arrived, Cady had no blood pressure and no pulse. The paramedics arrived at the hospital with Cady at 1:27 p.m. Additional measures were taken by hospital staff. However, Cady was pronounced dead soon thereafter.

The autopsy report and death certificate listed Cady's medical cause of death as Hashimoto's Thyroiditis and Complications Thereof. However, the medical experts deposed in this case did not necessarily agree. Pathology expert Dr. Richard VanderHeide testified that based on the histological evidence, he agreed that Cady had Hashimoto's thyroiditis at the time of her death. However, VanderHeide opined that even if Cady had Hashimoto's thyroiditis, it had nothing to do with her death: "I think that she ha[d] Hashimoto's thyroiditis, but I do not think there's a causal link between her Hashimoto's thyroiditis and her death." Similarly, endocrinology expert Dr. Bernard Degnan testified that a patient who has been diagnosed with a thyroid condition such as Hashimoto's disease does not have an increased risk of sudden cardiac arrest or seizure. Degnan testified that he disagreed with the cause of death as stated in the autopsy report because he did not believe that Cady's Hashimoto's thyroiditis caused or even contributed to her death. Degnan opined that if Cady suffered from cardiac arrhythmia, the arrhythmia was in no way related to her apparent thyroid condition. Degnan indicated that he was not certain whether Cady's death was caused by an arrhythmia, but that he was certain that her death was not caused by a thyroid condition. Cardiology expert Dr. Michael Epstein testified that "if [Cady] did have [Hashimoto's thyroiditis] I don't believe it played a part in her death." Epstein further testified that "hypothyroidism ... wouldn't contribute to an arrhythmia or a sudden event such as [Cady] suffered." Epstein believed that Cady suffered some

type of cardiac arrhythmia, but did not know what had caused the condition. Finally, neurology expert Dr. David Burdette testified that, in his opinion, an epileptic seizure could cause cardiac arrhythmia or cardiopulmonary arrest. Although Burdette was not certain whether Cady had experienced an epileptic seizure, he opined that the proper treatment for arrhythmia or cardiac arrest resulting from such a seizure would be the same as that for any other type of cardiac arrest or arrhythmia. However, Burdette admitted that he was not qualified to opine regarding the specific treatment that Cady should have received because this was a question for a cardiologist. Burdette opined, "I believe that [Cady's] ultimate death was due to cardiorespiratory arrest," but stated, "I do not know what caused her cardiorespiratory arrest."

**\*7** Pediatric cardiology expert Dr. Maria Serratto opined that Cady suffered a convulsion related to cardiac arrhythmia, but did not sustain an epileptic seizure. Based on her review of the autopsy report and medical evidence, Serratto testified that she believed Cady experienced a ventricular arrhythmia. However, Serratto testified that she could not identify precisely what caused the arrhythmia. Serratto testified that several different forms of ventricular arrhythmia "can occur in an individual who has a normal heart." Serratto further testified, based on her review of the "detailed autopsy report," that Cady had a normal heart at the time she died. Despite the fact that Cady was overweight, Serratto testified that the autopsy report showed no signs of structural heart disease, arteriosclerosis, congenital heart defects, or valve malformations. Serratto did state that Cady's heart was "somewhat larger and thicker than normal," but she opined that this was a common condition in overweight people. She concluded that "[b]y and large [Cady] had a healthy heart." Similarly, based on his review of the slides and other autopsy evidence, VanderHeide opined that Cady's heart was typical for her size and was essentially normal.

Serratto doubted assistant principal Clark's testimony that Cady had a pulse until just before the paramedics arrived. Serratto believed that Clark may have used his thumb to check Cady's pulse: "[W]hen you check the pulse with your thumb, you feel your own pulsation because the radial artery goes down [the thumb]." Serratto also testified that an **AED** will not shock a person unless the shock is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

needed. Serratto explained how an **AED** works, describing how the **AED** actually detects the heart rhythm or lack of heart rhythm before it administers a shock. According to Serratto, if the **AED** detects a normal rhythm, it will not administer a shock to the patient. Only if the **AED** detects the absence of a rhythm or an irregular rhythm will it administer a shock.

Serratto opined that defendants "didn't act in a reasonable manner." Serratto testified that after learning that Cady did not have a history of epileptic seizures, defendants should have called 911, used the **AED**, and then started CPR. Based on Cady's age, Serratto testified that she was reasonably certain that timely use of the **AED** would have restored Cady's normal heart rhythm. Serratto testified that this opinion was not based on speculation, but was strongly supported by the medical literature. Serratto testified, based on her review of the medical literature, that with respect to young patients with heart arrhythmias, the survival rate when an **AED** alone is used is "greater than 50 percent," and that the survival rate when an **AED** and CPR are used together is "much greater than that." Serratto reiterated her belief that, had defendants timely used the **AED** and started CPR, Cady's normal heart rhythm would have been restored. She again opined that had these measures been taken, there is a greater than 50 percent chance that Cady would have survived.

**\*8** Serratto further testified that it is unreasonable to delay calling 911 when a young student collapses and becomes unconscious, regardless of the belief that the student may be having an epileptic seizure. Serratto opined that, had 911 been called earlier, "[Cady] would be with us today." Serratto agreed with paramedic Pavlicek's testimony, opining that Cady's blue coloration indicated that she had not been breathing for several minutes before the paramedics arrived. Serratto testified that Cady's color change from ashen gray to blue was indicative of the fact that she was not getting oxygen to the brain. Serratto testified that an epileptic seizure alone could not cause a person to turn blue.

Plaintiff presented the testimony of risk management expert Marc Rabinoff, Ed.D. Rabinoff consults with school districts, universities, municipalities, insurance companies, professional sports teams, and sporting venues concerning risk management.

Rabinoff assists such entities in the formation of emergency procedures and protocols. Rabinoff testified that while he is unqualified to testify regarding strictly legal matters, he often testifies concerning the standard of care applicable in emergency situations, particularly in the educational and school setting. Rabinoff also consults with school districts on the use of **AEDs** and proper CPR procedures.

Regarding defendants' response to Cady's situation, Rabinoff testified, "They were extremely substandard performances by any standard...." Rabinoff opined that these "substandard performances" were the cause of Cady's death. Rabinoff testified that the standard of care required use of the **AED**. Rabinoff stated,

At least call for that **AED** and get it ready. If you put an **AED** on somebody who doesn't need it, it won't charge anyway. There's no downside to any of this, to do what they should have done.

\* \* \*

[A]ssuming they had plenty of people with CPR and **AED** training in the school, they could have easily done something within that period of time prior to the paramedics getting there and saying basically that she flat-lined.

Rabinoff further testified that defendants breached the standard of care by simply assuming that Cady was suffering an epileptic seizure. Rabinoff testified, "We teach students all the time not to diagnose. Call 911 and get into CPR, first-aid, **AED** ."

Rabinoff opined that it was nonsensical to not use the **AED** simply because defendants did not believe it was necessary. Rabinoff reiterated that "there's no downside" to using an **AED** because the **AED** itself will determine whether a shock is needed. Rabinoff opined that as school personnel, defendants had a duty to use the **AED**, to do CPR, and to timely call 911. Rabinoff opined that defendants breached all three of these duties with respect to Cady Elkins.

Rabinoff then testified that based on his understanding of the term "gross negligence," as used in MCL 691.1407, defendants had been grossly negligent in their treatment of Cady Elkins. Rabinoff further stated that, in his opinion, defendants' "gross negligence" was the "proximate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause" of Cady's death.FN3

FN3. Dr. Marc Rabinoff was not qualified to testify that defendants' actions were "grossly negligent" or that those actions were the legal cause of Cady Elkins' death. *Maiden v. Rozwood,* 461 Mich. 109, 130 n 11; 597 NW2d 817 (1999). Such testimony required legal conclusions that Rabinoff was not competent to make. *Id.* However, assuming that Rabinoff otherwise qualified as an expert on the issue of emergency protocol in the school setting, we perceive no reason why his testimony would not be admissible on general issues of duty and breach in this case.

**\*9** After extensive discovery, defendants moved for summary disposition pursuant to MCR 2.116(C)(7) and (C)(10), arguing that they were entitled to governmental immunity because (1) they had not been grossly negligent, and (2) their conduct was not the proximate cause of Cady's death. The trial court noted that plaintiff did not dispute that defendant Rochester Community Schools was entitled to governmental immunity. Instead, the court noted that plaintiff only argued that the individual defendants were not entitled to immunity as governmental employees. The court ruled that defendant Rochester Community Schools was entitled to absolute immunity because it had been engaged as a governmental entity in the exercise of a governmental function. The court then went on to address the individual immunity of the remaining defendants. The court found that reasonable minds could not conclude that defendants had been grossly negligent. The court also ruled, in the alternative, that defendants actions had not been the proximate cause of Cady Elkins' death. Based on "a review of the autopsy report and death certificate," the court observed: "[T]he alleged conduct of defendant employees was not the most immediate, efficient and direct cause of decedent's death." Moreover, the court determined that plaintiff's experts could only "speculate" as to whether defendants could have done more to save Cady's life. The court granted defendants' motion for summary disposition.

## II. Standard of Review

A grant of summary disposition on the basis of governmental immunity is reviewed under MCR 2.116(C)(7). We review de novo a grant of summary disposition pursuant to MCR 2.116(C)(7).

*Tarlea v.. Crabtree,* 263 Mich.App 80, 87; 687 NW2d 333 (2004). In reviewing a(C)(7) motion, we consider the affidavits, depositions, admissions, and other documentary evidence to determine whether the defendant is in fact entitled to immunity as a matter of law. *Id.* We view the evidence in a light most favorable to the nonmoving party, and make all legitimate inferences in favor of the nonmoving party as well. *Jackson v. Saginaw Co,* 458 Mich. 141, 142; 580 NW2d 870 (1998).

Whether a governmental employee's actions constituted gross negligence under MCL 691.1407 is generally a question of fact for the jury. *Tarlea, supra* at 88. However, when reasonable minds could not differ, the court should grant summary disposition with respect to this issue pursuant to MCR 2.116(C)(7). *Id.* Similarly, the issue of proximate cause is generally a question of fact for the jury. *Helmus v. Dep't of Transportation,* 238 Mich.App 250, 256; 604 NW2d 793 (1999). However, when the facts bearing on proximate cause are not disputed and reasonable minds could not differ, then the issue is a question of law for the court. *Robinson v. Detroit,* 462 Mich. 439, 463; 613 NW2d 307 (2000).

## III. Analysis

Plaintiff first argues that the trial court erred in granting summary disposition because reasonable jurors could have honestly disagreed regarding whether the individual defendants FN4 were grossly negligent in their response to Cady Elkins. We agree.

FN4. Plaintiff does not argue on appeal that summary disposition was improperly granted with respect to defendant Rochester Community Schools. Because this issue has not been raised on appeal, it is not presented for review. MCR 7.212(C)(7); *Silver Creek Twp v. Corso,* 246 Mich.App 94, 99-100; 631 NW2d 346 (2001). Therefore, we decline to disturb the trial court's ruling with respect to Rochester Community Schools, and affirm the grant of summary disposition in favor of that particular defendant.

**\*10** As an initial matter, defendants concede that they owed Cady Elkins a duty of reasonable care in this case.FN5 Governmental employees acting within the scope of their employment are immune

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from tort liability unless their conduct amounts to gross negligence. MCL 691.1407(2); *Poppen v. Tovey,* 256 Mich.App 351, 356; 664 NW2d 269 (2003). Gross negligence is statutorily defined as "conduct so reckless as to demonstrate a substantial lack of concern of whether an injury results." MCL 691.1407(7)(a); *Oliver v. Smith,* 269 Mich.App 560, 565; 715 NW2d 314 (2006). "[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence." *Maiden, supra* at 122-123. Instead, to survive summary disposition on the issue of gross negligence, "a plaintiff must adduce proof of conduct 'so reckless as to demonstrate a substantial lack of concern of whether an injury results.' " *Id.* at 123.

FN5. A teacher owes a duty of reasonable care to students in his or her charge. *Gaincott v. Davis,* 281 Mich. 515, 519; 275 NW 229 (1937); *Cook v. Bennett,* 94 Mich.App 93, 98; 288 NW2d 609 (1980). This duty also applies to principals and other public school personnel. *Id.* at 98-100.

Although mere evidence of ordinary negligence is inadequate to support a finding of gross negligence, there necessarily exists a point along the continuum of culpable conduct where the evidence becomes sufficient to allow a rational trier of fact to reach a finding of gross negligence. The precise position of that point varies from case to case, depending on the strength or weakness of the evidence adduced, and each tort case brought against governmental employees on the basis of alleged gross negligence is sui generis with respect to its particular facts. However, it bears repeating that in reviewing a motion for summary disposition, we must view all reasonable inferences arising from the particular facts in a light most favorable to the nonmoving party-here plaintiff.

Albeit not in the context of governmental immunity, the Michigan courts have long recognized that in proving gross negligence, a close or doubtful case " 'calls for jury instruction and jury verdict rather than a verdict by order of the court.' " *Washington v. Jones,* 386 Mich. 466, 471; 192 NW2d 234 (1971), quoting *Tien v. Barkel,* 351 Mich. 276, 283; 88 NW2d 552 (1958); see also *Coon v. Williams,* 4 Mich.App 325, 333; 144 NW2d 821 (1966) (in a close case, "[i]t was the jury's prerogative to determine the question of gross

negligence"). We similarly hold that in the present case, the evidence was sufficient to allow the question of gross negligence to reach a jury. Not only did genuine questions of fact remain concerning whether defendants should have done more to save Cady Elkins, but genuine questions of fact also remained concerning *why* defendants did not do more to save Cady Elkins.

To establish gross negligence, a plaintiff must focus on the actions of the individual governmental employees, not on the result of those actions. *Maiden, supra* at 127 n 10. The mere fact that a death results from the defendants' actions is insufficient to prove that the defendants were grossly negligent. *Id.* Similarly, "[s]imply alleging that an actor could have done more" is insufficient to prove gross negligence because, "with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Tarlea, supra* at 90. Thus, merely "saying that a defendant could have taken additional precautions" will not support a finding of gross negligence. *Id.*

**\*11** Although the statutory definition of gross negligence does not require an intent to injure, MCL 691.1407(7)(a), gross negligence suggests

almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge. *[Tarlea, supra* at 90.]

The evidence in the case at bar was sufficient to allow reasonable minds to conclude that defendants "willful[ly] disregard[ed] ... precautions or measures to attend to safety" and "singular[ly] disregard[ed] ... substantial risks." *Id.* The record evidence showed that defendants relied on paraprofessional Elizabeth Bentley and coach Mark Merlo to diagnose Cady Elkins as suffering from an epileptic seizure. The record evidence, including the testimony of several witnesses, established that Bentley was a paraprofessional with no expert medical training, and that Merlo's actions toward Cady Elkins were indifferent at best, and possibly even callous. Nonetheless, defendants deferred to these two non-experts in the diagnosis of Cady's condition, determining that Cady was experiencing an epileptic seizure and that she should be allowed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to "ride it out." Even after quickly learning that Cady was not epileptic and had no history of seizures or similar medical problems, defendants persisted in blindly characterizing Cady's condition as an epileptic seizure and in refusing to consider other possible causes for her unconsciousness.

Because defendants had already reached the conclusion that Cady was suffering from an epileptic seizure, no one at any time considered whether other lifesaving measures were required. Several defendants testified that they did not see the need to consider using a defibrillator or administering CPR because they believed that Cady was merely suffering from an epileptic seizure. Even after Cady began losing her color and turning blue, none of defendants had the presence of mind to dial 911 on the telephone that was located in the nearby kitchen or cook's office. Further, the record evidence indicates that at least two of defendants actively discouraged concerned bystanders from calling 911.

Even assuming that defendants honestly believed that Cady was suffering an epileptic seizure, we are at pains to comprehend how defendants could have honestly believed that, after several minutes of unresponsiveness and increasing blue coloration, Cady was merely "resting comfortably" following a seizure. Several of the individual defendants had been trained in either CPR or first aid. Even assuming that assistant principal Robert Clark in fact detected Cady's pulse, it should have been obvious to anyone present in the cafeteria and observing Cady's coloration that she was not merely asleep.

Three cafeteria workers, observing the events as they unfolded, all testified that they knew something was wrong and that more was needed to save Cady's life. However, on at least two occasions, cafeteria staff members were told not to call 911 and that the situation was "under control." All three cafeteria workers, as objective observers of defendants' actions, "conclude[d], reasonably, that [defendants] simply did not care about the safety or welfare of [Cady]." *Id.* Defendants' actions or lack thereof were sufficient to support a finding gross negligence. A rational finder of fact could have honestly found sufficient indicia of gross negligence in this case.

**\*12** Moreover, even if the above evidence were not sufficient to preclude summary disposition on the

issue of gross negligence, there remained additional questions of fact with respect to defendants' state of mind and reckless indifference, which alone would have been sufficient to allow this case to proceed to a jury. The evidence presented in this case showed that school personnel had promptly called 911 in the past when other students-with known histories of epilepsy-had experienced epileptic seizures on school premises. The evidence also showed that school staff had on at least one occasion called 911 nearly immediately for a student with a condition as minor as a nosebleed. However, in the present case, the evidence taken in a light most favorable to plaintiff showed that defendants waited at least 14 minutes, and perhaps even longer, before calling 911 for Cady.FN6

FN6. Proof of gross negligence requires proof of a specific state of mind. Therefore, it is relevant that defendants may have responded to Cady differently than they responded to other similarly situated students in the past. A reasonable jury could have honestly concluded that defendants response to Cady Elkins, as compared to defendants' past response to other students, was indicative of a substantial disregard for the likelihood of injury.

Defendants' failure to timely call 911 might be less remarkable but for the uncontested evidence of timely 911 calls in the past for other students. The fact that 911 was called quickly for some students and belatedly for other students raises important questions concerning the state of mind underlying defendants' disparate treatment of injured students. Summary disposition is rarely appropriate in cases involving questions of state of mind, *Michigan National Bank-Oakland v. Wheeling,* 165 Mich.App 738, 744-745; 419 NW2d 746 (1988), and the trial court may not make findings of fact or weigh credibility in deciding a summary disposition motion, *Skinner v. Square D Co,* 445 Mich. 153, 161; 516 NW2d 475 (1994). Questions regarding recklessness are typically questions for the jury. Viewing the evidence in the light most favorable to plaintiff, a reasonable finder of fact could have concluded that defendants recklessly delayed calling 911 in this case.

Finally, the record evidence showed that certain individuals were specifically directed by defendants *not* to call 911, and that at least three individual defendants made clear to bystanders that no outside

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assistance was wanted. This evidence was sufficient to support a rational finding that defendants were indifferent to Cady's general well-being. This point is emphasized by the testimony that Merlo's attitude toward Cady was "flippant," that Semann discouraged a student from calling 911, that Ingram "sternly" discouraged the cafeteria workers from assisting or calling 911, and that school personnel did not find it inappropriate to laugh about Cady's predicament while on the phone with the 911 operator.

"Summary disposition is precluded where reasonable jurors honestly could have reached different conclusions with respect to whether a defendant's conduct amounted to gross negligence." *Stanton v. Battle Creek,* 237 Mich.App 366, 375; 603 NW2d 285 (1999), aff'd 466 Mich. 611 (2002); see also *Kendricks v. Rehfield,* 270 Mich.App 679, 682; 716 NW2d 623 (2006). Because there remained jury-submissible questions of fact with respect to the adequacy of defendants' conduct and with respect to defendants' state of mind, summary disposition should not have been granted on the issue of gross negligence. A rational trier of fact could have found that defendants were grossly negligent within the meaning of MCL 691.1407(2).

**\*13** Plaintiff also argues that that the trial court erred in granting summary disposition because reasonable jurors could have honestly disagreed regarding whether defendants' actions were the proximate cause of Cady's death. We agree.

Even when a governmental employee is grossly negligent, that employee will remain immune from tort liability unless his or her gross negligence was "the proximate cause of the injury or damage." MCL 691.1407(2)(c). As used in MCL 691.1407, "the phrase 'the proximate cause' contemplates *one* cause." *Robinson, supra* at 462 (emphasis in original). Thus, the proximate cause for purposes of governmental immunity is "[t]he one most immediate, efficient, and direct cause" preceding the injury or damage. *Id.*

Defendants rely on this Court's opinion in *Love v. Detroit,* 270 Mich.App 563; 716 NW2d 604 (2006), and our Supreme Court's peremptory reversal in *Dean v. Childs,* 474 Mich. 914; 705 NW2d 344 (2005), for the proposition that Cady's death was not proximately caused by defendants' alleged gross

negligence. In *Dean v. Childs,* 262 Mich.App 48, 57-58; 684 NW2d 894 (2004), rev'd for the reasons stated in dissent 474 Mich. 914 (2005), the plaintiff argued that the defendant firefighter's alleged gross negligence proximately caused her decedents' deaths. We found that a factual question remained regarding whether the defendant firefighter's alleged gross negligence had been the proximate cause of the decedents' deaths. *Id.* at 58. In dissent, former Judge Griffin wrote that there was no remaining factual dispute for the jury because the decedents' deaths had been proximately caused by the fire and not by the defendant's alleged gross negligence. *Id.* at 61-62 (Griffin, J., dissenting). Judge Griffin opined that reasonable minds could not conclude that the defendant firefighter's alleged gross negligence had been "the most immediate, efficient, and direct cause" of the decedents' deaths. *Id.* The Supreme Court agreed with Judge Griffin's dissenting opinion, and peremptorily reversed our opinion for the reasons stated in dissent. *Dean, supra* 474 Mich. at 914.

Similar facts were again presented in *Love.* There, the plaintiff asserted that her decedents' deaths had been proximately caused by the alleged gross negligence of the defendant firefighters. *Love, supra* at 564. Citing the Supreme Court's peremptory reversal in *Dean, supra,* this Court determined that "[t]he firefighters' actions did not constitute the proximate cause of [the] decedents' deaths," because reasonable minds could not disagree that the proximate cause had been the fire itself. *Love, supra* at 566.FN7

FN7. Judge Cooper dissented, noting that under traditional principles of tort law, a superceding, intervening cause may supplant an earlier, more remote cause to become "the proximate cause" of an injury. *Love, supra* at 566-574 (Cooper, P.J., dissenting). However, in the instant case, it is not necessary to determine whether defendants' alleged conduct was a superceding cause of Cady's death. Even without characterizing defendants' alleged gross negligence as a superceding cause, there was still sufficient evidence to allow reasonable jurors to conclude that defendants' alleged conduct was "[t]he one most immediate, efficient, and direct cause" of Cady Elkins' death.

Like the defendants in *Dean* and *Love,* defendants in the case at bar argue that the proximate cause of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cady's death was not their alleged gross negligence, but was instead a preexisting medical condition that caused Cady to collapse, stop breathing, and suffer a cardiac arrhythmia. However, defendants fail to recognize that the facts of this case are distinguishable from those of *Dean* and *Love* in two critical respects.

**\*14** First, the expert evidence concerning causation in the present case was stronger than that presented in *Love,* and was arguably stronger than that presented in *Dean.* In *Dean,* firefighter John Soave averred in his affidavit that the defendant's actions had caused the decedents' deaths. *Dean, supra* at 57-58. However, although Soave was a firefighter who had been present at the fire, he was never qualified as an expert witness. *Id.* at 61 n 4 (Griffin, J., dissenting).

In *Love,* there was no expert testimony that the defendant firefighters' actions had caused the decedents' deaths. *Love, supra* at 566. The *Love* majority specifically noted that "no evidence established that the firefighters could have reached the victims or that, if fire fighters had acted more aggressively, the victims would have been rescued." *Id.*

In contrast, there was admissible expert testimony in the present case that defendants' alleged gross negligence actually caused Cady Elkins' death. Plaintiff's cardiology expert, Dr. Maria Serrato, testified that defendants "didn't act in a reasonable manner," and that after learning that Cady did not have a history of epileptic seizures, defendants should have called 911, used the **AED**, and then started CPR. Serrato testified that timely use of the **AED** would have restored Cady's normal heart rhythm. Serrato stated that this opinion was not based on speculation, but was strongly supported by the medical literature. Serrato also testified, based on the medical literature, that with respect to young patients with heart arrhythmias, the survival rate when an **AED** alone is used is "greater than 50 percent," and that the survival rate when an **AED** and CPR are used together is "much greater than that." Serrato reiterated her belief that, had defendants timely used the **AED** and started CPR, Cady's normal heart rhythm would have been restored. She conclusively opined that had these measures been taken, there is a greater than 50 percent chance that Cady would have survived.

Second, unlike *Dean* and *Love,* it was not clear how Cady Elkins actually died in the case at bar. In both *Dean* and *Love,* the decedents died as a result of the fires that occurred in their homes. Therefore, in the absence of the defendants' allegedly negligent conduct in those cases, there would have been no question regarding the actual cause of the decedents' deaths. However, the same cannot be said in the instant case. Here, there was conflicting evidence regarding the medical factors that led to Cady Elkins' death. The trial court accepted the medical examiner's view, and opined from the bench that the cause of Cady's death had been Hashimoto's thyroiditis. Similarly, defendants argue on appeal that " 'the one most immediate, efficient, and direct cause' of the tragic death of Cady Elkins was the cardiac arrhythmia she suffered due to Hashimoto's Thyroiditis ..., not the Appellees' alleged gross negligence in responding to it." Indeed, Hashimoto's thyroiditis is listed as the medical cause of death in both the autopsy report and the death certificate.

**\*15** However, two of defendants' own experts opined that even if Cady in fact suffered from Hashimoto's thyroiditis, that disease was not the cause of her death. Plaintiff's cardiology expert, Dr. Serrato, opined that Cady's death likely resulted from a ventricular arrhythmia. Defendants' cardiology expert, Dr. Epstein, testified that Cady's death likely resulted from some type of arrhythmia, but did not know what had caused the condition. At least two of the witnesses, including one of defendants' experts, agreed that based on their review of the autopsy results and medical evidence, Cady did not suffer from structural heart disease and had an essentially normal heart. Thus, even in the absence of defendants' alleged gross negligence, there still would have remained a genuine question of material fact regarding the actual cause of Cady's death in this case.

The nature of the documentary evidence presented here distinguishes the present case from *Dean* and *Love.* Irrespective of the defendants' conduct in *Dean* and *Love,* the fires were "but for" causes of the decedents' deaths in those two cases. Accordingly, the plaintiffs in those cases were to a certain extent limited in their attempts to characterize the defendants' actions as the proximate cause of their decedents' deaths.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
(Cite as: Not Reported in N.W.2d)

In the present case, however, there was admissible expert testimony indicating that a condition such as that suffered by Cady Elkins would not typically result in death in the absence of improper care and treatment. Therefore, the expert testimony supported a finding that defendants' conduct-and not Cady's medical condition itself-was the "but for" cause of Cady's death.FN8 On the basis of this evidence, reasonable jurors could have honestly concluded that but for defendants' conduct, Cady Elkins' would have survived. Furthermore, the evidence in this case left open questions regarding the specific medical cause of Cady Elkins' death. The trial court incorrectly ruled that there was no factual question regarding the cause of Cady's death. Similarly, defendants' argument on appeal, that the "one most immediate, efficient, and direct cause" of Cady's death was Hashimoto's thyroiditis, must fail.

FN8. Defendants argue that Serratto's testimony is irrelevant because it suggested that defendants' alleged gross negligence was the "but for" cause of Cady's death rather than the "proximate cause" of Cady's death. This argument is without merit. "Proximate cause" is a legal term of art that incorporates both "but for" causation and "legal" causation. *Craig v. Oakwood Hospital,* 471 Mich. 67, 86; 684 NW2d 296 (2004). When the Legislature deliberately chooses to use a word or phrase that has a particular and specific legal meaning, the Legislature incorporates the technical, peculiar meaning of the term. MCL 8.3a; *Ford Motor Co v. Woodhaven,* 475 Mich. 425, 439; 716 NW2d 247 (2006); *People v. Schaefer,* 473 Mich. 418, 439 n 67; 703 NW2d 774 (2005). The phrase "the proximate cause" used in MCL 691.1407 therefore subsumes the concept of "but for" causation. Accordingly, proof of "but for" causation is essential to proving "proximate cause" within the meaning of MCL 691.1407. Serratto could not have opined regarding the "legal" cause component of proximate causation because this would have called for a legal conclusion, regarding which she was not competent to testify. *Maiden, supra* at 130 n 11. However, Serratto was qualified to offer medical testimony regarding the "factual" or "but for" component of proximate causation.

In light of the disputed medical evidence, and drawing all reasonable inferences in favor of plaintiff, we conclude that rational jurors could have honestly concluded that defendants' alleged gross negligence was "[t]he one most immediate, efficient, and direct cause" of Cady Elkins' death. *Robinson, supra* at 462.

### IV. Conclusion

We affirm the grant of summary disposition in favor of defendant Rochester Community Schools. However, we reverse the grant of summary disposition in favor of the individual governmental-employee defendants.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

Mich.App.,2006.
Thompson v. Rochester Community Schools
Not Reported in N.W.2d, 2006 WL 3040137
(Mich.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.