UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HERBERT FRUH, VIRGINIA FRUH,                    )
Individually, and as Parent and Next Friend of  )
TRACEY FRUH, and KEVIN FRUH,                    )
    Plaintiffs                                 )
                                    ) CASE NUMBER: 02-10689 PBS
vs.                                             )
                                      )
WELLBRIDGE CLUB MANAGEMENT, INC.,               )
(F/K/A CLUB SPORTS INTERNATIONAL, INC.)         )
D/B/A THE WELLBRIDGE COMPANY AND/OR             )
WELLBRIDGE HEALTH AND FITNESS                   )
CENTER and MONSANTO COMPANY,                    )
    Defendants                                 )

## PETITION FOR COURT APPROVAL OF SETTLEMENT AND APPORTIONMENT AND FOR APPOINTMENT OF GUARDIANS *AD LITEM*

Plaintiffs move, pursuant to Fed. R. Civ. P. 17(c), for Court approval of their final settlement with Defendants and for the appointments of Marylin A. Beck, Esq. and Darrel C. Waugh, Esq. as guardians *ad litem* for plaintiffs Herbert Fruh and Tracey Fruh, respectively.

As grounds therefore, Plaintiffs state:

1. Plaintiff Herbert Fruh suffers from anterior retrograde amnesia. This renders him incapable of forming new memories. He has not been adjudicated or declared incompetent and is usually capable of understanding issues and proceedings and making informed choices, albeit for a limited period of time. As a further consequence of his anoxic brain injury, he is prone to obsessive behavior and intense agitation unless medicated. He is not capable of independent living. A report dated February 11, 2003 by a treating neuropsychologist, Dr. Buck Woo is attached to further illustrate Mr. Fruh's condition.

2. Plaintiff Tracey Fruh is a minor who has been represented in this matter by her mother, Plaintiff Virginia Fruh, acting as next friend. Mrs. Fruh is also a plaintiff in her own right.

0403111213

1

# EXHIBIT I

3. Defendants have agreed to pay the Plaintiffs the total amount of $1.8 million. Plaintiffs have agreed that the proceeds of the settlement should be allocated as follows:

$1 million to, or for the benefit of, Herbert Fruh, all or most of which net proceeds after attorney fees and costs are deducted will be the form of a structured annuity settlement;

$500,000 to Virginia Fruh; and

$300,000 to, or for the benefit of, Tracey Fruh, the net proceeds of which will be placed into an irrevocable trust.

Plaintiff Kevin Fruh has waived any entitlement to settlement proceeds.

4. Defendants have requested, and the parties have agreed, that the amount and apportionment of the settlement among the plaintiffs be approved by this Court and that guardians *ad litem* be appointed. Plaintiffs believe that, after hearing from counsel and the parties, this Court will be satisfied both as to the amount and proposed allocation of the settlement proceeds and that the interests of all parties are being protected.

5. In order to facilitate that approval, the Plaintiffs request that Attorney Marylin A. Beck be appointed guardian *ad litem* (GAL) for Herbert Fruh and that Attorney Darrel C. Waugh be appointed GAL for Tracey Fruh. Plaintiffs further request that the scope of review and authority for the proposed GALs be limited to (1) review of the settlement; and (2) review of the proposed allocation of settlement proceeds among the Plaintiffs. Virginia Fruh continues to care for Herbert Fruh and oversees his medical care by a power of attorney. The requested limitation in the GAL's authority is intended to eliminate potential confusion and possible inference with Herbert Fruh's ongoing care.

6. Attorney Beck is an experienced trial attorney who has been admitted to practice since 1977. She is a former President of the Massachusetts Bar Association and maintains a practice in

Dedham. She is familiar with the issues surrounding this litigation and has met several of the Plaintiffs. She has viewed documentation and video material concerning Herbert Fruh and the damages he has sustained. She has indicated her willingness to act on his behalf.

7. Attorney Waugh is an experienced trial attorney who has been admitted to practice since 1995. He currently is an associate with Sugarman, Rogers, Barshak and Cohen in Boston. Prior to his association with that firm, he was a law clerk for Judge Elizabeth Porada of the Massachusetts Appeals Court. He was also an attorney for the U.S. Justice Department for several years. He is generally familiar with the issues of this case and has reviewed Tracey Fruh's discovery responses and deposition. Prior to the hearing, he will have met with, or spoken to, her and her mother.

WHEREFORE, Plaintiffs request that the conference presently set for Thursday, March 18 at 3:00 p.m. be utilized for the purpose of obtaining Court approval of the settlement and proposed allocation of the proceeds. Plaintiffs request that Marylin A. Beck and Darrel C. Waugh be appointed guardians *ad litem* for Herbert Fruh and Tracey Fruh for the limited purpose of reviewing the settlement and proposed allocation of proceeds and advising this Court accordingly, and for such other and further relief as this Court deems just and proper.

THE PLAINTIFFS, HERBERT FRUH,
VIRGINIA FRUH, INDIVIDUALLY AND
AS PARENT AND NEXT FRIEND OF
TRACEY FRUH AND KEVIN FRUH

By _____
Paul S. Weinberg, Esq. BBO No. 519550
John E. Garber, Esq. BBO No. 635313
Weinberg & Garber, P.C.
71 King Street
Northampton, MA 01060
(413) 582-6886

By _____
Ronald C. Kidd, Esq. BBO No. 270720
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
(413) 732-2301

0403111213                                                                          3

ASSENTED TO:

By _____

Michael P. Giunta, Esq.
Donovan Hatem
2 Seaport Lane
Boston, MA 02210
(617) 406-4500

By _____

Peter Korneffel, Esq.
Brownstein, Hyatt & Farber, P.C.
410 Seventeenth Street
Denver, CO 80202-4437
(303) 223-1183

## CERTIFICATE OF SERVICE

I, Paul S. Weinberg, Esq., hereby certify that on this 16TH day of March, 2004, I served a copy of the above upon the parties in this action, via facsimile, to counsel, Michael Giunta, Esq., Donovan Hatem and Peter Korneffel, Esq. Brownstein Hyatt & Farber, PC.

Subscribed under the penalties of perjury.

_____

Paul S. Weinberg, Esq.

CLOSED

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:02-cv-10689-PBS

Fruh, et al v. Wellbridge Club, et al
Assigned to: Judge Patti B. Saris
Demand: $64,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 04/11/2002
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 04/11/2002 | 1 | Complaint filed. Case assigned to Judge: Saris. Receipt #: 38464 Amount:$ 150.00. Fee Status: pd (ms) (Entered: 04/12/2002) |
| 04/11/2002 | | Summons issued for Wellbridge Club, Monsanto Company (ms) (Entered: 04/12/2002) |
| 04/26/2002 | 2 | Return of service executed as to Wellbridge Club with service on 4/18/02 filed. Answer due on 5/8/02 for Wellbridge Club (ms) (Entered: 04/26/2002) |
| 04/26/2002 | 3 | Return of service executed as to Monsanto Company with service on 4/18/02 filed. Answer due on 5/8/02 for Monsanto Company (ms) (Entered: 04/26/2002) |
| 05/13/2002 | 4 | Notice of appearance of attorney for Wellbridge Club by John A. Donovan Jr., filed. (ms) (Entered: 05/15/2002) |
| 05/13/2002 | 5 | STIPULATION (Motion) by Herbert Fruh, Virginia Fruh, Wellbridge Club, to extend time to 5/22/02 to respond to pltfs complaint , filed. (ms) (Entered: 05/15/2002) |
| 05/15/2002 | | Judge Patti B. Saris. Endorsed Order entered granting [5-1] stipulation motion to extend time to 5/22/02 to respond to pltfs complaint. cc/cl [EOD Date 5/15/02] (ms) (Entered: 05/15/2002) |
| 05/22/2002 | 6 | Answer by Wellbridge Club, Monsanto Company to complaint; jury demand, filed. (ms) (Entered: 05/24/2002) |
| 05/24/2002 | 7 | Judge Patti B. Saris. Notice of Scheduling conference: set scheduling conference for 3:15 7/18/02 . cc/cl (ms) (Entered: 05/30/2002) |
| 05/24/2002 | 8 | Judge Patti B. Saris. Procedural Order entered re: Initial Scheduling conference;. cc/cl [EOD Date 5/30/02] (ms) (Entered: 05/30/2002) |
| 07/10/2002 | 10 | Notice of Certification by Herbert Fruh, Virginia Fruh by Paul S. Weinberg , filed. (ms) (Entered: 07/12/2002) |
| 07/11/2002 | 9 | Joint statement by Herbert Fruh, Virginia Fruh, Wellbridge Club, Monsanto Company, re: Pretrial Schedule, filed. (ms) (Entered: 07/12/2002) |
| 07/15/2002 | 11 | Initial disclosures by Wellbridge Club, Monsanto Company filed. (ms) (Entered: 07/16/2002) |

| | | |
|---|---|---|
| | | Hearing held on 9/9/2003 re 29 MOTION for Summary Judgment filed by Monsanto Company, Wellbridge Club Management, Inc. Court hears argument of counsel. Court takes motion under advisement. (Court Reporter Marie Cloonan.) (Alba, Robert) (Entered: 09/09/2003) |
| 09/09/2003 | | Judge Patti B. Saris : Electronic ORDER entered denying 29 Motion for Summary Judgment. After hearing, Denied. (Simeone, Maria) (Entered: 09/11/2003) |
| 09/23/2003 | 36 | Exhibit/Witness List by Herbert Fruh, Virginia Fruh. (Attachments: # 1 Witness List) (Simeone, Maria) (Entered: 09/24/2003) |
| 09/23/2003 | 37 | Trial Exhibit/Witness List by Monsanto Company, Wellbridge Club Management, Inc. (Attachments: # 1 Trial Witness list)(Simeone, Maria) (Entered: 09/25/2003) |
| 09/23/2003 | 38 | Supplement to the Exhibit/Witness List by Herbert Fruh, Virginia Fruh. (Simeone, Maria) (Entered: 09/25/2003) |
| 09/24/2003 | 39 | Pltfs supplement to their Trial Witness List by Herbert Fruh, Virginia Fruh. (Simeone, Maria) (Entered: 09/26/2003) |
| 10/07/2003 | 40 | Objection to defts rule 26(a)(3) disclosure. (Simeone, Maria) (Entered: 10/09/2003) |
| 10/07/2003 | 41 | MEMORANDUM in support by Herbert Fruh, Virginia Fruh to 40 Objections and motion to strike. (Simeone, Maria) (Entered: 10/10/2003) |
| 10/09/2003 | 42 | MOTION in Limine to preclude opinion testimony on standard of care by defts experts by Herbert Fruh, Virginia Fruh.(Simeone, Maria) (Entered: 10/10/2003) |
| 10/09/2003 | 43 | Request for Voir Dire by Herbert Fruh, Virginia Fruh. (Simeone, Maria) Additional attachment(s) added on 10/14/2003 (Simeone, Maria). (Entered: 10/14/2003) |
| 10/09/2003 | 44 | Pltfs request for Jury Instructions. (Simeone, Maria) Additional attachment(s) added on 10/14/2003 (Simeone, Maria). Additional attachment(s) added on 10/14/2003 (Simeone, Maria). Additional attachment(s) added on 10/14/2003 (Simeone, Maria). Additional attachment(s) added on 10/14/2003 (Simeone, Maria). Additional attachment(s) added on 10/14/2003 (Simeone, Maria). (Entered: 10/14/2003) |
| 10/09/2003 | 45 | MOTION in Limine to exclude evidence of Collateral sources of income and benefits by Herbert Fruh, Virginia Fruh.(Simeone, Maria) (Entered: 10/14/2003) |
| 10/09/2003 | 46 | MOTION in Limine to preclude all testimony by Pltfs expert Anthony Abbott by Monsanto Company, Wellbridge Club Management, Inc..(Simeone, Maria) (Entered: 10/14/2003) |
| 10/09/2003 | 47 | MOTION in Limine to preclude all testimony by Michael Tighe by Monsanto Company, Wellbridge Club Management, Inc..(Simeone, Maria) (Entered: 10/14/2003) |
| 10/09/2003 | 48 | MOTION in Limine to exclude testimony by George Murphy by Monsanto Company, Wellbridge Club Management, Inc..(Simeone, Maria) (Entered: 10/14/2003) |
| 10/09/2003 | 49 | MOTION in Limine to exclude any testimony or other evidence of alleged Negligent training by Monsanto Company, Wellbridge Club Management, Inc..(Simeone, Maria) (Entered: 10/14/2003) |
| 10/09/2003 | 50 | MOTION in Limine to exclude the pltfs post incident videotape by Monsanto Company, |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HERBERT FRUH, VIRGINIA FRUH,      )
Individually, and as Parent and Next   )
Friend of TRACEY FRUH, and        )
KEVIN FRUH,                       )         UNITED STATES DISTRICT
       Plaintiffs                 )         COURT FOR THE DISTRICT
                                  )         OF MASSACHUSETTS
vs.                               )
WELLBRIDGE CLUB MANAGEMENT,       )
INC., (F/K/A CLUB SPORTS          )
INTERNATIONAL, INC.) D/B/A THE    )
WELLBRIDGE COMPANY AND/OR         )
WELLBRIDGE HEALTH and             )
FITNESS CENTER and MONSANTO       )
COMPANY,                          )
       Defendants                 )         CASE NUMBER: 02-10689 PBS

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, for their Memorandum of Law in Opposition to the Motion for Summary Judgment of the Defendants, state as follows:

### A. Introduction And Summary of Facts

Cardiac arrest results from a disruption in the electrical system of the heart that usually can only be reversed by defibrillation – an electric shock to the heart by a defibrillator. The shock must be delivered within five or six minutes, in most cases, or there is scant chance of survival. (SF¶¶ 21-22, 25).[1] Without the circulation of oxygenated blood by the regular pumping of the heart, the body's cells die, beginning with brain cells. (SF¶¶ 20, 21, 57; Pltf. Ex. N, at 3). Even if properly performed, Cardiopulmonary Resuscitation (CPR) only buys a little time, and cannot restore the heart's rhythm. CPR is a weak substitute for a beating heart in perfusing oxygenated blood through the body, with about a 10 to 20% efficiency. (SF¶¶ 25, 83, 88). Mr. Fruh

---

[1] Plaintiffs incorporate herein their Response to the Defendants' Statement of Undisputed Facts in Support of Summary Judgment, referred to in the form "RSF¶__," and their Further Statement of Undisputed Facts in Opposition to the Defendants' Motion, referred to in the form "SF¶__," filed contemporaneously with this Memorandum.

1

sustained severe brain damage on April 15, 1999 for this reason. (Pltf. Ex. N, at 8). Between nine and eleven minutes passed from the time of his cardiac arrest until a Boston EMS crew arrived at the Defendants' health club to defibrillate him. (RSF¶ 26, 32).

Since the mid-1990s, automated external defibrillators ("AEDs") have been widely available, cheap and reliable. They cost about $2,500, were battery powered, the size of a large dictionary and foolproof to use. (SF¶¶ 20, 23, 49, 98, 133; Pltf. Ex. VV). The AED model that Wellbridge finally acquired, soon after Mr. Fruh's death, was first approved for sale by the FDA in 1996. (SF¶ 134). The American Heart Association ("AHA") is indisputably the final word on medical response to cardiac arrest. (SF¶15). The AHA discussed AEDs for health club use starting in the mid-1980s. (SF¶16). The Medical Advisory Committee of the YMCA, a recognized health club authority, recommended that health clubs have AEDs in 1997. (SF¶ 36).

Beginning in 1992, the AHA had recommended, in a widely publicized statement of principles, that any industry or business that expected its employees to use CPR (such as lifeguards, flight attendants, security guards and health club personnel) adopt AEDs and train and equip their employees accordingly. (SF¶¶ 17-22). Although the Defendants' employees conceded AHA authority concerning response to cardiac arrest, the Defendants failed to follow this recommendation until 2000, after Mr. Fruh sustained massive brain damage. (SF¶¶ 15, 82, 106).

The standards invoked by the Defendants, from International Health and Racquet & Sportsclub Association ("IHRSA"), required that member clubs to systematically upgrade professional knowledge and keep abreast of industry developments; meet or exceed relevant published standards; and be prepared "to respond in a timely manner to any reasonably forseeable medical emergency that threatens the health and safety of club users." (SF¶¶115-

2

117). Another organization, the American College of Sports Medicine, espoused similar standards, and went even further in recognizing that timely response to a cardiovascular incident meant within four minutes, as determined by the AHA. (SF¶¶29-30). The Defendants failed to meet any of these standards.

Years before Mr. Fruh's brain damage, the Defendants' decision-making executives knew beyond doubt that their policy for responding to cardiac arrest – employee training in CPR and dialing 911 – could do little to prevent death or brain damage from cardiac arrest without prompt defibrillation by an AED. (SF¶¶ 55-57, 83-84, 105-106). Wellbridge actually had a defibrillator on the premises of one of its clubs in St. Louis, which was affiliated with a cardiac rehabilitation center. (SF¶79). One Wellbridge executive had witnessed AEDs in use on several occasions in his earlier job as an EMT, and in November, 1998 had read in the Boston Globe about the widely-publicized in-flight save of American Airlines passenger Michael Tighe by an AED. (SF¶ 81).

Clubs the size of Wellbridge average at least two fatalities per year. (SF ¶¶ 89, 73, 78). The Defendants' executives also admitted that their employee CPR training was intended as a response to the anticipated cardiac arrest of a member, which they agreed was foreseeable, especially among older members, like Mr. Fruh, who the Defendants targeted as members. (SF¶¶ 37-38, 75-77, 86, 89). Like most health clubs, the Defendants screened Mr. Fruh for signs of coronary disease before he joined. Finding that he had significant risk factors (sedentary life-style, age and high cholesterol), in accordance with IHRSA guidelines, the Defendants sought to protect themselves with a note from Mr. Fruh's doctor, instead of preparing itself to make an effective response. (SF¶¶ 108-109, 118-119; Pltf. Ex. Y, at 18).

3

In its membership literature, invoking industry "standards", Wellbridge misrepresented to prospective and current members (including Mr. Fruh) that they were keeping abreast of new industry developments, were meeting or exceeding relevant published standards, and were prepared to timely respond to any foreseeable medical emergency. (SF¶¶ 115-117). None of these statements were true, because the Defendants did not have an AED on the premises, which was the only effective and proven response to cardiac arrest. (RSF¶ 65; SF¶ 17-25).

Other health clubs, in Boston and around the country, were using AEDs and saving lives in the years before Mr. Fruh's injuries. (SF¶¶ 45, 47, 49, 50, 68-70). A prominent health club industry magazine featured such a save in a January 1999 issue. (SF¶¶ 68-70). An IHRSA report in 1999 indicated that 16% of its member clubs responding to a survey had AEDs in place and a further 24% had decided to buy one in the near future. (SF¶ 95). In Boston, several office buildings, hotels and health clubs had AEDs before April, 1999. (SF¶ 46). In a local example, the Springfield, Massachusetts YMCA bought an AED in February, 1999 and has successfully resuscitated two members from cardiac arrest. (SF¶¶ 49-50). Wellbridge itself successfully resuscitated two members less than a year after it finally deployed AEDs. (SF¶ 136). During the mid- to late 1990s, in other industries, AEDs received widespread publicity: most United States domestic airlines had publicly announced they would carry AEDs by early 1998, and casinos were saving customers with AEDs by 1997. (SF¶¶64-67).

The Defendants' assertions about the difficulties of acquiring AEDs and training employees are strictly rationalizations after the fact, without any support in the evidence. Wellbridges' own executive told IHRSA, in writing, that deployment was "not overly difficult." (SF¶ 136). Boston EMS provided AED training free of charge to those who requested it. (SF ¶¶ 45, 49). Nor was

4

there any question of legality: anyone could buy and use AEDs provided a doctor signed for the device and training was given. (SF¶¶ 48-50).

At a minimum, a jury could reasonably conclude that the Defendants breached their duty of care to Mr. Fruh under the circumstances. This Court could reasonably conclude that they misrepresented their preparedness for cardiac emergencies, in violation of c.93A and in breach of warranty. The Defendants' motion should be denied.

### B. The Summary Judgment Standard

In addressing a motion for summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Willhauck v. Town of Mansfield*, 164 F. Supp. 2d 127, 132 (D. Mass. 2001), *quoting Barbour v. Dynamics Research Corp.*, 63 F. 3d 32, 36 (1st Cir. 1995). Because "the critical question" in establishing liability for negligence "is whether the Defendant has failed to act as a reasonably prudent person would have acted in all of the circumstances, 'including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk,'" *Gilhooley v. Star Market Company*, 400 Mass. 205, 207 (1987), the granting of summary judgment in favor of a Defendant in a negligence case is highly unusual. *E.g. Verge v. United States Postal Service*, 965 F.Supp. 112, 120 (D. Mass. 1996)(denying summary judgment due to issues of fact on liability and causation in a slip and fall negligence case).

### C. A Jury Must Determine Whether the Defendants Breached Their Duty of Reasonable Care Under the Circumstances

In their papers, the Defendants confuse duty with breach. All companies are subject to a duty of care to their customers as a matter of law. In the absence of a special duty of care (such as a common carrier or a fiduciary), the duty is one of reasonable care. The law imposes the duty, and a jury determines whether the duty has been breached. Statements to the effect that,

5

"the Defendants had no duty to have an AED in April, 1999" reflect a misunderstanding of Massachusetts law.[2] The issue presented by the Defendants' Motion for Summary Judgment is whether this Court, as opposed to a jury, may decide as a matter of law whether the Defendants complied with their duty of reasonable care in all of the circumstances. Even a cursory review of the facts and the law yields the obvious answer: a jury must decide the question.

Whether the Defendants breached their duty of care to Mr. Fruh is determined by whether they acted reasonably in light of all the circumstances. This requires consideration of any evidence indicating lack of care; whether the Defendants knew of the likelihood or possibility of injury; whether the Defendants ever took steps to address the danger or risk; the burden of avoiding the risk, and whether risk of harm to Mr. Fruh was reasonably foreseeable by the Defendants. *Gilhooley, supra,* 400 Mass. at 207; *Upham v. Chateau De Ville Dinner Theatre, Inc.,* 380 Mass. 350, 354 (1980); *Gelinas v. New England Power Co.,* 359 Mass. 119, 124 (1970); *Pucci v. Amherst Restaurant Enterprises, Inc..,* 33 Mass. App. Ct. 779, 785 (1992); *see also, Verge, supra,* 965 F. Supp. at 117-118.

### 1. THE DEFENDANTS FORESAW CLUB MEMBER CARDIAC ARREST

Health club member cardiac arrest is a regularly recurring event. The Defendants' executives admitted, without qualification, that club member cardiac arrest was reasonably foreseeable. (SF¶¶54, 73, 75-77, 86, 89). Their knowledge is demonstrated, most graphically, by their actions: training health club employees in CPR, a response appropriate only to cardiac

---

[2] In its discussion of duty, the Defendants repeatedly misuse words such as "standard" and "requirement." *E.g.,* p. 8 ("no standard or requirement existed in April 1999 to have had an AED at the Atlantic Center"). There were no regulations or laws specifically requiring an AED in health clubs in April 1999 in Massachusetts; to this extent, they were not "required." Industry "standards," of the kind invoked by the Defendants, do not impose independent mandatory requirements, like a statutory requirement, but are admissible as proof bearing on negligence. The common law of negligence does not impose affirmative mandatory requirements in the manner implied by the Defendants. Any person is free to act unreasonably to those to whom it owes a duty. Only in the event someone gets hurt as a result is compensation owed and a negligence claim made out.

6

arrest. The Defendants' executives admitted that the CPR training was designed to address anticipated cardiac arrest of a member. (SF¶¶ 75, 86). The average from various sources, including the Defendants' own information, puts the rate of cardiac arrest of club members at about two or more per year for a chain of Wellbridge's size. (SF¶ 73).

Before 1999, the industry was also aware, as were the Defendants (both at Wellbridge and CSI), that vigorous exercise put stress on the heart, and increased the likelihood of cardiac arrest. (SF¶¶ 37, 54, 76-77; RSF ¶ 112). To compound this increased risk, Wellbridge specifically targeted as potential members people over the age of 40 or 45, a segment of the population with an increased risk of heart attack and cardiac arrest, generally, and while vigorously exercising in particular. (SF¶ 114). Indeed, these were two reasons the American Heart Association and the Red Cross targeted health clubs as logical places for the deployment of AEDs, along with airlines and sports arenas. (SF¶¶ 16-24, 65-66).

Wellbridge's written materials, including the sub maximal consent form which it required Mr. Fruh to sign, specifically disclosed the risk of possible cardiac events during vigorous exercise. (SF¶¶ 77, 120).    The consent form, signed in 1995, actually gave the statistical likelihood of such an event, but (as discussed below) also falsely assured Mr. Fruh that Wellbridge was prepared to make an effective response to such events. (SF¶ 120). Not only was Mr. Fruh's arrest foreseen by Wellbridge, it told him in writing it could happen, but that it was prepared to respond effectively.

The Defendants' executives knew, before 1999, that the CPR and related policies in place at Wellbridge were ineffective to resuscitate or treat a victim of cardiac arrest, and that brain damage was a foreseeable consequence of delayed defibrillation. (SF¶¶ 55-57, 83-84, 105-106).

7

## 2. THE BURDEN OF AVOIDING CARDIAC ARREST WAS SLIGHT

Compared to the known risk, the burden of avoiding the risk of cardiac arrest fatality was slight. AEDs available in the mid- to late 1990s were foolproof for lay responder use, cost about $2,500 and were the size of a large dictionary. (SF¶¶ 20, 23, 49, 98, 133; Pltf. Ex. VV). They were proven to save lives in health clubs, airlines and casinos. (SF¶¶ 64-67). The requirements of a doctor's assistance in acquiring the device and minimal employee training were, according to Wellbridge itself, "not overly difficult." (SF¶ 136).

The Defendants target only this factor in the negligence equation. They assert that the acquisition and use of AEDs is heavily regulated, fraught with difficulties and possible illegality. This scenario has been rejected by everyone but the Defendants' lawyers: (1) the Wellbridge executive in charge of AED deployment said it was "not overly difficult;" (2) the Springfield, Massachusetts YMCA deployed in early 1999 without any significant difficulty; (3) the captain of Boston EMS testified that the only requirements were a doctor's assistance in acquiring the AED plus training of employees, which the AHA or local EMS representatives often provide for free. (SF¶¶ 48-50, 136). In any event, the extent of any actual or claimed difficulties present quintessential fact questions for the jury's resolution.

In an effort to paint a picture of dense regulatory restriction, the Defendants point to 105 CMR 170 *et seq.*, which, pursuant to M.G.L. c. 111C and M.G.L. c. 30A, sets out a comprehensive set of regulations for a coordinated Massachusetts Emergency Medical Services. The only problem with the citation is that the regulations became effective on February 16, 2001, and so obviously had no bearing on Wellbridge's deliberations two or three years earlier. 105 CMR 170 *et seq.* ("effective date"). Nor do they have any force or effect before they are effective. *See, Sweet v. Sheehan*, 235 F.3d 80, 87 (2d Cir. 2000)("proposed regulations...have

8

no legal effect"); *Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d at 44 (FAA regulations had no force or effect to pre-empt state law before effective date). In any event, the regulations do not inhibit AED acquisition and use by lay persons, beyond the basic requirements of physician oversight and minimal training.

The Defendants go so far as to complain that the Massachusetts Good Samaritan statute may not have immunized them from civil liability in 1998 and 1999 (though an AED-promoting statute now clearly does). This is completely irresponsible, because the for-profit Wellbridge was not a bystander Good Samaritan *vis a vis* its own paying member, Mr. Fruh. They owed a duty of reasonable care to him, which may well include some otherwise unnecessary expense, inconvenience, and perhaps dealings with local municipal regulators – as in the case of a fire sprinkler system or similar equipment designed to safeguard customer safety against foreseeable dangers.

The Defendants' reliance on *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218 (Pa. 2002) is misplaced for several reasons. First, obviously, it is not Massachusetts law, and is therefore binding on the Court only to the extent it is persuasive. Second, the holding also conflicts generally with Massachusetts law. *See, Rosado v. Boston Gas Co.*, 27 Mass.App.Ct. 675, 678 (1989)("Just precisely what constitutes reasonably prudent conduct in particular circumstances is generally left for a jury to decide"). Third, it appears there was very little, if any, factual record developed which could have formed a basis for negligence – as to foreseeability, the medical value of AEDs, industry standard and practice, ease of addressing the risk, etc. No factual record is referred to, and the dissent suggests that the reason for this is that the dismissal was originally premised on a narrow basis of illegality by virtue of a statute. Fourth, the cardiac event in *Atcovitz* took place in January, 1996. 812 A.2d at 1220. Mr. Fruh's

9

arrest was on April 15, 1999. During the three and half years between the two events, the health club industry's awareness of and use of AEDs increased dramatically. (SF¶¶ 16-25, 29-38, 45-52, 55-60, 64-66, 68, 98). The persuasive evidence that can be marshaled to support a claim of negligence for a 1999 event greatly exceeds similar evidence for a 1996 event. Thus, *Atcovitz* is factually distinguishable.

### 3. OTHER CIRCUMSTANCES EVIDENCE NEGLIGENCE

Other circumstances bearing on the Defendants' negligence include the pseudo-medical and quasi-scientific gloss by which Wellbridge marketed itself. It held itself out to the public, and Mr. Fruh, as "state-of-the-art," "scientifically-based" and designed to work in conjunction with physicians and medical professionals. (SF¶¶ 108-113, 118). Wellbridge should at least be held to the standard which it proclaimed for itself in public, as an expert in physical fitness. (SF¶__).

Wellbridge went further than broad statements of its sophistication; it specifically pledged that it systematically kept itself abreast of new industry developments; met relevant published industry standards; and was prepared to timely respond to foreseeable medical emergencies. (SF¶¶ 115-117). These representations were adopted from IHRSA standards. (SF¶ 117). As discussed in more detail below, the Defendants breached each of these warranties. Failure by a defendant to comply with its own putative standards is evidence of negligence, just as is failure to comply with an industry standard.

### 4. A CLAIMED INDUSTRY STANDARD IS ONLY ONE FACTOR FOR THE JURY T TO CONSIDER

The Defendants rely almost exclusively upon their assertion that the "industry standard" in April, 1999 was not to have AEDs in health clubs. As an initial matter, it is not true that published standards did not allow for AEDs in 1999; in fact, recognized authorities recommended them. (SF¶¶ 16-18, 29-30, 36). In addition, the evidence is that a significant

10

number of health clubs across the nation did, in fact, have AEDs prior to Mr. Fruh's cardiac arrest in April, 1999. (SF¶¶ 47, 49, 60, 68, 79, 92, 95).

Evidence as to whether a person conformed to a business custom that has grown up in a given industry is relevant evidence, and may be considered, but is not necessarily controlling on the question of whether or not the Defendants exercised appropriate care in the circumstances. *Back v. Wickes Corp.*, 375 Mass. 633, 641 (1978). The custom or practice of a trade or industry is not a substitute for the legal standard of reasonable care under the circumstances. *Upham v. Chateau De Ville Dinner Theater*, 380 Mass. 350, 354 (1980).

Evidence that has been recognized as sufficient to overcome a defendant's evidence of compliance with industry practice may include: that the defendant knew of the likelihood of danger or risk to the plaintiff; that the defendant had taken some measures to reduce the risk or danger, that the defendant knew that its measures to respond to the danger or risk were inadequate. *Bergendahl v. Massachusetts Electric Company*, 45 Mass. App. Ct. 715, 720 (1998). These are the basic elements of negligence discussed above.

> Where the technology is available, even the lack of availability of a safety device throughout an industry is not conclusive on the issue of feasibility, since, as Judge Learned Hand pointed out, "a whole calling may have unduly lagged in the adoption of new and available devices. [citation to T.J. Hooper]" Under these standards, the judge did not err in allowing the jury to consider evidence pertaining to the 1976 machine on the issue of the feasibility of better safety devices in 1961 or 1970, for the Defendant's product, because there was independent evidence presented by the Plaintiff's expert ... of such feasibility.

*Torre v. Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 677 (1980); *see, Wilson v. Bradlees of New England, Inc.*, 96 F.3d 552, 557 (1st Cir. 1996), *citing The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.) *cert. denied*, 287 U.S. 662 (1932)("If the Defendants want to show that they meet a prevailing industry standard, fine; but this should not preclude a plaintiff from showing that the industry should have done more under certain conditions"); *see also Schrottman v.*

11

*Barnicle*, 386 Mass. 627, 641 (1982)("Negligence throughout a trade should not excuse its members from liability").[3]  A case with striking parallels is *Spinosa v. International Harvester Company*, 621 F.2d 1154 (1st Cir. 1980):

> Harvester asserted it had no duty to provide a dual-braking system (in which a back-up system would continue to stop the vehicle despite a loss of brake fluid) or safer interior design, since neither was employed generally in the industry at the time.
>
> Plaintiffs-appellees ... offered as evidence patents showing the development of dual braking systems in the 1930s.  They offered testimony that the federal government used dual brake systems on its vehicles in World War II and that Congress required dual systems on government vehicles in 1965.  In addition, expert testimony was offered on the corrosive nature of the steel tubing used and the likelihood that sudden failure could someday result from corrosion. Moreover, Plaintiffs-appellees offered proof that safer brake and interior designs were feasible through evidence that shortly after the manufacture of the truck in question, in late 1966, International Harvester switched to the dual brake system and added significant padding inside the cab.  Clearly this volume of pertinent evidence, all properly introduced, adds up to controversy sufficient to send the issue to the jury. 621 F.2d at 1161.

The legal rule that an industry should not be permitted to set its own conclusive standard, in the context of a negligence claim, is vindicated by the evidence in this case.  The Defendants invoke mainly IHRSA and ACSM as setting the appropriate industry standards.  As an initial matter, the better evidence is that the Defendants actually breached several of these standards as discussed in more detail below.

---

[3] The status of defibrillators as a newly-embraced safety device in the airline industry was noted in *Stone vs. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28 (D. Mass. 2003), in which Chief Judge Young ruled that the Federal Aviation regulatory scheme did not preempt state law negligence claims against an airline for failure to have an automatic external defibrillator:

> So it is that, in this case, what once was a central issue of the common law of torts *see, e.g.,* the *T.J. Hooper*, 60 F. 2d 737 (2d Cir. 1932) (L. Hand, J.); *W. Page Keeton, et. al., Prosser & Keeton on Torts*, 1994 (5th Ed. 1984)(citing the *T.J. Hooper* for the proposition that an industry 'cannot be permitted to set its own uncontrolled standard[s] of care), and thus committed to the wisdom of the nation's juries, must now first be addressed by a judge to see whether congress inadvertently or not, has once more restricted recovery under state tort law. (256 F. Supp. 2d at 33).

12

The "Introduction" to the IHRSA Standards Facilitation Guide notes that "these recommendations do not imply a higher standard of industry practice at this time and clubs are not currently required to abide by them." (Pltf. Ex. Y, at 6). This sort of language, in a regulation, has been found to imply the application of the common-law standard. *See, Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d 28, 44 (D.Mass. 2002). Moreover, "[m]embers may find that exceeding some of these standards is desirable or necessary." (Pltf. Ex. Y, at 6). Presumably, IHRSA wanted its members to be able embrace the Standards to exculpate themselves, but remain free to disclaim them when choosing not to follow them. Similarly, the ACSM Standards identify themselves as "minimum" standards, which obviously "permit and invite the party to whom they apply to exceed the minimum." *Somes v. United Airlines, Inc.*, 33 F.Supp.2d 78, 87 (D.Mass. 1999)(rejecting "minimum" FAA regulations as a basis for federal pre-emption of negligence claim based on lack of an AED).

The testimony of IHRSA's founder and chief executive demonstrated that the interest of an organization such as IHRSA is its member health clubs, and not health club members. (SF¶¶90, 97, 100-102). The purpose of the IHRSA coronary disease screening standard, for example, was mainly for the benefit of the club, not the member. (Pltf. Ex. Y, at 18). In addition, IHRSA revealed itself to have a passionate dislike of lawyers, and made every effort to "stop/slow" any requirement of AEDs in health clubs, despite the obvious benefits. (SF¶¶100, 102). Although IHRSA's McCarthy testified that cost was only one factor in its stance against AEDs, IHRSA's Director of Policy lamented in an industry magazine that the AED's cost was the main reason clubs did not get them: the "margins in this business are not great" and club owners could say "I'm going to be better off spending my money on a treadmill." (SF¶ 101).

13

In the case of readiness to respond to forseeable club member cardiac arrest, a reasonable jury could reasonable conclude that the AHA and YMCA standards are closer to a reasonable standard of care than IHRSA's or the Defendants.'

### D. The Fruhs' c, 93A Claims Present Issues of Fact

The Defendants ignore the applicable law in addressing the Fruhs' c.93A claims. They omit any reference to the applicable statute and misstate the elements of a claim. Health clubs such as the Defendants have their own statutory c. 93A standard, contained in M.G.L. c. 93 § 84, which provides that a health club violates c. 93A if it "[m]isrepresent[s] directly or indirectly, including in its advertising, promotional materials, or in any other manner,"

> (2) the nature of its courses, membership programs, training devices or methods, services...;

> (3) the number, qualifications...training or experience of its personnel, agents, employees or other representatives, whether by means of endorsements or otherwise;

> (6) the nature extent or availability of any services, guidance, instruction, counseling, assistance, or other attention which the health club will provide to buyers; ...

M.G.L. c. 93 § 84. Consequently, any direct or indirect misrepresentation made by Wellbridge in advertising and promotional materials as to "the nature, extent or availability of any services... which the health club will provide" is a violation of c. 93A.

This standard is a specific application of the general rule, provided by Attorney General regulations, that it is unfair or deceptive "for a seller to make any material misrepresentations of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to mislead." 940 CMR § 6.04(1),[4] *quoted in*

---

[4] As the Supreme Judicial Court has held on a number of occasions, the Attorney General's regulations, in defining conduct violative of c. 93A, have the force and effect of law. *American Shooting Sports Council, Inc. v. Attorney*

14

*Skinder-Strauss Assoc. v. Massachusetts Continuing Legal Education, Inc.*, 914 F. Supp. 665, 681-82 (D. Mass. 1995)(finding word "official" had capacity to mislead as to the "imprimatur of state authority").

Conduct is unfair or deceptive, under c.93A, if it is "within the penumbra of some common law, statutory or other established concept of unfairness." *Cummings v. HPG Intern, Inc.*, 244 F.3d 16, 25 (1st Cir. 2001), *quoting PMP Assoc.,Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975), *see, Kenda Corp. v. Pot O'Gold Money Leagues*, 329 F.3d 216, 234 (1st Cir. 2003). "The context within which the unfair act took place is of great import." *Cummings*, 244 F.3d at 25, *citing Kattar v. Demoulas*, 433 Mass. 1, 14 (2000). Violations of c. 93A are determined on a case-by-case basis; the "fact-specific" nature of the inquiry is consistently emphasized in the Massachusetts courts. *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998).

A misrepresentation claim under c. 93A has fewer elements than a fraud or deceit claim. *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703 (1975), *Cummings*, 244 F.3d at 25. Proof of actual reliance is not required. *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 850 (1983); *Slaney*, 366 Mass. at 703. Nor must a plaintiff prove that the defendant knew that a representation was false; negligent misrepresentations are actionable. *Slaney*, 366 Mass. at 703; *Glickman v. Brown*, 21 Mass. App. Ct. 229, 235-36 (1985) *overruled on other grounds, Cigal v. Leader Development Corp.*, 408 Mass. 212, 216, n.8 (1990). Plaintiff need only show a causal connection between the misrepresentations and plaintiff's injury. *International Fidelity*, 387 Mass. at 850; *Glickman*, 21 Mass. App. Ct. at 236.

The context in which misrepresentations are made is crucial to c. 93A analysis. *See Cummings*, 244 F.3d at 25. Wellbridge's promotional and marketing materials created the

*General*, 429 Mass. 871, 877-78 (1999); *Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 775 (1980); *Maillet v. ATF-Davidson Co.Inc.*, 407 Mass. 187, 193 (1990).

15

impression of Wellbridge as an advanced "state-of-the-art" facility, medically and scientifically based, and specially designed for the health and safety of the older member. (SF¶¶ 108-113, 118). The medical screening of potential members for coronary artery disease contributed to the overall impression of quasi-medical expertise, as did the requirement of physician evaluation and approval, and the sub-maximal stress test, all conditions of membership. (SF¶¶ 108-109, 119-120, 122).

Against this background, WellBridge Company warranted to its members that it would conform to "...and in many areas surpass,..." the "standards of quality" of the International Health Racquet & Sports Club Association (IHRSA) including: ...

> Our club conforms to all relevant laws, regulations and published standards;
>
> Our club is able to respond in a timely manner to any reasonably foreseeable emergency event that threatens the health and safety of club users. Toward this end, our club has an appropriate emergency plan that can be executed by qualified personnel in a timely manner. (SF¶¶ 115, 117).

Wellbridge also publicized its IHRSA pledge to "systematically upgrade our professional knowledge and keep abreast of new developments in our field." (SF¶¶ 116, 117). As part of the fitness evaluation undergone by Herbert Fruh, as a condition to his joining Wellbridge, he signed a "Consent for Sub Maximal Fitness Evaluation," on October 27, 1995:

> During and immediately following the sub-maximal exercise test, I understand that there exists the possibility of unusual cardiovascular and/or cerebral changes occurring. These may include but are not limited to abnormal blood pressure changes, fainting, dizziness, very rapid, or very slow, or irregular, heart beat and rare instances of heart attack. National statistics indicate serious, but rarely catastrophic, complications in approximately .5 per 10,000 exercise tests. Every effort will be made to minimize this by preliminary examination and constant surveillance during the test. Emergency and trained personnel are available to deal with unusual situations which may arise. (SF¶ 120) (emphasis added).

It is not disputed that any health club, including the Defendants, foresaw the cardiac arrest of members; this is why they all trained their employees in CPR, which was also known by the mid-

16

1990s to consign the arrest victim to certain death if not followed by defibrillation. (SF¶¶ 55-57, 83-84, 105-106). In the above-quoted consent, Wellbridge goes so far as to tell Mr. Fruh in writing that it anticipates a chance of a cardiac problem when he exercises vigorously.

Wellbridge falsely implies that it has adequate or effective means to respond to "any" cardiac emergency. Strictly speaking, Wellbridge had personnel, as warranted, and they were, in fact, trained to respond to medical emergencies. The problem is the obvious implication that these trained personnel would be of some effective use in the case of a cardiac problem, such as an arrest. They were not of any use, though they easily could have been, if Wellbridge had had an AED. Wellbridge also failed to keep itself aware of new developments on the subject of cardiac arrest and AEDs. (SF¶¶ 124-129). They further failed to adhere to the most relevant "published standards" on the same subject, those of the AHA, whose guidelines are universally recognized as authoritative – including by Wellbridge executives, and in the industry. (SF¶¶15-18, 29-30, 36). The AHA's 1992 prime directive, to equip and train with AEDs where CPR is anticipated to be used, was ignored by the Defendants for seven years. Over a decade later, IHRSA continues to ignore it. (SF¶¶16-17, 100, 124).

The Defendants set up a straw man and proceed with great fanfare to knock it down: we never promised to have an AED on the premises, they say. The Fruhs do not dispute this obvious point. A general warranty may be breached by specific instances not explicitly identified in the warranty. This is the rule, not the exception. Taking the Defendants' argument to its logical conclusion, a warranty of habitability would not be breached by sewage flowing through the kitchen because the landlord did not specifically warrant a sewage-free kitchen. At a minimum, the Defendants' representations about adherence to standards, preparedness for forseeable medical emergencies had a capacity to mislead; or this Court, as fact-finder, could

17

reasonably so conclude.  *See Skinder-Strauss*, 914 F.Supp. at 682 (summary judgment denied because use of word "official" had capacity to mislead). Under the Attorney General regulations, breaches of warranty on the subject of safety are also violations of c. 93A.  *Maillet v. ATF-Davidson Co., Inc.*, 407 Mass. 185, 193 (1990).

As for the remaining elements of the claim, the misrepresentations made to Mr. Fruh, when he joined and after, were part of the mix of information upon which he made his decision to join and to remain a member.  Because he was a member at Wellbridge on April 15, 1999, as opposed to some other club, he sustained severe brain damage for lack of an on-site AED.  This revealed as false or misleading the statements by Wellbridge that its facility was "state-of-the-art" and prepared for forseeable cardiac emergencies like cardiac arrest.  This Court, as fact-finder, could reasonably conclude from these circumstances that Mr. Fruh's brain damage followed as a consequence from the Defendants' misrepresentations: if they had spoken the truth, and been prepared to effectively respond to  cardiac events (with an AED), Mr. Fruh would not have sustained brain damage.  This is all that is required to support a c. 93A claim.[5]  The Fruhs do not have to prove that Mr. Fruh <u>actually</u> relied on the misrepresentations – only that they had the capacity to mislead; actual reliance is not required. *International Fidelity*, 387 Mass. at 850.

The Defendants assert that there is no evidence as to any representations made directly to Mr. Fruh, or his reasons for joining.  To the contrary, in addition to the sub-maximal consent form Mr. Fruh signed, Ms. Turgiss and Mr. Patjane both testified that the representations were part of a pledge in the Member Handbook given to new members when Mr. Fruh joined. (SF¶¶115, 120).  In addition, Mr. Fruh answered a Wellbridge questionnaire about his reasons for joining, which included a greater "sense of wellbeing" and to be "more physically fit." (RSF¶ 8).  In the

---

[5] The grounds of the Defendants' Motion for Summary Judgment do not include any challenge to causation as an element of any of the Plaintiffs' claims. (Motion ¶¶4-7).

18

context of Wellbridge's repeated statements about its scientific expertise in health fitness and its

"state-of-the-art" facility, these facts would support a reasonable inference of reliance, if one

were necessary.

### E. The Fruhs' Express Warranty Claim Must Go to the Jury

The Defendants' false statements about its response to forseeable medical emergencies also

form the basis for Plaintiffs' express warranty claim.

> Under Massachusetts law, as elsewhere, an express warranty in a contract is a
> promise of a particular standard of performance, and it imposes on the warrantor
> an obligation to fulfill the promise made. (citations omitted). In the event of a
> breach, warrantee may bring a contract action for damages. (citations omitted). In
> effect, the warrantor proposes to indemnify the warrantee for any damage
> resulting from a variation between what was promised and what actually came to
> pass. (citations omitted). *Sparks v. Fidelity National Title Ins. Co.*, 294 F.3d 259,
> 272 (1st Cir. 2002).

The Defendants' only argument on this claim appears to be that they did not warrant that the

Atlantic Avenue club had an AED. This assertion misses the point of the Fruhs' claims, as

discussed above. The misrepresentations, described above, were plainly warranties of "a

particular standard of performance."

The Defendants also ignore the other basis for liability under a breach of warranty theory.

As Plaintiffs allege in their Complaint, and discussed above, the Defendants warranted that it

> is able to respond in a timely manner to reasonably forseeable emergency events
> that threatens the health and safety of club users. <u>Toward that end, our club has an
> appropriate emergency plan that can be executed by qualified personnel in a
> timely manner.</u> (SF¶ 115) (emphasis added).

They also warranted that "[e]mergency and trained personnel are available" for cardiac

problems. (SF¶ 120). In fact, the Wellbridge employees who responded to Mr. Fruh's cardiac

arrest (Robert Marini and Brooke Lathrop) were not trained in accordance with the Wellbridge

emergency plan, which called for periodic cardiac emergency drills which were never run.

19

(RSP¶69-70). As a direct result, Marini and Lathrop actually stopped performing CPR for about three minutes, mistakenly believing they had found a pulse. (Pltf. Ex. GGG; Pltf. Ex. N, at 1, 8; Pltf. Ex. M, at 10-11). This left Mr. Fruh without even the limited perfusion of oxygenated blood that CPR provides for that time. They also raised his legs, a mistake without basis in any recognized CPR procedure. (*id.*). On this alternative basis, genuine issues of fact remain as to the essential elements of the Plaintiffs' warranty claims. Summary judgment should be denied as to Counts II and XI.[6]

**Conclusion**

For all of the foregoing reasons, the Defendants' Motion should be denied.

THE PLAINTIFFS, HERBERT FRUH,
VIRGINIA FRUH, INDIVIDUALLY AND
AS PARENT AND NEXT FRIEND OF
TRACEY FRUH AND KEVIN FRUH

By
Paul S. Weinberg, Esq. BBO No. 519550
John E. Garber, Esq. BBO No. 635813
Weinberg & Garber, P.C.
71 King Street
Northampton, MA 01060
(413) 582-6886

By
Ronald C. Kidd, Esq. BBO No. 270720
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
(413) 732-2301

**CERTIFICATE OF SERVICE**

I, Paul S. Weinberg, Esq., hereby certify that on this 30th day of July, 2003, I served a copy of the above upon the parties in this action, via hand delivery, to counsel, Michael Giunta, Esq., Donovan Hatem and via priority mail Peter Korneffel, Esq. Brownstein Hyatt & Farber, PC.

Subscribed under the penalties of perjury.

Paul S. Weinberg, Esq.

---

[6] The Plaintiffs agree that the fate of their consortium claims are tied to the viability of the substantive claims (negligence and warranty). Because issues of fact remain as to all the challenged elements of the substantive claims, the consortium claims survive as well. As to the consortium claim of Kevin Fruh only, however, the Plaintiffs do not oppose the Defendants' arguments.