SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

AUG - 4 2005

CLERK OF THE SUPERIOR COURT
By E. Opelski-Erickson, Deputy

| | |
|---|---|
| RICHARD ENG, an incompetent, by and through his guardian ad litem, MONICA ENG, | No. RG03-120619 |
| Plaintiff, | ORDER DENYING SUMMARY JUDGMENT |
| v. | |
| 24 FITNESS USA, Inc., et al., | |
| Defendants. | |

The Motion of Defendant 24 Hour Fitness USA, Inc. ("Defendant") for Summary Judgment came on regularly for hearing on July 11, 2005 in Department 31 of the above-entitled Court, the Honorable James A. Richman presiding. Defendant appeared by Jack C. Nick, and Plaintiff Richard Eng ("Plaintiff") appeared by William C. Kwong.

The Court has considered all of the papers filed in connection with the motion, including the separate statements of the parties, and the arguments of counsel at the hearing, and, good cause appearing, HEREBY ORDERS as follows:

1

**EXHIBIT J**

(1) The Motion for Summary Judgment is DENIED. A defendant moving for summary judgment has the burden of showing that either (1) "one or more elements of a cause of action . . cannot be established;" or (2) "there is a complete defense to that cause of action." (Code Civ. Proc. § 437(c), subd., (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) Here, Defendant has not met its burden of showing that Plaintiff cannot establish the element of duty. (Defendant's Separate Statement of Undisputed Facts, Nos. 1-11, and the evidence cited in support thereof; Plaintiff's Separate Statement of Disputed Facts, Nos. 1-21, and the evidence cited in support thereof.) Further, there is a triable issue of material fact as to whether the release signed by Plaintiff's daughter bars this matter from proceeding. (Defendant's Separate Statement of Undisputed Facts, Nos. 1, 12-33, and the evidence cited in support thereof.)

(2) Defendant's Objections to Evidence, specifically four separate objections to four declarations, are ruled on as follows:

A. <u>Declaration of Kyle McInnis</u>: all three objections are OVERRULED.

B. <u>Declaration of Jennifer Eng</u>: all six objections are OVERRULED.

C. <u>Declaration of Monica Eng</u>: all five objections are OVERRULED.

D. <u>Declaration of Rosy Eng</u>: all seven objections are OVERRULED, except as follows:

2

Objection 7—SUSTAINED: lack of personal knowledge

Dated     **AUG**    **2005**

James A. Richman
Judge of the Superior Court

3

1   Dale Minami (SBN 51161)
    William C. Kwong (SBN 168010)
2   MINAMI, LEW & TAMAKI, LLP
    360 Post Street, 8th Floor
3   San Francisco, CA  94111-5315
    (415) 788-9000
4   (415) 398-3887 (fax)

5   Attorneys for Plaintiff Richard Eng

6

7

**F I L E D**
AL AMEDA COUNTY

JUN 2 7 2005

CLERK OF THE SUPERIOR COURT
By _____
                    DEPUTY

8              SUPERIOR COURT, STATE OF CALIFORNIA

9                      COUNTY OF ALAMEDA

10                   (Unlimited Jurisdiction)

11  Richard Eng, an incompetent, by and        )   Case No. RG03120619
    though his Guardian ad Litem, Monica Eng,  )
12                                             )   **PLAINTIFF'S OPPOSITION TO**
                      Plaintiff,               )   **MOTION FOR SUMMARY**
13                                             )   **JUDGMENT BY DEFENDANT, 24 HOUR**
           vs.                                 )   **HOUR FITNESS, INC.**
14                                             )
    24 Hour Fitness USA, Inc., et al.,         )   Date:      July 11, 2005
15                                             )   Dept:      31
                      Defendants.              )   Time:      9:00 a.m.
16  _____)

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Defendant's Motion
For Summary Judgment, Case No.RG03120619

# **TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................... 1

II.     STATEMENT OF FACTS .................................................. 2

        A.     SUDDEN CARDIAC ARRESTS ...................................... 2

        B.     THE PREVALENCE OF RISK OF SUDDEN CARDIAC ARRESTS .......... 2

        C.     HOW AEDs FUNCTION ........................................... 3

        D.     EFFECTIVENESS OF AEDs ........................................ 4

        E.     THE EFFECTIVENESS OF AEDs WAS WIDELY ACCEPTED MORE
               THAN 10 YEARS BEFORE PLAINTIFF WAS INJURED .................. 5

        F.     THE GOVERNMENTS RECOGNIZED THE EASE AND IMPORTANCE OF
               HAVING AED PROGRAMS LONG BEFORE PLAINTIFF WAS INJURED .... 6

        G.     DEFENDANT KNEW ABOUT THE RISKS THAT ITS MEMBERS FACED
               WHILE EXERCISING AND KNEW THE EFFECTIVENESS OF AEDs ....... 7

        H.     THROUGH ITS PLEDGE AS A MEMBER OF IHRSA, DEFENDANT HAS
               PLEDGED TO BE ABLE TO RESPOND IN A TIMELY MANNER TO ANY
               REASONABLY FORESEEABLE EMERGENCY ........................ 7

        I.     DEFENDANT IGNORED ITS POLICIES TO RESPOND IN A TIMELY
               MANNER TO ANY REASONABLY FORESEEABLE EMERGENCY AMD
               TO PROVIDE A SAFE ENVIRONMENT FOR ITS MEMBERS ............. 8

        J.     DEFENDANT FAILED TO PROVIDE PROPER AID TO PLAINTIFF ......... 9

        K.     PLAINTIFFS' ALLEGED RELEASE ................................. 10

III.    LEGAL ANALYSIS ...................................................... 11

        A.     SUMMARY JUDGMENT MUST BE DENIED IF THERE ARE DISPUTED
               ISSUES OF MATERIAL FACT. .................................... 11

        B.     DEFENDANT'S CONTENTION THAT IT HAD NO DUTY TO PLAINTIFF
               TO PROVIDE CPR OR AN AED IS A QUESTION OF FACT FOR THE
               FINDER OF FACT. ............................................. 12

        C.     CASES CITED BY DEFENDANTS IN SUPPORT OF ITS ARGUMENT THAT
               IT HAS NO DUTY ARE DISTINGUISHABLE FROM THE INSTANT CASE. . 12

        D.     DEFENDANT 24 HOUR FITNESS' DUTY TO PLAINTIFF EXTENDED TO
               ADMINISTERING CPR AND HAVING AEDs IN ITS HEALTH CLUBS ..... 16

               1.     As a Recreational Business Owner in California, Defendant 24 Hour
                      Fitness Had a Duty to Minimize the Risk of Serious Injury by

Administering CPR and Having AEDs on its Premises. . . . . . . . . . . . . . . . 16

2.  California Law Provides A Framework to Analyze Whether Defendant's
    Duty to Aid Plaintiff Extended to Administering CPR and Having an
    AED on its Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    a.  The Risk of SCA at a Health Club and the Ease With Which It Could
        Save a Victim of SCA Was Reasonably Foreseeable. . . . . . . . . . . . 18

    b.  Plaintiff Clearly Sustained Permanent Brain Damage. . . . . . . . . . 19

    c.  The Failure of Defendant to Administer CPR and Equip its
        Facility with an AED Is Very Strongly Connected to Plaintiff's
        Brain Damage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    d.  Defendant's Failure to Develop an Adequate Emergency Medical Plan
        and Equip Its Facility with AEDs While Knowing of Its Undisputed
        Effectiveness in Treating SCAs Demonstrates Moral Blame . . . . . 20

    e.  Requiring Defendant to Administer CPR and Equip Its Facilities
        with AEDs Will Prevent Similar Injuries and Bodily Death From
        Occurring to Other Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    f.  Defendant Bears a Negligible Burden By Equipping Its Facilities
        with an AED, while the Consequences are Life-Saving. . . . . . . . . 22

    g.  Availability of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    E.  PLAINTIFFS NEVER RELIEVED 24 HOUR FITNESS FROM LIABILITY . . . 23

        1.  Plaintiffs Never Signed the Release and Therefore Did Not Knowingly
            Relinquish Valuable, Legal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.  Plaintiffs Did Not Ratify Any Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        3.  Defendant Waived Its Right to Assert A Valid Release Because It
            Violated Its Own Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        4.  Even If the Release Is Valid, Plaintiffs Never Released Defendant From
            Liability Resulting From Injuries From Unanticipated Risks . . . . . . . . . . 26

        5.  The Scope of the Purported Release Does Not Extend to Conduct
            Constituting a Conscious Disregard For His Safety. . . . . . . . . . . . . . . . . . 27

        6.  The Release Is Unenforceable Under Civil Code Section 1668 . . . . . . . . 28

        7.  Defendant's Release Fails to Adequately Alert a Layperson That Legal
            Rights Are Being Relinquished and Is Therefore Invalid on its Face. . . . . . 28

        8.  The Release Shocks The Conscience, And Falls Outside the Reasonable
            Expectations of Mrs. Eng. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**CALIFORNIA CASES**

*24 Hour Fitness, Inc. v. Sup. Ct. (Munshaw)* (1998) 66 Cal.App.4th 1199 . . . . . . . . . . . . . . . . . .  11

*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 21

*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Alvarado Community Hospital v. Superior Court* (1985) 173 Cal.App.3d 476  . . . . . . . . . . . . . .  25

*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351  . . . . . . . . . . . . . . . . . . . . . .  24, 27, 28

*Breux v. Gino's Inc.* (1984) 153 Cal.App. 3d 379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Graham v. Scisssor-Tail, Inc.* (1981) 28 Cal.3d 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112 . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Juarez v. Boy Scouts of America, Inc., et al.* (2000) 81 Cal.App.4th 377 . . . . . . . . . . . . . . . .  14, 18

*Knight v. Jewett* (1992) 3 Cal.4th 296 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Lawson v. Management Activities, Inc.* (1999) 69 Cal.App.4th 652 . . . . . . . . . . . . . . . . . . . . . . .  22

*Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227 . . . . . . . . . . .  23, 27, 28, 29

*Lindsay-Field v. Friendly* (1995) 36 Cal.App.4th 1728  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733 . . . . . . . . . . . . . . . . . . . . . .  16, 24, 27

*Mann v. Cracchiolo* (1985) 38 Cal.3d 18  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*McNulty v. Copp* (1949) 91 Cal.App.2d 484 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Minton v. Cavaney* (1961) 56 Cal.2d 576  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127  . . . . . . . . . . . . . . . . . . . . . . .  17, 18

*Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833  . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Patterson v. ITT Consumer Fin. Corp.*, 14 Cal.App.4th (1993) 1659 . . . . . . . . . . . . . . . . . . . . . .  30

*People v. Visciotti* (1992) 2 Cal.4th 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Rowland v. Christian* (1968) 69 Cal.2d 108  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 14, 18

*Saenz v. Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758 . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173 . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17, 18

*Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, rev. denied by *Sakiyama v.*

    *AMF Bowling Centers Inc.*, 2003 Cal. LEXIS 7246 .......................... 18, 21

*Sanchez v. Bally's Total Fitness Corporation* (1998) 68 Cal.App.4th 62 ................ 24, 28

*Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461 ..................... 11

*Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862 ............................ 29, 30

*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301 ..................................... 19

*Titus v. Canyon Lake Property Owners Assn.* (2004) 118 Cal.App.4th 906 ................. 19

*Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92 ............................ 28

*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40 ................................... 18

**FEDERAL CASES**

*Bond v. Union Pac. R.R. Co.*, 2004 U.S. Dist. LEXIS 21337 ......................... 19, 20

*Lundy v. Adamar of New Jersey* (1994) 34 F. 3d 1173 ............................. 12, 13

**CASES FROM OTHER STATES**

*Atcovitz v. Gulph Mills Tennis Club* (Pa. 2002) 812 A.2d 1218 ....................... 12, 13

*Rutnik v. Coloine Center Court Club, Inc.* (1998) 672 N.Y.S.2d 451 ................... 12, 13

*Salte v. YMCA* (Ill.App. 2 Dist., 2004) 351 Ill.App.3d 524 .................... 12, 14, 15, 16

**CALIFORNIA STATUTES**

Civil Code, Section 1589 ......................................................... 25

Civil Code, Section 1668 ......................................................... 28

Civil Code, Section 1670.5 (a) .................................................... 30

Civil Code, Section 2330 ......................................................... 26

Code of Civil Procedure, Section 437c, subd. (c) .................................... 11

**OTHER**

Restatement (Second) of Torts 314A ........................................ 13, 14, 15

## I.    INTRODUCTION

This case is about Defendant's failure to prevent a foreseeable catastrophic injury to Plaintiff Richard Eng ("Plaintiff") despite its knowledge for many years that sudden cardiac arrest ("SCA") continued to kill or cause brain damage in exercise facilities, including its own facilities at the rate of two or more of its members a month. Plaintiff Richard Eng, now permanently brain damaged as the result of a June 2003 cardiac arrest, was one of those members.

As has been the case for at least the past five or six years, the fatalities and injuries resulting from sudden cardiac arrest could have been easily avoided through use of automated external defibrillators ("AEDs"). If the ability to prevent these catastrophic outcomes were not enough by itself, Defendant 24 Hour Fitness has had every reason to acquire them:

- It knew that exercise increased the risk of cardiac arrest by a factor of 20, and that by 1999 other health clubs, including other large chains, routinely used AEDs to save member lives;

- It knew that all the applicable published standards which it professed to embrace – American Heart Association, American College of Sports Medicine, YMCA, etc. – had recommended AEDs in health clubs as early as 1986 and no later than March, 2002;

- It claims to have recognized a duty to take "all reasonable steps" to protect member safety, to stay abreast of industry developments and timely respond to medical emergencies, duties it never came close to meeting;

- It knew AEDs were required by law in similar environments like schools and airplanes and that by 2001 federal and California legislation had been enacted to promote AED use through Good Samaritan immunities and similar laws;

- It says it budgeted the money for AEDs in all clubs in 2001 based on the industry trend toward AEDs, but even now has yet to spend its first dollar on AEDs.

24 Hour Fitness has successfully avoided responsibility through the use of releases, but cannot do so here, because it is undisputed that neither Plaintiff Richard Eng nor Plaintiff Rosy Eng, who is claiming loss of consortium, ever signed or ratified one. Since Plaintiff Rosy Eng's claim is based on the injury to her husband, Richard Eng, this brief will refer to both Plaintiffs in the singular, "Plaintiff" until the discussion on Rosy Eng's purported release.

In its moving papers, Defendant does not seem to deny that it owed some duty to Plaintiffs; indeed, in each of the cases cited by Defendant regarding duty, the court found that the defendant business owed some duty to the plaintiff. Cases cited by Defendant support this interpretation that

1  some duty is owed to Plaintiff. That alone requires this court to deny summary adjudication and find

2  that the extent or scope of this duty is a question of fact for the finder of fact.

3      Nevertheless, if this Court has any reluctance to accept the imposition of some duty on

4  Defendant to Plaintiff based on the arguments advanced by Defendant in its brief, the analysis

5  offered in the seminal case of *Rowland vs. Christian*, discussed below, supports imposition of a duty.

6  Plaintiff will introduce undisputed evidence that a significant risk of SCA from exercise was

7  foreseeable, that the effectiveness of AEDs and CPR in resuscitating SCA victims was clearly

8  established and that AEDs were widely accepted and available to health clubs which, in conjunction

9  with additional factors, establish triable issues of fact on Plaintiff's claim of negligent failure to

10  provide adequate care.

11  **II.    STATEMENT OF FACTS**

12      The complexity of the medical and legal issues in this case requires a discussion of the nature

13  and prevalence of SCAs; and a discussion of the history, function, availability, effectiveness and

14  acceptance by the public of AEDs.

15      **A.    SUDDEN CARDIAC ARRESTS ("SCA")**

16      A SCA is a significant life threatening event which occurs when the heart's electrical system

17  goes awry and causes the heart to become arrhythmic. It is akin to a short circuit of the electrical

18  function controlling the heart, preventing it from effectively pumping oxygen to the brain. If

19  untreated, the victim becomes unconscious, can suffer permanent brain damage and eventually die.

20  Studies have shown that without intervention, the brain begins to die in as little as 4 minutes.

21  (McInnis Decl., ¶ 28, Exh. M). CPR can delay the onset of permanent brain damage temporarily but

22  only an AED can shock the heart back to normal rhythm, restore oxygen to the brain and forestall

23  brain damage and death.

24      **B.    THE PREVALENCE OF RISK OF SUDDEN CARDIAC ARRESTS**

25      The American Heart Association has reported that more than 1000 Americans suffer sudden

26  cardiac arrests every day. (Declaration of Kyle McInnis ("McInnis Decl."), ¶ 12, Exh. A). A 2001

27  study published in the New England Journal of Medicine found the risk of cardiac death nearly 20

28  times higher during or immediately following vigorous exercise. (McInnis Decl., ¶ 15, Exh. B).

1   Studies and publications have reported numerous occurrences of SCAs at health clubs; so much that

2   even fitness industry publications encourage the installation of AEDs in clubs to help victims of

3   SCAs. (McInnis Decl., ¶ 16, Exh. C, and ¶ 21, Exh. H).  In 1998, the American Heart Association

4   ("AHA") and the American College of Sports Medicine[1] ("ACSM") highlighted health clubs in

5   particular as places susceptible to cardiovascular emergencies. (McInnis Decl., ¶ 23, Exh. I).

6   Plaintiff has evidence that Defendant knew of hundreds of prior cardiovascular emergencies in the

7   decade before Plaintiff suffered his SCA.

8       The demographic changes in health club members is also relevant.  The number of members

9   older than 55 increased by 343 percent from 1987 to 2003.  According to the International Health

10  and Racquet Sports Association[2], therefore, "over the past 15 years, the defining characteristic of

11  industry change has been the growth in the population of older health club members." (McInnis

12  Decl., ¶ 29, Exh. N).  These members are more likely to suffer SCA. (McInnis Decl., ¶ 30, Exh. O).

13      Defendant itself was well aware of the risk of a cardiac event happening in one of its health

14  clubs. Eric Guard, Defendant's Risk Manager, admitted that there were at least 20 to 30 cardiac

15  events per year in 2002 and 2003 in Defendant's health clubs.  (Deposition of Eric Guard ("Guard

16  Depo."), 32:16 - 33:1 (Kwong Decl., ¶ 2, Exh. A)).  In fact, the number is significantly higher –

17  discovery in a similar Florida case against Defendant, obtained only after numerous motions to

18  compel and requests for sanctions were granted, reveal that Defendant experienced more than 40

19  cardiac events per year during the 5 year period between 1996 and 2000.

20      **C.    HOW AEDs FUNCTION**

21      AEDs are small, inexpensive, lightweight, portable devices that can be used by a lay person

22  to assist another person whom he believes has suffered a SCA.  Some models are operated manually,

23  some semi-automatic and relatively newer models are completely automatic.  The AED determines

24

25      [1]The mission of the American College of Sports Medicine is " . . . to advance and integrate
26  scientific research to provide educational and practical applications of exercise science and sports."
    (McInnis Decl., ¶ 27).

27      [2]IHRSA is arguably the fitness industry's most prominent and prestigious association.  On its
28  website, IHRSA states that it " . . . is proud to be the **primary defender and promoter** of the health
    club industry in Washington, DC and in state capitals . . ."  Kwong Decl., ¶ 8, Exh. G.

1    the victim's heart rhythm and can recognize ventricular fibrillation or ventricular tachycardia.   In an

2    emergency, an AED can be taken to victim and pads attached to cords from the AED are applied to

3    several places on the victim's body before a "start" button is pushed.  The AED then takes over and

4    determines whether SCA is present, and if so, it clears the electrical "short circuit" in the arrested

5    heart by delivering an electrical charge. (McInnis Decl., ¶ 17).

6        **D.    EFFECTIVENESS OF AEDs**

7        The effectiveness of AEDs is undisputed.  The AED has been proven to be safe and effective,

8    even when used by lay people, since the devices are designed only to administer a shock after it has

9    analyzed a heart's rhythm and determined that an electric shock is required.  They are small in size,

10   and range in price between $1,500 and $3,000. (McInnis Decl., ¶ 17).  A study of casino security

11   guards trained in AEDs revealed a survival rate of 74 percent when victims were defibrillated within

12   the first three minutes. (McInnis Decl., ¶ 37, Exh. U).  Other studies report a survival rate of 90

13   percent of SCA victims when AEDs are used in the first minute. (McInnis Decl., ¶ 18, Exh. D).

14       Studies also verify that these devices are easy to use.  A study published by <u>Circulation</u>

15   magazine in 1999 compared the speed by which trained EMS responders and sixth grade children

16   were able to apply the defibrillator pads and effectively shock a mannequin.  This study showed that

17   EMS responders accomplished the task in 67 seconds, while the children accomplished the task in 90

18   seconds. (McInnis Decl., ¶ 19, Exh. E).

19       In 1992, more than 10 years before Defendant's failures resulted in Plaintiff's vegetative

20   state, the American Heart Association ("AHA") publicized a standard for the emergency treatment of

21   SCA known as the **"Chain of Survival"** which included recommendations for early CPR and early

22   defibrillation.  The International Guidelines for Cardiopulmonary Resuscitation and Emergency

23   Cardiovascular Care concluded that "Early CPR" is the best treatment for cardiac arrest until the

24   arrival of an AED and advanced cardiac life support.

25       IHRSA published similar standards for responding to a cardiovascular emergency, to first

26   "activate EMS" then to "begin basic cardiac life support."  By 1999, IHRSA recognized that "in the

27   case of a cardiac arrest, CPR is generally ineffective without another link in the American Heart

28   Association's 'chain of survival': early defibrillation." (McInnis Decl., ¶ 31, Exh. P).  The AHA and

1  ACSM had also urged CPR certification for health club employees and the adoption of an emergency

2  plan that designates a first responder employee to "promptly render immediate care, consistent with

3  the protocols of CPR." (McInnis Decl., ¶ 21, Exh. F).

4

5
### E.    THE EFFECTIVENESS OF AEDs WAS WIDELY ACCEPTED MORE THAN 10 YEARS BEFORE PLAINTIFF WAS INJURED

6  As early as 1986, the AHA and Journal of the American Medical Association ("JAMA")

7  identified "health club personnel" as capable first responders and users of AEDs. (McInnis Decl., ¶

8  32, Exh. Q).  In 1992, the AHA and JAMA mandated that any business expecting its employees to

9  perform CPR should also install and implement an AED program. (McInnis Decl., ¶ 20, Exh. F).

10  During the mid-1990s, AEDs gained public attention, with featured stories in a broad range

11  of publications including the New York Times, Readers Digest, Better Homes & Gardens, and USA

12  Today.  Beginning in 1996, major airlines began to publically announce their intention to install

13  AEDs on all passenger aircraft.  This was five years before the Federal Aviation Administration

14  required them.  (McInnis Decl., ¶ 22, Exh. I).

15  In 1997, the Medical Advisory Committee of the Young Men's Christian Association

16  ("YMCA"), the largest non-profit group of health club facilities in the country, recommended

17  installing AEDs "...as an organization dedicated to the health and safety of its constituents, many of

18  whom participate in activities requiring physical exertion. (McInnis Decl., ¶ 23, Exh. J).

19  In 2001, IHRSA, of which Defendant is a member, published a position paper, which

20  suggested strongly that their implementation was desirable.  It underscored the high survival rate

21  when AEDs are used and also described AEDs as user friendly which even untrained rescuers could

22  use to successfully revive a victim.  The paper quoted an attorney as saying that the benefits of AEDs

23  far outweighed any legal risks and that as these devices become more widely used, there will

24  potentially be greater liability for not adopting an AED program.  (McInnis Decl., ¶ 21, Exh. H).

25  In 2001, IHRSA entered into an agreement with Philips Medical Systems to provide AEDs at

26  a discounted rate to IHRSA members.  (McInnis Decl., ¶ 26).  Later, stories about SCA victims

27  saved by an AED in health clubs were published in conjunction with the discount program.

28  (McInnis Decl., ¶ 26, Exh. R).

1    Since 2000, industry publications, including Fitness Management and Club Business

2 Industry, featured stories on the success of AEDs in reviving members suffering from SCA,

3 including a June 2002 article, which urged health clubs that have not yet done so to "take one or

4 more of the following steps: (1) train all fitness staff in CPR; (2) acquire an AED and provide AED

5 training, integrating it into most CPR certifications." (McInnis Decl., ¶ 16, Exh. C).  IHRSA

6 publications continued to highlight the success of AEDs and featured Phillips Medical Systems (a

7 reputable manufacturer of AEDs) representatives as speakers at its January 2002 annual convention.

8 (McInnis Decl., ¶ 26, Exh. S).

9    Significantly, in 2002, the AHA and ACSM issued a Joint Position Statement entitled

10 "Automated External Defibrillators in Health/Fitness Facilities," in *Circulation*. 2002.  Among the

11 key points of this joint scientific statement is that these organizations strongly recommended AEDs

12 in large fitness facilities with membership over 2500 people. (McKinnis Decl., ¶ 21, Exh. T).

13    Defendant's own files reveal significant knowledge of the effectiveness of AEDs.  In its

14 responses to written discovery, Defendant produced documents such as news articles about people's

15 lives being saved by AEDs, studies by the American Heart Association reporting that health clubs

16 were not fit to respond to cardiac emergencies; an article produced by a law firm about the legal risk

17 of installing AEDs; articles by the AHA reporting that AEDs are a key link in the "Chain of

18 Survival, " marketing material from Philips Medical (AED maker), correspondence from CardioStat

19 (AED maker), and an article by attorney Richard A. Lazar indicating that AEDs *reduce* legal risk.

20 (Kwong Decl., ¶ 9, Exh. H).  Also included was an agenda for a September 24, 2001, presentation by

21 representatives of the American Heart Association to Defendant 24 Hour Fitness executives on

22 public access to defibrillation. (Kwong Decl., ¶ 10, Exh. I).

23    **F.    THE GOVERNMENT RECOGNIZED THE EASE AND IMPORTANCE OF**
     **HAVING AED PROGRAMS LONG BEFORE PLAINTIFF WAS INJURED**
24    Both the danger of SCAs and their preventability have been acknowledged by state and

25 federal governmental bodies.  In legislation passed in 1999 and again in 2002, Congress found that a

26 "victim's chance of survival drops 10 percent for every minute that passes" until defibrillation.

27 (McInnis Decl., ¶ 18, Exh. D).

28    By 2002, all fifty states had enacted defibrillator laws or regulations.  California passed laws

1  that encouraged the use of AEDs by immunizing trained rescuers using AEDs from civil liability.

2  (McInnis Decl., ¶ 24, Exh. K).  Recently, Rhode Island, New York, Louisiana, and Illinois enacted

3  laws mandating the placement of AEDs in health clubs. (McInnis Decl., ¶ 24).

4  **G.  DEFENDANT KNEW ABOUT THE RISKS THAT ITS MEMBERS FACED**
   **WHILE EXERCISING AND KNEW THE EFFECTIVENESS OF AEDs**

5  In 2004, Defendant 24 Hour Fitness operated approximately 300 health clubs and had

6  approximately 2.7 million members. (Guard Depo., 152:4-8 (Kwong Decl., ¶ 2, Exh. A). Defendant

7  was well aware of the risk of a cardiac event happening in one of its health clubs because 24 Hour

8  Fitness experienced at least 20 and 30 cardiac events per year in 2002 and 2003 in its clubs.  (Guard

9  Depo., 32:16 - 33:1 (Kwong Decl., ¶ 2, Exh. A)).

10  On September 24, 2001, Defendant's Risk Manager, Eric Guard, even met with

11  representatives of the AHA to discuss the possibility of 24 Hour Fitness' participation in a program

12  (Guard Depo., 117:7-17 (Kwong Decl., ¶ 2, Exh. A)) whereby 24 Hour Fitness health clubs in the

13  Pacific Northwest region would be equipped with AEDs and its employees trained on the use of

14  AEDs, all free of charge. (Guard Depo., 118:14-19 (Kwong Decl., ¶ 2, Exh. A)).  Defendant chose

15  not to equip even one of its health clubs with a defribillator because doing so would have assumed

16  the duty to equip all of its clubs.  (Guard Depo., 117:24 - 118:8 (Kwong Decl., ¶ 2, Exh. A)).

17  Also since 2001, Defendant has been contemplating an AED program, but has not yet chosen

18  a manufacturer.  (Deposition of Michael Feeney ("Feeney Depo."), 34:3-17 (Kwong Decl., ¶ 3, Exh.

19  B)).  In fact, a capital plan was prepared in early 2003 which included a $1,000,000 allocation for

20  AEDs. (Feeney Depo., 50:21-51:1 (Kwong Decl., ¶ 3, Exh. B)).  Yet, as of 2005, Defendant has not

21  purchased any AEDs for use at any of its facilities (Feeney Depo., 11:10-21 (Kwong Decl., ¶ 3, Exh.

22  B)), despite its knowledge that other large health clubs chains, such as Wellbridge, Lifetime, TSI and

23  Gold's Gym, had adopted AEDs.  (Feeney Depo., 39:24 - 40:17, 41:4-9 (Kwong Decl., ¶ 3, Exh. B)).

24  **H.  THROUGH ITS PLEDGE AS A MEMBER OF IHRSA, DEFENDANT HAS**
   **PLEDGED TO BE ABLE TO RESPOND IN A TIMELY MANNER TO ANY**
25  **REASONABLY FORESEEABLE EMERGENCY**

26  Defendant 24 Hour Fitness publicly describes itself as the " . . . innovative leader in the

27  health and fitness movement," (Kwong Decl., ¶ 11, Exh. J).  As a member of IHRSA, the leading

28  industry trade group which represents 6,500 health clubs worldwide, it accepts IHRSA's requirement

1  to meet 10 published standards, including "Standard #6" which provides that a club "must be able to

2  respond in a timely manner to any reasonably foreseeable emergency event that threatens the health

3  and safety of the club users." Eric Guard, Defendant's Risk Manager, testified that Defendant tried

4  to comply with that standard. (Guard Depo.,137:9 - 138:1 (Kwong Decl., ¶ 2, Exh. A)). In fact,

5  Defendant brags to customers that, "At 24 Hour Fitness, your safety is our primary concern."

6  (Declaration of Jennifer Eng, ¶ 20, Exh. D). Additionally, as a member of IHRSA, Defendant also

7  pledged to "systematically upgrade [its] professional knowledge and keep abreast of new

8  developments in [its] field" and to "design [its] facilities and programs with the members' safety in

9  mind." (McInnis Decl., ¶ 24, Exh. L).

10  **I.    DEFENDANT IGNORED ITS POLICIES TO RESPOND IN A TIMELY**
   **MANNER TO ANY REASONABLY FORESEEABLE EMERGENCY AMD**
11  **TO PROVIDE A SAFE ENVIRONMENT FOR ITS MEMBERS**

12          Mr. Guard claimed that Defendant was committed to providing a safe and healthy

13  environment for all employees, members, and guests (Guard Depo., 14:6-9 (Kwong Decl., ¶ 2, Exh.

14  A)) as one of its "core values". (Guard Depo., 74:2-25 (Kwong Decl., ¶ 2, Exh. A). Mr. Guard even

15  admitted that it was his obligation to do everything reasonable to protect the safety and welfare of

16  members while they were exercising in Defendant's health clubs. (Guard Depo., 75:25 - 76:4

17  (Kwong Decl., ¶ 2, Exh. A). Yet, as of 2005, Defendant had not purchased a single AED. (Feeney

18  Depo., 11:10-21 (Kwong Decl., ¶ 3, Exh. B).

19          As early as 1998, the AHA and ACSM urged the adoption of an emergency plan that

20  designates a first responder employee to "promptly render immediate care, consistent with the

21  protocols of CPR." (McInnis Decl., ¶ 21, Exh. G).

22          While Defendant purportedly had a written policy for responding to a SCA, Defendant's own

23  employees who were present during Plaintiff's SCA have admitted that they had not even been

24  trained about that policy (Deposition of Jeremy Diangson ("Diangson Depo."), 62:13-17 (Kwong

25  Decl., ¶ 4, Exh. C); Deposition of Justin Villaverde ("Villaverde Depo."), 59:12-15 (Kwong Decl., ¶

26  5, Exh. D)) nor had they participated in any drills or practices to respond to a medical emergency.

27  (Deposition of Lisa Clifford ("Clifford Depo."), 85:2-5 (Kwong Decl., ¶ 6, Exh. E); Diangson Depo.,

28  77:3-7 (Kwong Decl., ¶ 4, Exh. C); Deposition of Jonathan Heineman ("Heineman Depo."), 14:17-

1  19 (Kwong Decl., ¶ 7, Exh. F); Villaverde Depo., 58:23 - 59:11(Kwong Decl., ¶ 5, Exh. D)).

2  **J.    DEFENDANT FAILED TO PROVIDE PROPER AID TO PLAINTIFF**

3         On the evening of June 16, 2003, 56-year-old Plaintiff began exercising at Defendant's
4  Newark facility. While using a leg extension machine, Plaintiff suffered a SCA and became
5  unconscious. Some of the events which happen next are hotly disputed. Another club member,
6  Venky Kandaswamy, noticed Plaintiff and went to his aid. Mr. Kandaswamy called for help, and 24
7  Hour Fitness employees arrived but did nothing while plaintiff Eng continued to exhibit difficulty
8  breathing. (Deposition of Venky Kandaswamy ("Kandaswamy Depo."), 24:4-6 (Kwong Decl., ¶ 12,
9  Exh. K)). He urged them to page a doctor but was told that they could not for liability reasons.
10  (Kandaswamy Depo, 33:13-15 (Kwong Decl., ¶ 12, Exh. K)). Mr. Kandaswamy testified that none
11  of Defendant's employees even touched Plaintiff until paramedics came (Kandaswamy Depo., 28:7-
12  12 (Kwong Decl., ¶ 12, Exh. K)) *and that 25 minutes elapsed between the time that he first held*
13  *Plaintiff and the arrival of paramedics.* (Kandaswamy Depo., 40:9-14 (Kwong Decl., ¶ 12, Exh. K).

14         One of Defendant's employees, 19-year-old Lisa Clifford came to the scene and then left to
15  retrieve Will Rhodes, General Manager. When Rhodes asked Clifford what the problem was, she
16  replied that a member was having a heart attack. (Rhodes Depo., 31:3-9 (Kwong Decl., ¶ 6, Exh. E).
17  Rhodes asked an employee, Cindy Fernandez, to call 911.

18         Clifford returned to the scene with Rhodes and Jason Murakami, Fitness Manager. Clifford
19  called out for someone to call 911. Clifford, who had been CPR certified through an online CPR
20  training program, claimed to have assessed Eng's condition and claimed to have found a faint pulse
21  although she does not remember how she checked for Plaintiff's pulse. (Clifford Depo., 74:24 - 75:5
22  (Kwong Decl., ¶ 6, Exh. E). Importantly, a pulse check on the wrist would have been unreliable, and
23  the AHA has recommended that no pulse check be done before bystanders begin administering chest
24  compressions to an unconscious person. (McInnis Decl., ¶ 36, Exh. V). Clifford also believed Mr.
25  Eng was properly breathing although this fact is doubtful and strongly disputed. What Clifford likely
26  saw was agonal breathing, a condition when the heart stops beating but the brain's breathing center
27  remains alive, causing the victim to take abnormal breaths. These breaths may appear like snoring,
28  gasping, or snorting but they do not propel sufficient oxygen to the brain. (McKinnis Decl., ¶ 38).

1    Rhodes and Murakami then left the scene, leaving Clifford *alone* to tend to Plaintiff while a

2    crowd formed around them. Murakami, Hernandez, and Clifford, were certified in CPR *as a*

3    *condition of employment with Defendant* (Kwong Decl., ¶ 14, Exh. M), and Defendant had a CPR

4    breathing mask on its premises. (Heineman Depo., 16:15-19 (Kwong Decl., ¶ 14, Exh. F)). Not a

5    single CPR-trained employee, however, performed CPR on Plaintiff, despite the fact that Defendant

6    sold memberships in part by boasting of its trainers having CPR-certification. (Diangson Depo.,

7    48:1-11 (Kwong Decl., ¶ 4, Exh. C)). Rhodes, the General Manager, was never even certified in

8    CPR despite Defendant's policy. (Deposition of Will Rhodes ("Rhodes Depo."), 55:9-10 (Kwong

9    Decl., ¶ 15, Exh. N). Though the paramedics immediately began CPR upon arrival, Plaintiff had

10   stopped breathing long enough to suffer severe and permanent brain damage.

11       **K.    PLAINTIFFS' ALLEGED RELEASE**

12       Plaintiff's membership with Defendant was purchased by his daughter, Jennifer Eng as a

13   surprise gift. (Deposition of Jennifer Eng ("J. Eng Depo."), 44:7-10; 45:7-10; Kwong Decl., ¶ 17,

14   Exh. P)). Plaintiff Richard Eng had never had a health club membership. (Declaration of Rosy Eng

15   ("R. Eng Decl."), ¶ 6). Jennifer Eng worked at Defendant's Mountain View location at the time,

16   and Plaintiff's membership application was processed by the General Manager, Nik Kish, pursuant

17   to a program to provide discounted memberships to friends and families of employees. (J. Eng

18   Decl., ¶¶ 5, 10). *Plaintiff was not present during the application process.* (J. Eng Decl., ¶ 10). Kish

19   directed Jennifer Eng to sign *Mr. Eng's name* on the release and she complied with her boss'

20   instructions. ((J. Eng Decl., ¶ 12).

21       Kish folded the release and placed it into a plastic case so that the bar code would be

22   displayed for easy processing upon Plaintiff's entry. (J. Eng Decl., ¶ 15). Folded this way, the text

23   of the release was obscured and no other writing but the bar code was visible. ®. Eng Decl., ¶ 5;

24   Declaration of Monica Eng ("M. Eng Decl."), ¶ 7). Plaintiff never removed the release from the

25   plastic case or read the release. (J. Eng Decl., ¶ 17; R. Eng Decl., ¶ 11; M. Eng Decl., ¶ 10).

26       Plaintiff Rosy Eng also never signed her release, nor knew that she would be waiving rights

27   by using Defendant's facilities. ®. Eng Decl., ¶ 8). Plaintiff Rosy Eng's membership was given to

28   her by Jennifer as the one complimentary membership each employee received. (J. Eng Decl., ¶ 6).

1   Jennifer Eng approached Larry Arnold, a sales representative in the Mountain View facility to
2   arrange this membership for her mother. (J. Eng Decl., ¶ 8). Arnold processed the membership
3   agreement and told Jennifer Eng to initial and sign for Plaintiff Rosy Eng, which she did. (J. Eng
4   Decl., ¶ 8). *Plaintiff Rosy Eng was not present during this application process.* ®. Eng Decl., ¶ 8).

5        None of Defendant's employees ever spoke to Plaintiff or Plaintiff Rosy Eng about the
6   release. ®. Eng Decl., ¶ 11; M. Eng Decl., ¶ 10; J. Eng Decl., ¶ 19). Defendant never asked
7   Plaintiffs to sign their releases despite the fact that defendant's own policies and procedures required
8   all members to sign their releases. (J. Eng Decl., ¶¶ 15, 19; R. Eng Decl., ¶ 11). Jennifer Eng was
9   never told to inform her parents about the release or have them sign the documents. (J. Eng Decl.,
10  paras. 5, 15). She also did not know that new members were supposed to sign their own releases. (J.
11  Eng Decl., ¶ 8).  Jennifer Eng never signed any document or authorized any purchase on behalf of
12  her mother or father before. (J. Eng Decl., ¶ 14). Her parents never authorized or directed her to do
13  so. (J. Eng. Decl., ¶ 14). Both plaintiffs never allowed anyone to sign any document on their behalf.
14  ®. Eng Decl., ¶ 13).

15  ## III.    LEGAL ANALYSIS

16  ### A.    SUMMARY JUDGMENT MUST BE DENIED IF THERE ARE DISPUTED ISSUES OF MATERIAL FACT.

17        Summary judgment lies only where the opponent has no case at all. *24 Hour Fitness, Inc. v.*
18  *Sup. Ct. (Munshaw)* (1998) 66 Cal.App.4th 1199, 1215. In all cases, summary judgment is a "drastic
19  procedure" which must "be used with caution," not as a substitute for a full trial. *Sanchez v.*
20  *Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1465. In ruling on a motion for summary
21  judgment or summary adjudication, the court must "consider all of the evidence" and all of the
22  "inferences" reasonably drawn therefrom and must view such evidence and such inferences "in the
23  light most favorable to the opposing party." Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic*
24  *Richfield Co.* (2001) 25 Cal.4th 826, 843. If an inference is controverted by other evidence, or even
25  by other reasonable inferences, there is a triable issue of fact and summary judgment must be denied.
26  *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 841. The court may not weigh the
27  evidence in ruling on a motion for summary judgment. One witness' declaration may be sufficient to
28  controvert several declarations to the contrary. *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 39.

1   **B.   DEFENDANT'S CONTENTION THAT IT HAD NO DUTY TO PLAINTIFF
          TO PROVIDE CPR OR AN AED IS A QUESTION OF FACT FOR THE
2         FINDER OF FACT.**

3          Defendant's Motion for Summary Judgment rests on the denial of any duty to Plaintiff rather

4   than the scope or extent of a duty to Plaintiff. Because case law, including the cases cited by

5   Defendant in its brief, clearly recognize the duty of business owner or recreational business owner to

6   an invitee, the issue of whether CPR or an AED is required is not a question of duty but of the scope

7   or extent of the duty owed. <u>This is clearly a question of fact for the factfinder.</u>

8          In each of the cases cited by Defendant in support of its contention that it did not have a duty

9   to have and use an AED (*Breaux, Lundy, Salte, Atcovitz, Rutnik*), the courts found that the defendant

10  business, *at minimum,* had a duty to summon assistance for the plaintiff. In none of those cases did

11  the Court find that no duty existed on the part of the defendant to aid the plaintiff. Accordingly, this

12  motion must be denied because this case is not about whether Defendant had a duty to Plaintiff, but

13  whether Defendant's duty to Plaintiff *extends* to having an AED and/or administering CPR, an issue

14  for the jury.

15  **C.   CASES CITED BY DEFENDANTS IN SUPPORT OF ITS ARGUMENT THAT
          IT HAS NO DUTY ARE DISTINGUISHABLE FROM THE INSTANT CASE**
16         In *Breux v. Gino's Inc.* (1984) 153 Cal.App. 3d 379, the *only* California case cited by

17  defendant on the issue of duty, the appellate court found that because California Health and Safety

18  Code section 28689 specifically relieved any person of the obligation to remove food which has

19  become stuck in another person's throat, the legislature had spoken on the issue of a restaurant's duty

20  and that the restaurant had met its duty by calling 9-1-1.

21         *Breaux* is clearly distinguishable from this case. First, 24 Hour Fitness is a recreational

22  business and not a restaurant where a statute specifically relating to choking on food applies. As

23  such, Defendant has a different duty as discussed fully below. Second, a restaurant is very different

24  from a health club where stressing a customer's heart is one of the purposes of the business. Indeed,

25  Defendant in this case specifically required that certain employees be CPR certified *as a condition of*

26  *employment.* (Kwong Decl., ¶ 14, Exh. M). Last, the defendant restaurant, unlike 24 Hour Fitness,

27  did not take a pledge to "...respond in a timely manner to any reasonably foreseeable emergency

28  event that threatens the health and safety of the club users." (McInnis Decl., ¶ 25, Exh. L).

1    *Lundy v. Adamar of New Jersey* (1994) 34 F. 3d 1173, a New Jersey case, is likewise

2  distinguishable. Here, a patron who collapsed in a casino claimed negligence for the failure to have

3  intubation equipment. The appellate court analyzed defendant's duty under the Restatement

4  (Second) of Torts 314A and found that the casino had met its duty of providing first aid by

5  administering CPR until the arrival of emergency response personnel. Consequently, the court

6  affirmed the trial court's ruling because plaintiff's assertion that the casino should have had and used

7  intubation equipment was beyond the duty stated by the Restatement (Second) of Torts 314A.

8       Again, the Court in *Lundy* found a duty. Additionally, the facts are dramatically different

9  than those in this case. The defendant in *Lundy* was not a health club which: 1) had taken a pledge

10 to be able to respond to its patrons' safety , 2) professed to being committed to providing a safe and

11 healthy environment for all employees, members, and guests (Guard Depo., 14:6-9 (Kwong Decl., ¶

12 2, Exh. A)), and 3) did not require many of its employees to be CPR certified. Moreover, unlike

13 what happened in this case, the defendant casino actually administered CPR to its patron until

14 emergency personnel arrived.

15      In the Pennsylvania case cited by Defendant, the appellate court affirmed the trial court's

16 ruling that the defendant tennis club did not have a duty to have an AED. *Atcovitz v. Gulph Mills*

17 *Tennis Club* (Pa. 2002) 812 A.2d 1218. The appellate court, however, relied heavily on

18 Pennsylvania's EMS ACT *which prohibited defendant's employees from using an AED without*

19 *proper training.* California's public policy, on the other hand, has encouraged the use of AEDs by

20 immunizing lay people from any liability for the use of an AED. (McInnis Decl., ¶ 24, Exh. K).

21      Defendant's citation of a New York case is similarly inapplicable. In *Rutnik v. Coloine*

22 *Center Court Club, Inc.* (1998) 672 N.Y.S.2d 451, decided in 1998, a racquetball player participating

23 in a tournament died after suffering a SCA. His heirs sued the club claiming that it did not have an

24 AED. Defendants' motion for summary judgment was denied by the trial court but the appellate

25 court reversed on the ground that *CPR was administered and 9-1-1 was called*, and that Defendant's

26 duty was no greater than to avoid **reckless** conduct. Given the technology and knowledge of the day,

27 the appellate court found that administering CPR and calling 9-1-1 was enough. The circumstances

28 surrounding the *Rutnik* case is, obviously, very different than the instant case. As described above,

1    Defendant had such a wealth of information about: 1) the risks and likelihood of its members

2    suffering SCAs while working out, and 2) the effectiveness of AEDs, that its failure to have AEDs

3    on its premises and an effective emergency response plan is nothing short of reckless.

4        In yet another out-of-state case *Salte v. YMCA* (Ill.App. 2 Dist., 2004) 351 Ill.App.3d 524, a

5    health club member suffered a SCA while exercising on a treadmill and died. Decedent's wife sued

6    the health club claiming, among other things, that the defendant had a duty to equip its club with an

7    AED. The trial court granted defendant's motion for judgment on the pleadings and the appellate

8    court upheld that decision on the basis that Restatement (Second) of Torts 314A only compelled the

9    defendant to render whatever first aid that it was capable of providing under the circumstances, and

10   that CPR coupled with a call to 9-1-1 was enough. As Defendants have conveniently ignored, the

11   analysis under Restatement (Second) of Torts 314A is not the law in California.

12       The analysis used by the *Salte* Court has been specifically disparaged in California in favor of

13   the analysis set out in *Rowland v. Christian* (1968) 69 Cal.2d 108. Recently, in *Juarez v. Boy Scouts*

14   *of America* (2000) 81 Cal.App.4th 377, the California Court of Appeals examined the issue of

15   whether to impose a duty of care on the Boy Scouts to have taken reasonable protective measures to

16   protect plaintiff from the risk of sexual abuse by adult volunteers involved in scouting programs. In

17   addressing the use of the Restatement (Second) of Torts 314A, which was first formulated in 1965,

18   the court noted that the "pedantic use of the Restatement (Second) of Torts [defining principles

19   supporting 'special relationship' doctrine] to establish the parameters of tort duty, while eschewing

20   public policy concerns, is contrary to modern jurisprudential duty analysis." *Juarez* at 411 (citing

21   *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 286.

22       On the other hand, the *Juarez* court fully adopted the *Rowland* analysis to conclude that the

23   Boy Scouts indeed had a duty to plaintiff, stating "Since its publication in 1968, the seminal case of

24   *Rowland v. Christian* (1968) 69 Cal.2d 108, has stood as the gold standard against which the

25   imposition of common law tort liability in California is weighed by the courts in this state."

26   *Juarez* at 401. As discussed below, analysis of the facts of this case under the *Rowland* analysis

27   compels this Court to find that Defendant owed a duty to Plaintiff to administer CPR to him and

28   equip its facilities with AEDs.

1    Even if this Court chooses to follow the *Salte* court and analyze the issue of Defendant's duty

2 under Restatement (Second) of Torts Section 314A, it still must conclude that Defendant had a duty

3 to administer CPR and equip its health clubs with AEDs.  Restatement (Second) of Torts Section

4 314A is titled "Special Relations Giving Rise to Duty to Aid or Protect."  Specifically, it states:

5    (1)    A common carrier is under a duty to its passenger to take reasonable action
            (a)    to protect them against unreasonable risk of physical harm, and
6           (b)    to give them first aid after it knows or has reason to know that they are ill or
                   injured, and to care for them until they can be cared for by others.
7    (2)    An innkeeper is under a similar duty to his guests.
     (3)    A possessor of land who holds it open to the public is under a similar duty to
8           members of the public who enter in response to his invitation.
     (4)    One who is required by law to take or who voluntarily takes the custody of another
9           under circumstances such as to deprive the other of his normal opportunities for
            protection is under a similar duty to the other.

10 Under subsection (1)(a), Defendant must take reasonable action to protect Plaintiff against an

11 unreasonable risk of physical harm.  Defendant's knowledge of the frequency of SCA events and

12 AEDs, and the ease with which AEDs can be acquired for each health club, all discussed above,

13 clearly gives rise to Defendant's duty to administer CPR and equip its health clubs with AEDs.

14    Illustration number 5 of comment f of the Restatement (Second) of Torts Section 314A is

15 telling.  In that illustration, a patron of a theater suffers a heart attack and asks that a doctor be called.

16 The theater's employees do nothing to assist the patron and, as a result, the patron's illness is

17 aggravated.  The theater is liable for aggravation of the patron's illness.  The facts of the illustration

18 closely resemble what happened to Plaintiff in this case where the employees did virtually nothing to

19 assist Plaintiff, thereby causing an aggravation of the original injury.

20    In its analysis of Section 314A, the *Salte* court fails to cite any of evidence that defendant,

21 unlike 24 Hour Fitness in this case, knew that: 1) there was some likelihood that a cardiac event

22 would occur in the health club, and 2) AEDs are effective and easy to use for treating SCAs.  In fact,

23 with respect to AEDs, the *Salte* court stated "The use of a defibrillator requires specific training and

24 we believe that its use is far beyond the type of "first aid" contemplated by Restatement section

25 314A." *Id.* at 530.  Clearly, the plaintiff in *Salte* failed to introduce evidence of the widespread

26 knowledge, especially in the health club industry, that AEDs are inexpensive and easy to use.

27    The dissent in *Salte* had it right:

28    "Defendant's duty, as it acknowledges, was to render reasonable first

1    aid until professional assistance arrived . . . Whether reasonable
     assistance encompasses the use of a defibrillator . . . is . . . a factual
2    question. [A] reasonable jury could find that defendant did not
     provide reasonable first aid to [plaintiff] when it failed to equip its
3    paramedic with a defibrillator to use on [plaintiff].

4  *Salte* at 532. Given that the central issue in this case is not whether Defendant had a duty, but

5  *whether defendant's duty to assist plaintiff **extended** to having and using AEDs and/or administering*

6  *CPR to plaintiff,* Plaintiff submits that this is a question of disputed fact for the jury to decide given

7  the context in which Plaintiff's injury occurred.

8  **D.    DEFENDANT 24 HOUR FITNESS' DUTY TO PLAINTIFF EXTENDED TO
            ADMINISTERING CPR AND HAVING AEDs IN ITS HEALTH CLUBS**

9  Defendant's brief overlooks cases related to the duty of a recreational business owner and,

10  surprisingly, the long-established and traditional tort analysis under *Rowland v. Christian* (1968) 69

11  Cal.2d 108 to argue that it has no duty to Plaintiff. Even if this Court finds that the issues of whether

12  Defendant acted reasonably in failing to provide an AED or CPR are questions of law, Plaintiff

13  contends that case law clearly supports imposition of such a duty and therefore, Defendant's Motion

14  for Summary Judgment must be denied.

15  **1.    As a Recreational Business Owner in California, Defendant 24 Hour
             Fitness Had a Duty to Minimize the Risk of Serious Injury by
16           Administering CPR and Having AEDs on its Premises.**

17  On the homepage of its website, Defendant advertises itself as " . . . the world's largest

18  privately owned and operated fitness center chain" and that its vision is " . . . to make fitness a way

19  of life for everyone." <u>A fitness club has been held to be a recreational business.</u> *Lund v. Bally's*

20  *Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 739 (comparing fitness center activity to recreational

21  sports). Several recent California cases have held that recreational businesses owe a duty of care to

22  its customers to minimize risks of harm to them.

23  In *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 178-79, defendant marathon race

24  organizer told participants that there would be numerous water stations throughout a marathon race

25  from which participants could get water. On the day of the race, plaintiff Saffro ran and completed

26  the race, but found that water was not available as had been advertised. Afterward, plaintiff boarded

27  a plane to return home and, in the middle of the flight, suffered, among other things, severe

28  hyponatremia, which occurs as a result of decreased sodium concentration in the blood. His injuries

1  caused him to suffer lasting neurological deficits. Plaintiff's medical experts thought that his

2  hyponatremia was caused by the inability to consume adequate amounts of water and fluids during

3  the marathon. Plaintiff sued defendant marathon organizer for negligence and negligent supervision.

4  The defendant filed a motion for summary judgment on the ground that plaintiff's causes of action

5  were barred by the doctrine of primary assumption of risk.

6        The trial court granted the motion, ruling that hyponatremia is an inherent risk of running a

7  marathon and thus, plaintiff's claims were barred by the primary assumption of risk doctrine. On

8  appeal, however, the Court overturned the trial court's ruling and held that a race organizer that

9  stages a marathon has a duty to organize and conduct a reasonably safe event, which required it to

10  "minimize the risks without altering the nature of the sport" and to "minimize the risks of

11  dehydration and hyponatremia by providing adequate water and electrolyte fluids along the 26-mile

12  course." *Id.* at 179 (quoting *Knight v. Jewett* (1992) 3 Cal.4th 296, 317). The Court thus found that

13  defendant had a duty to make the marathon reasonably safe because providing water in the context of

14  a marathon would have reasonably minimized the risk that plaintiff took by running in the marathon.

15        Similarly, in *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, plaintiff Morgan

16  was injured on defendant Fuji's golf course when he was standing on the fifth tee and he was hit by a

17  ball from the nearby fourth tee. Trees which had separated the fourth and fifth tee had been recently

18  removed because they were diseased, but had not been replaced. Plaintiff Morgan sued for damages

19  on the grounds of negligence, premises and landowner's liability. Defendant moved for summary

20  judgment, asserting plaintiff knowingly assumed the risk of being struck with a golf ball hit by

21  another golfer. The trial court ruled for defendant, finding that primary assumption of risk barred

22  plaintiff's claim since no duty was owed to plaintiff. In analyzing whether the doctrine of primary

23  assumption applied in the case, the Court of Appeal stated, ". . .before concluding a case falls within

24  primary assumption of the risk it is not only necessary to examine the nature of the sport but also the

25  'defendant's role in, or relationship to, the sport.'" *Id.* at 133 (quoting *Knight v. Jewett* (1992) 3

26  Cal.4th 296, 317). The Court concluded that defendant Fuji was responsible for providing a

27  reasonably safe golf course, and held that ". . . the owner of a golf course has an obligation to design

28  a golf course to minimize the risk that players will be hit by golf balls, e.g., by the way the various

1  tees, fairways and greens are aligned or separated." *Morgan* at 134. Accordingly, the appellate court

2  overturned the trial court's ruling for defendant and found a duty to the plaintiff.

3      Following *Morgan* and *Saffro*, Plaintiff does not claim the existence of a duty to prevent

4  SCA, which can occur when exercising, but rather a duty by a recreational business such as 24 Hour

5  Fitness to **minimize risk of harm** arising from a cardiac event by administering CPR, when

6  employees must be CPR-certified as a condition of employment, and having AEDs on premises.

7          **2.    California Law Provides A Framework to Analyze Whether Defendant's
                Duty to Aid Plaintiff Extended to Administering CPR and Having an
8              AED on its Premises.**

9      The traditional framework for analyzing duty in California, was established in the seminal

10  case of *Rowland v. Christian* (1968) 69 Cal.2d 108. The California Supreme Court has set forth "the

11  now well-known factors courts consider in ascertaining whether a legal duty exists." *Sakiyama v.*

12  *AMF Bowling Centers, Inc.* (2003) 110 Cal. App. 4th 398, rev. denied by *Sakiyama v. AMF Bowling*

13  *Centers Inc.*, 2003 Cal. LEXIS 7246 [referring to *Rowland v. Christian* (1968) 69 Cal.2d 108, 113].

14  The *Rowland* factors are (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that

15  the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and

16  the injury suffered, (4) the moral blame attached to the defendant's conduct, (5) the policy of

17  preventing future harm, (6) the extent of the burden to the defendant and consequences to the

18  community of imposing a duty to exercise care with resulting liability for breach, and (7) the

19  availability, cost, and prevalence of insurance for the risk involved.

20          **a.    The Risk of SCA at a Health Club and the Ease With Which It
                Could Save a Victim of SCA Was Reasonably Foreseeable.**
21      When analyzing whether a duty exists under *Rowland* "foreseeability of risk is a primary

22  consideration in establishing the element of duty." *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d

23  40, 46. ""[I]n cases where the burden of preventing future harm is great, a high degree of

24  foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy

25  reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of

26  foreseeability may be required.' [Citation.] Thus, foreseeability is a somewhat flexible concept."

27  *Juarez v. Boy Scouts of America, Inc., et al.* (2000) 81 Cal.App.4th 377, 402 (quoting *Isaacs v.*

28  *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125). A reasonably foreseeable risk is one that

1 "is likely enough in the setting of modern life that a reasonably thoughtful [person] would take

2 account of it in guiding practical conduct." *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 307.

3         Plaintiffs contend that the risk of SCA during exercise was well publicized and well known

4 to the fitness industry and that Defendant 24 Hour Fitness knew or should have know about the risks

5 of SCA in its health clubs especially since Defendant's Risk Manager, Eric Guard, testified that

6 Defendant experienced between 20 and 30 cardiac events per year in 2002 and 2003 in Defendant's

7 health clubs. (See Guard Depo., 32:16 - 33:1 (Kwong Decl., ¶ 2, Exh. A).

8         Similarly, the fitness industry, including 24 Hour Fitness, knew in as early as 1986 that AEDs

9 were effective devices for responding to a SCA. By 1999, 42 percent of health clubs polled reported

10 installing an AED or planning AED installations. Defendant, however, was not one of them.

11         Defendant could have easily acquired AEDs for its facilities at the beginning of the decade,

12 particularly given IHRSA's agreement with Philips Medical Systems to provide AEDs at a

13 discounted rate for its members, but chose not to.

14                     **b.    Plaintiff Clearly Sustained Permanent Brain Damage.**

15         The degree of certainty that plaintiff would be injured by defendant's conduct or failure to act

16 must be great in order to impose a duty on a defendant. *Bond v. Union Pac. R.R. Co.*, 2004 U.S.

17 Dist. LEXIS 21337, at 13. In "evaluating the degree of certainty of injury factor, courts consider the

18 closeness of the connection between the defendant's actions and the plaintiff's injuries." *Titus v.*

19 *Canyon Lake Property Owners Assn.* (2004) 118 Cal.App.4th 906, 913.

20         In the instant case, there is no dispute that: 1) Defendants did not administer CPR or use an

21 AED on Plaintiff , 2) paramedics administered CPR and defibrillated Plaintiff immediately upon

22 arrival thereby saving his life, and 3) plaintiff, however, suffered severe brain damage and lies in a

23 persistent vegetative state. It is a generally accepted principle in the medical community that brain

24 damage begins to occur after approximately 4-6 minutes of no oxygen. (McInnis Decl., ¶ 28, Exh.

25 M). A study of the use of AEDs in casinos published in The New England Journal of Medicine

26 found a survival rate of 74 percent when victims were defibrillated within the first three minutes.

27 (McInnis Depo., ¶ 37, Exh. U). Thus, it is almost certain that had Defendant immediately

28 administered CPR or used an AED on Plaintiff, he would have lived and not suffered brain damage.

1                   **c.**    **The Failure of Defendant to Administer CPR and Equip its**
                                  **Facility with an AED Is Connected to Plaintiff's Brain Damage.**

2         For "purposes of determining duty, courts may consider the sufficiency of nexus between the

3 defendant's alleged negligent conduct and plaintiff's injury," though a similar inquiry of causation is

4 usually a question of fact for a jury. *Bond v. Union Pac. R.R. Co.*, 2004 U.S. Dist. LEXIS 21337, at

5 13. A scientific and compelling nexus exists here between Defendant's failure to administer CPR

6 and equip its facility with an AED, and Plaintiff's permanent brain injury is evident by Plaintiff's

7 current condition.

8         The wealth of articles cited by Plaintiff establish the effectiveness of CPR and AED in

9 reversing SCA. Within the medical community, it is accepted that after four-to-six minutes without

10 oxygen, brain damage results. (McInnis Decl., ¶ 28, Exh. M). The fact that Plaintiff suffered brain

11 damage from a cardiac arrest but did not die strongly indicates that his brain lacked oxygen for at

12 least 4 minutes. Since AEDs can restore a heart's normal rhythm and circulation of oxygen after a

13 person experiences a SCA, a victim's chance of surviving brain or bodily death is 90 percent if

14 defibrillated within the first minute after SCA. (McInnis Decl., ¶ 18, Exh. D). For each minute that

15 passes, the chance of survival drops by 10%. Time, therefore, is of the essence and recognized

16 emergency standards for treating SCA, had for over a decade, incorporated the use of AEDs.

17         Here, three of Defendant's employees already CPR-certified observed Plaintiff but not a

18 single one of them administered CPR. Administering CPR would have delayed the onset of severe

19 brain damage to Plaintiff. Had Defendant equipped its facility with an AED, employees could have

20 restored Plaintiff's normal heart rhythm and oxygen to his brain. Plaintiff therefore would not have

21 sustained permanent brain injuries.

22                   **d.**    **Defendant's Failure to Develop an Adequate Emergency Medical**
                                  **Plan and Equip Its Facility with AEDs, While Knowing of Its**

23                                     **Effectiveness in Treating SCAs Demonstrates Moral Blame**

24         It is appalling that the largest health business in the United States was woefully unprepared

25 for situations likely to lead to serious injuries of its paying members. Defendant knew that the risk

26 of cardiac arrest was well-established, and yet it prepared absolutely no effective emergency

27 response plan for dealing with cardiac events.

28         Virtually every employee deposed in this case has testified that there was no plan for dealing

1  with medical emergences, no drills, no practices and only a few were aware of any written materials

2  dealing with such a plan. (Diangson Depo., 62:13-17 (Kwong Decl., ¶ 4, Exh. C); Villaverde Depo.

3  59:12-15 (Kwong Decl., ¶ 5, Exh. D)).  Many had also not participated in any drills or practices to

4  respond to a medical emergency. (Clifford Depo., 85:2-5 (Kwong Decl., ¶ 6, Exh. E); Diangson

5  Depo., 77:3-7 (Kwong Decl., ¶ 4, Exh. C); Heineman Depo., 14:17-19 (Kwong Decl., ¶ 7, Exh.

6  F);Villaverde Depo., 58:23 - 59:11 (Kwong Decl., ¶ 5, Exh. D)).

7      Perhaps even more shocking is that defendant drafted a self-serving, ambiguous policy with

8  regard to CPR which left the decision to provide CPR to the individual employee.  The policy was

9  produced in response to Plaintiff's request for production of documents and reads as follows:

10          Administering CPR is not a requirement of employment.  If an
           employee administers CPR it is considered a Good Samaritan Act
11          performed of their own free will. (Kwong Decl., ¶ 14, Exh. M).

12      The hypocrisy of requiring CPR certification then imposing no requirement or guidelines for

13  its use underscores the lack of concern for the welfare of its members.  Employees deposed had little

14  or no knowledge of this "Guideline" which was buried in a tome of personnel policies.  Even more

15  deplorable is the failure to obtain a simple, inexpensive, effective device which would save lives.

16  Trade organizations commented on their value to members of health clubs and manufacturers of

17  AEDs even offered Defendant 24 Hour Fitness discounted prices complete with training and

18  implementation. (McInnis Decl., ¶ 26).  Despite the recognition of the obvious value of AEDs in

19  helping SCA victims, Defendant's founder and owner, Mark Mastrov, engaged in e-mail

20  correspondence with an IRHSA representative, who spoke of the need to combat the pressure from

21  groups such as the American Heart Association in their effort to promote mandatory availability of

22  AEDs.  (Kwong Decl., ¶ 16, Exh. O).

23      Moral blame involves a level of culpability beyond "ordinary negligence." *Adams v. City of*

24  *Fremont* (1998) 68 Cal.App.4th 243, 270.  Moral blame is evident when the defendant (1) intended

25  or planned the harmful result; (2) had actual or constructive knowledge of the harmful consequences

26  of their behavior; (3) acted in bad faith or with a reckless indifference to the results of their conduct;

27  or (4) engaged in inherently harmful acts." *Sakiyama,* at 410; *Adams v. City of Fremont* (1998) 68

28  Cal.App.4th 243, 270.  Given all of the information available to Defendant, and indeed targeted at

1  the health club industry, Defendant's failure to have an emergency response plan which incorporated

2  the administration of CPR and equip its facilities with an AED constitutes reckless indifference.

3      The moral blame is compounded by the custom of 24 Hour Fitness to require that its

4  members release claims against the chain, which allows it to sanction death and severe injury

5  without any recourse for the victims. 24 Hour Fitness was at the heart of the health club industry

6  debate, and knew all of the reasons to have AEDs, but nonetheless opposed them, and refused to

7  acquire them.

8              e.    **Requiring Defendant to Administer CPR and Equip Its Facilities
                     with AEDs Will Prevent Similar Injuries and Bodily Death From
9                    Occurring to Other Members.**

10     Considering the policy of preventing future harm, "the same considerations apply as moral

11  blame." *Lawson v. Management Activities, Inc.* (1999) 69 Cal.App.4th 652, 657. As discussed

12  above, the value of administering CPR to a victim under certain circumstances has been well

13  established as beneficial. With respect to AEDs, Congress recognized as early as 1999 the value of

14  AEDs in treating SCA by immunizing lay responders throughout the country. By 2002, all fifty state

15  legislatures had adopted AED related legislation. In California, bills that immunized Good

16  Samaritans using AEDs were enacted in 1999 and 2002. The benefits of AEDs are well-established

17  as Congress has estimated 30,000 lives could be saved every year because of this device.

18              f.    **Defendant Bears a Negligible Burden By Equipping Its Facilities
                     with an AED, while the Consequences are Life-Saving.**
19     The burden on the defendant to equip its facilities with AEDs, require CPR in certain

20  situations, prepare a medical emergency plan and engage in practice drills is small compared to the

21  simple benefits such actions confer - saving human lives. As a member of IHRSA, Defendant can

22  purchase AEDs at a discounted price per a joint marketing agreement between IHRSA and Phillips

23  Medical Systems, an AED manufacturer. (McInnis Decl., ¶26, Exh. R). Included in this discounted

24  price package is training for employees and implementation. Indeed, training in the use of an AED

25  would be slight as the devices can be used by lay persons, including naive sixth grade children.

26  Defendant also already requires CPR certification for all of its fitness personnel as well as some

27  members of local management. The burden therefore is nominal, as costs are as well. AEDs are

28  inexpensive and easy to use and were even budgeted for purchase by Defendant before Plaintiff

1    suffered severe injury, although Defendant never bought any AEDs.  (McInnis Decl., ¶ 17).

2                    **g.    Availability of Insurance**

3        Eric Guard, Defendant's Risk Manager, testified that Defendant had no less than three layers

4    of insurance at the time of Plaintiff's injury: $250,000 self-insured retention, $1,000,000 per

5    occurrence primary policy with Royal & Sun Alliance, and $50,000,000 excess policy with National

6    Union.  There is no evidence that imposing a duty upon Defendant to administer CPR or equip its

7    health clubs with AEDs would have made it more difficult for Defendant to obtain insurance.  In

8    fact, Defendant's own AED file contained 2002 material from The Hartford insurance company

9    *recommending* the acquisition, placement and use of AEDs in appropriate circumstances.  Clearly,

10   insurance was available to Defendant.  Finally, IHRSA's 2001 briefing paper states that it surveyed

11   several liability insurance providers and found that "Whether a club has an AED on site does not

12   effect its coverage or rates under *most* liability insurance companies."  (McInnis Decl, ¶ 21, Exh. H).

13   **E.    PLAINTIFFS NEVER RELIEVED 24 HOUR FITNESS FROM LIABILITY**

14       Defendant commits the bulk of its Memorandum of Points and Authorities challenging

15   releases which the *Plaintiffs never signed.*  This unrelenting fact cannot be overcome by Defendant's

16   arguments: that Plaintiff Richard Eng ratified a release[3], express releases are not void as against

17   public policy, and the language of its release is clear.

18              **1.    Plaintiffs Never Signed the Release and Therefore Did Not Knowingly
                        Relinquish Valuable, Legal Rights**

19       The releases are simply not valid because there is no evidence that either Plaintiff or Plaintiff

20   Rosy Eng signed them.  A release "must notify the prospective releasor of the effect of *signing* the

21   agreement," that is, "valuable, legal rights are being relinquished."  *Leon v. Family Fitness Center*

22   *(#107), Inc.* (1998) 61 Cal.App.4th 1227, 1232.  A signature, therefore, manifests notice of and

23   assent to the release of liability.  Accordingly, there are no California cases which enforced, much

24   less considered, a release of liability against a Plaintiff injured at a health club facility who had not

25   signed the release himself.  Recent cases assessing the validity of waivers in a health club

26

27       [3] Defendant did not argue that Plaintiff Rosy Eng ratified a release.  Because Mrs. Eng did not
28   sign her release either, Plaintiff's MPA addresses ratification as applied to Mrs. Eng as well in
     anticipation of Defendant's Reply.

1   membership agreement involve those *signed by the plaintiffs themselves*. *See Sanchez v. Bally's*
2   *Total Fitness Corporation* (1998) 68 Cal.App.4th 62, 66 (emphasizing plaintiff herself "admitted in
3   her deposition that she signed" the membership agreement "and read it."); *Lund v. Bally's Aerobic*
4   *Plus* (2000) 78 Cal.App.4th 733, 736 (finding plaintiff herself signed the membership agreement
5   when she joined the club); *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1354
6   (finding plaintiff "signed the two-page membership agreement").

7        When determining the validity of a release in other recreational contexts, courts have also
8   looked first to the plaintiff's signature. *See e.g., Saenz v. Whitewater Voyages, Inc.* (1990) 226
9   Cal.App.3d 758, 760 (assessing the validity of plaintiff's signature). Defendant 24 Hour Fitness
10  itself recognizes the necessity of a member's signature, as reflected in the language of the release,
11  which reads: "This agreement is not effective until you and an authorized 24 Hour Fitness
12  Representative sign and date it." Defendant's employee testified in deposition that even "before we
13  can have them [members or guests] walk around the gym or go any further, we have them sign this
14  liability form." (Diangson Depo., 42:21-24 (Kwong Decl., ¶ 4, Exh. C)). Defendant's Senior
15  Director of Production Administration Joanna Tuttle, the person most knowledgeable about sales
16  pitches, orientation of new members, and completion of applications, stated as well that individuals
17  who refuse to sign the release are denied membership. (Deposition of Joanna Tuttle ("Tuttle
18  Depo."), 26:1-3, (Kwong Decl., ¶ 18, Exh. Q)).

19       **2.    Plaintiffs Did Not Ratify Any Release.**

20       Without signatures, Defendant proposes waivers by ratification. However, ratification "can
21  only occur where the person ratifying has full knowledge of the facts." *See e.g., McNulty v. Copp*
22  (1949) 91 Cal.App.2d 484, 492; *Lindsay-Field v. Friendly* (1995) 36 Cal.App.4th 1728, 1736.

23       Defendant cites no evidence which constitutes ratification of any release for membership
24  with 24 Hour Fitness. The undisputed evidence, in fact, is directly to the contrary. Plaintiff's
25  daughter, Jennifer Eng, sought to purchase a membership for Plaintiffs as a <u>gift</u>. She was not sent by
26  either Richard Eng or Rosy Eng to purchase the memberships as their agents nor did she act on their
27  behalf as a matter of course in the past. In fact, she specifically denies ever signing or acting, on
28  behalf of her father or mother. There is no evidence that Jennifer Eng or anyone else explained the

1  release provisions to Plaintiffs.. There is no evidence that either Plaintiff or Plaintiff Rosy Eng had

2  ever bought a health club membership before, and were therefore acquainted with health club

3  releases. Finally, there is no evidence that either Plaintiff or Plaintiff Rosy Eng ever read the

4  membership agreement, let alone pulled it from the case which contained it. Only the bar code was

5  visible through the plastic lanyard – the release was concealed.

6      Defendant fails on the facts and even on the law it cites: *Rakestraw v. Rodrigues*

7  (1972) 8 Cal.3d 67 and *Alvarado Community Hospital v. Superior Court* (1985) 173 Cal.App.3d

8  476. In *Rakestraw*, the alleged ratifier discovered that her husband forged her signature on a deed of

9  trust and a promissory note to secure a loan. *Rakestraw*, 8 Cal.3d at 71. The court found that she

10  "elected not to rescind at a time when she was fully informed and had power to do so and had been

11  advised of her rights." *Id.* at 75. Indeed, she "consulted an attorney" in connection with the

12  forgeries. *Id.* Likewise, in *Alvarado Community Hospital*, an attorney forged a client's signature to

13  settle her case and absconded with the funds. 173 Cal.App.3d at 479. The State Bar later concluded

14  that the attorney defrauded her, and it reimbursed her for the amount she lost. *Id.* at 480. The court

15  reasoned that the client was "never told by the State Bar or her present counsel that she would lose

16  her rights if she were to seek reimbursement from" the State Bar, and therefore should be allowed to

17  pursue her original action. *Id.* at 483-84. In both of these cases, ratification was conditioned upon

18  the parties being advised of their rights. Here, neither Plaintiffs had any knowledge, or reason to

19  know, of their rights (and waiver thereof), much less advised of them. Indeed, Defendant's citation

20  of California Civil Code Section 1589 makes plainly clear why ratification is not applicable here:

21          A voluntary acceptance of the benefit of a transaction is equivalent to a
             consent to all the obligations arising from it, *so far as the facts are*
22          *known, or ought to be known*, to the person accepting.

23  (Emphasis added.) There is simply no evidence that Plaintiffs were aware of the release provisions

24  or that they should have been aware of the release provisions in the membership agreement.

25          **3.    Defendant Waived Its Right to Assert A Valid Release Because It**
                   **Violated Its Own Policies.**
26      Any issue of a waiver in this case *applies to the Defendant* – not the Plaintiffs. The court

27  may determine the issue of waiver or estoppel as a matter of law when "the facts are undisputed and

28  only one inference may reasonably be drawn." *Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307,

1   319 (holding that a party's failure to perform an act as written "precludes judicial enforcement of
2   [that] right."). *Platt Pacific* at 321. Otherwise, it is generally a question of fact for the jury. *Id.*

3        The term "waiver" means "the loss of an opportunity or a right as a result of a party's failure
4   to perform an act it is required to perform, regardless of the party's intent to abandon or relinquish
5   the right." *Id.*; *see also Minton v. Cavaney* (1961) 56 Cal.2d 576, 581 (defendants failure to allege
6   statute of limitations as affirmative defense constituted a "waiver" of the defense).

7        Here, Manager Nik Kish directed Jennifer Eng to sign her father's name on his agreement,
8   and another employee, Larry Arnold, told Jennifer to sign her mother's name on her agreement.
9   Defendant, therefore, knew that Plaintiffs never signed the release. *See e.g.,* Cal. Civ. Code § 2330.
10  Yet, for six months, Defendant knowingly left the release unsigned, which violated the express terms
11  of the release itself and numerous company policies.

12       The release clearly spelled out this condition: "This agreement is not effective until you and
13  an authorized 24 Hour Fitness Representative sign and date it." (Kwong Decl., ¶ 19, Exh. R).
14  Sections 7 and 10 of Defendant's "Membership Agreement Policies," respectively commanded
15  Defendant's employees as follows: "It is mandatory that anyone 18 years of age or older sign their
16  own agreement," and that both the employee and a family member, who is eligible for a free
17  membership "must sign a 24 Hour Fitness Membership Agreement." (Kwong Decl., ¶ 19, Exh. R).
18  Moreover, Defendant failed to complete the "New Member Orientation Checklist" for Plaintiff
19  Richard Eng, which would have ensured that he signed the release himself. (Kwong Decl., ¶ 19,
20  Exh. R). Indeed, Defendant maintains a clear policy in this circumstance, as stated by Defendant's
21  most knowledgeable person for completion of membership agreements:

22          . . . We need the signature of all members on the agreement, so you
            can't sign for somebody else, but if a signature is missing, we will go
23          back and collect it as we do with all contracts.

24  (Tuttle Depo., 33: 7-10 (Kwong Decl., ¶ 18, Exh. Q)). By failing to adhere to its own policies,
25  Defendant, therefore, waived its right to assert the release against Plaintiffs.

26  **4.   Even If the Release Is Valid, Plaintiffs Never Released Defendant
          From Liability Resulting From Injuries From Unanticipated Risks.**
27       Even assuming a valid release, the scope of such a release fails to bar plaintiffs' claims. The
28  risk of sudden cardiac arrest is wholly dissimilar from the risk of brain damage following a sudden

Plaintiff's Opposition to Defendant's Motion
For Summary Judgment, Case No.RG03120619          26

1  cardiac arrest for lack of proper care. Richard Eng's injuries do not arise from the use of

2  Defendant's facilities, which the language of the release explicit contemplates, but rather, from

3  Defendant's conduct solely after he suffered a sudden cardiac arrest.

4        The scope of any written release includes an act of negligence which is "reasonably related to

5  the object or purpose for which the release is given." *Leon*, 61 Cal.App.4th at 1234 (citations and

6  quotations omitted). The release is a " written assumption of a known risk, i.e., a risk reasonably

7  anticipated by the plaintiff." *Lund*, at 738. Defendant's "Club Membership Agreement" states:

8             *Using the 24 Hour Fitness Facilities* naturally involves the risk of injury to
            you or your guests . . . Specific injuries vary from one activity to another and
9             the risks range from minor injuries to major injuries . . . *In consideration of
            your participation in the activities offered by 24 Hour,* you understand and
10            voluntarily accept this risk and agree that 24 Hour . . .will not be liable for any
            injury, including, without limitation, personal, bodily, or mental injury,
11            economic loss or any damage to you, your spouse, guests, unborn child, or
            relatives resulting from the negligence of 24 Hour or anyone on 24 Hour's
12            behalf or anyone *using the Facilities.*

13  (Emphases added) (Kwong Decl., ¶ 20, Exh. Q). This language obviously signals acceptance of risks

14  associated with use of exercise facilities, such as the risk of sudden cardiac arrest, or "the risk of a

15  sprained ankle due to improper exercise or overexertion, a broken toe from a dropped weight,

16  injuries due to malfunctioning exercise or sports equipment, or from slipping in the locker-room

17  shower." *See Leon*, at 1231. This language does not however signal to the reader that he or she

18  assumes the risk of the failure of Defendant's employees to render proper care in the event of

19  anticipated injuries. *Cf. Leon* (the release there also included a provision for the rendering of aid:

20  "*Buyer acknowledges that FFC has not and will not render any medical services including medical*

21  *diagnosis of Member's physical condition.*"). *Id.* at 1231 (emphasis added)  There is no language

22  even alluding to such a matter in Defendant's release. Therefore, Plaintiffs may have contemplated

23  Richard Eng's risk of experiencing a sudden cardiac arrest, but never released Defendant for claims

24  arising from the permanent brain injuries he suffered due to the failure to render first aid. Even a

25  validly executed release therefore fails to bar Plaintiffs' claims on these grounds.

26        **5.    The Scope of the Purported Release Does Not Extend to Conduct
            Constituting a Conscious Disregard For His Safety.**

27        The scope of Defendant's release also fails to expressly reach conduct constituting a

28  conscious disregard for Richard Eng's safety. Without extrinsic evidence, "the scope of a release is

1  determined by the express language of the release." *Benedek*, 104 Cal.App.4th at 1357.  Defendant's

2  release provides, "24 Hour will not be liable . . . for any injury . . . resulting from the *negligence* of

3  24 Hour or anyone on 24 Hour's behalf or anyone using the Facilities" (emphasis added).  The

4  "inclusion of the term 'negligence' is simply not required to validate an exculpatory clause."

5  *Sanchez*, 68 Cal.App.4th at 67.  The maxim *"Expressio unius est exclusio alterius"* applies here: The

6  mention of one thing implies the exclusion of another."  Defendant, therefore, expressly excluded

7  conduct other than negligence.  The express language of the release does not protect Defendant from

8  Plaintiffs' claims because the conduct alleged goes beyond negligence.  It is undisputed that

9  Defendant's employees, who were CPR certified, failed to administer CPR to Plaintiff Richard Eng

10  after he suffered a sudden cardiac arrest.  Moreover, while at least 20-30 cardiac events took place on

11  Defendant's premises during 2002 and 2003, Defendant knew of the value of AEDs but did not

12  equip its facilities with these cheap, easy-to-use, and effective devices.  Defendant, therefore, acted

13  willfully to keep AEDs off its premises and, as a result, caused Plaintiffs serious and permanent

14  injuries, and any release of liability for this conduct falls outside the express scope of the release.

15        **6.**      **The Release Is Unenforceable Under Civil Code Section 1668**.

16        Under Civil Code section 1668, and the cases interpreting it, a party could not contract away

17  liability for his fraudulent or intentional acts or for his negligent violations of statutory law, but "a

18  contract exempting from liability for ordinary negligence is valid where no public interest is involved

19  . . . and no statute expressly prohibits it." *Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92,

20  96, fn. 4.  Therefore, a waiver of liability for ordinary negligence "may stand only if it does not

21  involve 'the public interest.'" *Id.*  Because the undisputed facts establish elements of willful conduct,

22  the *Tunkl* public interest criteria do not apply, and Defendant's arguments regarding the legality of

23  recreation-based releases are irrelevant.

24        **7.**      **Defendant's Release Fails to Adequately Alert a Layperson That Legal**
                     **Rights Are Being Relinquished and Is Therefore Invalid on its Face.**

25        In any case, the release is void for lack of clarity and notice.  A written release of liability

26  "must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties." *Leon,*

27  61 Cal.App.4th at 1233.  Because "valuable, legal rights are being relinquished," the "important

28  operative language should be placed in a position which compels notice and must be distinguished

1  from other sections of the document." *Leon*, at 1223. In *Leon*, the court struck down the release of

2  defendant health club there for similar reasons Defendant's release is defective here. *Id.*

3      In *Leon*, as here, 24 Hour Fitness' document encompassing the release is titled "'Club

4  Membership Agreement' . . . giving no notice to the reader it includes a release or waiver of

5  liability." *Id.* at 1233; (Kwong Decl., ¶ 20, Exh. Q). The *Leon* court also noted, "the release clause,

6  although a separate paragraph, is in undifferentiated type located in the middle of the document." *Id.*

7  Similarly, Defendant's release clause in the instant case begins near the middle of the page, is

8  comprised of unremarkable type compared to the rest of the text in the document, and is dwarfed in

9  larger type by the "RIGHT TO CANCEL" paragraph immediately below it. Juxtaposed as such, a

10  reader is easily drawn away from the release language. Moreover, the document's "RELEASE OF

11  LIABILITY", "ASSUMPTION OF RISK", and "BUYER'S RIGHT TO CANCEL" paragraphs are

12  lumped together in one space on the page – sharing one heading, the type font of which is no

13  different in size, if not smaller, than the other headings in the document. Therefore, in addition to

14  the document's consolidated heading, the release clause is "hidden among other verbiage" and "[no]

15  physical characteristics distinguishes the exculpatory clause from the remainder of the document."

16  *Leon*, at 1233. To make matters worse, the paragraph explaining the waiver of liability compels

17  notice *to the other side of the page!* The last sentence reads:

18      By signing below, you acknowledge and agree that you have read the
        foregoing and know of the nature of the activities at 24 hour and you agree to
19      all the terms on the <u>front and back</u> pages of this agreement and acknowledge
        you have received a copy of it and the membership policies.
20  (Emphasis in original) Three words – of 237 total – are featured in this critical paragraph: "Front",

21  "And", "Back." (Kwong Decl., ¶ 20, Exh. Q). Defendant did not underline, italicize, or otherwise

22  call attention to the fact that one was signing away valuable legal rights. Because Defendant's

23  release failed to compel notice that by signing the document, a person would voluntarily and

24  knowingly waive valuable, legal rights, it is invalid on its face, and cannot be enforced against

25  Plaintiffs under any circumstances.

26      **8.    The Release Shocks The Conscience, And Falls Outside the Reasonable
               Expectations of Mrs. Eng.**
27      For "standardized contracts . . . California courts have long been disinclined to effectuate

28  clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable."

1 *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 879; *see also* Cal. Civ. Code § 1670.5 (a):

2          when a "court as a matter of law finds the contract or any clause of the
         contract to have been unconscionable at the time it was made the court may
3          refuse to enforce the contract . . . "

4 Based on this section, a court may find a contract unconscionable, and therefore unenforceable, if

5 "the contract or provision falls outside the reasonable expectations of the weaker party," and "even if

6 it does fall within the reasonable expectations of the parties, but it is unduly oppressive or

7 unconscionable." *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal.App.4th (1993) 1659, 1664; Cal.

8 Civ Code § 1670.5 (a). *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820, fn. 18 (stating

9 notice as being "simply one of the factors -- albeit an extremely significant one -- to be weighed in

10 assessing the reasonable expectations of the adhering party.").

11       Defendant's release includes a waiver of liability for, "without limitation, personal, bodily, or

12 mental injury, economic loss or any damage" to Plaintiff Rosy Eng, her " spouse, guests, unborn

13 child, or relatives resulting from the negligence of 24 Hour." (Kwong Decl., ¶ 21, Exh. R). This

14 clause, which binds Plaintiff Rosy Eng's relatives – including an "unborn child" – reeks of

15 unreasonableness, and should have been distinguished from the other text, in the least. It is absurd

16 that Plaintiff Rosy Eng can sign away liability *in her contract* for injury to someone other than

17 herself, including human beings not yet in existence and third cousins whom she may have never

18 met. Equally shocking is that such a clause applies to her husband. Because the release falls outside

19 the reasonable expectations of Mrs. Eng, it is invalid on this basis as to her claim.

20 **CONCLUSION**

21       For the reasons stated above, plaintiff Richard Eng respectfully requests that the Court deny

22 Defendant's motion for summary judgment.

23 Dated:  June 20, 2005             Respectfully Submitted,

24

25                          MINAMI, LEW & TAMAKI LLP

26

27                        By: _____

28                          William C. Kwong
                         Attorneys for Plaintiff Richard Eng