CAUSE NO: 83083A

| | | |
|---|---|---|
| BARBARA ANN SCHROEDER, individually, and as Representative of the Estate of Kenneth Wayne Schroeder, and as Representative of the children of Kenneth Wayne Schroeder, | § § § § § § | IN THE PROBATE COURT NO. 1 |
| Plaintiffs, | § § | |
| vs. | § § | OF |
| GOLD'S GYM INTERNATIONAL, INC. | § § | |
| Defendant | § | TRAVIS COUNTY, TEXAS |

## ORDER DENYING DFENDANT'S TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

On this day the Court heard Defendant's Traditional and No-Evidence Motion for Summary Judgment. Having considered the motion and the arguments of counsel, the Court is of the opinion and finds that the motion should be DENIED. It is therefore:

ORDERED that Defendant's Traditional and No-Evidence Motion for Summary Judgment is DENIED.

Signed this the 1st day of *August*, 2006.

Judge Presiding

# EXHIBIT K

CAUSE NO: 83083A

| | | |
|---|---|---|
| BARBARA ANN SCHROEDER, individually, | § | IN THE PROBATE COURT NO. 1 |
| and as Representative of the Estate of Kenneth | § | |
| Wayne Schroeder, and as Representative of the | § | |
| children of Kenneth Wayne | § | |
| Schroeder, | § | |
| | § | |
|       Plaintiffs, | § | |
| | § | |
| vs. | § | OF |
| | § | |
| GOLD'S GYM INTERNATIONAL, INC. | § | |
| | § | |
|       Defendant | § | TRAVIS COUNTY, TEXAS |

**PLAINTIFF'S RESPONSE TO DFENDANT'S
TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT
AND MOTION FOR LEAVE WITH RESPECT TO THE SAME**

## SUMMARY OF THE RESPONSE

Gold's had a duty to provide AEDs based on the simple common-law risk/utility test we all learned in our first year torts class. The published literature proves that the American Heart Association, American College of Sports Medicine and the International Health, Racquet & Sportsclub Association had all made it crystal clear way before this incident to any reasonably prudent gym owner or operator exercising ordinary care that an AED was just as important to have as a good first aid kit and a staff trained in CPR. In addition to the published literature, Plaintiff also offers the opinion of one of the preeminent experts in the field of exercise and health science to that effect.

Plaintiff has offered more than sufficient evidence to prove Mr. Schroeder's death was caused by the lack of an AED. That is the conclusion of Dr. Paul Roach, a board certified cardiologist and the Chief of Staff at Brackenridge Hospital. That conclusion is also supported by several published studies showing survival rates as high as 90% for victims of sudden cardiac

arrest, like Mr. Schroeder, who, unlike Mr. Schroeder, had the benefit of early defibrillation with an AED.

## FACTUAL BACKGROUND.

In 1986, the American Heart Association and Journal of the American Medical Association identified "health club personnel" as capable first responders and users of AEDs.[1]

In 1996, seven years before Mr. Schroeder died, the American Heart Association published a paper entitled, "When Every Second Counts – Cardiac Arrest and the Need for Early Defibrillation." It noted that more than 1,000 Americans suffer a sudden cardiac arrest *every day*. Even more shocking is that only 5% of them survive "in many cases because life-saving defibrillators arrive on the scene too late, if at all."[2]

> Sudden cardiac arrest, also known as sudden cardiac death, is a major cause of death in the United States. It claims and estimated 250,000 lives each year.
> Abnormal heart rhythms called arrhythmias cause most sudden cardiac arrests. Ventricular fibrillation (VF) is the most common arrhythmia that causes cardiac arrest. It's a condition in which the heart's electrical impulses suddenly become chaotic, often without warning. This causes the heart to stop abruptly. Victims collapse and quickly lose consciousness. Death usually follows unless responders restore a normal heart rhythm within 5-7 minutes.
> However, people who survive a sudden cardiac arrest have a good long-term outlook. About 80 percent are alive at one year and as many as 57 percent are alive at five years.[3]

One of the most publicized incidents of a death by sudden cardiac arrest was the death of Hank Gathers, the Loyola Marymount University basketball star who collapsed and died during a game in the early 90's.[4] This is a perfect example of how, (1) sudden cardiac arrest can affect people who are extremely physically fit and showing no signs of heart problems, and (2) sudden cardiac arrest is more likely to occur during physical exercise.

---

[1]    McInnis, Ex. Q.
[2]    McInnis, Ex. A, p. 1
[3]    McInnis, Ex. A, p. 2
[4]    McInnis, Ex. A, p. 2

An extensive body of scientific publications conclusively documents that while exercise is safe for most people, the incidence of experiencing an adverse cardiovascular event such as sudden cardiac arrest or myocardial infarction is considerably higher during or immediately following moderate-vigorous exertion compared to that at any other time of daily life. This is rudimentary knowledge in the field of fitness and exercise.[5]

These studies date back to the early 1970s on joggers, while even cases in early Greece and pre-modernized medicine have reported elevated cardiovascular risk with exercise.[6]  More recently (but still three years before Mr. Schroeder's death), a study in the New England Journal of Medicine found the risk of sudden cardiac death was nearly 20 times higher during or immediately following vigorous exercise.[7]

CPR dos not replace early defibrillation in saving the lives of those suffering a sudden cardiac arrest.[8]  Defibrillation is the only way to restore a normal rhythm to the heart, and "[e]ach minute of delay in returning the heart to its normal pattern of beating decreases the chance of survival by 10%".[9]

Based on this information, the American Heart Association developed what it calls the "chain of survival" in 1992 (*eleven* years before Mr. Schroeder died).  It refers to the four critical links in the emergency treatment of sudden cardiac arrest. [10]  The links are (1) dialing 911, (2) early CPR, (3) early defibrillation, and (4) early advanced care. [11]  This "chain of survival" was created and publicized at least seven years prior to Mr. Schroeder's death. [12]  "The chain of survival is only

---

[5]   McInnis, ¶ 13
[6]   McInnis, ¶ 14
[7]   McInnis, Ex. B
[8]   McInnis, Ex. A, p. 3
[9]   McInnis, Ex. A, p. 3
[10]   McInnis, Ex. A, p. 3, Ex. H
[11]   McInnis, Ex. A, p. 3, Ex. F
[12]   McInnis, Ex. A, p. 3

as strong as its most critical link – which in most cases of cardiac arrest is early defibrillation."[13]

The 1992 National Conference of the American Heart Association (*eleven* years before Mr. Schroeder died), "strongly endorsed the principle of early defibrillation, which states that all personnel whose jobs require that they perform basic CPR be trained to operate and permitted to use defibrillators, particularly automated external defibrillators (AEDs). . . . In cardiac arrest, the need for early defibrillation is clear and should have the highest priority. Today with the availability of automated external defibrillators, defibrillation can be considered part of basic life support."[14] That was way back in 1992.

By the mid-1990's, there was wide-spread press coverage of AEDs and the lives they were saving. Articles appeared in publications as diverse as USA Today, The New York Times, Reader's Digest, Better Homes and Gardens, and The Denver Post.[15] There were many, many other articles in magazines and newspapers all across the country telling of lives that were saved by AEDs well before Mr. Schroeder died from lack of an AED in October 2003.[16] Many of these stories have been published in magazines and other publications specifically geared toward the fitness industry.[17]

In 1997, the Medical Advisory Committee of the Young Men's Christian Association ("YMCA"), recommended installing AEDs at its facilities for the health and safety of its constituents.[18] That was six years before Mr. Schroeder died from lack of an AED.

In 1998, five years before Mr. Schroeder died from lack of an AED, the American Heart Association and American College of Sports Medicine issued a joint Scientific Statement

---

[13]    McInnis, Ex. A, p. 4
[14]    McInnis, Ex. F, p. 2
[15]    McInnis, Ex. I
[16]    McInnis, ¶ 37
[17]    McInnis, ¶ 37
[18]    McInnis, ¶ 23, Ex. J

recommending "cardiovascular screening of all persons before enrollment or participation in activities at health/fitness facilities."[19]  They noted that nearly one-fourth of adult Americans have some form of cardiovascular disease and that "the incidence of a cardiovascular event during exercise in patients with cardiac disease is estimated to be 10 times that of otherwise healthy persons."[20]  They also noted that the fastest growing segments of users of health clubs were older Americans.[21]

According to the American Heart Association, in an article published in 1999 (four years prior to Mr. Schroeder's death):

> AEDs were fist developed in the late 1970's and became available for clinical use in the early 1980s.  The AED identifies VF [ventricular fibrillation] in cardiac arrest victims and provides the means to deliver defibrillation shocks.  The operator is neither required to make judgments regarding the cardiac rhythm nor required to acknowledge the need for defibrillatory shocks.  . . .
> The impetus for support of broader use of AEDs derives from observations that the single most important factor determining outcome from cardiac arrest is time to defibrillation.  Providing defibrillation to a cardiac arrest victim improves survival by approximately 10%/min during the first 10 minutes of the arrest.  Use of AEDs by trained EMTs has shown to improve survival from OHCA [out-of-hospital cardiac arrest].  Likewise, use of AEDs in OHCA by police officers has significantly improved response times and yielded survival rates of as high as 58%.[22]

The American Heart Association published a study in 1999 (four plus years before Mr. Schroeder's death) showing that it only took untrained sixth-grade children 90 seconds to *properly* apply an AED, compared with 67 seconds for trained paramedics.[23]  "These findings suggest that widespread use of AEDs will require only modest training."[24]  In fact, "[h]aving completed the drill, all children but 1 agreed that they could teach the use of this AED to someone else. . . ."[25]  The American Heart Association stated the following in that 1999 publication:

---

19    McInnis, Ex. G, p. 2283
20    McInnis, Ex. G, p. 2283
21    McInnis, Ex. G, p. 2284
22    McInnis, Ex. E, p. 7
23    McInnis, Ex. E
24    McInnis, Ex. E, p. 2
25    McInnis, Ex. E, p. 9

Sudden cardiac death (SCD) is the leading cause of death in the United States, accounting for > 350,000 cases annually. The vast majority of SCD cases are due to ventricular fibrillation (VF). Survival to hospital discharge after out-of-hospital cardiac arrest remains poor, generally only in the 5% to 20% range, from the best of emergency response centers. The most effective intervention for VF is rapid defibrillation. This intervention is significantly more important to survival than cardiopulmonary resuscitation – and is the reason the American Heart Association guidelines were rewritten to support the use of defibrillatory shocks before basic life support in a cardiac arrest. In certain environments, survival rates can approach 80% to 100% when defibrillation is achieved within the first few minutes of a cardiac arrest. [26]

Congress made the following findings in 2000 (three plus years prior to Mr. Schroeder's

death) when it passed the Cardiac Arrest Survival Act of 2000:[27]

(1) Over 700 lives are lost every day to sudden cardiac arrest in the United States alone.

(2) Two out of every three sudden cardiac deaths occur before a victim can reach a hospital.

(3) More than 95 percent of these cardiac arrest victims will die, many because of lack of readily available life saving medical equipment.

(4) With current medical technology, up to 30 percent of cardiac arrest victims could be saved if victims had access to immediate medical response, including defibrillation and cardiopulmonary resuscitation.

(5) Once a victim has suffered a cardiac arrest, every minute that passes before returning the heart to a normal rhythm decreases the chance of survival by 10 percent.

(6) Most cardiac arrests are caused by abnormal heart rhythms called ventricular fibrillation. Ventricular fibrillation occurs when the heart's electrical system malfunctions, causing a chaotic rhythm that prevents the heart from pumping oxygen to the victim's brain and body.

(7) Communities that have implemented programs ensuring widespread public access to defibrillators, combined with appropriate training, maintenance, and coordination with local emergency medical systems, have dramatically improved the survival rates from cardiac arrest.

(8) Automated external defibrillator devices have been demonstrated to be safe and effective, even when used by law people, since the devices are designed not to allow a user to administer a shock until after the device has analyzed a victim's heart rhythm and determined that electric shock is required.

(9) Increasing public awareness regarding automated external defibrillator devices and encouraging their use in Federal buildings will greatly facilitate their adoption.

(10) Limiting the liability of Good Samaritans and acquirers of automated external defibrillator devices in emergency situations may encourage the use of automated external defibrillator devices, and result in saved lives.

On or about October 16, 2001, the International Health, Racquet & Sportsclub Association

---

[26]    McInnis, Ex. E, p. 2

[27]    McInnis, Ex. D, p. 1

issued a press release announcing that it had entered into an agreement with Philips Medical Systems to provide AEDs at a discounted rate for its health club members.[28] Later, stories about sudden cardiac arrest victims saved by AEDs in health clubs were published in conjunction with the discount program.[29] At its January 2002 annual convention, the International Health, Racquet & Sportsclub Association even featured a Philips Medical Systems (a reputable manufacturer of AEDs) representative as a speaker.[30]

In 2001 (over two years prior to Mr. Schroeder's death) the International Health, Racquet & Sportsclub Association issued a Briefing Paper on Defibrillators (AEDs) In Health Clubs. Gold's Gym is a member of the International Health, Racquet & Sportsclub Association.[31] That briefing paper persuasively made the case for putting AEDs in health clubs.[32] In fact, a reading of the entire paper makes it crystal clear that any reasonably prudent health club owner or operator should have an AED on site. The paper walks through how the risk of sudden cardiac arrest is much greater while exercising, how 95% of cardiac arrests result in death, how an AED is the only treatment for sudden cardiac arrest, how AEDs can be used effectively by untrained sixth graders, how use of an AED can increase the survival rate from 5% to 90% if used in the first minute after collapse, how every minute counts when dealing with sudden cardiac arrests and it takes on average two minutes before 911 is even called, how inexpensive AEDs have become, and finally how the federal government and 45 states had passed liability protection laws for those using AEDs.[33] They said all of this to their member clubs, including Gold's, over two years before Mr. Schroeder died. Here are some quotes from the paper, with some comments in brackets. The shaded quotes show

---

[28]     McInnis, ¶ 25
[29]     McInnis, ¶ 25, Ex. R
[30]     McInnis, ¶ 25, Ex. S
[31]     McInnis, ¶ 16
[32]     McInnis, Ex. H
[33]     McInnis, Ex. H

information that was also contained in an earlier version of the same Briefing Paper published in

1999 – four years before Mr. Schroeder died.[34]

> \*    **IHRSA's Position**

After significant research, IHRSA has concluded that there is not a legal standard of care that requires that automated external defibrillators (AEDs) be in all fitness centers. [What else would you expect a trade association to say, not to mention the lack of a legal basis for this position?  There is even a disclaimer of legal advice at the end of the paper.] However, the association encourages health club operators to consider the advantages of installing AEDs in their facilities.

> \*    **What is cardiac arrest and how prevalent is it?**

One of the leading causes of death among American adults, sudden cardiac arrest (SCA) strikes more than 700 people in the U.S. every day and kills over 95% of them.  The risk increases with age.  The average age of a victim is 65, but SCA is unpredictable and can happen to anyone, anywhere.  Although pre-existing heart disease is a common cause of cardiac arrest, some victims have had no previous heart problems.

The most common cause of SCA is ventricular fibrillation – an ineffective quivering of the heart muscle that makes it unable to pump blood through the body.  Once the blood stops circulating, a person quickly loses consciousness and the ability to breathe, and, without prompt, effective treatment will die.

SCA is *not* the same thing as a heart attack, although a person suffering a heart attack is more likely to develop abnormal hearty rhythms and SCA.  A heart attack is caused by blocked blood flow to the heart muscle so the muscle begins to die.  SCA is caused by an abnormal heart rhythm.  A heart attack is often proceeded by chest, arm, upper abdomen, or jaw pain, nausea and sweating.  There is rarely a warning before SCA.  Heart attack patients usually remain conscious, but SCA victims always loose consciousness.

> \*    **How effective are AEDs at treating cardiac arrest?**

"Survival can be as high as 90% if defibrillation is provided during the first minute following collapse," according to Mary Fran Hazinski, R.N., M.S.N., chairperson of the American Heart Association's Emergency Cardiovascular Care Programs.  For every minute that defibrillation is delayed, survival falls about 7-10%.

People who survive SCA have a good long-term outlook.  About 80% are alive after one year and approximately 57% are alive after five years.

> \*    **Are AEDs safe to use?**

According to the American Heart Association, an AED is safe to use by anyone who has been trained to operate it. . . .  Because of the wide variety of situations in which it will typically be used, the AED is designed with multiple safeguards and warnings before an

---

[34]    McInnis, Ex. P

electric shock is released. The AED is programmed to deliver a shock only when it has detected ventricular fibrillation.

\*    **If AEDs are easy to use, why is formal training needed to use them?**

Emergency equipment alone doesn't save lives. Its presence in a club can give a false sense of security if staff is not trained and prepared to use it.

Still, AEDs are considered so user-friendly that even untrained rescuers can generally succeed in attaching the pads, pressing "analyze" (if required) and delivering shocks. In one study, sixth graders with no AED experience were put up against paramedics. The children performed a successful rescue in about 90 seconds – only 20 seconds behind the professionals. . . .

\*    **Will obtaining an AED increase our responsibility and therefore our liability risk?**

According to IHRSA's survey of its members, concerns about potential liability have held back many clubs from looking into obtaining an AED.

However, according to Richard A. Lazar, an attorney and AED industry consultant, "In most settings the medical benefits of AEDs far outweigh any legal risks. As these devices become more widely used, there will potentially be greater liability risk for not adopting AED programs."

At the federal level, the "Cardiac Arrest Survival Act" became law in November of 2000. It establishes protections from civil liability for personal injury or wrongful death resulting from the emergency use of AEDs. Not only does it protect the AED user from liability, but it also protects a person who maintained the device, provided training in the device, tested the device, or acquired the device (in most cases) . . .

At lease 45 states have amended their "Good Samarian" laws to cover the use of an AED.

\*    **If I decide to install an AED, is one per facility enough?**

. . . Officials at Chicago's Midway and O'Hare Airports recently installed 70 AEDs into their corridor walls. The devices are no more than 2 minutes apart at walking speed. According to Agilent Technologies, between June 1999 and July 2000, 13 people were treated with AEDs at these two airports. While four had underlying conditions that could not be treated by an AED, nine survived to be discharged from the hospital.

\*    **Why are health clubs often mentioned as possible locations for AEDs?**

. . . physical stress, such as that caused by intensive exercise, can cause the heart rhythm in some people to become chaotic, which can lead to ventricular fibrillation.

Nearly one in four adult Americans has some form of cardiovascular disease. During exercise, people with heart disease are at a 10 times higher risk of having a cardiac event that people who are disease free.

The fastest-growing segment of health club members is people over age 34, an age

when the risk of heart disease begins to rise, says Gary J. Balady M.D., the previously mentioned cardiologist and professor of medicine at Boston University School of Medicine. "Many Americans are surviving their heart attacks and are being told by their doctors to exercise more. So there may be more individuals showing up at heath clubs who have hear disease. **JWT – WHERE IS THE CLOSE QUOTE?**

**Common reasons cited by IHRSA clubs for having AEDs include:**
- High number of older and/or deconditioned members
- Belief that an AED is as essential as CPR training
- Response time for local rescue squad is too long
- Review of response to previous medical emergency at club
- Prices have gone down in recent years
- Media coverage of lives saved
- Marketing/PR value
- State's "Good Samaritan" law now protects facility from liability
- Requests of members, including those in medical fields
- Club offers cardiac rehabilitee programs
- Concern that it is becoming an industry standard

**Common reasons cited by IHRSA clubs for not having AEDs include**
- Cost [less expensive than treadmill]
- Liability concerns if AED is used improperly, ineffectively, or not at all [untrained 6th graders could do it, plus federal and 45 states passed Good Samaritan laws]
- Hospital/fire station/ambulance service located close to club [never close enough to administer within the recommended 3 minutes or less]
- High staff turnover causes training problems [not for 6th graders]
- Difficulty in ensuring that someone who is trained is always on duty [not if hire 6th graders]
- Certification is too involved, time-consuming, or costly [not if hire 6th graders]
- Desire to keep club out of medical field
- Concerns about insurance coverage [IHRSA says not affected]

\*    **Have any lives been saved in clubs with AEDs?**

Yes, according to news stories, AED suppliers, and surveys of IHRSA members. Here are a few examples [which are omitted].

\*    **Has anyone died at a club that might have been saved by an AED?**

Yes. News stories as well as surveys of IHRSA clubs indicated that there have been some recent fatal cardiac arrests at fitness centers. Here are a few examples [which are omitted].

    \*      **Have any facilities been sued for not having an AED?**

        Yes, including some health clubs. . . . .

    \*      **Will having an AED affect my liability insurance coverage?**

        IHRSA surveyed several liability insurance providers on this topic. Whether a club has an AED on site does not affect its coverage rates under *most* liability insurance companies.

    Club Business International is the official publication of the International Health, Racquet & Sportsclub Association that is distributed to every health club member of the association. Club Business International published an article 15 months before Mr. Schroeder's death that requried that health clubs have AEDs.[35] The article described AEDs as "essential to a safe exercise environment."[36] "CPR is critical to maintaining the supply of oxygen to vital organs during an attack, but only a defibrillating heart shock can save someone who's succumb to SCA [sudden cardiac arrest]." [37] The article noted that 20% of clubs reported having had a heart attack take place on site.[38] An earlier study showed that 70% of clubs had experienced a medical emergency serious enough to require than an ambulance be called.[39]

> These findings, sobering enough in themselves, take on added significance when one considers the fact that one of the fastest growing membership categories now consists of people 55 or older – the age when serious heart disease is most prevalent. Overall, 60.8 million Americans, or approximately 20% of the population, have some form of cardiovascular disease, and, this year alone, an estimated 1.1 million will suffer a new or recurrent heart attack.[40]

The article further noted that AEDs had already been mandated in all federal buildings. [41] The article also reminded member clubs, like Gold's, that the risk of a sudden cardiac arrest was "as much as 15-20 times higher during, or immediately following, vigorous exercise" and that

---

[35]    McInnis, Ex. C
[36]    McInnis, Ex. C, p. 34
[37]    McInnis, Ex. C, p. 34
[38]    McInnis, Ex. C, p. 34
[39]    McInnis, Ex. C, p. 34
[40]    McInnis, Ex. C, p. 34
[41]    McInnis, Ex. C, p. 34

**Response to Motion for Summary Judgment – Page 11**

"potential victims are difficult to identify since most of the victims of SCA have no previous warnings signs." [42]    "What that means is that, while dialing 911 is an important part of any emergency response plan, it's hardly the entire plan. What's **_required_** is a trained staff who can identify a cardiac event, summons EMS quickly, initiate CPR, and, if necessary, using an AED, deliver a shock to the heart until trained medical personnel arrive on the scene." [43] (emphasis added) At the bottom of the article, the association told their members, including Gold's, that they had arranged for them to be able to obtain AEDs at a discounted price and told them how to do it. [44]

The fact that this article published in the official publication of the International Health, Racquet & Sportsclub Association listed AEDs as a "required" component "of any emergency response plan" 15 months before Mr. Schroeder's death is extremely significant. Each member of International Health, Racquet & Sportsclub Association makes the following pledge:

> The club must be able to respond in a timely manner to any reasonably foreseeable emergency event that threatens the health and safety of the club users. Toward this end, a club must have an **_appropriate emergency plan_** that can be executed by qualified personnel in a timely manner. [45] (emphasis added)

In 2002, over a year before Mr. Schroeder died, the American Heart Association and the American College of Sports Medicine issued a Joint Position Statement titled *Automated External Defibrillators in Health/Fitness Facilities*, in which they "encouraged" all health and fitness facilities to install AEDs.[46]  They went even further and stated "AED placement is strongly encouraged in those health/fitness facilities with a large number of members" [47] such as the one at issue here. The paper noted "the single greatest determinant of survival is the time from collapse to defibrillation" for victims of sudden cardiac arrest from ventricular fibrillation, such as Mr.

---

[42]     McInnis, Ex. C, p. 34
[43]     McInnis, Ex. C, p. 34-35
[44]     McInnis, Ex. C, p. 35
[45]     McInnis, Ex. L
[46]     McInnis, Ex. T
[47]     McInnis, Ex. T

Schroeder.[48]    The paper also noted "A survival rate, among victims of witnessed ventricular fibrillation cardiac arrest, as high as 90% has been reported when defibrillation is achieved within the first minute of collapse."[49]

Despite all of this overwhelming information, Gold's did not install AEDs in its facilities until sometime after June of 2004.[50] Unfortunately for Mr. Schroeder and his family, he suffered a sudden cardiac arrest while working out at Gold's on October 21, 2003.[51]  There was no AED, and he died despite the heroic efforts of the Hudson Bend Fire Department to save him.[52]  When they arrived on the scene, his heart was still in ventricular fibrillation, but too much time had passed for him to be revived.[53]

## THE OPINION OF KYLE MCINNIS, Sc.D.

Dr. McInnis is currently Professor and Chair of the Department of Exercise and Health Sciences, of the College of Nursing and Health Sciences at the University of Massachusetts. He received his bachelor's degree in Biology at the University of Massachusetts-Lowell in 1985 graduating Cum Laude, and an M.S. in Cardiac Rehabilitation from Springfield College in 1987. He earned a Sc.D. (Doctorate in Science) in Applied Anatomy and Physiology from Boston University in 1991. That course of study involves biological systems of the body including exercise in health and disease.

Dr. McInnis has taught in the Department of Exercise Science and Physical Education at the University of Massachusetts-Boston since 1991, serving as Assistant Professor until 1997. He became a tenured Associate Professor in 1997 and became a full professor in 2003. The subject

---

[48]    McInnis, Ex. T
[49]    McInnis, Ex. T
[50]    Thomas, Ex. A
[51]    Roach, Ex. B
[52]    Roach, Ex. B
[53]    Roach, Ex. B

of Exercise Science and Physical Education integrates scientific research to provide educational

and practical application of exercise. His specific focus and interest is in cardiovascular

screening and emergency preparedness in fitness centers. In 2004, he became the Chairperson of

the Department of Exercise and Physical Education.

Dr. McInnis has authored 32 chapters in numerous publications, 25 research abstracts,

and two books, including the following in citation form. The acronym ACSM listed in several of

these publications refers to the American College of Sports Medicine.

a.  Tharrett, S, McInnis KJ, and Peterson J. ACSM's Health and Fitness Facilities Standards Guidelines (3rd Edition). Champaign, IL: Human Kinetics, (2005);

b.  McInnis KJ and Balady, GJ. Exercise Guidelines for Health/Fitness Facilities. In: The Health Professionals Guide to diabetes and exercise. American Diabetes Association Clinical Education Series. Alexandria, VA. 2001.

c.  McInnis KJ, Hayakawa S., Balady GK. Cardiovascular screening and emergency procedures at health clubs and fitness centers. Am J. Cardiol 80:380-383, 1997.

d.  McInnis, KJ. Safe exercise for heart disease patients. ACSM's Health and Fitness Journal September/October, 1 (5): 26-33, 1997.

e.  McInnis KJ and Balady GJ. Higher cardiovascular risk in health clubs. ACSM's Health and Fitness Journal Jan/Feb; 19-24, 1999.

f.  McInnis KJ and Balady G, Foster C. Exercise in health clubs. ACSM Current Comments Jan/Feb 2000.

g.  McInnis KJ, Herbert W, Herbert D, Herbert J, Ribisl P., Franklin B. Low compliance with national standards for cardiovascular emergency preparedness at health clubs. Chest 2001; 120:283-288.

h.  McInnis KJ, Herbert D, Herbert W. Are health clubs unfit for cardiovascular emergences. Cardiovascular Reviews and Reports 2001; Oct: 570-572.

i.  McInnis KJ. Compliance with emergency recommendations at health clubs. Am J Med Sports 2003; Jan/Feb 100-102.

j.  McInnis KJ. Advising patients on selecting a health/fitness facility and qualified personal fitness trainer. Am J Med Sports 2003; Jan/Feb 100-102.

Dr. McInnis also served in numerous professional and advisory positions, including, but

not limited to:

a.   Applied Science Advisor to WellBridge Health and Fitness/Club Sports International between 1998 and 2000, providing expertise to develop policies and procedures related to health/fitness facility standards and lifestyle disease management programs.

b.   Special Projects Coordinator for the YMCA of the USA, chairing a group and serving as primary author of a technical assistance paper on automated external defibrillators for distribution to all YMCA facilities across the United States.

c.   Since 1995, he has served as a Fellow and Program Director for the American College of Sports Medicine, and since 2002 he has served on its Board of Trustees.

d.   Between 1993 and 1995, he was a member of the American Heart Association – Massachusetts Affiliate's Committee on Cardiovascular Risk Prevention and it's Task Force on Cardiovascular Risk Prevention in Racial Minorities.

Dr. McInnis has delivered or been invited to deliver 64 lectures on various exercise science related topics at regional and national health/fitness centers, hospitals, businesses, and community centers, including, but not limited to the following:

a.   Invited speaker – "Screening for Cardiovascular Diseases in Health Clubs." American College of Sports Medicine's 1998 Health/Fitness Summit. Austin, Texas. 1998.

b.   Invited speaker – "Cardiac Rehabilitation and Secondary Prevention in Women." American College of Sports Medicine – New England Regional Chapter Annual Meeting. Providence, Rhode Island. 1998.

c.   Invited Speaker – "Emergency Preparedness of Health Clubs." American Heart Association Scientific Sessions. Chicago, Illinois. November 2002.

d.   Invited Speaker: Implementing an AED program. International Health, Racquet & Sportsclub Association Annual Meeting. San Francisco, California. February 2003. He was invited to speak to International Health, Racquet & Sportsclub Association in 2004 and 2005 on the subject of AEDs.

e.   Invited Speaker: AEDs and Evolving Standards in Emergency Preparation. International Health, Racquet & Sportsclub Association Annual Meeting. Las Vegas, Nevada. February 2003.

The following are some of the opinions expressed in Dr. McInnis' affidavit attached hereto:

The increased risk and foreseeability of sudden cardiac arrest occurring during exercise was well known throughout the fitness industry well before October of 2003. The likelihood of serious injury and death from sudden cardiac arrest has also been well known throughout the fitness industry well before October of 2003.

The burden of providing an AED in a facility like the Gold's Gym at issue here

would be minimal. By 2003, AEDs could be obtained at a cost of approximately $1,500. In fact, the International Health, Racquet, and Sportsclub Association had a program whereby member clubs could obtain AEDs at a discounted rate. A single treadmill, for example, would cost several times more than an AED. There would be virtually no burden in terms of training employees, as AEDs are designed to be used by laypeople with no training.

It is my opinion that any reasonably prudent operator of a health club, especially one as large as the gym involved here, should have had an AED on site by October of 2003. Any reasonably prudent operator of a health club, especially one as large as the gym here, would have foreseen that the consequence of failing to have an AED on site by October 2003 would likely lead to the death or serious injury of one of their patrons.

It is my opinion that any reasonably prudent operator of a health club, especially one as large as the gym involved here, would have had superior knowledge of the risks associated with the failure to have an AED on site when compared to the knowledge of their patrons.

Frankly, AEDs had become an essential piece of safety equipment for health clubs like the one involved in this case by October 2003, much like fire extinguishers, smoke detectors, and first-aid kits. There simply is no legitimate excuse for the gym in question here not having an AED. It is my opinion based on my own experience and studies as well as the published literature I have reviewed that had they had an AED, it is more likely than not that Mr. Schroeder would have survived.

Based on my knowledge of and review of the information available to the general public and to health and exercise facilities, including Gold's Gym before October 2003, about sudden cardiac arrests, the frequency and increased risk of sudden cardiac arrest in health facilities, the demographic changes which increased the number of older persons exercising in health facilities with a corresponding increased risk of suffering a cardiac arrest, and the availability and effectiveness of AEDs, it is my opinion that a sudden cardiac arrest was an entirely foreseeable event at a gym well in advance of October 2003. It was also reasonably foreseeable to any gym owner or operator using ordinary care that an AED would be an effective device to reverse a sudden cardiac arrest as of October 2003. Therefore, any gym operator or owner that failed to have an AED on site as of October 2003 would not have been exercising that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

## THE OPINION OF PAUL ROACH, M.D.

Dr. Roach is a board certified cardiologist and the Chief of Staff at Brackenridge Hospital.

He reviewed the medical records of Mr. Schroeder as well as the autopsy report and EMS records.

His opinions as set forth in his affidavit attached to this response are:[54]

Kenneth Wayne Schroeder had coronary artery disease, aortic valve sclerosis with narrowing of the aortic valve, and cardiomegaly with left ventricular hypertrophy. These

---

[54]    Plaintiff objects to the affidavit of Dr. Paul Dlabai attached as Exhibit B to Defendant's motion. The affidavit does not state that the statements contained in it are true and correct. Further, the affidavit contains conclusory statements and does not point to any literature or studies supporting its conclusory statements.

are commonly encountered and treatable cardiac conditions. In patients similar to Mr.
Schroeder treatment of these conditions would in all reasonable medical probability lead
to a greater than fifty percent chance of survival. Additionally, none of these conditions
would preclude successful resuscitation from sudden cardiac arrest. Mr. Schroeder
suffered a sudden cardiac arrest while exercising on October 21, 2003. It is my
experience, which is supported by the literature, that early defibrillation in the setting of
cardiac arrest results in a greatly improved chance of successful resuscitation, defined as
survival to hospital discharge. The medical literature shows that patients with out of
hospital arrests have a greater than fifty percent chance of successful resuscitation if early
defibrillation is applied. The use of an automated external defibrillator (AED) in the
setting of arrest in cardiac rehabilitation programs resulted in survival rates approaching
ninety percent. This is a population of patients with conditions very similar to those that
Mr. Schroeder had. Additionally, the literature shows a steep decline in the chances of
successful defibrillation for every minute that passes from the onset the arrest. Based on
the well documented fact that early defibrillation results in a dramatic improvement in
survival in the setting of cardiac arrest and that even minimal delays in defibrillation
drastically reduce the chances of survival the American Heart Association and the
American College of Sports Medicine made a recommendation in 2002 that health clubs
have AEDs.

In all reasonable medical probability Mr. Schroeder would have had a greater than fifty
percent chance of successful resuscitation and survival to hospital discharge in a fully
functional state had an AED been promptly used.

### THERE IS A DUTY UNDER THE COMMON LAW

Gold's seeks to have this court rule that as a matter of law it owed no duty at all to take

reasonable steps to protect its customers (whom it charged large sums of money to) from

reasonably foreseeable risks of harm associated with the use of Gold's facilities. That is

preposterous. More specifically, Gold's wants this Court to rule that it did not have to equip its

facilities with AEDs as a matter of law. If the Court rules that way, will Gold's then remove all

of the AEDs it has installed all over the country? Of course not - it will leave them in place

because even it recognizes it has a duty to do so. If Gold's recognizes the duty, why shouldn't

the Court?

### A.    THE DUTY UNDER RISK-UTILITY ANALYSIS.

An analysis of general negligence law demonstrates that Texas law requires gyms to have an

AED on the premises. Legal duties, beyond those imposed by statute, can be imposed against

health clubs by the application of general negligence law, which requires consideration of simple proof of the standard of care proper under the circumstances. *See e.g., Figure World, Inc. v. Farley*, 680 S.W.2d 33, 36 (Tex. App.—Austin 1984, writ ref'd n.r.e)(employee's shouting "suck in that stomach" to person on treadmill who fell as a result found unprofessional, unusual and negligent).

In Texas, the courts apply the "risk-utility test" in determining whether there is a common law duty for which a defendant can be held liable in court. *Reed v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998). The courts must balance the factors of risk, foreseeability and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Smith-Kline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995). The most important factor is the foreseeability of the risk. *Texas Home Mgmt. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002). The test on foreseeability is whether the defendant should, under the circumstances, reasonably anticipate the consequences of its conduct. *Foster v. Denton I.S.D.*, 73 S.W.3d 454, 465 (Tex. App.—Fort Worth 2002, no pet.). In determining the existence of a duty, courts also consider whether one party has a superior knowledge of the risk, whether one party has the right to control the conduct of the other, whether societal changes require the recognition of new duties, and whether the creation of a new duty would conflict with existing statutory law. *Graff v. Beard*, 858 S.W.2d 918, 920-22 (Tex. 1993) (knowledge and control); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309-10 (Tex. 1983)(societal change); *Thaper v. Zezulka*, 994 S.W.2d 635, 639-40 (Tex. 1999)(conflict with statutory law).

The evidence presented above establishes in an overwhelming fashion that Gold's had a duty to have AEDs in its locations way before October 2003 under the risk/utility test. Gold's

now has AEDs in all of its facilities.[55] To the extent that Gold's disputes the magnitude of the

burden, Gold's conduct indicates that it is entirely feasible to provide AEDs in all of its

facilities.

Industry guidelines promulgated by at least the International Health, Racquet &

Sportsclub Association indicate a recognition of a duty of health clubs to provide AEDs under

the risk-utility analysis. This is part of Gold's duty to take reasonable care to provide first aid

and to otherwise care for customers until they can be cared for by others and should not be a

shock to Gold's. All heath clubs have for years had first aid kits, ice packs and employees

trained in CPR in order to care for their customers who become sick or injured. "YMCAs have

long required staff to be certified in CPR in the event of a cardiac emergency in YMCA

activity."[56] International Health, Racquet and Sportsclub Association, of which Gold's is a

member, original eligibility standards required the clubs have "at least one fully stocked first aid

kit in a place where staff can easily access it" and that the "club has at least one staff member

scheduled to be on site at all times who has current CPR certification."[57]  This is significant

because the American Heart Association has taken the position since 1992 that "all personnel

whose jobs require that they perform basic CPR be trained to operate and permitted to use

defibrillators, particularly automated external defibrillators (AEDs)"[58] – eleven years before Mr.

Schroeder died because there was no AED on site.

As mentioned above, the International Health, Racquet & Sportsclub Association, of which

Gold's is a member, has published standards that its members agree to abide by.  The association

published a "Standards Facilitation Guide" in 1998 that is designed to help members comply with

---

[55]     Thomas, Ex. A
[56]     McInnis, Ex. J
[57]     McInnis, Ex. L
[58]     McInnis, Ex. F, p. 2

**Response to Motion for Summary Judgment – Page 19**

the standards.[59] The model emergency plan in the guide states that the first employee on the scene of a "life-threatening emergency" should first call 911 and then "BEGIN BASIC CARDIAC LIFE SUPPORT."[60] This is significant because the American Heart Association has publicized AEDs as part of basic life support since 1992: "Today with the availability of automated external defibrillators, defibrillation can be considered part of basic life support."[61]

Gold's own marketing materials suggest that it is up to speed with industry standards. The following excerpts are from the marketing material in use by Gold's Gym at the time Mr. Schroeder joined: "Gold's Gym provides a comprehensive approach to the health and well-being of its members." "You have made one of the wisest decisions of your life, for your life, by joining Gold's Gym. Since 1965 we have been the recognized authority on fitness. You will now experience for yourself every time you come through the door why 3 million members at over 650 locations around the world trust Gold's Gym with their health and fitness." "Your Gold's Gym membership gives you access to *the most qualified fitness staff in the industry, technically superior equipment and cutting edge facilities*." *See* Defendant Gold's Gym International, Inc.'s Responses and Objections to Plaintiffs' First Request for Production, attached to the Thomas affidavit. Gold's should be required to recognize and live up to the standards within its own literature.

The summary judgment evidence presented by Schroeder is much like the information considered by a federal court in Massachusetts when it considered an airline's liability to a cardiac arrest victim for failing to have AEDs aboard its aircraft. *See Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d 28, 33-35 (D. Mass. 2002). That federal court recognized that although the FAA had not yet required aircraft to carry AEDs, airlines could be required to carry them under

---

[59] McInnis, Ex. L
[60] McInnis, Ex. L
[61] McInnis, Ex. F, p. 2

state law, and it left undisturbed a jury finding that effectively would impose a requirement on airlines to carry AEDs. *Stone*, 256 F.Supp.2d at 45-46. This opinion also demonstrates that the benefits to the community sometimes require an imposition of duties under the common law, even in a highly regulated industry, thereby refuting Gold Gym's argument that requirements such as this one are best left to the Legislature. This Court can and should recognize the existence of a duty in this case.

**B.    THE DUTY BY VIRTUE OF THE SPECIAL RELATIONSHIP**

A duty to provide AEDs can also be found by virtue of a special relationship. Parties to a 'special relationship' owe specific duties as a matter of law. Examples of these special relationships are employer-employee, doctor-patient, attorney-client, parent-child, hirer-independent contractor, and parties to a contract. Significant to this discussion is that Gold's and Schroeder were at least parties to a contract for which there is a special relationship. *See e.g. Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 49, n.1 (Tex. 1991)(discussion of special relationship in the context of whether claim resounds in contract or tort). Here, the relationship was even more special than "parties to a contract." Mr. Schroeder was a paying customer, or business invitee, of Gold's.

It goes without saying that an owner or occupier of land owes its business invitees a duty to protect them from foreseeable risks that may arise on the premises. "Generally, a premises owner or occupier owes to invitees a duty to use reasonable care to protect them from foreseeable injuries. It is undisputed in this case that Kendrick was Allright's invitee at the time of the assault. The question, then, becomes whether Kendrick's injuries from this criminal act were foreseeable, and whether Allright exercised reasonable care to protect Kendrick." *Allright San Antonio Parking Inc. v. Kendrick*, 981 S.W.2d 250, 252 (Tex. App.-San Antonio 1998, no.

pet.). The evidence attached to this motion, including the affidavits and the published materials

attached to them, demonstrates that Mr. Schroeder's sudden cardiac arrest was foreseeable and

that Gold's failed to use ordinary care to protect Mr. Schroeder from that risk when it could have

easily done so. To the extent that the facts pointing to the issue of foreseeability are in dispute,

the question of whether a duty exists should be decided by the jury even though the existence of

a duty is ordinarily a question of law. *See e.g. Bennett v. Span Industries, Inc.* , 628 S.W.2d 470,

474 (Tex. App.—Arkansas 1981, writ ref'd n.r.e.)("The existence of a duty is a question of law

when all of the essential facts are undisputed, but when the evidence does not conclusively

establish the pertinent facts or reasonable inferences to be drawn therefrom, the question

becomes one of fact for the jury.").

## THERE WAS ALSO A DUTY UNDER RESTATEMENT § 314A

Restatement (Second) of Torts §314A (1965) provides:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>     (a) to protect them against unreasonable risk of physical harm, and
>     (b) to give them first aid after it knows or has reason to know that they are ill or injured,
>     and to care for them until they can be cared for by others.
> (2) An innkeeper is under a similar duty to his guests.
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the
> public who enter in response to his invitation.

The failure to have an AED not only posed an unreasonable risk of physical harm to customers like

Mr. Schroeder, but also breached Gold's duty to render first aid an provide care to customers who

become ill or injured under Restatement §314A. The duty arises not only when the actor actually

knew of the risk, but also when the actor *should have known* of the risk. *Id.* at comment e.

> The duty to protect the other against unreasonable risk of harm extends to risks arising out
> of the actor's own conduct, or the condition of his land or chattels. It extends also to risks
> arising from forces of nature or animals, or from the acts of third persons, whether they be
> innocent, negligent, intentional, or even criminal. It extends also to risks arising from pure
> accident, or from the negligence of the plaintiff himself, as where a passenger is about to fall
> off a train, or has fallen. The duty to give aid to one who is ill or injured extends to cases

where the illness or injury is due to natural causes, to pure accident, to the acts of third persons, or to the negligence of the plaintiff himself, as where a passenger has injured himself by clumsily bumping his head against a door.

Restatement § 314A, comment d.

Texas courts have recognized the law as expressed in §314A. *Allright San Antonio Parking Inc. v. Kendrick*, 981 S.W.2d 250 (Tex. App.-San Antonio 1998, writ denied); *Howell v. City Towing Associates, Inc.*, 717 S.W.2d 729, 732 -733 (Tex. App.-San Antonio, 1986 writ ref'd n.r.e.). Gold's breach of this duty under Restatement §314A was made clear by all the evidence and studies cited above which shall not be repeated here. There is, at the very least, a fact issue.

The Restatement (Third) of Torts will replace Section 314A with its Section 40, which states the duty in what is clearly even broader form. *See* Restatement (Third) of Torts, §40 (Proposed Final Draft No. 1, 2005). Section 40(a) says, "An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship." Special relationships are defined to include businesses that open their premises to the public with those who are lawfully on the premises. Comment "e" to this proposed section says that, "The duty in each case is only to exercise reasonable care under the circumstances," which is reminiscent of general negligence law, which Schroeder has already established imposes a duty for health clubs to have an AED on the premises.

Gold's reliance on Restatement § 314 is misplaced.

[Section] 314A "states exceptions to the general rule, stated in § 314, that the fact that the actor realizes or should realize that his action is necessary for the aid or protection of another does not in itself impose upon him any duty to act. The duties stated in this Section arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule. The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found."

Restatement § 314A, comment b.

Whether a duty exists to have an AED under § 314A is a question of fact for the jury given the summary judgment evidence before the court. It is up to the judge to decide if a broad duty exists, such as giving fist aid to customers and caring for them until they can be cared for by others. However, it is the province of the jury to determine whether that duty was properly carried out given the facts of any particular set of circumstances. That will depend on the state of knowledge at the time in the industry, what a reasonably prudent operator should have known, and whether the operator exercised ordinary care in the circumstances. All of those inquiries are for the jury, not the court, so long as there is sufficient evidence to allow a reasonable jury to possibly conclude that ordinary care required having an AED. Frankly, the evidence is not only sufficient, it is overwhelming. If anyone is entitled to summary judgment it should be Plaintiff.

### GOLD'S CASES DON'T CHANGE THE RESULT HERE

The court in *Salte v. YMCA of Metropolitan Chicago Foundation*, 814 N.E.2d 610 (Ill. App. 2004), held the health club owed its "business invitee the level of aid that was reasonable under the circumstances." *Id.* at 529. The question, then became what was reasonable under the circumstances. The plaintiff in that case obviously failed to offer any evidence like the Plaintiff in this case showing the importance of having AEDs in the health club setting, how they were so easy to use they could be used by sixth graders, how effective they were at saving lives, how industry associations and the American Heart Association had recommended they be installed in health clubs, and how inexpensive they were. None of that type of evidence was mentioned by the court in its analysis. The court in *Salte* was clearly under the mistaken belief that AEDs were much more sophisticated and novel than they actually were. The court erroneously concluded: "The use of a defibrillator requires specific training and we believe that its use is far

beyond the type of "first aid" contemplated by Restatement." *Id.* at 529. The evidence cited above shows this conclusion by the court was simply wrong. Untrained sixth graders are perfectly capable of operating AEDs properly. In fact, the evidence shows that AEDs require much less training than CPR.[62] Our case is much different where we have offered a ton of evidence proving that a reasonable health club owner or operator would have had an AED by October 2003. On top of that, the court in *Salte* applied a different standard than a Texas court would. Under Texas law, it is up to the judge to determine whether a duty exists, and then up to the jury to determine whether the defendant lived up to the duty required. The majority in *Salte* would have invaded the province of the jury under Texas law when it stated: "we disagree with the dissent's conclusion that the reasonableness of the care exercised by defendant under the circumstances was a question of fact that precluded the dismissal of plaintiff's complaint." *Id.* at 530. *See, e.g. Marczak v. Storybook Square, Inc.,* 1999 WL 568687 (Tex. App.-Houston [1st Dist.] 1999, no writ).[63] According to the dissent in *Salte*, the majority got it wrong under Illinois law as well.

---

[62]    McInnis, Ex. E

[63]    No Texas statute or regulation imposes on day care centers the duties the Marczaks claimed Storybook breached in caring for Rachel. We must therefore determine whether a duty arises under the common law. *See Applebaum v. Nemon,* 678 S.W.2d 533, 535 (Tex.App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.). As in *Lawson,* the threshold question on appeal is not whether Storybook breached its duty to Rachel, but whether a duty existed. At a minimum, Storybook owed Rachel a duty of ordinary care to avoid foreseeable injury. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987) (imposing on alcoholic beverage licensee a duty not to serve alcoholic beverages to a person the licensee knows or should know is intoxicated); *Lawson,* 888 S.W.2d at 31 (citing *El Chico,* 732 S.W.2d at 311, as recognizing the duty of every person to exercise reasonable care to avoid foreseeable risk of injury to others).

In determining whether a duty exists, courts consider the risk, foreseeability, and likelihood of injury, and weigh these factors against the social utility of the actor's conduct, the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Bird,* 868 S.W.2d at 769; *Lawson,* 888 S.W.2d at 34. Foreseeability of the risk is foremost and dominant among these factors. *El Chico,* 732 S.W.2d at 311; *Lawson,* 888 S.W.2d at 34. The Marczaks' allegations included claims that Storybook was negligent in placing an age-inappropriate table in Toddler Room 1, where Rachel had been assigned. They presented summary judgment evidence that Storybook employees were aware that other children had fallen from the "Grow With Me" table, and, as a rule, placed younger children with their backs against the wall to prevent their falling. The Marczaks' summary judgment evidence further reveals that Storybook employees tried to catch children they saw beginning to fall, and that Storybook had assigned a staff member to supervise children at the table.

The summary judgment evidence raises a genuine issue of material fact whether Storybook foresaw or should have

Whether a duty exists is a question of law. *Godee,* 327 Ill.App.3d at 697, 261 Ill.Dec. 976, 764 N.E.2d 591. However, the reasonableness of the care exercised by the defendant is generally a question of fact and becomes a matter of law only where reasonable people could not disagree as to the conclusions resulting from the facts. *Agnello,* 110 Ill.App.3d at 917-19, 66 Ill.Dec. 722, 443 N.E.2d 648; see also *Jones,* 257 Ill.App.3d at 853, 196 Ill.Dec. 397, 630 N.E.2d 94.

I disagree with the majority's and defendant's characterization of the issue as solely a legal question of whether defendant had a duty to provide a defibrillator. Defendant's duty, as it acknowledges, was to render reasonable first aid until professional assistance arrived. See Restatement (Second) of Torts § 314A, Comment *f,* at 120 (1965). Whether reasonable assistance encompasses the use of a defibrillator by defendant's staff paramedic is, I believe, a factual question. I further believe that a reasonable jury could find that defendant did not provide reasonable first aid to Terry when it failed to equip its paramedic with a defibrillator to use on Terry.

*Id.* at 532.

In *Rutnik v Colonie Center Court Club, Inc.*, the decedent was not, contrary to Gold's

Gym's representation, a club member playing tennis at the club he ultimately sued. Instead, he was

a mere participant in a racquetball tournament sponsored by the club. *See Rutnik v Colonie Center*

*Court Club, Inc.*, 672 N.Y.S.2d 451 (N.Y. App. Div. 1998). There, the court relied on New York

law that a voluntary participant in a sporting event assumes the risk of injuries associated with the

sport. This participant was an "experienced amateur racquetball player who was known to play two

to three games a week." *Rutnik*, 672 N.Y.S.2d at 452-53. On top of that, the incident occurred way

back in 1991, which was some 12 years prior to the incident in this case and before all of the studies

and recommendations set out in the factual background here that prove AEDs should definitely have

been placed in Gold's facility by October 2003. None of this type of proof was even discussed by

the court, which dismissed the issue of requiring an AED with one sentence and absolutely no

analysis of the issue. *Id.* at 875.

---

foreseen the likelihood of serious injury to children like Rachel who were placed at the "Grow With Me" table in Toddler Room 1. We hold that Storybook owed Rachel a common-law duty of ordinary care to avoid injury. We further hold that Julie Marczak's additional exercise of care, custody, and control over Rachel did not conclusively negate Storybook's duty to Rachel. Accordingly, the trial court erred in rendering summary judgment in favor of Storybook on the Marczaks' negligence cause of action.

Finally, in *Atcovitz v. Gulph Mills Tennis Club, Inc.*, the court declined to hold that a tennis club owes its members a duty to have an AED on premises, but it did so on the basis of a Pennsylvania statute that regulated AEDs. *See Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218 (Pa. 2002). The club argued that it would have been illegal under the statute for its employees to use an AED, and the court found that, in light of the statute and in the absence of a similar provision authorizing the use of AEDs in such clubs, the tennis club did not owe a duty to have an AED on the premises. *Atcovitz*, 812 A.2d at 1223-24. Finally, the opinion lacks any discussion on the impact of AEDs or the more recent recommendations as to their availability in health clubs. *Atcovitz* is not instructive under these circumstances, since the incident there occurred in 1996. It is interesting to note, however, that court applied the risk/utility test Plaintiffs in this case are arguing applies when determining whether a duty existed – it just had different facts because of the statute and the earlier incident date. *Id.* at 587.

The incident in *Applebaum v. Newmon*, 678 S.W.2d 533 (Tex. App. – Houston [14h Dist.] 1984, writ ref'd n.r.e.) happened way back in 1980. There is no real doubt that the result would be much different were it decided now, or probably even ten years later. Again, the issue is hat steps a reasonably prudent operator would have taken under the circumstances as the existed at the time – not circumstances from some other case that happened 26 years ago. The evidence is clear Gold's should have had an AED – there certainly is enough for a fact issue.

Under Gold's reading of these cases, the standard of care would be static rather than evolve with knowledge and technology. If that were true, we wouldn't have seat belts.

## THERE IS AMPLE EVIDENCE ON CAUSATION

There is a question of fact as to whether the absence of an AED proximately caused Schroeder's death. Proximate cause is a question of fact unless the evidence is undisputed and only

one reasonable inference can be drawn. *Ambrosio v. Carter's Shooting Ctr.*, 20 S.W.3d 262, 266 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

In response to the motion and contrary to the affidavit provided by the expert for Gold's Gym, Schroeder offers as summary judgment evidence the affidavits of Dr. McInnis and Dr. Roach and numerous publications within the industry. This evidence makes clear that Gold's had a duty to provide an AED, that an AED would have dramatically improved the chances of saving Kenneth Wayne Schroeder's life, and that the danger created by the absence of an AED was foreseeable. Both experts testify that the failure to have an AED was more likely than not the cause of Mr. Schroeder's death. This evidence at least creates a question of fact, so summary judgment must be denied.

Numerous studies have been offered as summary judgment evidence showing that AEDs keep victims of sudden cardiac arrest from dying. One study was done on the effectiveness of AEDs at health clubs. The study, which was performed by Plaintiff's expert and published in Club Business International the official publication of the International Health, Racquet & Sportsclub Association, "revealed that AEDs produced a short-term survival rate of 75%, as opposed to . . . 2%-5% for those who suffer SCA outside a medical setting."[64] The article also lists eleven clubs that it describes as "just a few of the IHRSA facilities that have utilized AEDs to save members' lives."[65]

The International Health, Racquet & Sportsclub Association's own Briefing Paper on Defibrillators (AEDs) In Health Clubs, of which Gold's is a member, states:

"Survival can be as high as 90% if defibrillation is provided during the first minute following collapse," according to Mary Fran Hazinski, R.N., M.S.N., chairperson of the American Hearth Association's Emergency Cardiovascular Care Programs. For every minute that defibrillation is delayed, survival falls about 7-10%."

---

[64] McInnis, Ex. O
[65] McInnis, Ex. O

> People who survive SCA have a good long-term outlook. About 80% are alive after one year and approximately 57% are alive after five years. [66]

The same Briefing Paper also report results of 69% survival rates from the use of AEDs in Chicago airports:

> . . . Officials at Chicago's Midway and O'Hare Airports recently installed 70 AEDs into their corridor walls. The devices are no more than 2 minutes apart at walking speed. According to Agilent Technologies, between June 1999 and July 2000, 13 people were treated with AEDs at these two airports. While four had underlying conditions that could not be treated by an AED, nine survived to be discharged from the hospital. [67]

In 2002, over a year before Mr. Schroeder died, the American Heart Association and the American College of Sports Medicine issued a Joint Position Statement titled *Automated External Defibrillators in Health/Fitness Facilities*, in which they "encouraged" all health and fitness facilities to install AEDs.[68] The paper also noted "A survival rate, among victims of witnessed ventricular fibrillation cardiac arrest, as high as 90% has been reported when defibrillation is achieved within the first minute of collapse."[69]

The New England Journal of Medicine published a study in 2000 titled "Outcomes of Rapid Defibrillation by Security Officers After Cardiac Arrest in Casinos." "The survival rate was 74% for those who received their first defibrillation no later than three minutes after a witnessed collapse" and a 53% overall survival rate.[70]

These and the other studies offered by Plaintiff as summary judgment evidence establish that Ms. Schroeder's chances of survival would have been exceptionally good had AEDs been available. There is at least a question of fact on the issue of causation.

## OBJECTION AND RESPONSE TO THE NO-EVIDENCE MOTION

---

[66]    McInnis, Ex. H
[67]    McInnis, Ex. H
[68]    Roach Affid, Ex. C
[69]    Roach Affid, Ex. C
[70]    Roach Affid, Ex. C

Plaintiff objects to Gold' no-evidence motion due to lack of specificity and ask that the Court treat the motion as a traditional motion for summary judgment. Gold's Gym filed a no-evidence motion for summary judgment on Schroeder's claims for negligence, gross negligence, liability under the Texas Survival Statute, and liability under the Texas Wrongful-Death Statute. Although the motion claims to be a motion on each element of each claim, Gold's Gym moves specifically on the issues of duty and proximate cause, which are the same issued presented by Gold's Gym's traditional motion.

Defendants have brought their motion, in part, as a no-evidence motion under Texas Rule of Civil Procedure 166a(i), but they have failed to meet the required standard. Rule 166a(i) makes clear that no-evidence motions brought under this rule "must state the elements as to which there is no evidence." The comments to this rule further specify that "[t]he motion must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to the opponent's case." In paragraph 10 of its motion, Defendant says it challenged "each element of negligence, gross negligence, wrongful death and survival claims raised by Plaintiff." Then, in paragraphs 11-17, Defendants address just two issues – duty and causation. The allegations in Gold's motion are conclusory and general challenges to Plaintiff's case. Therefore, the motion should be treated as a traditional summary judgment motion, with the burden on the Defendant. *See e.g. Amouri v. Southwest Toyota, Inc.*, 20 S.W.3d 165, 168 (Tex. App. – Texarkana 2000, pet. denied); *Weaver v. Highlands Ins. Co.*, 4 S.W.3d 826, 828 (Tex. App. – Houston [1st Dist.] 1999, no pet.).

Plaintiff requests that the Court treat the entirety of Defendant's motion as a traditional motion for summary judgment. Alternatively, in the event that the Court overrules this objection, Plaintiff requests that the Court grant Plaintiff leave to amend her response to address the other

purported no-evidence grounds.

Out of an abundance of caution and in the event that the Court construes Gold's Gym's motion as properly brought as to each and every element of Schroeder's claims for negligence, gross negligence, the Wrongful Death Statute, and the Texas Survival Statute, Schroeder quickly addresses the other elements of those claims here.

As to negligence, the only element not already addressed in this response is one of breach. There is no dispute in this proceeding that Gold's Gym did not have an AED on premises. If there was a duty to have an AED, there certainly was a breach of that duty.

As to gross negligence, Schroeder need only provide some evidence that the failure to have an AED on premises, when viewed objectively from Gold's Gym's standpoint at the time it occurred, involved an extreme risk, considering the potential harm and that Gold's Gym had subjective awareness of the risk but proceeded anyway with a conscious indifference to the rights, safety or welfare of others. *See* Tex. Civ. Prac. & Rem. Code § 41.001(11). Schroeder has provided evidence of this in the affidavits that address the risk and the harm known and promulgated through the industry.

As to the Texas Wrongful Death Statute, although Gold's Gym may be claiming to challenge each element of this claim, it cannot seriously refute that the widow is a statutory beneficiary of Kenneth Wayne Schroeder or that Kenneth Wayne Schroeder is a person who suffered an actual injury. Had Kenneth Wayne Schroeder lived, he would have been entitled to bring action for whatever extent of the injury he suffered due to Gold's Gym's failure to have an AED on premises. To the extent that Schroeder is challenging whether Gold's Gym's wrongful act caused Kenneth Wayne Schroeder's death, that issue has been addressed by the above discussion of both duty and proximate cause, both of which are addressed by the affidavits attached to this

response.

Finally, as to the Texas Survival Statute, again although Gold's Gym arguably challenged each element, there is no dispute that Schroeder is a legal representative of Kenneth Wayne Schroeder's estate. The issues of whether Schroeder had a cause of action for personal injury before he died, whether he would have been entitled to bring that action had he lived, and whether Gold's Gym's conduct caused his injury are encompassed by the discussions of duty and proximate cause, both of which are addressed by the affidavits attached to this response.

Whether the applicable standard is under the traditional or no-evidence grounds, Plaintiff has produced summary judgment evidence as to each of her claims. Defendant's motion as to each of these should be denied.

PRAYER

Plaintiff asks that the summary judgment motion be denied, and for such other and further relief to which she may be justly entitled.

Respectfully submitted,

_____

John W. Thomas
Texas Bar No. 19856425
**GEORGE & BROTHERS, L.L.P.**
1100 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
Telephone: (512) 495-1400
Telecopier: (512) 499-0094

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2006 a true and correct copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANT'S TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT AND MOTION FOR LEAVE WITH RESPECT TO THE SAME was served on counsel for Defendant addressed as follows:

Lynn S. Castagna
Connolly & Castagna, LLP
3660 Stoneridge Road, Suite B-102
Austin, Texas 78746
*Via Hand Delivery*

John W. Thomas