F i L E D
Clerk of the Superior Court

SEP 3 0 2005

By: L. ROCKWELL, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| BOBBI COHEN, et al.,<br><br>Plaintiff,<br><br>v.<br><br>HILTON HOTELS CORPORATION, et al.,<br><br>Defendants. | CASE NO. GIC 821664<br><br>**ORDER DENYING SUMMARY JUDGMENT/SUMMARY ADJUDICATION** |

The court heard oral argument on September 29, 2005 before the Honorable Jay M. Bloom, Judge presiding. The court, having considered the oral and written arguments, evidence presented by counsel and taking the matter under submission, rules as follows:

The MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION by defendant Hilton Hotels Corporation is DENIED.

The following objections are sustained:

Declaration of Hassankhani: Page 6 at lines 22-24;

Declaration of Cummins: Page 6 at lines 15-23; Page 8 at lines 2-28; Page 9 at lines 1-5;

Declaration of Roseman: entire declaration.

-1-    **EXHIBIT M**

1    Exs. K-U.

2    All other objections are overruled.

3    As this court previously ruled on May 4, 2004, defendant owed no duty to plaintiffs to maintain

4    an automatic external defibrillator ("AED") on its premises. However, as an innkeeper, defendant is

5    under a duty to protect guests against unreasonable risk of physical harm and to give them first aid after

6    it knows or has reason to know that they are ill or injured and to care for them until they can be cared for

7    by others. (Restatement 2d Torts § 314A)

8    While the duty has been established by the court, whether first aid includes providing AEDs is a

9    question of fact. There is evidence that doctors assisting the decedent, Mr. Cohen, asked for an AED.

10   (Depositions of Rosen, Dunn, and Wallman) It is for the jury to decide under the specific facts and

11   circumstances of this case whether Hilton's failure to provide an AED for guests at a social function

12   where Hilton had no specific knowledge that any guest had need for such a device amounted to

13   negligence that caused the decedent's death. (See, Greyhound Lines, Inc. v. Superior Court of Shasta

14   County (1970) 3 Cal.App.3d 356, 360; Campbell v. General Motors Corp. (1982) 32 Cal.3d 112, 120;

15   McNeil v. Yellow Cab Co. (1978) 85 Cal.App.3d 116, 118)

16   Further, there are triable issues of fact whether Hilton delayed the application of appropriate first

17   aid and whether such delay caused the death of Mr. Cohen. (Declarations of Marciniak, Hassankhani

18   and Cummins, Depositions of Marciniak, Bellows, Passini, Rosen, Dunn, Wallman, Egel and Gold)

19   Because there are triable issues as to Hilton's negligence, the claims for loss of consortium and

20   negligent infliction of emotional distress also cannot be summarily adjudicated.

21

22   Dated: September 30, 2005

23   JAY M. BLOOM
     Judge of the Superior
24

25

26

27

28

1  GATES, O'DOHERTY, GONTER & GUY, LLP
2  11545 West Bernardo Court, Suite 305
   San Diego, California 92127
   Telephone: (858) 676-8600
3  Facsimile: (858) 676-8601

CALENDARED
*m 1-14-05*
*0/n sition Response.to MSJ*
*12-31-04*

4  Attorney: DOUGLAS D. GUY, ESQ. (SBN 117844)

5  Attorneys for Defendant HILTON HOTELS CORPORATION

6

7

8              SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

9

10  BOBBI COHEN, an individual, and ) CASE NO. GIC 821664
    BOBBI COHEN as Successor in    )
11  Interest of the ESTATE OF      ) NOTICE OF MOTION AND MOTION FOR
    STUART A. COHEN,               ) SUMMARY JUDGMENT, OR IN THE
12                                 ) ALTERNATIVE, FOR SUMMARY
                                   ) ADJUDICATION OF ISSUES;
13             Plaintiffs,         )
                                   )
14  v.                             ) DECLARATION OF PAUL MARCINIAK;
                                   )
15  HILTON HOTELS CORPORATION, a   ) DECLARATION OF DOUGLAS D. GUY;
    Delaware corporation dba HILTON )
16  LA JOLLA TORREY PINES; CHH     ) DECLARATION OF THOMAS A. SCUTTI;
    TORREY PINES HOTEL GP, LLC, a  )
17  Delaware Limited Liability     ) MEMORANDUM OF POINTS AND
    Corporation, and DOES 1        ) AUTHORITIES;
18  through 30, inclusive,         )
                                   ) SEPARATE STATEMENT OF UNDISPUTED
19                                 ) MATERIAL FACTS, SERVED AND FILED AS A
             Defendants.          ) SEPARATE DOCUMENT;
20                                 )
                                   )
21                                 ) NOTICE OF LODGMENT OF EXHIBITS,
                                   ) SERVED AND FILED AS A SEPARATE DOCUMENT
22                                 )
                                   ) Date:   January 14, 2005
23                                 ) Time:   11:00 a.m.
                                   ) Dept:   70
24                                 ) Judge:  Jay M. Bloom
25                                 )
                                   ) Action Filed: November 26, 2003
26  _____ )

27  ///

28  ///

                               1
_____
              MOTION FOR SUMMARY JUDGMENT, OR IN THE
            ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1

TABLE OF CONTENTS

2

Page(s)

3  NOTICE OF MOTION..................................................2

4  INTRODUCTION......................................................4

5  SUMMARY OF ARGUMENT...............................................6

6  DECLARATION OF PAUL MARCINIAK.....................................7

7  DECLARATION OF DOUGLAS D. GUY...................................10

8  DECLARATION OF THOMAS A. SCUTTI.................................27

9  MEMORANDUM OF POINTS AND AUTHORITIES............................41

10 I.   THE COURT MAY GRANT A MOTION FOR SUMMARY JUDGMENT
        IF IT FINDS THAT THERE ARE NO TRIABLE ISSUES OF
11      MATERIAL FACT..............................................41

12 II.  PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT
        INTERFERED WITH OR DELAYED THE EMERGENCY RESCUE
13      EFFORTS ON THE DECEDENT....................................41

14 III. PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT FAILED
        TO PROVIDE THE DECEDENT WITH FIRST AID UNTIL HE
15      COULD BE CARED FOR BY OTHERS...............................44

16 IV.  PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT'S
        CONDUCT WAS THE PROXIMATE OR LEGAL CAUSE, THEREBY
17      ENTITLING DEFENDANT TO SUMMARY JUDGMENT....................45

18 V.   A CAUSE OF ACTION FOR LOSS OF CONSORTIUM IS
        PREDICATED ON THE DEFENDANT'S NEGLIGENCE...................46
19
   VI.  PLAINTIFF CANNOT ESTABLISH A CAUSE OF ACTION FOR
20      NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.................47

21 CONCLUSION.......................................................49

22

23

24

25

26

27

28

i

1

TABLE OF AUTHORITIES

2

Page(s)

3

Cases

4

Brantley v. Pisaro
    (1996) 42 Cal.App.4th 1591, 1597 ...........................41
5

Greeneich v. Southern Pacific Co.
    (1961) 189 Cal.App.2d 100...................................43
6

7

Merrill v. Navegar, Inc.
    (2001) 26 Cal.4th 465, 477 .................................45
8

9

Potter v. Firestone Tire & Rubber Co.
    (1993) 6 Cal.4th 965 .......................................48

10

Rodriguez v. Bethlehem Steel Corp.
    (1974) 12 Cal.3d 382.......................................47
11

Ulwelling v. Crown Coach Corp.
    (1962) 206 Cal.App.2d 96, 119..............................45
12

13

Statutes

14

Code of Civil Procedure section 437c............................44

15

Code of Civil Procedure section 437c(c) .........................41

16

Code of Civil Procedure section 437c(f) .........................41

17

Health & Safety Code section 1799.107...........................43

18

Miscellaneous

19

Restatement of Torts............................................43

20

21

22

23

24

25

26

27

28

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1  TO PLAINTIFF BOBBI COHEN AND HER ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTE that on January 14, 2005, at 11:00 a.m. or as

3  soon thereafter as the matter may be heard in Department 70 of the

4  above-entitled court, located at 330 West Broadway, San Diego,

5  California, defendant HILTON HOTELS CORPORATION will move the court

6  for summary judgment in favor of defendant HILTON HOTELS CORPORATION

7  and against plaintiff BOBBI COHEN, individually, and as Successor in

8  Interest of the ESTATE OF STUART A. COHEN.

9      In the alternative, defendant will seek an order summarily

10 adjudicating the following issues:

11     1.   Defendant Hilton Hotels Corporation did not interfere with

12          or delay the emergency rescue personnel's rescue efforts on

13          Stuart Cohen;

14     2.   Defendant did not fail to provide Mr. Cohen with first aid

15          until he could be cared for by others;

16     3.   Since defendant was not negligent, defendant cannot be

17          liable for plaintiff Bobbi Cohen's loss of consortium

18          damages;

19     4.   Since defendant was not negligent, defendant cannot be

20          liable for negligent infliction of emotional distress.

21     The motion will be made pursuant to Code of Civil Procedure

22 sections 437c(c) and (f).  The motion will be made on the grounds

23 that no triable issues of material fact exist and that defendant

24 Hilton Hotels Corporation is entitled to summary judgment as a matter

25 of law, or in the alternative, to have the issues referenced above

26 summarily adjudicated in defendant's favor.

27 ///

28 ///

2

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1    The motion will be based on this notice, the declarations of
2  Douglas D. Guy, Thomas A. Scutti, and Paul Marciniak, served and
3  filed herewith, the Separate Statement of Undisputed Material Facts,
4  served and filed as a separate document, the Notice of Lodgment of
5  Exhibits, served and filed as a separate document, and on the
6  pleadings, records, and files in this action.

7  Dated:   October 28, 2004      GATES, O'DOHERTY, GONTER & GUY, LLP

8

9                                 By: _____
                                       DOUGLAS D. GUY
10                                     Attorneys for Defendant
                                       HILTON HOTELS CORPORATION
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1

## INTRODUCTION

2      This litigation arises out of a heart attack sustained by Stuart
3  A. Cohen at the Hilton La Jolla Torrey Pines on November 23, 2002.
4  The hotel is owned and operated by defendant Hilton Hotels
5  Corporation.

6      On November 23, 2002, Stuart Cohen was at defendant's hotel in
7  order to attend his daughter's wedding and reception.  The reception
8  was held in a ballroom known as the Pavilion.  During the reception,
9  while Mr. Cohen was dancing, he suffered a heart attack.  Several
10 physicians who were attending the wedding reception immediately
11 commenced cardiopulmonary resuscitation on Mr. Cohen when he
12 collapsed on the dance floor.

13      Meanwhile, guests notified Hilton Hotel employees that emergency
14 medical assistance was needed.  A hotel employee immediately used the
15 house phone in the Pavilion and advised the hotel operator to contact
16 911.  In the meantime, someone else present at the reception used a
17 cell phone to call 911.

18      Shortly thereafter, paramedics and firemen arrived at the hotel
19 and continued the medical care rendered to Mr. Cohen by the
20 physicians who were guests at the wedding.  Mr. Cohen was then
21 transported to Scripps Memorial Hospital in La Jolla, where he
22 remained until November 26, 2002, when he passed away.

23      Plaintiff BOBBI COHEN, individually, and in her capacity as the
24 SUCCESSOR IN INTEREST OF THE ESTATE OF STUART A. COHEN, filed her
25 First Amended Complaint for damages on or about May 14, 2004.  The
26 complaint sets forth four causes of action against defendant Hilton
27 Hotels Corporation.

28 ///

4

1    The first cause of action is for "wrongful death/negligence."
2  The first amended complaint alleges that defendant Hilton had a duty
3  to assist emergency rescue personnel to aid the decedent and not to
4  interfere or delay the emergency rescue personnel's efforts to
5  provide medical attention to the decedent.  (Complaint, page 6, lines
6  9-13)  Plaintiff alleges defendant breached this duty by interfering
7  with and delaying the arrival of emergency medical assistance to Mr.
8  Cohen.  (Complaint, page 6, lines 13-20)

9    The second cause of action, also for "wrongful
10  death/negligence," alleges that defendant had a duty to provide
11  guests with first aid and to provide ill or injured guests with aid
12  until the guest could be cared for by others.  (Complaint, page 9,
13  lines 23-26)  The second count further claims that defendant had a
14  duty to take all precautions necessary to ensure the safety of guests
15  upon its premises, to take reasonable and necessary steps to
16  safeguard the health and well-being of persons upon its property from
17  foreseeable injury or harm, and to provide a safe environment,
18  including planning to administer first aid if necessary.  (Page 10,
19  lines 3-8)  The second count alleges that defendant breached these
20  duties by negligently failing to render appropriate first aid to the
21  decedent, which resulted in his death.  (Page 11, lines 16-18)

22    The third cause of action is for loss of consortium by plaintiff
23  Bobbi Cohen, and relies upon defendant's alleged negligence in the
24  first and second causes of action.  Likewise, the fourth cause of
25  action is for negligent infliction of emotional distress, and alleges
26  that as a result of defendant's alleged failure to render first aid
27  to the decedent, plaintiff Cohen sustained emotional distress.  (Page
28  15, lines 21-28)

5

1

**SUMMARY OF ARGUMENT**

2       Defendant Hilton Hotels Corporation contends that it is not
3  liable under any of the four theories alleged by plaintiff Bobbi
4  Cohen, individually, and in her capacity as the Successor in Interest
5  of the Estate of Stuart A. Cohen.  Defendant contends that it did not
6  breach any of the duties alleged in the First Amended Complaint.
7  Specifically, defendant did not interfere with or delay the emergency
8  rescue personnel's medical efforts administered to Mr. Cohen.

9       Defendant Hilton further contends it did not breach its duty to
10  provide first aid to Mr. Cohen until he could be cared for by others.
11  The evidence presented in this motion clearly establishes that
12  Mr. Cohen received immediate medical attention upon his cardiac
13  arrest by qualified physicians.  There was nothing further defendant
14  Hilton could have done in regard to the rescue efforts administered
15  to Mr. Cohen.  There has been no criticism of anything Hilton did on
16  the evening of Mr. Cohen's heart attack by the emergency medical
17  personnel or the guests who administered first aid to Mr. Cohen.

18       Accordingly, since defendant did not breach the alleged duties
19  set forth in the first amended complaint, defendant Hilton Hotels
20  Corporation is entitled to have these issues summarily adjudicated in
21  its favor.

22       As for the third and fourth causes of action, because they are
23  derivative on defendant's purported negligence, should the court
24  agree that defendant cannot be liable under the first two causes of
25  action, defendant is entitled to have the last two causes of action
26  summarily adjudicated in its favor.  If the court adjudicates all
27  issues in defendant's favor, defendant is entitled to summary
28  judgment as a matter of law.

6

1

## DECLARATION OF PAUL MARCINIAK

2      I, Paul Marciniak, declare:

3      1.    I am employed as a security officer for the Hilton La Jolla
4  Torrey Pines located in La Jolla, California.  I have been a security
5  officer with the hotel since January 11, 2002.  I was on duty on
6  November 23, 2002.  If called as a witness, I could and would
7  competently testify to the following matters which are personally
8  known to me.

9      2.    At approximately 8:30 that evening, I heard over the
10  hotel's radio system that a Code One medical emergency had been
11  reported in one of our ballrooms, known as the Pavilion.  It was my
12  responsibility to await the arrival of the fire department and
13  paramedics.

14     3.    I went outside the front doors of the hotel and waited for
15  the fire trucks and paramedics to arrive.  The first unit that
16  arrived was a fire truck that appeared to be outfitted like a
17  paramedic unit.  I went directly to the fire truck and spoke to the
18  individual I believed was the fire captain.

19     4.    The fire captain asked me where the victim was, and I
20  advised the fire captain that the victim was in the Pavilion.  At the
21  same time, I pointed in the general location of the Pavilion.  The
22  fire captain asked me for directions as to the quickest route for the
23  fire trucks and paramedics to travel to the Pavilion so that their
24  equipment would be as close to the victim as possible.

25     5.    I advised the fire captain that the quickest way to reach
26  the Pavilion would be to exit the hotel's driveway, turn right on
27  North Torrey Pines Road, go to a second driveway and turn right.
28  ///

6.   In addition to providing the fire captain with instructions, I got into the front seat of the fire truck in order to direct the driver to the location I had identified.  I estimate that the fire truck traveled approximately 200 yards to the road where the fire truck needed to make a right turn.

7.   It is my  understanding that the fire captain thought I was a bellman.  I was the only hotel employee to get into the fire engine that evening.  So, regardless of his belief as to my title, I am in fact the employee who assisted the fire department reach the victim that evening.

8.   The driveway that the fire truck needed to travel down leads to a parking structure for the Scripps Clinic.  The driveway has a sturdy concrete bridge.  During my years at the hotel, I have seen numerous large vehicles traverse this bridge, including 18 wheelers with heavy equipment.

9.   However, as the fire truck neared the bridge, I heard the fire captain instruct the driver to stop the truck short of the bridge, expressing his concern that the fire truck's weight could cause the bridge to collapse.  I then observed at least four fire personnel exit the truck, gather equipment, and begin walking at a fast pace down the driveway toward the Pavilion.  I also accompanied the fire personnel as they were walking toward the Pavilion.  As we approached the Pavilion, I observed another paramedic unit pass us, heading toward the Pavilion.  I then observed firemen and paramedics enter into the Pavilion, where they began medical treatment upon the victim.

10.   I believe that I provided the quickest route for the rescue personnel to reach the victim at the Pavilion.  There was no fire

1  lane for the fire department to travel to reach this area of the
2  hotel.

3      I declare under penalty of perjury under the laws of the State
4  of California that the foregoing is true and correct and that this
5  declaration was executed on October 22 , 2004, at La Jolla,
6  California.

PAUL MARCINIAK

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION FOR SUMMARY JUDGMENT, OR IN THE

1

## DECLARATION OF DOUGLAS D. GUY

2

I, Douglas D. Guy, declare:

3      1.    I am an attorney licensed to practice in California and am
4  a member of the firm of Gates, O'Doherty, Gonter & Guy, LLP,
5  attorneys of record for defendant Hilton Hotels Corporation.  If
6  called as a witness, I could and would competently testify to the
7  following matters which are personally known to me.

8      2.    On June 4, 2004, I served Special Interrogatories (Set Two)
9  on plaintiff Bobbi Cohen.  Plaintiff Bobbi Cohen served her responses
10 to the interrogatories on August 11, 2004.  A copy of the
11 interrogatories and plaintiff's responses are lodged herewith as
12 Exhibits A and B, respectively.

13     3.    On July 8, 2004, I issued a Deposition Subpoena for the
14 Production of Business Records by the custodian of records for
15 San Diego EMS (Emergency Medical Services), requesting this
16 facility's records pertaining to the heart attack Mr. Cohen sustained
17 on November 23, 2002.  A copy of the deposition subpoena is lodged
18 herewith as Exhibit C.

19     4.    On July 29, 2004, the San Diego EMS custodian of records
20 provided records in response to my deposition subpoena.  A copy of
21 the records produced in response to the subpoena is lodged herewith
22 as Exhibit D.

23     5.    On September 8, 2004, I took the deposition of Logan
24 Bellows, the fire captain for Station 35, who responded to the Hilton
25 La Jolla Torrey Pines on November 23, 2002 following Mr. Cohen's
26 heart attack.  Captain Bellows testified that as the fire engine
27 arrived at the hotel, they were met by a Hilton employee who gave
28 them directions to the Pavilion, where Mr. Cohen had suffered his

10

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1 | heart attack.  Captain Bellows asked the employee for the most direct

2 | route to the Pavilion from their location:

3 |         Q   And when you got to the hotel, were you
met by a Hilton employee?

4

5 |         A   No.

6 |         Q   Who were you met by?

7 |         A   We pulled into the main entrance of the
hotel.  I was not flagged down immediately by
anyone, so I jumped off the fire truck. And I

8 | grabbed one of the bellmen.  And I asked him
where their emergency was.  And he stated that it

9 | was at the pavilion. And I asked him what was the
most direct route to the pavilion from where we

10 | were.  And he said that we had to go back out
onto the main street, go south to the next

11 | driveway, and turn right, and go down that
driveway. [p. 19, lines 6-20]

12

13 |     6.   Captain Bellows testified that he asked the employee to get

14 | into the fire truck to direct them:

15 | I asked him to get into the fire truck and direct
us, since I was not familiar with that -- that

16 | entrance that he was describing. [p. 20, lines
14-16]

17

18 |     7.   Captain Bellows testified that upon his arrival at the

19 | hotel, he asked what the quickest way to the victim would be, and

20 | that he considered walking versus driving, but determined that

21 | driving would be quicker than walking to the victim's location:

22 |         Q.   Did you ever go through that thought
process, what you wanted to do?

23

24 |         A   Absolutely.  When we arrived at the
front of the hotel --

25 | That's usually how it happens.  I'll say which is
the quickest way there.  I don't know the hotel

26 | property, myself.  I ask the people that work
there which is the quickest way there.

27 | Sometimes, they will say just right down that
walkway and to your right.  And it's right there,

28 | which would be closer than driving around,
possibly.  But in this particular case, I asked

11

1         can we get there from here with our equipment,
walking.  And he said it would be better to
2         drive.

3              Q   And the route you did drive, you were
able to drive your equipment to a hundred yards,
4         or so, seventy-five yards from the pavilion?

5              A   Now that I think of it, maybe fifty
yards from the pavilion.  And, certainly, quicker
6         than we could have hauled all our equipment
there.
7

              Q   So driving was quicker than walking?
8
              A   Yes. [p. 37, lines 1-22]
9

10     8.   Captain Bellows testified that as the fire captain, he

11  makes the decision as to the best route to take to bring the firemen

12  and equipment to the site of the victim, and that the Hilton employee

13  provided the information he requested:

14              Q.   It seems like on every run you have to
go on, you, as the fire captain, have to make a
15         decision.

16              A   That's correct.

17              Q   And in this particular case, you were
confronted with a situation what's the best way
18         to get your equipment and your folks down to the
pavilion to render aid to Mr. Cohen.
19

              A   That's correct.
20

              Q   And you talked to the person at the
21         front desk.  And you made a decision that we're
going to go together.  We're going to drive the
22         truck down and do our best to save Mr. Cohen.

23             A   Correct.  You show me where it is, take
me the most direct route.
24

              Q   And the man you asked that question to
25         did exactly what you asked him.

26             A   That's correct. [p. 88, lines 9-25]

27  ///

28  ///

12

1    9.   Captain Bellows testified that the Hilton employee answered

2  every question asked of him, was helpful, did not interfere with his

3  efforts to render care to Mr. Cohen:

4            Q.   The employee you interacted with
         answered every question you asked of him.
5
         A    Yes, he did.
6
              Q    And he was as helpful as you would have
7        expected.

8            A    Absolutely.

9            Q    Did he in any way interfere with your
         efforts to provide the best and most quality care
10       you had the ability to render to Mr. Cohen?

11           A    No. [p. 89, lines 5-14]

12   10.   Captain Bellows also testified that although he assumed

13  there was a walking path to get to the Pavilion, he made the decision

14  that it would be better to take the fire engine so that the fire

15  engine equipment would be at hand and so that the firemen were not

16  worn out upon reaching the victim so that they could perform their

17  job:

18           Q    He did not tell you there was a walking
         path; correct?
19
              A    Well, I assumed there are walking paths
20       everywhere.  But he didn't lead me to believe he
         could get there faster by walking.
21
              Q    But he didn't even tell you there was a
22       walking path; right?

23           A    No, he didn't –

24           MR. GUY:  Assumes facts not in evidence,
         that he ever asked. But go ahead.
25
              THE WITNESS:  No, he didn't tell me. But I
26       assume there's walking paths throughout the
         complex.  And at the time that I have to make
27       this decision, it's how do I get my equipment and
         my   personnel to the incident as fastly and
28       efficiently as possible and not wear 'em out so
                                  13

              MOTION FOR SUMMARY JUDGMENT, OR IN THE
              ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1        by the time they get there, they can't even
perform their job correctly.  And, usually, it is
2        always better to take the fire truck to the most
-- you know, to as close you can with a fire
3        truck, and then take the equipment and take  it,
because it's heavy, a lot of stuff. [p. 92,
4        lines 1-22]

5    11.  Captain Bellows testified that the Hilton employee got into

6  the truck and provided the directions requested:

7           Q  Okay.  But, anyway, a person from Hilton
got into the truck with you?
8
          A  That's correct.
9
          Q  And did you ask that person to assist in
10        you that regard?

11          A  That's correct.

12          Q  And did he give you the directions that
you requested?
13
          A  Yes, he did.  [p. 20, line 24 - p. 21,
14        line 7]

15    12.  Captain Bellows testified that the fire engine proceeded to

16  a driveway and traveled down a road as far as he believed they could

17  drive the fire truck, approximately 100 yards from the Pavilion:

18    .       Q  And you come to a driveway where you
were told is the most direct route to the
19        pavilion?

20          A  Yes.

21          Q  And what happened at that point?

22          A  At that point, we drove down that road
to -- as far as we could drive the fire truck,
23        which was not really, really close to the
pavilion.  It was probably a hundred yards away
24        from the pavilion, at the most. [p. 22, lines 14-
21]
25

26    13.  Captain Bellows testified that they stopped the fire truck

27  from traveling to the Pavilion because it was a dirt road and he was

28  concerned about the weight of the fire truck:

14

1      Q   Okay.  And was there anything that
       prevented you from taking the truck all the way
2      down to the pavilion itself?

3      A   If I recall correctly, it was dirt.  And
       those fire engines weigh a considerable amount of
4      money -- weight.  And we don't usually take 'em
       off onto a dirt, dirt path.  And I think that's
5      the reason why we didn't go there.  It was a
       field, or something, that we couldn't drive the
6      fire truck on. [p. 23, line 22- p. 24, line 5]

7      14.   Captain Bellows testified that the Hilton employee was

8   helpful, helped him to accomplish getting the firemen to the

9   Pavilion, assisted the firemen, did not interfere with their ability

10  to respond to the situation, and had nothing critical to say about

11  the employee:

12          Q   From the point in time you picked up
        this Hilton employee up until the time you
13      stopped the truck, was the Hilton employee
        helpful to what you wanted to accomplish?
14

        A   Yes.
15
            Q   Do you have anything critical to say
16      about that employee?

17          A   No.

18          Q   Did the Hilton employee in any way
        interfere with your ability to respond to the
19      situation?

20          A   No.

21          Q   Did he actually assist you in that
        regard?
22
            A   Absolutely.  [p. 24, lines 9-21]
23

24     15.   Captain Bellows also testified that he observed the

25  paramedic unit pass behind them, make a U-turn, and eventually pass

26  the fire engine on the way to the Pavilion:

27          Q   Okay.  You see the paramedic pass from
        behind you.  Does it flip a U-turn and come back?
28

                            15

1          A     Yes.

2          Q     How much time do you think was delayed
           in making a U-turn and getting back into the
3          right driveway?

4          A     It was thirty seconds, maybe.

5          Q     And did the paramedic unit drive up to
           where you were and even pass you, up to the
6          pavilion itself?

7          A     They pulled in past us and stopped,
           where myself and the employee got out and pointed
8          that there was the pavilion. [p. 24, line 22 - p.
           25, line 9]
9

10    16.   When Captain Bellows arrived inside the Pavilion, he saw a

11    man on the floor with individuals performing CPR, who later were

12    identified as physicians:

13          Q     And what was the first thing -- What did
           you see when you got inside?
14
           A     I saw a middle-aged man on the floor,
15         with a number of bystanders around, with few of
           them performing CPR.
16
           Q     And when I think of CPR, as a layman, I
17         think of somebody administering breaths and the
           other one doing compression?
18
           A     That's correct.
19
           Q     So you saw two people working on Mr.
20         Cohen?

21         A     Yes.

22         Q     Now, did you have an understanding that
           these people were medical doctors?
23
           A     They informed me at the time that they
24         were telling me what happened.  As my paramedics
           equipment was coming in, they told me that they
25         were physicians and that they were helping.  I
           didn't ask them what type of physicians, or
26         anything.  But - [p. 27, line 11 - p. 28, line
           3]
27

28    ///

                              16

           MOTION FOR SUMMARY JUDGMENT, OR IN THE
           ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1        17.   Captain Bellows further testified that once the fire

2   personnel arrived inside the Pavilion, they took over the lifesaving

3   efforts:

4                   Q.   Now, once you got inside the pavilion,
             I assume you and your staff took over the life-
5            saving efforts?

6                   A    Well, we usually -- If there is a doctor
             and he's willing to -- to take responsibility or
7            be a part of the operation, as long as they're
             not interfering, we usually let them, you know,
8            at least be a part of it, to some degree.  But as
             soon as we got there, our crew took over with the
9            -- with the breathing.  And the paramedic put a
             breathing tube down the victim's throat.  And --
10           And we administered some shocks, or attempted to
             administer shocks, with our defibrillator and did
11           the CPR.  And, at that time, the doctors -- I
             think there was only one that stayed involved,
12           and that was maintaining the victim's airway.
             [p. 28, lines 5-21]
13

14       18.   Captain Bellows further testified that upon his arrival

15  into the Pavilion where Mr. Cohen was, the Hilton employees provided

16  carts to transport equipment, accommodating his requests, and he had

17  no criticism of anything the Hilton employees did in the Pavilion:

18                  Q    Did you interact with any Hilton
             employees once inside the pavilion?
19
                    A    Yes.
20
                    Q    Who did you interact with there?
21
                    A    Unknown names, just people that --
22           employees that worked there.  And I asked for a
             cart, something to transport our equipment, so
23           that we could get to the ambulance with all of
             our equipment quicker than hoofing it, ourselves.
24
                    Q    Okay.  And did they accommodate your
25           request?

26                  A    Yes.

27                  Q    Any criticisms concerning their
             assistance?
28

                                   17

1          A    No.   They were very helpful.  [p. 37,
      line 23 - p. 38, line 11]
2

3     19.   Captain Bellows testified that no one at the Hilton

4  interfered with the lifesaving efforts once they entered the

5  Pavilion, and that he had no criticism of any Hilton employee as to

6  the fire department's efforts that evening:

7          Q    Now, did anybody from the Hilton
      interfere with your life-saving efforts once you
8     entered the pavilion?

9          A    No.

10         Q    Do you have any criticisms of any Hilton
      employee as far as what they attempted to do in
11    assisting you that particular evening?

12         A    No.   Once -- Once this started to evolve
      and everyone knew the severity of everything, the
13    Hilton employees were bringing carts -- They
      brought us carts to carry all of our equipments,
14    which normally we have to carry by hand, and
      assisted us getting all of our equipment to the
15    ambulance, and to the rig, and to the fire truck.
      So once we arrived there at the pavilion,
16    everything worked pretty smoothly.  [p. 29, lines
      7-22]
17

18    20.   Captain Bellows testified that no one at Hilton interfered

19  with the lifesaving efforts to Mr. Cohen.  Everyone at Hilton was as

20  cooperative and as helpful as expected, and he expected nothing more

21  from the Hilton employees:

22         Q    Okay.  And once you were providing life-
      saving efforts to Mr. Cohen, nobody at the Hilton
23    in any way interfered with your operation.

24         A    No.

25         Q    In fact, everybody from Hilton was as
      cooperative and as helpful as you would have
26    expected?

27         A    That's correct.

28

                              18

1

        Q    You would have expected nothing more
    from the Hilton folks?

2

        A    No.  [p. 90, lines 7-16]

3

4       21.  Copies of the deposition excerpts referenced above are

5   lodged herewith as Exhibit E.

6       22.  On September 9, 2004, I took the deposition of Dr. Brian

7   Dunn, one of the physicians who was a guest at the wedding reception

8   and who rendered medical care to Mr. Cohen following his heart

9   attack.  Dr. Dunn testified that he did not witness any Hilton

10  employee delay any life-saving effort or first aid to Mr. Cohen or

11  interfere with the aid or care rendered to Mr. Cohen:

12          Q.   Now while you were present, did you
         observe any Hilton employee delay the first aid
13          that was being initiated to Stuart Cohen.

14          A.   No.

15          Q.   While you were present did any Hilton
         employee delay any lifesaving efforts to Stuart
16       Cohen.

17          A.   No.

18          Q.   Did -- while you were present did any
         Hilton employee interfere at all with first aid
19       or CPR being administered to Stuart Cohen.

20          A.   No. [p. 27, line 5-18]

21      23.  Dr. Dunn testified that he expected the Hilton staff would

22  allow the physicians to continue life-saving efforts without

23  interruption, which is what occurred:

24          Q.   Since you and other medical doctors
         were attending to Stuart Cohen, did you expect
25       that the Hilton staff would allow you to continue
         your lifesaving efforts without interruption?
26
            A.   Um-hum.  Yes.
27
            Q.   And did -- Hilton did exactly what you
28       expected in that regard?
                              19

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1              A.    Yes.  [p. 27, line 19 - p. 28, line 2]

2        24.  Copies of the deposition excerpts referenced above are

3    lodged herewith as Exhibit F.

4        25.  On September 9, 2004, I took the deposition of Gregory

5    Wallman, D.O., who was also a guest and rendered medical care to

6    Mr. Cohen on the night in question.  Dr. Wallman testified that no

7    Hilton employee delayed the initiation of care to Mr. Cohen:

8              Q.    Now, as far as you know, from your
             personal knowledge, did any Hilton employee delay
9             the first-aid being initiated to Mr. Cohen?

10             MR. PRAGER:  Lacks foundation.  Calls for
             speculation.  You can answer the question.
11
             BY THE WITNESS:
12
             A.    Not that I know of.
13
             BY MR. GUY:
14
             Q.    As far as you know of from your own
15             personal knowledge, did any Hilton employee delay
             the initiation of the life savings efforts to Mr.
16             Cohen?

17             MR. PRAGER:  Same objections.

18             BY THE WITNESS:

19             A.    Not that I know of.

20             BY MR. GUY:

21             Q.    Okay.  Did any Hilton employee
             interfere with first-aid being administered to
22             Mr. Cohen?

23             MR. PRAGER:  Same objections.

24             BY THE WITNESS:

25             A.    Not that I know of.  [p. 29, line 14 -
             p. 30, line 13]
26

27    ///

28    ///

                                20

─────────────────────────────────────────

                MOTION FOR SUMMARY JUDGMENT, OR IN THE
                ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1      26.   Dr. Wallman testified no one from Hilton interfered with

2   the efforts that were being put forth by the physicians to save

3   Mr. Cohen:

4             Q.   Did anybody from Hilton interfere with
          the efforts that you were putting forth to save
5         Mr. Cohen?

6             A.   No. [p. 30, line 18-21]

7      27.   Dr. Wallman testified that he expected Hilton no to

8   interrupt with the life-saving efforts, with which the Hilton

9   employees complied:

10            . . . expect that the Hilton staff would
          allow you to continue trying to save Mr. Cohen
11        without interruption?

12            A.   Yes.

13            Q.   And did the Hilton employees live up
          to that expectation?
14
              A.   Yes.   [p. 31, line 2-8]
15

16     28.   Dr. Wallman testified that no Hilton employee interfered

17  with the life-saving efforts administered to Mr. Cohen:

18            If I understand you correctly, no Hilton
          employee interfered with the CPR or lifesaving
19        efforts being administered to Stuart Cohen; is
          that accurate?
20
              MR. PRAGER:   Lacks foundation, assumes
21        facts, beyond the scope of the witness'
          knowledge.
22

23            BY MR. GUY:

24            Q.   Can you answer the question?

25            A.   Yes.

26            Q.   As far as while you're present and
          while CPR lifesaving efforts are ongoing by not
27        only you and the other docs but when the
          paramedics arrived, nobody from the Hilton
28
                              21

          MOTION FOR SUMMARY JUDGMENT, OR IN THE
          ALTERNATIVE   SUMMARY ADJUDICATION OF ISSUES

1    interrupted or interfered with the CPR or life
     savings efforts; is that correct?

2
             MR. PRAGER:  Same objections.
3
             BY THE WITNESS:
4
             A.    Correct.  [p. 45, line 10 - p. 46,
5    line 5]

6    29.  Dr. Wallman testified that the Hilton employees also did

7    not interfere with any of the other physicians performing services

8    upon Mr. Cohen before the paramedics arrived and that the Hilton

9    employees met every expectation up to the time the paramedics walked

10   through the door:

11           Q.    As far as the interference or
     obstruction by Hilton employees not occurring
12   while you're performing your services, the same
     is true for the services being performed by the
13   other doctors who were attending to Mr. Cohen
     before the paramedics arrived?
14
             A.    Correct.
15
             Q.    The Hilton employees met every
16   expectation you would have of them up until the
     paramedics walked through the door?
17
             A.    Correct.  [p. 51, line 10-20]
18

19   30.  Copies of the deposition excerpts referenced above are

20   lodged herewith as Exhibit G.

21   31.  On September 9, 2004, I took the deposition of David Rosen,

22   M.D., who was also a guest and rendered medical care to Mr. Cohen on

23   the night in question.  Dr. Rosen testified that he commenced CPR on

24   Mr. Cohen, which he performed until the paramedics arrived:

25           Q.    At some point did you begin performing
     CPR?
26
             A.    Correct.
27
             Q.    Were you doing the compressions or the
28   breathing?

                          22

1           A.    I was the breathing.

2           Q.    Did anybody else provide the breathing
     function on the CPR?
3
            A.    Not that I recall.
4
            Q.    So you were doing it until the
5    paramedics arrived?

6           A.    As far as I can recall, yes.  [p. 20,
     line 19 - p. 21, line 5]
7

8     32.   Dr. Rosen testified that no one from Hilton interfered with

9    his efforts to perform CPR on Mr. Cohen:

10          Q.    Did any person from the Hilton
     interfere with your specific efforts in trying to
11   perform the CPR that you were doing?

12          A.    No. [p. 28, line 3-7]

13    33.   Dr. Rosen testified that he did not believe any Hilton

14   employee did anything he felt was inappropriate before the paramedics

15   arrived:

16          Did something that you were unhappy with as
     far as what they were doing in responding to the
17   emergency, hearing that, did anybody in the
     pavilion in your presence that you believed to be
18   a Hilton employee do anything that you felt was
     inappropriate?
19
            A.    During which time?
20
            Q.    During the time you were working on
21   Mr. Cohen.

22          A.    Before the paramedics got there?

23          Q.    Yes.

24          A.    No. [p. 28, line 25 - p. 29, line 11]

25    34.   Dr. Rosen had no criticism of any Hilton employee before

26   the paramedics arrived, and no employee interfered with his care to

27   Mr. Cohen:

28   ///

23

1        Let's go into detail.  You're in the
         pavilion with Mr. Cohen before the paramedics
2    come?

3        A.    Yes.

4        Q.    And for that period of time you have
         no criticisms concerning any employee of Hilton;
5    am I correct so far?

6        A.    Correct.

7        Q.    The paramedics respond –

8        A.    They were not interfering with what
         I'm doing at the time.  No, sir, I had no issue.
9    [p. 30, lines 4-15]

10       35.  Copies of the deposition excerpts referenced above are

11   lodged herewith as Exhibit H.

12       36.  On September 9, 2004, I took the deposition of Robert Egel,

13   M.D., who was also a guest and rendered medical care to Mr. Cohen on

14   the night in question, and who, with another young doctor, performed

15   CPR on Mr. Cohen seconds after he fell:

16       Q.    This young doctor though, by the time
         you got over to Mr. Cohen in this five or ten
17   second time span that elapsed, was already
         administering CPR to Mr. Cohen?
18

19       A.    As I said, I didn't see the initial
         fall to the floor.  When I got there Mr. Cohen
20   was lying supine, s-u-p-i-n-e, on his back.  The
         doctor was at his head feeling his neck and then
21   began to breathe a couple of breaths.  I got down
         on my knees. I said, "I'm a doctor.  Can I help."
22   He said, "I'm a doctor.  Start pumping," and we
         did a tandem resuscitation.  [p. 19, lines 8-20]

23       37.  Dr. Egel testified that he had no knowledge that Hilton

24   employees delayed the first aid administered to Mr. Cohen, delayed

25   the initiation of life-saving efforts, or interfered with the first

26   aid administered to Mr. Cohen:

27       Q.    Did any Hilton employee delay the
         first aid that was being initiated to Stuart
28   Cohen.

                                24

1      MR. PRAGER:  Calls for speculation, lacks
       foundation, exceeds the scope of this lay
2      witness' knowledge.

3           THE WITNESS:  I have no knowledge about it.

4           BY MR. GUY:

5           Q.    That's a perfectly appropriate answer.
       Did any Hilton employee delay the initiation of
6      the lifesaving efforts that were performed to
       Stuart Cohen.
7
            MR. PRAGER:  Same objection.
8
            THE WITNESS:  No knowledge.
9
            BY MR. GUY:
10
            Q.    Did any Hilton employee interfere with
11     the first aid that was being administered to
       Stuart Cohen.
12
            MR. PRAGER:  Same objection, and also it's
13     vague and ambiguous.

14          THE WITNESS:  No knowledge.  [p. 30, line 14
       - p. 31, line 11]
15

16     38.  During the time Dr. Egel worked on Mr. Cohen, no Hilton

17  employee interfered with his efforts.  He did not expect the hotel

18  staff to interfere with his efforts:

19          Q.    During the time that you are working
       on Mr. Cohen did any Hilton employee interfere
20     with your efforts in the lifesaving efforts being
       given to Mr. Cohen.
21
            A.    No.
22
            Q.    Since you and this other medical
23     doctor were attending to Stuart Cohen, did you
       expect that the Hilton staff would allow you to
24     continue the lifesaving efforts without
       interruption?
25
            MR. PRAGER:  Assumes facts.
26
            THE WITNESS:  Yes.
27
            BY MR. GUY:
28

                          25
       ─────────────────────────────────
       MOTION FOR SUMMARY JUDGMENT, OR IN THE
       ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1              Q.    And did they perform as you would have
     expected?

2

3              A.    Yes. [p. 31, line 18 - p. 32, line 8]

4        39.    Dr. Egel testified that no Hilton employee delayed the

5    commencement of life-saving efforts or interfered with the life-

6    saving efforts once the paramedics took over:

7              Q.    Did any Hilton Hotel employee delay
     the commencement of the lifesaving efforts on
     Stuart Cohen.

8

9         MR. PRAGER:    Same objection.

10        THE WITNESS:    No.

11        BY MR. GUY:

12             Q.    Did any Hilton Hotel employee
     interfere with the lifesaving efforts of Mr.
     Cohen once the paramedics took over the

13        situation.

14        MR. PRAGER:    Same objection. Also lacks
     foundation.

15

16        THE WITNESS:    No.    [p. 31, lines 9-21]

17       40.    Copies of the deposition excerpts referenced above are

18   lodged herewith as Exhibit I.

19       I declare under penalty of perjury under the laws of the State

20   of California that the foregoing is true and correct and that this

21   declaration was executed on October 28, 2004, at San Diego,

22   California.

23   _____
     DOUGLAS D. GUY

24

25

26

27

28

                        26

1

**DECLARATION OF THOMAS A. SCUTTI**

2    I, Thomas A. Scutti, declare:

3    1.    I am an attorney licensed to practice in California and am

4  a member of the firm of Gates, O'Doherty, Gonter & Guy, LLP,

5  attorneys of record for defendant Hilton Hotels Corporation.  If

6  called as a witness, I could and would competently testify to the

7  following matters which are personally known to me.

8    2.    On September 14, 2004, I took the deposition of Captain

9  Kyle Passini, one of the San Diego Fire Department paramedics who

10 responded to the defendant's property on November 23, 2002.  He was

11 the driver of the paramedic unit that responded to the scene:

12            Q.    And do you recall if you were the
             driver of the unit that evening?
13
             A.    To the best of my recollection, I was
14           the driver.   [p. 16, line 23 through p. 17, line
             1]
15

16   3.    Captain Passini testified that upon his arrival at the

17 hotel, he saw fire engine 35, which was near the lobby, which was the

18 department's protocol in responding to a hotel:

19            Q.    All right.  So your testimony is, then,
             as you arrived in the vicinity of the hotel, you
20           saw Engine 35 already in the vicinity?

21            A.    To the best of my recollection, they
             had done just what I had said:  They had
22           responded to the lobby.

23            Q.    Okay.  And you're saying -- Is it your
             testimony, then, that that's typical protocol
24           when you're responding to a hotel, is to arrive
             at the lobby?
25
             A.    Yes.   [p. 20, lines 14-22]
26 ///

27 ///

28 ///

27

1     4.     Captain Passini testified that engine 35 had been rerouted

2   to the correct location of the victim by the time his unit reached

3   the fire engine:

4              Q.   And so is it your understanding, then,
           that Engine 35 had already been given the
5          rerouting directions by the time you arrived?

6              A.   To the best of my recollection, it was
           very shortly after we had pulled up with Engine
7          35 that we then were rerouted to the correct
           location.  [p. 20, line 23 through p. 21, line 3]
8

9     5.     Captain Passini testified that he observed engine 35 in

10  front of his unit when they pulled over and their personnel got into

11  his unit because the road was narrow and winding.

12             Q.   Okay.  But at some point you remember
           that you made a U-turn and were actually heading
13         south on Torrey Pines Road?

14             A.   South on Torrey Pines Road.  And to the
           best of my recollection, I believe Engine 35 was
15         ahead of us.  So they had already gotten the
           rerouting instructions, and we followed them
16         back.  And then at a point they pulled over and
           we put their personnel on Medic Rescue 9 and
17         proceeded to the incident because the road, seems
           to me, got a little narrow and windy.
18
               Q.   The road -- You mean for Engine 35?
19

20             A.   Yeah.  A little narrow.  The ambulance
           is smaller, has a little easier time getting back
21         to hard-to-reach places.  [p. 23, line 16 through
           p. 24, line 4]
22
                              ***
23

24             Q.   Okay.  When you say it's a narrow road,
           is it a one-lane
25         road?

26             A.   It's more of a driveway.  And we would
           - we wouldn't -- Engine 35 wouldn't have pulled
27         to the side if it had been a nice, wide two-lane
           -- It was easier for us to take their personnel
28         back there.

28

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1

                   Q.   Okay.  And how many personnel got onto
your unit from Engine 35?

2

                   A.   I know of two -- Two personnel, I know

3

for sure, got into the back of Medic Rescue 9.
[p. 24, line 19 through p. 25, line 3]

4

5

    6.   Captain Passini estimated that the transition for the two

6

crew members to get into his unit took 10 to 15 seconds:

7

                   Q.   Okay.  How long would you estimate this
transition took for them to get into your unit?

8

                   A.   10, 15 seconds.  [p. 26, line 25

9

through p. 27, line 2]

10

    7.   Captain Passini parked the Medical Rescue Unit

11

approximately 50 to 100 feet from the entrance to the Pavilion:

12

                   Q.   How close to the pavilion did you park?

13

                   A.   Probably parked -- I'm going to guess -
a hundred feet?

14

15

                   Q.   That's your best estimate?

16

             MR. PRAGER:  You can estimate.

17

             THE WITNESS:  Best estimate.

18

              BY MR. SCUTTI:

19

                   Q.   A hundred feet?

20

                   A.   Fifty to a hundred feet.  [p. 30, lines
7-15]

21

    8.   Captain Passini believed that his unit had all the

22

equipment necessary to respond to the emergency:

23

                   Q.   Was it your belief that the MR-9 had
all the equipment you would need to respond to

24

this emergency?

25

                   A.   Yes.  [p. 27, lines 5-7]

26

    9.   Captain Passini testified that with a cardiac arrest, a

27

Level I event, the department strives to arrive in less than 10

28

minutes:

1     Q.   Do you have a recollection as to how
      long it took you from the moment you got the call
2     to your arrival at the premises?

3         A.   No.   The only thing that I believe
      would have stuck in my mind is because we're
4     under strict guidelines on a Level-I call as to
      how much time we have to get there.   The only
5     time a call would really stick in my head I
      believe is if there were something that had
6     delayed us.

7         Q.   Okay.

8         A.   Especially if we're responding to
      something that is reported, you know, as a
9     cardiac arrest or a cardiac event.

10        Q.   So a cardiac arrest is a Level I event?

11        A.   It's a Level I response.

12        Q.   And what is the expected time for you
      to respond to a Level I event?
13
          A.   Less than 10 minutes.   [p. 19, lines 8-
14    25]

15
      10.   It was Captain Passini's belief that their arrival to
16
   Mr. Cohen was within the department's acceptable parameters:
17
          Q.   What is your recollection as to how
18    long it took you to get to Mr. Cohen's location
      that evening?
19
          A.   It didn't stand out as being outside
20    what are acceptable parameters to me.   [p. 50,
      lines 10-13]
21

22    11.   Captain Passini testified that he did not remember thinking

23 anyone at the hotel had impeded his efforts that evening and he never

24 complained to Hilton that his ability to do his job that evening had

25 been impeded:

26        Q.   Do you remember thinking that the hotel
      had impeded your efforts that evening?
27
          MR. PRAGER:   Same objections.
28
                                    30

1       THE WITNESS:  I didn't -- No, I didn't have
        that thought.
2
                BY MR. SCUTTI:
3
                Q.   In other words, did you ever complain
4       to the Hilton or to any organization that you
        felt they had impeded your ability to do your job
5       that evening?

6               A.   No, I did not.  [p. 33, lines 2-11]

7       12.   Captain Passini had no criticism of anything the hotel or

8    its employees did that evening:

9               Q.   Do you have any criticism of anything
        the hotel did that evening?
10
                A.   No.
11
                Q.   Or its employees.  Any criticism of
12      their employees?

13              A.   No.  [p. 49, lines 16-21]

14      13.   Captain Passini did not see any employee interfere with the

15   first aid administered to Mr. Cohen and was never advised by anyone

16   at the fire department that their efforts had been impeded or

17   interfered with:

18              Q.   Did you see any employee interfering
        with the first-aid being administered to Mr.
19      Cohen?

20              A.   I have no recollection of that
        happening.
21
                Q.   Did anyone from the Fire Department
22      afterwards tell you that they thought that their
        efforts were impeded or interfered with?
23
                A.   No.  [p. 49, line 24 through p. 50,
24      line 5]

25      14.   Captain Passini testified that he did not believe the hotel

26   inhibited the fire department's access:

27              Q.   In your opinion, is there anything that
        the hotel or its employees did to interfere with
28      your arrival that evening?
                                    31

                    MOTION FOR SUMMARY JUDGMENT, OR IN THE
                    ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1              MR. PRAGER:  Same objections.

2              THE WITNESS:  I don't have any recollection
of feeling that the hotel was in any way

3  inhibiting our access on the scene.  [p. 52,
lines 16-22]

4

5     15.  Captain Passini did not have a criticism that Hilton

6  delayed him in getting to the patient:

7              Q.  Do you have a criticism that the Hilton
delayed you in getting to the patient?

8

              A.  I do not.  [p. 78, lines 9-11]

9

10    16.  Captain Passini testified that upon reaching Mr. Cohen, he

11  had a shockable rhythm at the time paramedic Tosca commenced his

12  procedures, due to the CPR which was performed on Mr. Cohen before

13  the paramedics' arrival:

14             Q.  You mentioned that Mr. Cohen had a
shockable rhythm?

15

             A.  Yes.

16

             Q.  Is there a certain amount of time that

17  that rhythm is shockable?

18            A.  Well, as long as they're in that
rhythm, they're shockable.  How long that rhythm

19  will last is anyone's guess.

20            Q.  Was he in that rhythm when Officer
Tosca commenced his procedures?

21

22           A.  Yes.  It's something that is also --
CPR buys time; in other words, will keep somebody
in that rhythm longer than if nothing is being

23  done.

24            Q.  You kind of anticipated my next
question.  I mean short of having a defibrillator

25  in your pocket, having two physicians performing
CPR on you until the paramedics arrive is pretty

26  good treatment?

27           MR. PRAGER:  Objection, calls for
speculation, lacks foundation, and may exceed the

28  scope of this witness's knowledge.

                               32

1     THE WITNESS:  I'll tell you it buys time.
      It buys time until you get the defibrillator in
2     place.  [p. 83, line 21 through p. 84, line 17]

3     17.  Captain Passini testified that according to the medical

4  equipment, an airway adjunct procedure was performed on Mr. Cohen at

5  20:44:

6          Q.  And, in fact, if you go two entries
       down, it says, at 20:44, the airway adjunct SO
7      was performed; correct?

8          A.  Correct.

9     18.  Captain Passini testified that the clock in the medical

10 equipment utilized by the paramedics is calibrated daily in

11 accordance with the department's custom and practice:

12         Q.  Could you explain to us how the clock
       in the device is calibrated?
13
           A.  We check the clock in the defibrillator
14     every morning.  We do have the capability to
       adjust the time on it.  And we change the times
15     twice a year to account for Daylight Savings
       Time.
16
           Q.  Do you know if the defibrillator was
17     checked on the day of the incident?

18         A.  Yes, it would have been.

19         Q.  Do you know that for a fact?

20         A.  I do not know that for a fact.  It's
       our standard operating procedure.
21
           Q.  It's just your custom and practice,
22     you're saying?

23         A.  Yes.

24         Q.  Is there a notation made somewhere on
       the device that denotes that the device was
25     checked that day?

26         A.  There's nothing on the device itself.
       However, we do have paperwork that states that
27     that along with other essential equipment is
       checked, and that paperwork is filled out every
28     morning.

                              33

1          Q.    What is that paperwork called?

2          A.    That's called a Quick Check form.  I
        don't remember the number, but the form is called
3       a Quick Check form.  [p. 87, line 18 through p.
        88, line 18]
4

5    19.    Captain Passini testified that Mr. Cohen was transported

6   from the hotel to Scripps Memorial Hospital:

7          Q.    And you transported him to Scripps
        Memorial?
8
           A.    Yes.  [p. 43, lines 14-15]
9

10   20.    Portions of the deposition testimony referenced above are

11  lodged herewith as Exhibit J.

12   21.    On September 14, 2004, I also took the deposition of

13  paramedic Anthony Tosca.  Mr. Tosca was part of the paramedic unit

14  that responded to the hotel on the night in question.  Mr. Tosca

15  testified that when entered the ballroom, he saw two people he

16  learned were medical physicians performing CPR on a male patient:

17         Q.    Okay.  Now, once you went inside the
        ballroom, can you describe for me what you saw?
18
           A.    I saw a room full of people and two
19      people doing two-person CPR on a male patient.
        [p. 30, lines 9-12]
20
                          * * *
21
           Q.    And you say that you determined that
22      the CPR was being done right.  You're referring
        to the two individuals who were doing the CPR
23      upon your arrival?

24         A.    Yes.

25         Q.    At some point did any of the Fire
        Department personnel take over the CPR?
26
           A.    Yes.  I believe it was myself and
27      Firefighter Klitzing.

28

                          34

1      Q.   Okay.  Before you took it over, did
       anyone advise you that Mr. Cohen was being tended
2      to by physicians?

3      A.   I do remember that there were
       physicians on scene.  Whether they identified
4      themselves or someone told us, I don't remember.

5      Q.   In other words, did you learn that the
       physicians had actually been guests at the
6      wedding?

7      A.   Yes.

8      MR. PRAGER:  Vague as to time.

9      BY MR. SCUTTI:

10     Q.   When did you learn that?

11     A.   Almost immediately.

12     Q.   Okay.  So could it have been, as you
       were walking toward Mr. Cohen, that someone
13     advised you that there were doctors that were
       tending to Mr. Cohen?
14
15     A.   I would say almost immediately, as soon
       as getting to the patient, yes.  [p. 32, line 25
16     through p. 33, line 25]

17     22.  Mr. Tosca testified that upon his arrival at the Pavilion,

18  he and Ms. Klitzing took over the CPR being performed on Mr. Cohen:

19     Q.   At some point did any of the Fire
       Department personnel take over the CPR?
20
21     A.   Yes.  I believe it was myself and
       Firefighter Klitzing.  [p. 33, lines 4-7]

22     23.  Mr. Tosca testified that he defibrillated Mr. Cohen at

23  20:45:

24     Q.   So if the system is working correctly,
       then, this would say that at 2045 is when Mr.
25     Cohen was defibrillated?

26     A.   Yes.  [p.37, lines 10-13]

27     24.  Mr. Tosca testified that no Hilton employee delayed the

28  first aid rendered to Mr. Cohen:

35

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1
               Q.   Okay.  Did any Hilton employee delay
the first-aid you were rendering to Mr. Cohen?
2

3
            MR. PRAGER:  Calls for speculation and lacks
foundation and calls for information outside the
scope of this witness's knowledge; hence, vague.

4
You can answer the question.

5
            THE WITNESS:  Not to my knowledge. [p. 55,
lines 19-25]

6

7     25.  Mr. Tosca testified that no Hilton employee delayed the

8  initiation of the resuscitation efforts or the services performed to

9  Mr. Cohen:

10
               Q.   Okay.  Did any Hilton employee delay
the initiation of the efforts you made to
11
resuscitate Mr. Cohen?

12
            MR. PRAGER:  Same objections.

13
            THE WITNESS:  Again, not to my knowledge.

14
            BY MR. SCUTTI:

15
               Q.   Did any Hilton employee interfere with
the services you were performing to Mr. Cohen?
16

            MR. PRAGER:  Same objections.
17

            THE WITNESS:  No.  [p. 56, lines 2-11]
18

19     26.  Mr. Tosca did not believe anyone at the hotel deliberately

20  delayed or interfered with their arrival:

21
               Q.   But do you remember thinking, as you
were trying to get to where the patient was, that
22
someone at the hotel had delayed your arrival?

23
            MR. PRAGER:  Same objections.

24
            THE WITNESS:  Nobody deliberately delayed us
in any way.
25

            BY MR. SCUTTI:
26

               Q.   Okay.  Did they interfere with your
27
arrival at all?

28

36

1             MR. PRAGER:  Vague and ambiguous.
    Otherwise, same objections as previous.

2

3             THE WITNESS:  No.  [p. 57, lines 3-14]

4      27.  Mr. Tosca did not believe any hotel employee prevented him

5   from getting to Mr. Cohen nor did anyone in his crew ever comment

6   that the employees inhibited them from reaching Mr. Cohen:

7             Q.  Did any hotel employee prevent you from
    getting to Mr. Cohen?

8

9             MR. PRAGER:  Same objections -- Well, lacks
    foundation, assumes facts, calls for speculation.
    Exceeds the scope of this lay witness's

10      knowledge.

11            MR. SCUTTI:  You have to come up with your
    own objections.  You can't use mine.

12

13            THE WITNESS:  No.

14            BY MR. SCUTTI:

15            Q.  Were any of them standing in the
    roadway, preventing your unit from getting down
    to the pavilion?

16

17            A.  Not that I recall.

18            Q.  I mean do you have a recollection of
    thinking that night, geez, these hotel people are
    preventing me from getting to the patient?

19

20            A.  No.

21            Q.  Did any of your crew ever make that
    comment to you, that the hotel inhibited you from
    getting to the patient?

22

23            MR. PRAGER:  Same objections on there.

24            THE WITNESS:  No.  [p. 96, line 6 through p.
    97, line 1]

25     28.  Mr. Tosca could not think of anything the hotel could have

26  done to get the fire department personnel to the patient that evening

27  any quicker:

28  ///

                       37

1
2

        Q.   I mean can you think of anything the
hotel could have done to get you to the patient
quicker that evening?

3
4

        MR. PRAGER:   Exceeds the scope of this
witness's knowledge.   Lacks foundation.   Calls
for speculation.

5
6

        THE WITNESS:   I don't think so. [p. 97,
lines 3-9]

7
8

    29.   Portions of the deposition testimony referenced above are
lodged herewith as Exhibit K.

9
10
11
12
13

    30.   On September 14, 2004, I also took the deposition of
paramedic Ann Klitzing, who also responded to the hotel on the night
in question.   Ms. Klitzing was unaware of anything any Hilton
employee did to delay the department's arrival at Mr. Cohen's
location that evening:

14
15

        Q.   Are you aware of anything that a Hilton
employee did to delay your arrival at Mr. Cohen's
location?

16

        A.   No.

17
18
19

        MR. PRAGER:   Lacks foundation, calls for
speculation, assumes facts, and exceeds the scope
of this lay witness's knowledge.   You can answer
the question.

20

        BY MR. SCUTTI:

21

        Q.   You may answer.

22

        A.   No.   [p. 30, lines 5-15]

23
24

    31.   She likewise was unaware of anything any hotel employee did
to delay initiation of first aid to Mr. Cohen:

25
26

        Q.   Are you aware of anything a Hilton
employee did to delay your initiation of first-
aid to Mr. Cohen?

27

        A.   No.   [p. 30, lines 21-23]

28

///

38

1      32.   Ms. Klitzing also was unaware of anything any Hilton

2   employee did to delay initiation of any life-saving efforts toward

3   Mr. Cohen:

4                   Q.   Anything that any Hilton employee did
                    to delay your initiation of any life-saving
5                   efforts towards Mr. Cohen?

6                   MR. PRAGER:   Same objections.

7                   THE WITNESS:   No. [p. 31, lines 5-9]
        33.   Ms. Klitzing was not aware of anything any Hilton employee
8
    did to interfere with the paramedics once they arrived at Mr. Cohen's
9
    side or anything done to interfere with or impede their efforts until
10
    Mr. Cohen was taken out of the Pavilion:
11
                    Q.   Anything that any Hilton employee did
12                  to interfere with what you were doing once you
                    were at Mr. Cohen's side?
13
                    A.   No.
14
                    Q.   Anything that any Hilton employee did
15                  to interfere or impede what you were doing until
                    the time you took him out of the pavilion?
16
                    A.   No.   [p. 31, lines 11-18]
17

18      34.   She likewise was not aware of anything any Hilton employee

19   did to interrupt the life-saving efforts of Mr. Cohen:

20                  Q.   Again, I'm not sure I asked this
                    question, but did any employee of the Hilton
21                  Hotel interrupt the life-saving efforts that were
                    being administered to Mr. Cohen?
22
                    MR. PRAGER:   Same objections.
23
                    THE WITNESS:   No.   [p. 31, line 23 through
24               .   p. 32, line 3]

25      35.   Ms. Klitzing testified that no Hilton employee did anything

26   to inhibit her ability to care for and treat Mr. Cohen, and she had

27   no criticism of anything the hotel, its employees, or the property

28   did that evening:

                                     39

1            They didn't inhibit your ability to care and
    treat Mr. Cohen; correct?

2

3         A.   Correct.

     Q.   Aside from that, do you have one single
4    criticism of anything the hotel, its employees,
    or the property did that evening?

5

6         A.   No. [p. 69, lines 1-7]

7       36.  Copies of the deposition excerpts referenced above are

8    lodged herewith as Exhibit L.

9       I declare under penalty of perjury under the laws of the State

10   of California that the foregoing is true and correct and that this

11   declaration was executed on October 20, 2004, at San Diego,

12   California.

13

14   _____

15           THOMAS A. SCUTTI

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1             **MEMORANDUM OF POINTS AND AUTHORITIES**

2                       I.

3      THE COURT MAY GRANT A MOTION FOR SUMMARY JUDGMENT IF IT

4      FINDS THAT THERE ARE NO TRIABLE ISSUES OF MATERIAL FACT

5     Code of Civil Procedure section 437c(c) states:

6          (c) The motion for summary judgment shall be
           granted if all the papers submitted show that
7          there is no triable issue as to any material fact
           and that the moving party is entitled to a
8          judgment as a matter of law.

9     Alternatively, the court may grant summary adjudication as to

10  one or more causes of action.  (Code of Civil Procedure § 437c(f))

11     Based upon the evidence presented in this motion, the Court

12  should grant summary judgment in favor of defendant Hilton Hotels

13  Corporation and against plaintiff Bobbi Cohen, in her individual

14  capacity and as Successor-in-Interest of the Estate of Stuart A.

15  Cohen.  In the alternative, the Court should grant defendant's motion

16  for summary adjudication of the issues set forth in the notice.

17                     II.

18     PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT INTERFERED WITH

19     OR DELAYED THE EMERGENCY RESCUE EFFORTS ON THE DECEDENT

20     Plaintiff's first theory against defendant Hilton Hotels

21  Corporation alleges that defendant interfered with or delayed the

22  rescue efforts on Stuart Cohen performed by emergency rescue

23  personnel.  The plaintiff, however, cannot establish this purported

24  breach of duty as a matter of law.  The Court can therefore

25  adjudicate this issue in favor of defendant. (*Brantley v. Pisaro*

26  (1996) 42 Cal.App.4th 1591, 1597 – "A cause of action 'cannot be

27  established' if the undisputed facts presented by the defendant prove

28  the contrary of the plaintiff's allegations as a matter of law.")

                     41

1       The undisputed evidence presented in this motion establishes
2   that the San Diego Fire Department arrived at defendant's premises
3   and was directed to Mr. Cohen's location.  The Fire Department
4   Captain specifically asked for the "quickest way" to reach Mr. Cohen
5   and was provided with directions by the Hilton employee.  In fact,
6   the employee got into the fire truck and drove with the Fire
7   Department personnel to direct them to Mr. Cohen's location.

8       The evidence also establishes that the fire truck drove to a
9   location where the driver did not believe the truck could be driven
10  any further.  The Fire Department personnel made this decision to
11  stop the fire truck, not the Hilton Hotel employee.  Thereafter,
12  individuals in the fire truck got into the paramedic unit and
13  continued down to Mr. Cohen's location in the Pavilion.

14      None of the paramedics or fire department personnel had any
15  criticism of Hilton or its employees on the night in question.
16  Hilton completed every act and task it was called upon to perform
17  that evening.  All emergency personnel agree that no Hilton employee
18  interfered, delayed, or impeded their efforts on November 23, 2002.

19      Furthermore, Captain Passini believed that the fire department
20  reached Mr. Cohen within the department's acceptable time parameters.
21  Even if there were momentary delay, the fire department's rescue
22  efforts were unaffected.

23      The plaintiff may contend that there was a faster or better
24  route to Mr. Cohen that evening.  However, they can present no
25  evidence in this motion to substantiate this argument.  Contrary to
26  possible arguments, there was no fire lane available for the fire
27  truck to take to reach the Pavilion.  The Captain chose the best way
28  to reach Mr. Cohen.  He ruled out the option of walking from the

42

1  lobby to the Pavilion, because he was concerned that he needed to
2  have all available equipment, wanted the fire truck as close to the
3  victim as possible, and did not want to physically wear out the
4  paramedics in reaching the victim.[1]

5  Furthermore, the decision of defendant's employee was clearly
6  reasonable under the circumstances, and should be not second-guessed
7  under the same analogy for one faced with an imminent peril.   In
8  *Greeneich v. Southern Pacific Co.* (1961) 189 Cal.App.2d 100, the
9  court discussed the doctrine of imminent peril by citing the
10  Restatement of Torts:

11       In determining whether conduct is negligent
         toward another, the fact that the actor is
12       confronted with a sudden emergency not caused by
         his own tortious conduct that requires rapid
13       decision is a factor in determining the
         reasonable character of his choice of action.
14       (p. 119)

15  The public policy behind the imminent peril doctrine is equally
16  applicable in this circumstance.  First, the undisputed evidence is
17  that defendant gave the Captain in charge the travel options to reach
18  the victim.  The Captain selected the route of travel, not the
19  defendant.  Whatever delay may have occurred in reaching Mr. Cohen,
20  once the Captain selected the route, Hilton cannot be responsible.

21  Indeed, the fire department in this circumstance has immunity
22  under Health & Safety Code section 1799.107, which states:

23       (b) . . . neither a public entity nor emergency
         rescue personnel shall be liable for any injury
24       caused by an action taken by the emergency rescue
         personnel acting within the scope of their
25       employment to provide emergency services, unless
         the action taken was performed in bad faith or in
26       a grossly negligent manner.

27  _____

28   [1] See excerpt from Deposition of Logan Bellows, p. 92, lines 1-22.

43

MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1    If the fire department cannot be liable for the purported delay
2  in reaching Mr. Cohen, it would be equally inequitable to allow a
3  theory to be maintained against a landowner for the decision made by
4  the fire department Captain.

5    Plaintiff cannot contradict the evidence presented to create a
6  triable issue regarding defendant's lack of interference or delay in
7  the rescue efforts performed on Stuart Cohen.  Defendant is entitled
8  to have this issue summarily adjudicated in its favor.

9                                III.

10 PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT FAILED TO PROVIDE THE
11 DECEDENT WITH FIRST AID UNTIL HE COULD BE CARED FOR BY OTHERS

12   Although plaintiff has alleged a breach of duty by Hilton in
13 failing to render aid to Mr. Cohen, the evidence overwhelming
14 establishes that there is no triable issue in regard to this
15 circumstance.  The lack of a triable issue entitles defendant to have
16 this issue summarily adjudicated in its favor.  (CCP § 437c)

17   The evidence unequivocally establishes Mr. Cohen was immediately
18 treated by four physicians, who were guests at the wedding reception.
19 These physicians continued to provide CPR to Mr. Cohen until the
20 paramedics arrived and resumed medical treatment.

21   The physicians who rendered the CPR all readily agreed that they
22 did not expect Hilton to interfere with their efforts or to take over
23 the first aid.  The paramedics had no criticism about the medical
24 care provided to Mr. Cohen prior to their arrival.  Mrs. Cohen
25 herself, in discovery responses, does not contend that Hilton failed
26 to provide Mr. Cohen with first aid.

27   There clearly is no triable issue of material fact as to this
28 purported breach of duty.  Plaintiff cannot establish her second

                                44

1 | cause of action, thereby entitling defendant to summary adjudication
2 | of this cause of action.

3 | IV.

4 | PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT'S
5 | CONDUCT WAS THE PROXIMATE OR LEGAL CAUSE,
6 | THEREBY ENTITLING DEFENDANT TO SUMMARY JUDGMENT

7 | Plaintiff has alleged that defendant's conduct on the night in
8 | question resulted in the wrongful death of Stuart Cohen.  However,
9 | plaintiff cannot recover against defendant unless she establishes
10 | negligent conduct which is the proximate cause of the damage she
11 | complains. (*Ulwelling v. Crown Coach Corp.* (1962) 206 Cal.App.2d 96,
12 | 119.)

13 | In other words, plaintiff must establish that the proximate
14 | cause of Mr. Cohen's death was the purported negligence by defendant
15 | Hilton Hotel.  The purported negligence, based on the pleadings,
16 | amounts to interfering with rescue efforts and not providing first
17 | aid until Mr. Cohen could be cared for by others.

18 | Even if plaintiff could establish defendant breached either of
19 | these duties, she cannot establish that the breach of these duties
20 | was the proximate cause of Mr. Cohen's death.  She likewise cannot
21 | establish that defendant's purported negligence was a legal cause of
22 | plaintiff's injury.  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4[th] 465,
23 | 477 – "To prevail on [a] negligence claim, plaintiffs must show
24 | [defendant] owed them a legal duty, that it breached the duty, and
25 | that the breach was a proximate or legal cause of their injuries.
26 | (Citation)")

27 | There is no dispute that Mr. Cohen suffered a heart attack which
28 | eventually resulted in his death.  Plaintiff does not claim defendant

1  caused the heart attack.  Plaintiff has no evidence whatsoever that
2  defendant's action or inaction caused Mr. Cohen to die.  Defendant's
3  purported negligence was not the proximate or legal cause of
4  plaintiff's damages.

5     Indeed, the evidence establishes that when the paramedics
6  reached Mr. Cohen, he was still in a "shockable" rhythm and the
7  paramedics used a defibrillator on him.  The paramedics have also
8  testified that the fact that Mr. Cohen was receiving CPR from
9  physicians allowed him to remain in a physical condition where a
10 defibrillator could be utilized to resuscitate him.

11    Plaintiff therefore would need to prove that the purported delay
12 or interference caused Mr. Cohen's death.  She has no evidence to do
13 so.  Defendant, of course, contends that there was no delay or
14 interference, especially on defendant Hilton's part.  Nevertheless,
15 plaintiff cannot create a triable issue, since she has no evidence to
16 establish Mr. Cohen's death resulted from defendant's purported delay
17 or interference.  The element of causation is lacking from
18 plaintiff's case.

19    Defendant, therefore, is entitled to summary judgment as a
20 matter of law.

21                              V.

22          A CAUSE OF ACTION FOR LOSS OF CONSORTIUM

23          IS PREDICATED ON THE DEFENDANT'S NEGLIGENCE

24    The plaintiff's first two negligence-based theories against
25 defendant Hilton Hotels Corporation alleges defendant breached the
26 duty to render first aid to Mr. Cohen and the duty not to interfere
27 or delay first aid to him.  Defendant has provided the Court with

28.

46

1 ample evidence and law to establish defendant did not breach any duty
2 of care to plaintiff or the decedent on the night in question.

3     The third cause of action, for loss of consortium, cannot be
4 established by the plaintiff because she cannot establish any
5 negligence on the part of defendant Hilton.

6     In *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, the
7 California Supreme Court recognized a cause of action for loss of
8 consortium, stating:

9     . . . [I]n California each spouse has a cause of
    action for loss of consortium, as defined herein,
10     caused by a negligent or intentional injury to
    the other spouse by a third party. (p. 408)
11

12     Therefore, negligence is an element in a cause of action for
13 loss of consortium.  Plaintiff cannot establish any negligence on the
14 part of defendant Hilton Hotels Corporation in purportedly injuring
15 Mr. Cohen on the night in question.  There is no dispute Mr. Cohen
16 suffered a heart attack, from which he eventually died.  Plaintiff
17 can produce no evidence, however, to establish that defendant was
18 negligent, or that the purported negligence resulted in the death of
19 Mr. Cohen.

20     Defendant, therefore, is entitled to have the third cause of
21 action summarily adjudicated in its favor.

22                      VI.

23 ## PLAINTIFF CANNOT ESTABLISH A CAUSE OF ACTION

24 ## FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

25     Plaintiff Bobbi Cohen's fourth cause of action is for negligent
26 infliction of emotional distress and refers to the purported
27 negligence of defendant Hilton Hotels Corporation in failing to
28 render first aid to Mr. Cohen.  As set forth above, defendant Hilton

47

1  contends that it breached no duty of care on the night in question.

2  Since plaintiff cannot establish any breach of duty by defendant

3  Hilton, she likewise cannot maintain a cause of action for negligent

4  infliction of emotional distress.

5      In *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965,

6  the California Supreme Court stated:

7          Firestone first asks this court to expressly
           adopt the rule recently applied by the Supreme
8          Court of Texas in *Boyles v. Kerr* (Tex. 1993) 855
           S.W.2d 593.  There the court held that there is
9          no duty to avoid negligently causing emotional
           distress to another, and that damages for
10         emotional distress are recoverable only if the
           defendant has breached some other duty to the
11         plaintiff. (Citation)

12         That is already the law in California.  Indeed,
           the Texas court relied on recent decisions of
13         this court in which we recognized that there is
           no independent tort of negligent infliction of
14         emotional distress. (Citation)  The tort is
           negligence, a cause of action in which a duty to
15         the plaintiff is an essential element.
           (Citations)  That duty may be imposed by law, be
16         assumed by the defendant, or exist by virtue of a
           special relationship. (Citation) (p. 984-85)
17

18     The California Supreme Court concluded:

19         The lesson of these decisions is: unless the
           defendant has assumed a duty to plaintiff in
20         which the emotional condition of the plaintiff is
           an object, recovery is available only if the
21         emotional distress arises out of the defendant's
           breach of some other legal duty and the emotional
22         distress is proximately caused by that breach of
           duty.  Even then, with rare exceptions, a breach
23         of the duty must threaten physical injury, not
           simply damage to property or financial interests.
24         (Citations) (p. 985)

25     Clearly, the Supreme Court in *Potter* held that the prerequisite

26  for a cause of action for negligent infliction of emotional distress

27  is some negligence by the defendant.  Since defendant has established

28  by way of this motion that it did not breach any purported duty owed

                                 48

1  to the plaintiff or the decedent, plaintiff cannot proceed with a

2  negligent infliction theory.

3      Accordingly, defendant is entitled to have the fourth cause of

4  action summarily adjudicated in its favor, as defendant did not

5  breach any duty of care to plaintiff or the decedent.

6                              **CONCLUSION**

7      The events of November 23, 2002, are indeed tragic and

8  unfortunate.  However, defendant Hilton Hotels Corporation simply

9  cannot be found liable under plaintiff's theories for the death of

10  Stuart Cohen.  Defendant complied with its duties as a landowner, by

11  assisting paramedics to Mr. Cohen's location and not interfering with

12  the rescue efforts of both the physicians on scene or the paramedics

13  who continued care.

14      Defendant Hilton Hotels Corporation is entitled to summary

15  judgment as a matter of law, or alternatively, to have the issues

16  identified adjudicated in its favor.

17  Dated:  October 28, 2004      GATES, O'DOHERTY, GONTER & GUY, LLP

18

19                          By: _____
                                 DOUGLAS D. GUY
20                               Attorneys for Defendant
                                 HILTON HOTELS CORPORATION
21

22

23

24

25

26

27

28

                                    49